# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WHITE ENERGY, INC., *et al.*,[1] | Case No. 09-11601 (CSS) |
| Debtors. | Jointly Administered |

## DISCLOSURE STATEMENT RELATING TO THE CHAPTER 11 PLAN OF REORGANIZATION FOR WHITE ENERGY, INC. AND ITS AFFILIATED DEBTORS FILED BY COLUMBUS NOVA ETHANOL HOLDINGS LLC AS EQUITY SPONSOR

Dated:   December 31, 2009
Wilmington, Delaware

YOUNG CONAWAY
STARGATT & TAYLOR, LLP
Michael R. Nestor, Esq.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Direct Dial:  302-571-6699
Direct Fax:  302-576-3321

and

LATHAM & WATKINS LLP
Mark Broude, Esq.
James Gorton, Esq,
885 Third Avenue
New York, New York 10022
Direct Dial:  212-906-1200
Direct Fax:  212-751-4864

Counsel for Columbus Nova Ethanol Holdings LLC

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: White Energy, Inc. (1083); White Energy Holding Company, LLC (3034); US Energy Partners, L.L.C. (1177); WE Hereford, LLC (9408); and Plainview BioEnergy, LLC (5553).  The corporate headquarters for each of the Debtors is 5005 LBJ Freeway, Suite 1400, Dallas, TX 75244.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "BANKRUPTCY COURT") UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE PLAN DESCRIBED HEREIN.  ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN.  THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.[2]

---

[2] Legend to be removed upon entry by the Clerk of the Bankruptcy Court of Order of the Bankruptcy Court approving this Disclosure Statement.

# TABLE OF CONTENTS

Page

ARTICLE I. INTRODUCTION ...........................................................................................1

ARTICLE II. NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS...................2

ARTICLE III. EXPLANATION OF CHAPTER 11 .........................................................4

ARTICLE IV. OVERVIEW OF THE PLAN....................................................................5

Section 4.1    Summary of Key Components of the Terms of the Plan. ...........................5
Section 4.2    Summary of Distributions Under the Plan....................................................6

ARTICLE V. THE DEBTORS' BUSINESS....................................................................12

Section 5.1    Overview of the Debtors' Business Operations and Facilities. ................12
Section 5.2    Secured Credit Facility. ....................................................................13

ARTICLE VI. EVENTS LEADING TO CHAPTER 11 FILING....................................13

Section 6.1    Commodity Prices, Diminishing Margins and Other Factors....................13

ARTICLE VII. THE REORGANIZED COMPANIES....................................................14

Section 7.1    Certain Restructuring Transactions; Issuance of New Equity
              Interests and New Debt Facilities. ............................................14
Section 7.2    Continued Corporate Existence of the Debtors. ..........................16
Section 7.3    Revesting of Assets..........................................................................16
Section 7.4    Management...........................................................................16
Section 7.5    Initial Boards of Directors, Managers and Members.................................16
Section 7.6    Officers. ................................................................................17
Section 7.7    Management Incentive Plan....................................................................17

ARTICLE VIII. SELECTED FINANCIAL INFORMATION ........................................18

Section 8.1    Consolidated and Year-to-Date Annual Financial Information for
              the Debtors. ...........................................................................18

ARTICLE IX. FINANCIAL PROJECTIONS AND ASSUMPTIONS .........................18

Section 9.1    Purpose and Objectives...........................................................................18
Section 9.2    Projected Consolidated Financial Statements............................................18

ARTICLE X. THE CHAPTER 11 CASES ...................................................................19

Section 10.1    Commencement of the Chapter 11 Cases. .................................................19
Section 10.2    Continuation of Business After the Petition Date......................................19

Section 10.3    Use of Cash Collateral. ...................................................................20
Section 10.4    Post-Petition Reporting. ..................................................................20
Section 10.5    The General Claims Bar Date. ..........................................................21
Section 10.6    Representation of the Debtors. .........................................................21
Section 10.7    Formation and Representation of the Committee. .....................21
Section 10.8    Representation of the Prepetition Agent. .......................................21
Section 10.9    Matters Relating to Unexpired Leases and Executory Contracts. .............21
Section 10.10   Exclusivity. .......................................................................................22
Section 10.11   Claims Administration. .....................................................................22

ARTICLE XI. THE CHAPTER 11 PLAN ...............................................................23

Section 11.1    Introduction. ....................................................................................23
Section 11.2    General Description of the Treatment of Claims and Equity
                Interests. .........................................................................................23
Section 11.3    Acceptance or Rejection of the Plan; Effect of Rejection by One or
                More Classes of Claims. .................................................................26
Section 11.4    Substantive Consolidation. ...............................................................27
Section 11.5    Operations Between the Confirmation Date and the Effective Date. .......28
Section 11.6    Certain Transactions On or Before the Effective Date. .............28
Section 11.7    Causes of Action/Reservation of Rights. .........................................29
Section 11.8    Causes of Action - No Waiver. .........................................................29
Section 11.9    Appointment of the Disbursing Agent. ............................................29
Section 11.10   Sources of Cash for Plan Distributions. ..........................................30
Section 11.11   Distribution Provisions. ...................................................................30
Section 11.12   Setoffs. .............................................................................................32
Section 11.13   Procedures for Resolving and Treating Contested Claims. .......32
Section 11.14   Conditions Precedent to Confirmation of Plan. .............................33
Section 11.15   Conditions Precedent to the Occurrence of the Effective Date. .....34
Section 11.16   Waiver of Conditions. ......................................................................35
Section 11.17   Effect of Non-Occurrence of the Effective Date. ...........................35
Section 11.18   Releases by Holders of Claims and Equity Interests. ....................35
Section 11.19   Assumption and Rejection of Executory Contracts. .......................37
Section 11.20   Survival of Indemnification Obligations. ..**Error! Bookmark not defined.**
Section 11.21   Retention Of Jurisdiction. ................................................................39

ARTICLE XII. RISK FACTORS ............................................................................39

Section 12.1    Certain Bankruptcy Considerations. ................................................39
Section 12.2    The Reorganized Debtors' Actual Financial Results May Vary
                Significantly from the Projections Included in this Disclosure
                Statement. ........................................................................................39
Section 12.3    Competition, Market Considerations/Volatility and Other
                Variables. .........................................................................................39
Section 12.4    Limited Liquidity of New Common Stock or New Term Loan
                Notes. ...............................................................................................40
Section 12.5    Limited Liquidity of Interests in New LLC.**Error! Bookmark not defined.**

ARTICLE XIII. SECURITIES LAW MATTERS ..........................................................................41

    Section 13.1    Issuance of New Securities. ......................................................41
    Section 13.2    Subsequent Transfers of New Common Stock. ........................41
    Section 13.3    Delivery of Disclosure Statement. ............................................43
    Section 13.4    SEC Reporting Requirements. ...................................................43
    Section 13.5    Transfers of Interests in the New LLC. .....**Error! Bookmark not defined.**

ARTICLE XIV. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ....................43

ARTICLE XV. ALTERNATIVES TO CONFIRMATION AND  CONSUMMATION
      OF THE PLAN ......................................................................................................43

    Section 15.1    Liquidation Under Chapter 7 of the Bankruptcy Code.............................43
    Section 15.2    Alternative Plans of Reorganization. .......................................44

ARTICLE XVI. CONCLUSION.................................................................................................46

## EXHIBITS

Chapter 11 Plan of Reorganization ...................................................................................Exhibit A

Disclosure Statement Order and Notice
of the Confirmation Hearing..............................................................................................Exhibit B

Projections and Summary of Significant Assumptions Related Thereto............................Exhibit C

Liquidation Analysis of the Debtors ..................................................................................Exhibit D

NY\1601397.4

# ARTICLE I.

## INTRODUCTION

**All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings ascribed thereto in the Plan (see Article I of the Plan entitled "Definitions and Interpretations").**

THIS DISCLOSURE STATEMENT INCLUDES AND DESCRIBES THE CHAPTER 11 PLAN OF REORGANIZATION, DATED DECEMBER 31, 2009 (THE "PLAN"), A COPY OF WHICH IS ATTACHED AS **EXHIBIT A**, FILED BY COLUMBUS NOVA ETHANOL HOLDINGS LLC AS EQUITY SPONSOR.

HOLDERS OF PREPETITION LENDER CLAIMS ARE IMPAIRED AND THUS ENTITLED TO VOTE THEIR CLAIMS IN CLASS 2 TO ACCEPT OR REJECT THE PLAN. HOLDERS OF GENERAL UNSECURED CLAIMS ARE IMPAIRED AND THUS ENTITLED TO VOTE THEIR CLAIMS IN CLASS 5 TO ACCEPT OR REJECT THE PLAN. HOLDERS OF FAGEN CLAIMS ARE IMPAIRED AND THUS ENTITLED TO VOTE THEIR CLAIMS IN CLASS 6 TO ACCEPT OR REJECT THE PLAN.

CLASS 1 PRIORITY CLAIMS, CLASS 3 OTHER SECURED CLAIMS, CLASS 4 SECURED TAX CLAIMS AND CLASS 7 SUBSIDIARY EQUITY INTERESTS ARE UNIMPAIRED UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE ACCEPTED THE PLAN. CLASS 8 PREFERRED WHITE ENERGY EQUITY INTERESTS AND CLASS 9 COMMON WHITE ENERGY EQUITY INTERESTS ARE NOT ENTITLED TO A DISTRIBUTION UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE REJECTED THE PLAN AND ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.

ACCORDINGLY, THE EQUITY SPONSOR IS SOLICITING ACCEPTANCES OF THE PLAN FROM THE HOLDERS OF PREPETITION LENDER CLAIMS IN CLASS 2, GENERAL UNSECURED CLAIMS IN CLASS 5 AND FAGEN CLAIMS IN CLASS 6. THE EQUITY SPONSOR IS NOT SOLICITING ACCEPTANCES FROM THE HOLDERS OF PRIORITY CLAIMS IN CLASS 1, OTHER SECURED CLAIMS IN CLASS 3, SECURED TAX CLAIMS IN CLASS 4, SUBSIDIARY EQUITY INTERESTS IN CLASS 7, PREFERRED WHITE ENERGY EQUITY INTERESTS IN CLASS 8 AND COMMON WHITE ENERGY EQUITY INTERESTS IN CLASS 9.

THE EQUITY SPONSOR BELIEVES THAT THE PLAN IS IN THE BEST INTEREST OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALL CLASSES OF CLAIMS. ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN. TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY **4:00 P.M., EASTERN STANDARD TIME, ON [_____], 2010** (THE "VOTING DEADLINE").

FOR YOUR ESTIMATED DISTRIBUTION, IF ANY, UNDER THE PLAN, PLEASE SEE THE CHART SET OUT IN "OVERVIEW OF THE PLAN – SUMMARY OF DISTRIBUTIONS UNDER THE PLAN."

## ARTICLE II.

### NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST,

OR EQUITY INTERESTS IN, THE DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES.

On [January 14], 2010, after notice and a hearing, the Bankruptcy Court issued an order (the "Disclosure Statement Order") approving the Disclosure Statement because it contains information of a kind, in sufficient detail, and adequate to enable a hypothetical, reasonable investor typical of the solicited class of Claims of the Debtors to make an informed judgment with respect to the acceptance or rejection of the Plan (a true and correct copy of the Plan is annexed hereto as **Exhibit A**). The Disclosure Statement Order is attached hereto as **Exhibit B** and should be referred to for details regarding the procedures for the solicitation of votes on the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. No Person has been authorized to use or promulgate any information concerning the Debtors, their businesses, or the Plan other than the information contained in this Disclosure Statement and if given or made, such information may not be relied upon as having been authorized by the Equity Sponsor. You should not rely on any information relating to the Debtors, their businesses, or the Plan other than the information contained in this Disclosure Statement and the exhibits hereto.

The Equity Sponsor is the holder of substantially all of the Common White Energy Equity Interest and Preferred White Energy Equity Interest. The Equity Sponsor is not involved in the day to day operation of the Debtors' businesses and does not have unfettered access to the Debtors' books and records. Accordingly, the Equity Sponsor has limited knowledge with regard to certain facts uniquely available to the Debtors. The Equity Sponsor therefore relies on the Debtors with regard to the truth and accuracy of the statement of such facts. Specifically, in preparing this Disclosure Statement and making statements of fact herein, the Equity Sponsor has relied substantially upon the information and statements of fact contained in the disclosure statement relating to the chapter 11 plan of reorganization for White Energy and its affiliated Debtors filed by the Debtors and WestLB AG, New York Branch, as administrative agent for the Prepetition Lenders under the Credit Agreement, on December 15, 2009 [Docket No. 426] (the "Agent's Disclosure Statement"). The Equity Sponsor makes no representations regarding such statements except that the Equity Sponsor believes the statements contained herein to be true but has not conducted any due diligence of any kind or nature to confirm the truth or accuracy of statements regarding facts uniquely available to the Debtors.

After carefully reviewing this Disclosure Statement, including the attached exhibits, if you are entitled to vote to accept or reject the Plan, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot (the "Ballot") for acceptance or rejection of the Plan, as well as whether you prefer the Plan or the Agent's Plan (as defined below) and return the same to the address set forth on the Ballot, in the enclosed, postage

prepaid, return envelope so that it will be received by the Debtors' balloting agent (the "Balloting Agent") no later than the Voting Deadline.

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

You may be bound by the Plan if it is accepted by the requisite holders of Claims even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a Confirmation Hearing on [_____], 2010 at [__]:[_]:0 [_].m., Eastern Time, before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before [_____], 2010 at 4:00 p.m. Eastern Standard Time, in the manner described in the related order.

**THE EQUITY SPONSOR, SUPPORTS CONFIRMATION OF THE PLAN AND URGES ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN AND TO INDICATE A PREFERENCE FOR THE PLAN OVER THE AGENT'S PLAN.**

## ARTICLE III.

## EXPLANATION OF CHAPTER 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code, pursuant to which a debtor-in-possession may reorganize its business. The formulation of a plan of reorganization is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying the holders of claims against and interests in the debtor's estate.

Although referred to as a plan of reorganization, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets. In either event, upon confirmation of the plan, it becomes binding on a debtor and all of its creditors and equity holders, and the obligations owed by a debtor to such parties are compromised and exchanged for the obligations specified in the plan.

After a plan of reorganization has been filed, the holders of impaired claims against and interests in a debtor may be permitted to vote to accept or reject the plan, although impaired Equity Interests in the Debtors are not permitted to vote here. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the proponent of a plan to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of Claims against and Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the solicitation of votes by the Equity Sponsor on the Plan.**

The bankruptcy court may confirm a plan of reorganization even though fewer than all of the classes of impaired claims and equity interests accept such plan. For a plan of reorganization to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote

of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan. **The Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting class of Claims or Equity Interests and can therefore be confirmed, if necessary, over the objection of any (but not all) classes of Claims and any or all classes of Equity Interests.**

## ARTICLE IV.

## OVERVIEW OF THE PLAN

The Plan provides for the treatment of Claims against and Equity Interests in all of the Debtors in the jointly administered bankruptcy cases of In re White Energy, Inc., Chapter 11 Case No. 09-11601 (CSS).

**Section 4.1     Summary of Key Components of the Terms of the Plan.**

The Plan implements and is built around the following key elements:

(a)     The Debtors will be reorganized from and after the Effective Date and shall be the Reorganized Debtors.

(b)     All of the Common and Preferred White Energy Equity Interests shall be cancelled as of the Effective Date. Each of the Reorganized Subsidiaries shall retain its Subsidiary Equity Interests.

(c)     Each holder of an Allowed Prepetition Lender Claim will receive on the Effective Date in full satisfaction of its Allowed Prepetition Lender Claim, its Pro Rata Share of:

(i)     New Term Loans in a principal amount equal to its Pro Rata share of $260 million. The New Term Loans will be governed by the New Term Loan Facility, on the terms set forth on Exhibit A to the Plan; and

(ii)     The Class 2 Cash Distribution, in an amount equal to the difference between the aggregate total of the Prepetition Lender Claims and the total principal amount of the New Term Loans, which amount is to be funded by the Equity Infusion.

(d)     The holder of the Fagen Claim will receive on the Effective Date, in full satisfaction of its Allowed Fagen Claim:

(i)     The Fagen Cash Distribution of $1,500,000,

(ii)     The Fagen Note in a principal amount of $8,500,000, on the terms set forth on Exhibit B to the Plan; and

(iii)     The Fagen Equity Distribution.

(e)     In addition, on, or as soon as practicable after the Effective Date, the Reorganized Debtors will dismiss the Fagen Litigation.

(f)     Each holder of an Allowed General Unsecured Claims will receive its Pro Rata share of the General Unsecured Claim Cash Distribution Amount of $400,000, to be distributed in accordance with Article 4.6 of the Plan.

(g)     Other holders of Claims and Equity Interests will receive Plan Distributions and treatment as described herein and as set forth in the Plan.

The Plan is the product of the Equity Sponsor's analysis of the Debtors' business and capital structure and represents, in the view of the Equity Sponsor, a reasonable and appropriate compromise that will maximize creditor recoveries and the value of the Debtors' business.

**Section 4.2     Summary of Distributions Under the Plan.**

The following is a summary of the distributions under the Plan. It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as **Exhibit A**.

The claim amounts set forth below are based on information contained in the Debtors' Schedules and reflect what the Equity Sponsor believes to be reasonable estimates of the likely resolution of outstanding disputed Claims, based upon information and estimates prepared and provided by the Debtors. The amounts utilized may differ from the outstanding filed claims amounts.

The following chart summarizes the distribution to each class under the Plan:

## UNCLASSIFIED CLAIMS

| Types of Claims | Treatment of Unclassified Claims |
| --- | --- |
| **Administrative Claims** (includes costs of the chapter 11 proceedings for the Debtors and expenses of operation as specified in section 503(b) (including 503(b)(9)) and 507(a)(2) of the Bankruptcy Code including Fee Claims, Claims arising after the Petition Date, obligations with respect to assumed executory contracts and leases, and any outstanding statutory fees).<br><br>Estimated Claims: Approximately $[5,511,182.08] [includes asserted 503(b) claims at $4.4 mm and professional fees as of December 9, 2009 at $1.1 mm] | Except to the extent that a holder of an Allowed Administrative Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Administrative Claim shall receive, in full and final satisfaction of its Allowed Administrative Claim, a Plan Distribution of Cash in the amount of such holder's Allowed Administrative Claim, without interest, on the Distribution Date or such later date or dates as may be agreed to by the Equity Sponsor and such holder; provided, however, that an Allowed Administrative Claim representing a liability incurred after the Petition Date in the ordinary course of business by the Debtors may be paid in the ordinary |

course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

**Estimated Recovery: 100% of Allowed Claim.**

**Priority Tax Claims** (includes all Claims entitled to priority under section 507(a)(8) of the Bankruptcy Code other than Secured Tax Claims).

Estimated Claims: Approximately $[7,085.47]

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, at the option of the Equity Sponsor, in full and final satisfaction of such holder's Allowed Priority Tax Claim (a) payments in Cash, in regular installments over a period ending on the fifth (5th) anniversary of the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claim; (b) a lesser amount in one Cash payment as may be agreed upon in writing by such holder and the Equity Sponsor; or (c) such other treatment as may be agreed upon in writing by the Debtors (with the prior written consent of the Equity Sponsor) and such holder.

**Estimated Recovery: 100% of Allowed Claim.**

## CLASSIFIED CLAIMS AND INTERESTS

**Classes of Claims and Interests**

**Treatment of Classes of Claims and Interests**

**Class 1 – Priority Claims**

Estimated Claims: $[29,123.94]

Unimpaired.

Except to the extent that a holder of an Allowed Priority Claim agrees to a different treatment of such Allowed Priority Claim, each holder shall receive a Plan Distribution of Cash in an amount equal to such Allowed Priority Claim, without interest, on the Distribution Date or such later date or dates as may be agreed to by the Equity Sponsor and such

holder.

**Estimated Recovery: 100% of Allowed Claim.**

**Class 2 – Prepetition Lender Claim**

Estimated Claims: Approximately $[308 million]

Impaired.

Pursuant to the Plan, the Prepetition Lender Claim is the Claim of the Prepetition Lender against any of the Debtors arising under, in connection with or related to the Credit Agreement, including any Claim with respect to any and all guarantees, pledges, notes and other agreements and documents executed and/or delivered by any Debtor pursuant to, in connection with or related to the Credit Agreement, including any Claim under the Financing Documents (as defined in the Credit Agreement), the Letters of Credit and the Swap Agreements, including any accrued and unpaid interest, fees and expenses, which Prepetition Lender Claim shall be allowed in the amount as agreed to by the Debtors, the Prepetition Agent and the Equity Sponsor, or as determined by the Bankruptcy Court.

The holders of Allowed Prepetition Lender Claims shall receive, on account of such Allowed Claims, Plan Distributions as follows:

> (i)     *New Term Loans.* On the Effective Date, or as soon thereafter as is practicable, each holder of an Allowed Prepetition Lender Claim shall receive New Term Loans in a principal amount equal to its Pro Rata share of $260 million. The New Term Loans will be governed by the New Term Loan Facility on the terms set forth on Exhibit A to the Plan.

> (ii)    *Class 2 Cash Distribution.* On the Effective Date, or as soon thereafter as is practicable, each holder of an Allowed Prepetition Lender Claim shall receive its Pro Rata share of the Class 2 Cash Distribution.

**Estimated Recovery: 100% of Allowed Claim.**

**Class 3 – Other Secured Claims**

Estimated Claims: Approximately $0

Unimpaired.

Each holder of an Allowed Other Secured Claim shall receive, on account of its Allowed Other Secured Claim, at the option of the Equity Sponsor, a Plan Distribution (i) equal to the net proceeds of the sale or disposition of the Collateral securing such holder's Allowed Other Secured Claim; (ii) of the Collateral securing such holder's Allowed Other Secured Claim; or (iii) of such other Plan Distribution necessary to satisfy the requirements of the Bankruptcy Code, which Plan Distribution will be made on the Distribution Date. Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final payment of such Allowed Other Secured Claim is made as provided in the Plan, and upon such full and final payment, such Liens shall be deemed to have been satisfied and shall be null, void and unenforceable for all purposes.

**Estimated Recovery: 100% of Allowed Claim.**

**Class 4 –Secured Tax Claims**

Estimated Claims: Approximately $[2,475,345.19]

Unimpaired.

Except to the extent that a holder of an Allowed Secured Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Secured Tax Claim shall receive, at the option of the Equity Sponsor (a) a Plan Distribution of Cash in an amount equal to such Allowed Secured Tax Claim, without interest, on the Distribution Date, or (b) payments in Cash, in regular installments over a period ending on the fifth (5th) anniversary of the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Allowed Secured Tax Claim. Each holder of an Allowed Secured Tax Claim shall retain

the Lien securing its Allowed Secured Tax Claim as of the Effective Date until full and final payment of such Allowed Secured Tax Claim is made as provided in the Plan, and upon such full and final payment, such Lien shall be deemed to have satisfied and shall be null and void and unenforceable for all purposes.

**Estimated Recovery: 100% of Allowed Claim.**

**Class 5 – General Unsecured Claims**

Estimated Claims: Approximately $[_____]

Impaired.

Each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the General Unsecured Claim Cash Distribution Amount. Each holder of an Allowed General Unsecured Claim shall receive on the Initial Distribution Date an Initial Distribution. Each holder of an Allowed General Unsecured Claim may receive Interim Distributions on a date after the Initial Distribution Date and before the Final Distribution Date, in the discretion of the Distribution Agent. Each holder of an Allowed General Unsecured Claim shall receive on the Final Distribution Date a Final Distribution.

On the Effective Date, the Reorganized Debtors shall segregate in a separate bank account Cash equal to the General Unsecured Claim Cash Distribution Amount.

**Estimated Recovery: [___]% of Allowed Claims.**

**Class 6 – Fagen Claim**

Estimated Claim: Approximately $[14,900,669.39]

Impaired.

On the Effective Date, or as soon thereafter as is practicable, the holder of the Fagen Claim shall receive, in full and complete satisfaction and release of the Fagen Claim, (i) the Fagen Cash Distribution, (ii) the Fagen Note and (iii) the Fagen Equity Distribution.

In addition, on or as soon as practicable after

the Effective Date, the Reorganized Debtors will dismiss the Fagen Litigation.

**Estimated Recovery: [__]% of Allowed Claims.**

**Class 7 – Subsidiary Equity Interests**

Unimpaired.

Each holder of a Subsidiary Equity Interest will retain its Subsidiary Equity Interest and will not receive any Plan Distribution.

**Estimated Recovery: None.**

**Class 8 – Preferred White Energy Equity Interests**

Impaired.

On the Effective Date, all Preferred White Energy Equity Interests shall be deemed cancelled and extinguished and the holders of Preferred White Energy Equity Interests will not receive any Plan Distribution, or be entitled to retain any property or interest in property on account of such Preferred White Energy Equity Interests. Holders of Preferred White Energy Equity Interests shall not be required to surrender their certificates or their instruments evidencing ownership of such Preferred White Energy Equity Interests.

**Estimated Recovery: None**

**Class 9 – Common White Energy Equity Interests**

Impaired.

On the Effective Date, all Common White Energy Equity Interests shall be deemed cancelled and extinguished and the holders of Common White Energy Equity Interests will not receive any Plan Distribution, or be entitled to retain any property or interest in property on account of such Common White Energy Equity Interests. Holders of Common White Energy Equity Interests shall not be required to surrender their certificates or their instruments evidencing ownership of such Common White Energy Equity Interests.

**Estimated Recovery: None**

## ARTICLE V.

## THE DEBTORS' BUSINESS

### Section 5.1    Overview of the Debtors' Business Operations and Facilities.

The Debtors are one of the ten largest producers of ethanol and the second largest producer of gluten in the United States. The Debtors' ethanol customers consist primarily of oil refineries that blend ethanol with gasoline. The Debtors' gluten customers consist primarily of food companies, bakers, and pet food producers. The Debtors' combined operations generated over $500 million in revenue in 2008.

The Debtors' corporate headquarters are located in Dallas, Texas, where the Debtors have 17 employees. Debtor U.S. Energy Partners, LLC owns and operates an integrated ethanol and vital wheat gluten production facility in Russell, Kansas (the "Russell Facility"). Debtor WE Hereford, LLC owns and operates an ethanol production facility in Hereford, Texas (the "Hereford Facility"). Debtor Plainview BioEnergy, LLC owns and operates an ethanol production facility in Plainview, Texas (the "Plainview Facility").

The Debtors began operations in 2006 with the purchase of the Russell Facility, which was built in 2001. The Company expanded its operations with the development of the Hereford Facility (which went online in February of 2008) and the Plainview Facility (which went online in May of 2008).

The Russell Facility is a unique facility in that U.S. Energy Partners, LLC produces both vital wheat gluten and ethanol on site. The processing of wheat to make gluten produces starch that comprises one third of the total raw materials that U.S. Energy Partners, LLC uses in a year to produce ethanol. The starch from the gluten production process which is transferred for ethanol production allows U.S. Energy Partners, LLC to maintain better margins on its ethanol than the Debtors are able to maintain at other locations. The other two thirds of the raw material that U.S. Energy Partners, LLC uses at the Russell Facility is "milo" (also known as sourgham). Milo tends to be a lower cost feedstock than yellow corn. The Debtors also use milo and corn to produce ethanol at their other production facilities. The Russell Facility has a capacity of 40 million pounds per year of vital wheat gluten and 50 million gallons per year of ethanol. That facility currently employs 73 employees – four management employees and 69 clerical and rank-and-file employees. The Russell Facility is currently operating in excess of its capacity.

After beginning operations with the acquisition of the Russell Facility, the Debtors developed the Hereford Facility, which is a state of the art 100 million-gallon-per-year ethanol only production facility. WE Hereford, LLC also markets distillers grain as a wet product. The Hereford Facility is located adjacent to an Archer Daniels Midland ("ADM") 8-million-bushel grain storage facility, which delivers milo and corn to the Hereford Facility by a conveyer belt. The Debtors have a long-term supply agreement in place with ADM under which the cost of milo and corn is tied to market rates. The Hereford Facility enjoys access to a "unit train shipping facility" which allows transportation of product and incoming supplies in greater volume and at lower cost. The Debtors employ 3 manager-level and 38 clerical and rank-and-file employees at the Hereford Facility.

The Plainview Facility, developed after the Hereford Facility, is a substantial duplicate of the Hereford Facility. It, too, is a 100 million gallon per year ethanol only facility. Plainview owns a 3 million bushel grain elevator adjacent to the Plainview Facility and is able to store and obtain its milo and corn through that facility. The Plainview Facility also enjoys access to a "unit train shipping facility" which allows transportation of product and incoming supplies in greater volume and at lower cost. Plainview also markets distillers grain as a wet product. The Plainview Facility, which employs 43 employees – one manager and 42 clerical and rank and file employees – was in "hot idle" from February of 2009 to October of 2009 when the Facility was re-started. The Debtors' management re-started the plant to take advantage of favorable economic conditions, including improved margins in ethanol sales.

### Section 5.2    Secured Credit Facility.

White Energy Holding Company, LLC is the borrower under that certain Amended and Restated Credit Agreement, dated as of July 31, 2006, by and among White Energy Holding Company, LLC, as Borrower (as defined in the Credit Agreement), the Borrower Subsidiaries (as defined in the Credit Agreement), each of the lenders party thereto, the Prepetition Agent and any of their respective successors or assigns. Under the Credit Agreement, the Lenders made term loans, working capital loans and issued letters of credit to fund the acquisition of the Russell Facility, the construction of the Hereford and Plainview Facilities, and the Debtors' working capital needs. The Debtors are parties to certain other documents, notes, instruments and agreements, including each of the Financing Documents (as defined in the Credit Agreement), the Ancillary Documents (as defined in the Credit Agreement), the Letters of Credit (as defined in the Credit Agreement), and the Swap Agreements, executed, delivered or filed pursuant to or in connection with the Credit Agreement.

The Debtors' primary source of funding prior to the Petition Date was loans and advances under the Credit Agreement.

## ARTICLE VI.

## EVENTS LEADING TO CHAPTER 11 FILING

### Section 6.1    Commodity Prices, Diminishing Margins and Other Factors.

When the Debtors aggressively entered the ethanol industry in 2006, there was an expectation that ethanol could be produced at a level that would generate significant profit margins. Market forces, including oversupply and investor speculation, conspired to prevent the Debtors (and other ethanol producers) from realizing their expectations. The Debtors' business was adversely affected prior to the Petition Date by skyrocketing commodity prices for corn, milo and wheat. For instance, in June of 2008, fueled by speculation in commodity markets, corn prices spiked to $7.80 per bushel, from a historic norm of less than $3 per bushel. Weather, international supply and demand, and other market forces have also impacted commodity prices. While the cost of raw materials to produce ethanol had been high, an excess of supply of ethanol in the market place kept ethanol prices relatively low, resulting in minimal or nonexistent profit margins.

The weaker-than-expected profit margins earned by the Debtors in 2008 and the first quarter of 2009 caused significant strain to the Debtors' liquidity. The Debtors' weak cash position, coupled with significant debt service obligations under the Credit Agreement, and an inability to access additional investment capital from frozen equity markets, caused the Debtors' to initiate the Chapter 11 Cases.

As of the Petition Date, certain defaults and events of default were acknowledged to have occurred under the Credit Agreement.

## ARTICLE VII.

## THE REORGANIZED COMPANIES

**Section 7.1     Certain Restructuring Transactions; Issuance of New Equity Interests and New Debt Facilities.**

(a)     <u>Current Company Structure.</u>

The Debtors consist of five companies. Two are holding companies-- White Energy, Inc. and White Energy Holding Company, LLC. White Energy, Inc. owns 100 percent of White Energy Holding Company, LLC. White Energy Holding Company, LLC own 100 percent of the three operating Debtors – U.S. Energy Partners, LLC, WE Hereford, LLC and Plainview BioEnergy, LLC. White Energy, Inc. has issued and outstanding: (i) 1,100,000 shares of Series A-1 preferred stock, (ii) 69,101 shares of Series A-2 Preferred Stock, (iii) 578,100 shares of Series B Preferred Stock, and (iv) 1,096,600 shares of common stock. Columbus Nova Ethanol Holdings LLC holds more than 90 percent of the Series A-1, A-2 and B Preferred Stock and more than 85 percent of the common stock of White Energy, Inc.

Under the Plan, the Common and Preferred White Energy Equity Interests will be cancelled and no Plan Distribution will be made to the holders of such Equity Interests. The Plan further provides that each holder of a Subsidiary Equity Interest will retain its Subsidiary Equity Interest, which will survive and continue, but such holders of Subsidiary Equity Interests will not receive a Distribution.

(b)     <u>Corporate Action Under the Plan: Certificates of Incorporation, By-laws, Formation Documents and Limited Liability Company Agreements.</u>

On or before the Effective Date, the certificate or articles of incorporation, by-laws, formation documents and limited liability company agreements as applicable to each respective Debtor will be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code. The amended certificates of incorporation, amended by-laws, amended formation documents and amended limited liability company agreements will also include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code provisions (a) creating the New Common Stock, (b) to the extent necessary or appropriate, stating any restrictions on the transfer of the New Common Stock, (c) to the extent

necessary or appropriate, effectuating the provisions of the Plan and (d) such other provisions as may be determined by the Equity Sponsor. The Amended White Energy Certificate of Incorporation and the Amended White Energy By-Laws shall be filed with the Bankruptcy Court at least five (5) Business Days prior to the Plan Objection Deadline.

On or before the Effective Date, Reorganized White Energy, Inc. shall file the Amended White Energy Certificate of Incorporation with the Secretary of State of its jurisdiction of organization or formation. Each of the Subsidiaries that is a limited liability company shall file an amendment to its formation documents with the Secretary of State of its jurisdiction of organization or formation on the Effective Date. The Amended White Energy By-Laws shall be deemed adopted by the board of directors of the Reorganized White Energy, Inc. as of the Effective Date.

On the Effective Date, the cancellation of all Common White Energy Equity Interests and Preferred White Energy Equity Interests, the authorization and issuance of the New Common Stock, the New Term Loan Facility, the New Term Loan Notes, the Fagen Note, and the adoption of the Management Incentive Plan and all other matters provided in the Plan involving the corporate and capital structure of the Debtors or the Reorganized Debtors or corporate action by any of the Debtors or the Reorganized Debtors shall be deemed to have occurred, be authorized, and shall be in effect from and after the Effective Date without requiring further action under applicable law, regulation, order or rule, including any action by the stockholders or directors of any of the Debtors or any of the Reorganized Debtors pursuant to section 303 of the General Corporation Law of the State of Delaware and other applicable corporation law of jurisdictions in which the Reorganized Debtors are incorporated or existing. Entry of the Confirmation Order will constitute approval of the Plan, the Plan Documents and the transactions thereunder, subject to the occurrence of the Effective Date.

(c)     Effectuating Documents; Further Transactions.

The acting chief executive officer, chief restructuring officer, chief financial officer or any other appropriate officer of White Energy, Inc. or any applicable Debtor, as the case may be, shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The secretary or assistant secretary of White Energy, Inc. or any applicable Debtor, as the case may be, shall be authorized to certify or attest to any of the actions specified in the preceding sentence.

(d)     Execution of Documents and Certain Other Actions on or Prior to the Effective Date.

The Plan provides that on or prior to the Effective Date, the following Persons will take the following actions and will execute the following documents, all of which documents will become effective on the Effective Date, unless otherwise specified:

i.     the Reorganized Debtors, the New Term Loan Facility Agent and the New Term Loan Facility Lenders will execute the New Term Loan

Documents and such other documents as are contemplated by the New Term Loan Facility;

     ii.    the Reorganized Debtors and Fagen will execute the Fagen Note; and

     iii.    the Reorganized Debtors will release the Fagen Litigation.

**Section 7.2    Continued Corporate Existence of the Debtors.**

Following confirmation and consummation of the Plan, the Reorganized Debtors will continue to exist as separate corporate entities or limited liability companies, as applicable to each respective Debtor, in accordance with the laws of their respective states of incorporation or formation and pursuant to their respective certificates, articles of incorporation, by-laws, formation documents and limited liability company agreements in effect prior to the Effective Date, except to the extent such certificates, articles of incorporation, bylaws, formation documents and limited liability company agreements are amended pursuant to the Plan or upon or after the Effective Date.

**Section 7.3    Revesting of Assets.**

Pursuant to section 1141(b) of the Bankruptcy Code, all property of the Estate of each Debtor, together with any property of the Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Plan, shall vest in such Reorganized Debtor on the Effective Date without the payment or incursion of transfer tax liability pursuant to section 1146(a) of the Bankruptcy Code. Thereafter, subject to the terms of the Plan (including those of Article IV of the Plan), the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court. As of the Effective Date, all property of each Reorganized Debtor shall be free and clear of all Liens, Claims and Equity Interests, except as specifically provided in the Plan, the Confirmation Order, the New Term Loan Facility or the Fagen Note.

**Section 7.4    Management.**

Upon the occurrence of the Effective Date, the management, control, and operation of each of the Reorganized Debtors shall be the general responsibility of each such entity's then, as applicable, current board, managing member, manager, member(s) and management as set forth in such Reorganized Debtor's governing documents and according to applicable law. Entry of the Confirmation Order shall ratify and approve all actions taken by each of the Debtors from the Petition Date through and until the Effective Date.

**Section 7.5    Initial Boards of Directors, Managers and Members.**

The Plan provides that the initial Board of Directors of Reorganized White Energy, Inc. shall be comprised of 3 to 5 members, as determined in the sole and absolute discretion of the Equity Sponsor prior to the Confirmation Hearing. The Equity Sponsor shall file with the Bankruptcy Court the identities of the initial members on a date not less than five (5) Business

Days prior to the Plan Objection Deadline. After the Effective Date, the holders of the New Common Stock will elect members of the Board of Directors of Reorganized White Energy, Inc. in accordance with the Amended White Energy Certificate of Incorporation, Amended White Energy By-laws and applicable nonbankruptcy law.

The Plan provides that the sole member of Reorganized WE Holding Company, LLC shall be Reorganized White Energy, Inc. The sole member of each of Reorganized US Energy Partners, LLC, Reorganized WE Hereford, LLC, and Reorganized Plainview BioEnergy, LLC, shall be Reorganized WE Holding Company, LLC, in accordance with the provisions of their respective organizational documents and applicable law.

### Section 7.6    Officers.

The Equity Sponsor will provide in the Plan Supplement the identity of each Person that shall serve as an initial officer of Reorganized White Energy, Inc. and the Reorganized Subsidiaries on and after the Effective Date. Such officers shall serve in accordance with the by-laws of Reorganized White Energy, Inc. or the Reorganized Subsidiary, as applicable, any employment agreement with such Reorganized Debtor and applicable nonbankruptcy law. The Equity Sponsor will provide in the Plan Supplement the identity of each Insider that will be employed or retained by a Reorganized Debtor and the nature of any compensation for such Insider in the Plan Supplement. On or after the Effective Date, the officers of the Reorganized Subsidiaries shall be determined by the respective boards of directors, managers or members, as applicable, of the Reorganized Debtors.

### Section 7.7    Management Incentive Plan.

On the Effective Date, Reorganized White Energy, Inc. shall adopt the Management Incentive Plan. All shares of New Common Stock issued under the Management Incentive Plan (including those issued upon the valid exercise of options issued therunder) shall be duly authorized, validly issued, fully paid for, non assessable shares of New Common Stock, free of preemptive rights.

On the Effective Date, unissued shares of New Common Stock equal to 5% on a fully diluted basis shall be reserved for issuance to the Reorganized Debtors' management team under the Management Incentive Plan. Awards of shares of New Common Stock or options therefor will be subject to the Reorganized Debtors meeting certain financial performance criteria to be established by the board of directors of Reorganized White Energy, Inc. or the Compensation Committee of the board of directors of Reorganized White Energy, Inc. The Compensation Committee of the board of directors of Reorganized White Energy, Inc. will make the individual awards and establish the terms and conditions of each award.

# ARTICLE VIII.

## SELECTED FINANCIAL INFORMATION

**Section 8.1    Consolidated and Year-to-Date Annual Financial Information for the Debtors.**

[To be provided.]

# ARTICLE IX.

## FINANCIAL PROJECTIONS AND ASSUMPTIONS

**Section 9.1    Purpose and Objectives.**

The Debtors' long term business plan (the "Business Plan") and the underlying projections and assumptions serve as the basis for the Plan. The Debtors have informed the Equity Sponsor that the assumptions that underlie the projections are reasonable under the circumstances and that achieving the projections set forth herein will maximize the value of the Debtors' businesses.

**Section 9.2    Projected Consolidated Financial Statements.**

The Equity Sponsor has prepared the projected operating and financial results (the "Projections") on a consolidated basis for the period ending [_____, 2012], assuming the effects of certain transactions that will occur in connection with and upon consummation of the Plan. The Projections, and a summary of significant assumptions related thereto, are attached to this Disclosure Statement as **Exhibit C**.

The Projections should be read in conjunction with the assumptions, qualifications, and the footnotes to the tables containing the Projections, the historical consolidated financial information (including the notes and schedules thereto), and the information contained in "Selected Financial Information."

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS NOR IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES. THE DEBTORS' ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH THEIR BUSINESS PLANS AND STRATEGIES OR PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. ACCORDINGLY, THE DEBTOR DOES NOT INTEND, AND DISCLAIMS ANY OBLIGATION, TO (1) FURNISH UPDATED BUSINESS PLANS OR PROJECTIONS TO HOLDERS OF CLAIMS OR

EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE, OR TO HOLDERS OF SECURITIES, OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE, (2) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC, OR (3) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THE PROJECTIONS HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT AND PROFESSIONALS. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE EQUITY SPONSOR, CAUTIONS THAT NO ASSURANCES CAN BE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR THE ABILITY OF THE REORGANIZED DEBTORS TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

THE ASSUMPTIONS AND RESULTANT COMPUTATIONS WERE MADE SOLELY FOR PURPOSES OF PREPARING THE PROJECTIONS.

## ARTICLE X.

## THE CHAPTER 11 CASES

### Section 10.1   Commencement of the Chapter 11 Cases.

On May 7, 2009, each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

### Section 10.2   Continuation of Business After the Petition Date.

From and after the Petition Date, the Debtors have maintained operations with minimal disruption. In addition, the Debtors re-started their 100-million-gallon-per-year Plainview Facility in October of 2009. The Plainview plant had been in "hot idle" since before the Petition Date. The Debtors re-started the plant to take advantage of favorable economic conditions, including improved margins in ethanol sales.

On or after the Petition Date, the Debtors and their counsel expended significant time and resources preparing, filing and supporting motions with the Court essential to the Debtors' continued operations, administration of the Chapter 11 Cases and restructuring efforts, including "first day" and administrative motions, the consensual resolution of which has required negotiations with the Debtors' secured lenders, the Office of the United States Trustee, and unsecured creditors. The Debtors sought and obtained a full spectrum of first-day relief, including the entry of orders providing for joint administration of the Chapter 11 Cases (Docket No. 21), continuing use of the Debtors' cash management system (Docket No. 22), prohibiting utilities from discontinuing service (Docket No. 26 and 37), maintaining postpetition financing of insurance premiums and authorizing payment thereof (Docket No. 23), authorizing payment of prepetition wages, benefits and related compensation to employees (Docket No. 24), authorizing the use of cash collateral (Docket No. 15 and 31), retaining Garden City Group as claims agent (Docket No. 25), and authorizing payment of certain prepetition taxes (Docket No. 126).

Following the Petition Date, the Debtors and their professionals engaged in extensive discussions and negotiations with employees, vendors, utilities, customers, taxing authorities, and the Committee to resolve consensually issues and claims arising from the Debtors' pre- and post-petition business operations. The Debtors and their professionals responded to and resolved a myriad of issues, including requests for adequate assurance and the assertion of liens, reclamation claims, requests for administrative priority under section 503(b)(9) of the Bankruptcy Code, and setoff claims.

### Section 10.3   Use of Cash Collateral.

The Debtors commenced the Chapter 11 Cases without lender consent to use cash collateral and immediately began negotiating with the Prepetition Agent, as agent for the Prepetition Lenders. The Debtors came before the Court on an emergency basis on May 8, 2009, seeking authorization to use cash collateral to pay suppliers in order to continue operation of the Debtors' Hereford and Russell Facilities. The Debtors and the Prepetition Agent reached agreement on the consensual use of cash collateral minutes before the emergency hearing. See Docket No. 15. After that, the Debtors faced no fewer than four hearings where the use of cash collateral was contested until shortly before the hearing. The Debtors have prepared and negotiated updated cash collateral budgets at least every four weeks and enter into new stipulations providing for the continued use of cash collateral every month.

### Section 10.4   Post-Petition Reporting.

The Debtors' financial and accounting staff have been fully engaged throughout the cases in preparing the Debtors' statements of financial affairs and schedules of assets, liabilities, executory contracts and unexpired leases, Bankruptcy Rule 2015.3 reports, budgets, monthly operating reports, and responses to various requests from vendors, suppliers, current and former employees and secured and unsecured creditors.

### Section 10.5 The General Claims Bar Date.

On June 26, 2009, the Debtors filed their Motion for Entry of an Order Establishing Bar Dates and Related Procedures for Filing Proofs of Claims and Approving the Form, Manner and Sufficiency of Notice of the Bar Dates pursuant to Fed. R. Bankr. P. 3003 and 9007 (Docket No. 147). On July 29, 2009, the Court entered the Bar Date Order, establishing, among other things, the general bar date and the bar date for section 503(b)(9) administrative claims as September 14, 2009. The Bar Date Order established the Bar Date.

### Section 10.6 Representation of the Debtors.

The Debtors retained Duane Morris LLP ("Duane Morris") as lead bankruptcy counsel to the Debtors in connection with the Chapter 11 Cases. The Debtors also retained Ice Miller LLP to serve as bankruptcy co-counsel. The Debtors retained Jefferies & Co. as the Debtors' investment banker and financial advisor.

### Section 10.7 Formation and Representation of the Committee.

On May 27, 2009, the U.S. Trustee appointed the Committee comprised of Nexen Marketing U.S.A., Inc., Archer Daniels Midland Company, The Scoular Company, Occidental Chemical Corporation, and Atmos Energy Marketing. The Committee retained Lowenstein Sandler PC and Polsinelli Shughart PC, as counsel. Carl Marks Advisory Group LLC has acted as the Committee's financial advisor.

### Section 10.8 Representation of the Prepetition Agent.

The Prepetition Agent is represented in the Chapter 11 Cases by Kaye Scholer LLP and Pepper Hamilton LLP. Capstone Advisory Group, LLC has acted as the Prepetition Agent's financial advisor.

### Section 10.9 Representation of the Equity Sponsor.

The Equity Sponsor is represented in the Chapter 11 Cases by Latham & Watkins LLP and Young Conaway Stargatt & Taylor, LLC. Houlihan Lokey Howard & Zukin Capital has acted as the Equity Sponsor's financial advisor.

### Section 10.10 Matters Relating to Unexpired Leases and Executory Contracts.

Section 365 of the Bankruptcy Code grants a debtor the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. Section 365(d)(4) of the Bankruptcy Code provides that if a debtor does not assume or reject an unexpired lease of nonresidential real property under which a debtor is the lessee (i) within 120 days after the Petition Date (the "365(d)(4) Deadline"), (ii) within an additional 90-day period as the bankruptcy court, for cause, may allow, or (iii) within such additional time as the bankruptcy court may permit with the consent of the landlord of the leased premises, then such lease is deemed rejected.

On Motion of the Debtors, the Court entered an Order on September 11, 2009 (Docket No. 254), extending the deadline for the Debtors to assume or reject certain real property leases to December 3, 2009. On December 3, 2009, the Debtors filed a motion seeking an extension of their deadline to assume or reject certain real property leases to the earlier of the effective date of a plan of reorganization or April 2, 2010. The Motion is scheduled to be heard on January 14, 2010. As of the date hereof, the Debtors have not sought to assume or reject any Executory Contracts. See Article XI of the Plan for the proposed treatment of Executory Contracts thereunder.

### Section 10.11 Exclusivity.

Pursuant to sections 1121(b) and (c)(3) of the Bankruptcy Code, the Debtors have a certain amount of time in which they have the exclusive right (a) to file their Plan (the "Filing Period"); and (b) to solicit acceptances of a timely filed Plan (the "Solicitation Period"). On September 15, 2009, the Court entered an Order (Docket No. 263) that provided for an extension by 30 days of the Filing Period and the Solicitation Period. On October 14, 2009, the Court entered a second Order (Docket No. 325) that provided for an extension of the Filing Period to November 16, 2009 and the Solicitation Period by 30 days through and including January 4, 2010. On November 13, 2009, the Debtors filed their Third Motion of Debtors for an Order Extending Exclusive Periods During which Debtors May File and Solicit Acceptances of a Plan of Reorganization (Docket No. 366) (the "Third Motion"), seeking a further extension of the Filing Period and the Solicitation Period. The filing of that motion caused an automatic extension, under Rule 9006-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, of the Filing Period to such time that the Court acts on the motion. On December 3, 2009, the Court entered an order denying the Third Motion. Accordingly, the Filing Period lapsed on December 1, 2009.

### Section 10.12 Filing of the Agent's Plan.

On December 15, 2009, the Debtors and the Prepetition Agent filed (i) the Joint Chapter 11 Plan of Reorganization for White Energy and its Affiliated Debtors (the "Agent's Plan") (Docket No. 425), (ii) a disclosure statement relating to the Agent's Plan (the "Agent's Disclosure Statement") (Docket No. 426) and (iii) a motion (the "Agent's Disclosure Statement Motion") for approval of the Agent's Disclosure Statement, the proposed form of ballots, the proposed solicitation, voting and tabulation procedures, the proposed form of solicitation packages, scheduling a hearing to consider confirmation of the Agent's Plan, and related relief (Docket No. 434). The Debtors and the Prepetition Agent requested a hearing on the Agent's Disclosure Statement Motion on January 14, 2010 at 11:00 a.m. prevailing Eastern time.

### Section 10.13 Claims Administration.

(a)     Claim Objections

In the ordinary course of business, the Debtors maintain books and records (the "Books and Records") that reflect, among other things, the Debtors' liabilities and the amounts owed to their creditors in connection with such liabilities. The Debtors, the Disbursing Agent and their Professional Persons will review the proofs of claim submitted in the Chapter 11 Cases,

including any supporting documentation, and compare the Claims asserted in the proofs of claim with the Books and Records and will otherwise analyze the Claims to determine the validity of such Claims. The Debtors and the Disbursing Agent may file substantive and/or procedural objections based upon such review.

(b)    The Fagen Litigation

On or about September 2, 2009, Fagen, Inc., filed a Proof of Claim asserting a Claim in the amount of $8,883,919.84 against WE Hereford, Inc. and contending that the Claim was fully secured by Liens in substantially all of the real estate and improvements comprising the Hereford Facility. At the same time, Fagen, Inc. filed a Proof of Claim against Plainview BioEnergy, LLC, asserting a claim in the amount of $6,016,749.55, allegedly secured by Liens in substantially all of the real estate and improvements comprising the Plainview Facility.

On December 27, 2009, two of the Debtors, WE Hereford, LLC and Plainview Bioenergy, LLC, each commenced an adversary proceedings in the Bankruptcy Court (Docket Nos. 452 and 453, respectively) under applicable authority, including but not limited to Rule 7001 of the Federal Rules of Bankruptcy Procedure and sections 502, 506, 544 and 545 of the Bankruptcy Code, to: (a) object to the Proofs of Claim filed by Fagen, Inc.; (b) otherwise determine the validity, extent and priority of the Liens asserted by Fagen, Inc.; and (c) avoid certain liens which Fagen, Inc. asserts in certain of Plaintiffs' assets.

## ARTICLE XI.

## THE CHAPTER 11 PLAN

**Section 11.1    Introduction.**

The following is a summary of certain terms and provisions of the Plan. This summary of the Plan is qualified in its entirety by reference to the full text of the Plan, which is annexed to this Disclosure Statement as **Exhibit A**.

**Section 11.2    General Description of the Treatment of Claims and Equity Interests.**

(a)    Unclassified Claims Generally.

Administrative Claims and Priority Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively. Such Claims are not designated as classes of Claims for the purposes of the Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

(b)    Treatment of Allowed Administrative Claims

(i)    *Administrative Claims Defined.*

Administrative Claims are rights to payment constituting a cost or expense of administration of any of the Chapter 11 Cases allowed under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of

preserving the estates of each of the Debtors, any actual and necessary costs and expenses of operating the businesses of each of the Debtors, any indebtedness or obligations incurred or assumed by any of the Debtors in connection with the conduct of its business on or after the Petition Date, any allowances of compensation and reimbursement of expenses to the extent allowed by a Final Order under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the estates of the Debtors under 28 U.S.C. § 1930.

(ii)     *Time for Filing Administrative Claims.*

All requests for payment of Administrative Claims (other than (i) Administrative Claims incurred by a Debtor in the ordinary course of business after the Petition Date, (ii) Administrative Claims that have been Allowed by order of the Bankruptcy Court on or before the Effective Date, (iii) Section 503(b)(9) Claims and other Administrative Claims for which a Proof of Claim was filed on or before the Bar Date, and (iv) fees or charges assessed against the Debtors under section 1930 of title 28 of the United States Code) must be filed with the Bankruptcy Court and served on the Debtors, the Committee, the Equity Sponsor, the Prepetition Agent and the U.S. Trustee not later than (x) thirty (30) days after service of the Notice of Confirmation, in the case of requests for payment of Administrative Claims other than Fee Claims and (y) forty-five (45) days after the Effective Date, in the case of Final Fee Applications seeking payment of Fee Claims; provided, however, that (A) any Section 503(b)(9) Claim or other Administrative Claim that was required pursuant to the terms of the Bar Date Order to be filed on or before the Bar Date and was not filed on or before the Bar Date is barred based on the Bar Date Order and shall remain forever barred and discharged; and (B) any Administrative Claim or Fee Claim that is not filed on or before the deadline shall result in the Administrative Claim or Fee Claim being forever barred and discharged. Any request for payment of an Administrative Claim must include at a minimum the name of the Debtor(s) which are alleged to be liable for the Administrative Claim, the name of the holder of the alleged Administrative Claim, the amount of the alleged Administrative Claim, and the basis of the alleged Administrative Claim, and must be mailed by the applicable deadline set forth in the Plan:

(i)      If by First Class U.S. mail, to:
         The Garden City Group, Inc.
         Attn:  White Energy, Inc.
         P.O. Box 9379
         Dublin, Ohio 43017-4279

(ii)     If by messenger or overnight courier, to:
         The Garden City Group, Inc.
         Attn:  White Energy, Inc.
         5151 Blazer Parkway, Suite A
         Dublin, Ohio 43017

The Claims Agent will not accept any request for payment of an Administrative Claim sent by facsimile or email.

**THE FAILURE TO FILE TIMELY A REQUEST FOR AN ADMINISTRATIVE CLAIM AND TO SERVE SUCH REQUEST WILL RESULT IN THE ADMINISTRATIVE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

   (iii) *Time for Filing Fee Claims.*

   Each Professional Person who holds or asserts a Fee Claim will be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Final Fee Application within forty-five (45) days after the Effective Date.

**THE FAILURE TO FILE TIMELY AND SERVE SUCH FEE APPLICATION WILL RESULT IN THE FEE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

   (iv) *Allowance of Administrative Claims/Fee Claims.*

   Unless the Debtors or the Equity Sponsor object, in whole or in part, to a timely filed request for payment of an Administrative Claim within sixty (60) days after the Effective Date, such request for payment of an Administrative Claim shall be deemed Allowed in the amount requested. If the Debtors or the Equity Sponsor object to a request for payment of an Administrative Claim in whole or in part, the requested Administrative Claim shall become an Allowed Administrative Claim only to the extent allowed by a Final Order. A Fee Claim in respect of which a Final Fee Application has been properly and timely filed and served shall become an Allowed Administrative Claim only to the extent allowed by Final Order.

   (v) *Payment of Allowed Administrative Claims.*

   Except to the extent that a holder of an Allowed Administrative Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Administrative Claim shall receive, in full and final satisfaction of its Allowed Administrative Claim, a Plan Distribution of Cash in the amount of such holder's Allowed Administrative Claim, without interest, on the Distribution Date or such later date or dates as may be agreed to by the Debtors (with the prior written consent of the Equity Sponsor) and such holder; provided, however, that an Allowed Administrative Claim representing a liability incurred after the Petition Date in the ordinary course of business by the Debtors may be paid in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

   (c) Treatment of Priority Tax Claims.

   Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, at the option of the Equity Sponsor, in full and final satisfaction of such holder's Allowed Priority Tax Claim (a) payments in Cash, in regular installments over a period ending on the fifth (5th) anniversary of the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claim; (b) a lesser amount in one Cash payment as may be agreed upon in writing by such holder and the

Debtors, with the prior written consent of the Equity Sponsor; or (c) such other treatment as may be agreed upon in writing by the Debtors (with the prior written consent of the Equity Sponsor) and such holder. The Confirmation Order shall enjoin any holder of an Allowed Priority Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer or director of the Debtors that otherwise would be liable to such holder for payment of an Allowed Priority Tax Claim so long as the Debtors are in compliance with this section 2.6. So long as the holder of an Allowed Priority Tax Claim is enjoined from commencing or continuing any action or proceeding against any responsible person, officer or director under this section 2.6 or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or proceeding shall be tolled.

(d)     Classified Claims and Equity Interests.

The classified Claims against, and Equity Interests in, the Debtors are classified in the Plan as follows:

> i.      Class 1 — Priority Claims
>
> ii.     Class 2 — Prepetition Lender Claims
>
> iii.    Class 3 — Other Secured Claims
>
> iv.     Class 4 — Secured Tax Claims
>
> v.      Class 5 — General Unsecured Claims
>
> vi.     Class 6 –  Fagen Claims
>
> vii.    Class 7 — Subsidiary Equity Interests
>
> viii.   Class 8 — Preferred White Energy Equity Interests
>
> ix.     Class 9 — Common White Energy Equity Interests

The treatment of each class of claims is summarized in Article IV hereof.

(e)     Treatment of Intercompany Claims.

Intercompany Claims shall not be classified and no Plan Distribution shall be made in respect of Intercompany Claims.

**Section 11.3   Acceptance or Rejection of the Plan; Effect of Rejection by One or More Classes of Claims.**

(a)     Class Entitled to Vote.

Holders of Allowed Prepetition Lender Claims (Class 2), General Unsecured Claims (Class 5) and Allowed Fagen Claims (Class 6) are entitled to vote on the Plan. Class 1, Class 3,

Class 4 and Class 7 are deemed to have accepted the Plan. Classes 8 and 9 are deemed to have rejected the Plan.

      (b)      <u>Class Acceptance Requirement</u>.

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan.

      (c)      <u>Cramdown</u>

In the event that any impaired Class of Claims or Equity Interests rejects the Plan or is deemed to have rejected the Plan, the Equity Sponsor hereby seeks to confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class.

      (d)      <u>Feasibility</u>

The Bankruptcy Code conditions confirmation of a plan of reorganization on, among other things, a finding that it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. For purposes of determining whether the Plan satisfies this condition, the Equity Sponsor has analyzed the capacity of each Debtor to service its obligations under the Plan. Based upon its analysis of its Projections, the Equity Sponsor believes that the Debtors or their successors pursuant to the Plan will be able to make all payments required to be made under the Plan. See Article VIII hereof – "Selected Financial Information."

**Section 11.4  Substantive Consolidation.**

Entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Chapter 11 Cases for certain purposes related to the Plan, including for purposes of voting, confirmation, Plan Distributions and determining and calculating post-confirmation quarterly fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930. On and after the Effective Date: (i) no Plan Distributions shall be made under the Plan on account of Intercompany Claims; (ii) all guarantees by any of the Debtors of the obligations of any other Debtor arising prior to the Effective Date shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the deemed consolidated Debtors; and (iii) each and every Claim filed or to be filed in the Chapter 11 Cases shall be deemed filed against the consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors.

The substantive consolidation proposed by the Plan shall not (other than for purposes related to funding Plan Distributions and as set forth above in section 6.1.1) affect: (i) the legal and organizational structure of the Reorganized Debtors; or (ii) pre- and post-Petition Date Liens, guarantees and security interests that are required to be maintained (x) in connection with Executory Contracts that were entered into during the Chapter 11 Cases or that have been or will be assumed pursuant to section 365 of the Bankruptcy Code, (y) pursuant to the Plan, or (z) in

connection with the New Term Loan Facility or the Fagen Note. As of the Effective Date, each of the Reorganized Debtors shall be deemed to be properly capitalized, legally separate and distinct entities.

A holder of Claims asserted against more than one Debtor but arising under the same facts, shall receive not more than one Plan Distribution under the Plan on account of such holder's Allowed Claim and shall be enjoined from seeking any further Plan Distribution.

### Section 11.5    Operations Between the Confirmation Date and the Effective Date.

During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to operate their businesses as debtors-in-possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules and all orders of the Bankruptcy Court that are then in full force and effect.

### Section 11.6    Certain Transactions On or Before the Effective Date.

(a)     Pursuant to section 1123(a)(5) of the Bankruptcy Code, on or before the Effective Date:

(i)     The Equity Sponsor shall make the Equity Infusion to Reorganized White Energy, Inc.;

(ii)     Reorganized White Energy, Inc. shall issue (i) to the Equity Sponsor, or its designee the New Common Stock representing at the time of issuance 98.5% of the equity interests in Reorganized White Energy, Inc. and (ii) to the holder of an Allowed Fagen Claim New Common Stock representing at the time of issuance 1.5% of the equity interests in Reorganized White Energy, Inc. (all of which are subject to dilution by the New Common Stock to be reserved for issuance pursuant to the Management Incentive Plan). The issuance of the New Common Stock shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code;

(iii)     Reorganized WE Holding Company, LLC and the Reorganized Debtors shall enter into the New Term Loan Facility and issue to the holders of Allowed Prepetition Lender Claims the New Term Loan Notes evidencing the New Term Loans. The issuance and the delivery of the New Term Loan Notes shall be in accordance with the terms of the New Term Loan Documents;

(iv)     Reorganized WE Holding Company, LLC and the Reorganized Debtors shall enter into the Fagen Note and issue to the holder of an Allowed Fagen Claim the Fagen Note. The issuance of the Fagen Note and the delivery of the Fagen Note shall be in accordance with the terms of the documents establishing the Fagen Note;

(v)     All security interests, Liens and other encumbrances granted to secure the Original Debt shall survive and shall continue to secure the Reorganized Debtors' secured obligations under the New Term Loan Facility; and

(vi)    All security interests, Liens and other encumbrances granted to Fagen to secure the Fagen Claims shall survive and continue to secure the Reorganized Debtors' secured obligations under the Fagen Note

### Section 11.7    Causes of Action/Reservation of Rights.

The Reorganized Debtors shall, in accordance with section 1123(b) of the Bankruptcy Code, reserve, retain and may enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) all rights, claims, Causes of Action, rights of setoff, suits, proceedings or other legal or equitable defenses accruing to the Debtors or the Estates pursuant to the Bankruptcy Code or pursuant to any statute or legal theory, including any Avoidance Actions, except (i) as otherwise provided in the Plan or the Confirmation Order, (ii) with respect to the Released Parties and (iii) preference claims under section 547 of the Bankruptcy Code.

### Section 11.8    Causes of Action - No Waiver.

Except as otherwise expressly set forth in the Plan (including in sections 6.13.1 and 6.14.1 of the Plan), nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any right or Causes of Action that the Debtors or the Reorganized Debtors may have or which the Debtors or the Disbursing Agent may choose to assert on behalf of the Debtors' respective Estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including (i) any and all Claims against any Person, to the extent such Person asserts a Claim, cross-claim, counterclaim and/or Claim for setoff which seeks affirmative relief against any of the Debtors, the Reorganized Debtors, their officers, directors or representatives and (ii) the turnover of any property of any of the Debtors' or the Reorganized Debtors' Estates.

The Disbursing Agent shall be deemed the appointed representative to the Reorganized Debtors, and may pursue, litigate, compromise, settle, transfer or assign any such rights, claims, causes of action, suits or proceedings as appropriate, in accordance with the best interests of the Reorganized Debtors or their respective successors who hold such rights.

No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Disbursing Agent will not pursue any and all available Causes of Action against them. The Debtors, the Disbursing Agent and the Estates expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise provided in the Plan.

All Claims and Causes of Action under section 547 of the Bankruptcy Code are waived and released under the Plan. Additionally, as of the Effective Date of the Plan, the Debtors will dismiss the Fagen Litigation.

### Section 11.9    Appointment of the Disbursing Agent.

Upon the occurrence of the Effective Date, Reorganized White Energy, Inc. will be appointed to serve as the Disbursing Agent, and will have all powers, rights, duties and protections afforded the Disbursing Agent under the Plan.

**Section 11.10 Sources of Cash for Plan Distributions.**

All Cash necessary for the Disbursing Agent to make payments and Plan Distributions shall be obtained from proceeds of the Debtors' existing Cash balances and/or proceeds of the Equity Infusion.

**Section 11.11 Distribution Provisions.**

(a)     Distribution Record Date.

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors or their agents shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Equity Interests. The Debtors shall have no obligation to recognize any transfer of any Claims or Equity Interests occurring on or after the Distribution Record Date. The Debtors or Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date.

(b)     Plan Distributions.

Reorganized White Energy, Inc. as Disbursing Agent shall make all Plan Distributions on behalf of itself and each Debtor. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

(c)     Timing of Plan Distributions.

Each Plan Distribution shall be made on the relevant Distribution Date therefor and shall be deemed to have been timely made if made on such date or within ten (10) days thereafter.

The Disbursing Agent shall make all Plan Distributions on account of Allowed Prepetition Lender Claims to the Prepetition Agent, which Plan Distributions the Prepetition Agent shall distribute to the holders of Allowed Prepetition Lender Claims pursuant to the Plan.

Interim Distributions may be made from time to time at the discretion of the Disbursing Agent.

(d)     Address for Delivery of Plan Distributions/Unclaimed Distributions.

Notwithstanding Bankruptcy Rule 9010, any Plan Distribution or delivery to a holder of an Allowed Claim shall be made at the last known address of such holder as set forth (a) in the Schedules filed with the Bankruptcy Court unless the Debtors have been notified in writing of a change of address, including by the filing of a Proof of Claim by such holder that contains an address for such holder different from the address reflected in such Schedules for such holder, (b) on the Proof of Claim filed by such holder, (c) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e), or (d) in any notice served by such holder giving details of a change of address. If any Plan Distribution is

returned to the Disbursing Agent as undeliverable, no Plan Distributions shall be made to such holder unless the Disbursing Agent is notified of such holder's then current address within ninety (90) days after such Plan Distribution was returned. After such date, if such notice was not provided, a holder shall have forfeited its right to such Plan Distribution, and the undeliverable Plan Distributions shall be returned to Reorganized White Energy, Inc. for distribution.

(e)    De Minimis Distributions.

Notwithstanding anything to the contrary in the Plan, any holder of an Allowed Claim that would have received a Plan Distribution of less than twenty-five dollars ($25.00) with respect to such Allowed Claim shall not receive any Plan Distribution.

(f)    Time Bar to Cash Payments.

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued. Any claim in respect of such a voided check shall be made within ninety (90) days after the date of issuance of such check. If no request is made as provided in the preceding sentence, any claims in respect of such voided check shall be discharged and forever barred and such unclaimed Plan Distribution shall revert to the Disbursing Agent for distribution to holders of Allowed General Unsecured Claims on a Pro Rata basis.

(g)    Manner of Payment under the Plan.

All Plan Distributions of Cash, New Common Stock, New Term Loan Notes and the Fagen Note, as applicable, to the creditors of each of the Debtors under the Plan (or to the Equity Sponsor and Fagen in the case of the New Common Stock) shall be made by the Disbursing Agent or its designee on behalf of the applicable Debtor.

Unless the Person receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may, in addition to the foregoing, be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

(h)    Fractional Plan Distributions.

Except as provided in section 7.9.4 of the Plan, no payments of fractions of dollars shall be made under the Plan. Fractions of dollars shall be rounded to the nearest whole dollar (up and down) with any half dollar rounded down. No fractional shares of New Common Stock shall be issued or distributed under the Plan. If any Plan Distribution would result in the issuance of shares of New Common Stock that is not a whole number, the actual Plan Distribution of shares of New Common Stock shall be rounded to the next higher or lower number, with fractions of one-half or less being rounded down. The total number of shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the rounding provided for in the Plan. No consideration shall be provided in lieu of fractional shares that are

rounded down. The New Term Loan Notes and the Fagen Note shall be issued in dollars and cents.

### Section 11.12 Setoffs.

The Debtors or Reorganized Debtors may, but shall not be required to, apply setoff or recoupment against any Claim (for purposes of determining the Allowed amount of such Claim on which a Plan Distribution shall be made), any claims, rights, or Cause of Action of any nature whatsoever that the Debtors or Reorganized Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such claim, right or Cause of Action the Debtors or Reorganized Debtors may have against the holder of such Claim.

### Section 11.13 Procedures for Resolving and Treating Contested Claims.

(a)     Prosecution of Contested Claims.

Unless otherwise ordered by the Bankruptcy Court, only the Disbursing Agent shall be entitled to object to, settle, compromise, withdraw or litigate objections to Claims. Any objections to Claims shall be served and filed on or before the Claims Objection Deadline (subject to being extended by the order of the Bankruptcy Court upon motion of the Disbursing Agent without notice or a hearing).

(b)     Claims Objection Deadline.

As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date (subject to being extended by order of the Bankruptcy Court upon motion of the Disbursing Agent without notice or a hearing to all creditors), objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made. If an objection has not been filed to a Proof of Claim or a Claim listed on the Schedules by the Claims Objection Deadline, the Claim to which the Proof of Claim or Claim listed on the Schedules relates will be treated as an Allowed Claim, if such Claim has not been previously Allowed.

(c)     Claims Settlement.

From and after the Effective Date, the Disbursing Agent shall have authority to settle or compromise all Claims and Causes of Action without further review or approval of the Bankruptcy Court, other than any settlement or compromise of a Claim or Cause of Action that involves an Insider.

(d)     No Plan Distributions Pending Allowance.

Notwithstanding any other provision of the Plan, no payments or Plan Distributions shall be made with respect to all or any portion of a Claim that is Contested in whole or in part, unless and until all objections to such Claim have been settled or withdrawn or have been determined by Final Order, and the Claim or some portion thereof, has become an Allowed Claim.

(e)     Distributions After Allowance.

Subject to the setoff rights as provided in section 7.10 of the Plan, and subject to section 8.4 of the Plan, after such time as a Contested Claim becomes, in whole or in part, an Allowed Claim, the Disbursing Agent shall distribute to the holder thereof the Plan Distributions if any to which such holder is entitled under the Plan. No interest shall be paid on any Contested Claim that later becomes an Allowed Claim.

(f)     Contested Claims Reserve.

The Disbursing Agent shall establish appropriate reserves for Contested Claims by withholding the lesser of (a) 100% of the Plan Distribution to which holders of Contested Claims would be entitled under the Plan if such Contested Claims were Allowed Claims, or (b) such other amount as may be approved by the Bankruptcy Court.

On, or as soon as practicable after the Initial Distribution Date, Reorganized White Energy, Inc. shall transmit to the Disbursing Agent the Cash that would otherwise be distributable to a holder of a General Unsecured Claim if such Claim were not a Contested Claim.

(g)     No Recourse Against the Debtors or Reorganized Debtors.

Any holder of a Contested Claim that ultimately becomes an Allowed Claim shall be entitled to receive its applicable Plan Distribution solely from the Contested Claim Reserve established on account of such Contested Claim. In no event shall any holder of a Contested Claim have any recourse with respect to Plan Distributions made, or to be made, under the Plan to holders of such Claims, to any Debtor or Reorganized Debtor or their Related Persons on account of such Contested Claim, regardless of whether such Contested Claim shall ultimately become an Allowed Claim, and regardless of whether sufficient Cash remains available for distribution in the Contested Claim Reserve established on account of such Contested Claim at the time such Claim becomes entitled to receive a Plan Distribution.

**Section 11.14 Conditions Precedent to Confirmation of Plan.**

The Plan will not be confirmed and the Confirmation Order will not be entered until and unless each of the following conditions has occurred or been waived in accordance with the terms of the Plan:

(a)     The clerk of the Bankruptcy Court shall have entered an order or orders:

(i)     approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(ii)     determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan;

(iii)     confirming and giving effect to the terms and provisions of the Plan;

(iv)     determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Debtors and the Plan;

(v)     approving the Plan Documents, including the New Term Loan Documents; and

(vi)     authorizing the Debtors to execute, enter into, and deliver the Plan Documents and to execute, implement, and to take all actions otherwise necessary or appropriate to give effect to, the transactions contemplated by the Plan and the Plan Documents.

(b)     The Confirmation Order shall be entered no later than March 8, 2010, time being strictly of the essence.

**Section 11.15 Conditions Precedent to the Occurrence of the Effective Date.**

The Effective Date of the Plan shall not occur unless and until each of the following conditions has occurred or has been waived in accordance with the terms of the Plan:

(i)     the Confirmation Order shall have been entered and shall have become a Final Order;

(ii)     the Debtors shall in the aggregate have no less than $25 million in unreserved, unrestricted Cash available for working capital, notwithstanding any reasonable and customary restrictions provided in the New Term Loan Documents;

(iii)     all necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan, including satisfaction or waiver of all conditions to the obligations of the Debtors under the Plan and the Plan Documents;

(iv)     all agreements and other instruments that are exhibits to the Plan or included in the Plan Supplement shall be acceptable to the Equity Sponsor (after consultation with the Debtors), in its sole discretion;

(v)     all actions, documents and agreements necessary to implement the Plan and the transactions contemplated by the Plan shall have been effected or executed;

(vi)     the New Term Loan Facility shall have been entered into by all of the parties thereto, and the New Term Loan Notes shall have been issued thereunder;

(vii)     The Fagen Note shall have been entered into by the parties thereto and shall have been issued to the holder of the Fagen Claims;

(viii)     the New Common Stock shall have been duly authorized, issued and transferred to the Equity Sponsor or its designee and Fagen, in accordance with the terms of the Plan;

(ix)     since [January 14], 2010, there shall not have occurred an event, matter, change, occurrence or circumstance that, individually or in the aggregate with any such other events, changes, occurrences or circumstances, has had or is reasonably likely to result in a Material Adverse Effect;

(x)    the Effective Date shall have occurred no later than April 8, 2010, time being strictly of the essence; and

(xi)    all fees, reasonable costs and expenses of the Prepetition Agent incurred under the Credit Agreement on or prior to the Effective Date shall have been paid in full.

**Section 11.16  Waiver of Conditions.**

The Equity Sponsor may waive, in whole or in part, any of the conditions to confirmation of the Plan or the effectiveness of the Plan.  Any such waiver of a condition may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

**Section 11.17  Effect of Non-Occurrence of the Effective Date.**

In the event that the conditions specified in section 9.2 of the Plan have not been satisfied or waived in accordance with section 9.3 of the Plan, and upon notification submitted by the Equity Sponsor to the Bankruptcy Court, (a) the Confirmation Order shall be vacated; (b) no Plan Distributions shall be made; (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (d) all of the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained in the Plan or the Disclosure Statement shall be deemed to constitute a waiver or release of any Claims or Causes of Action by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any proceedings further involving the Debtors.

**Section 11.18  Releases by Holders of Claims and Equity Interests.**

(a)    Releases and Injunction Related to Releases.

**Releases by Debtors**

**Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Debtors and Reorganized Debtors and their respective Estates and each of their respective Related Persons, and the Committee and their Professional Persons or any other representative of the Estates will be deemed to completely and forever release, waive, void, extinguish and discharge all Released Actions (other than (x) the rights to enforce the Plan and any right or obligation under the Plan, and (y) the securities, contracts, instruments, releases, indentures and other agreements or documents delivered under the Plan or contemplated thereby, including the Plan Documents) that may be asserted against the Released Parties or any of their respective Related Persons by or on behalf of the Debtors or Reorganized Debtors or their respective Estates.**

## Releases by Holders of Claims and Equity Interests

Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, the Committee and each Person receiving a Plan Distribution, and each of their respective Related Persons will be deemed to completely and forever release, waive, void, extinguish and discharge all Released Actions (other than the rights to enforce the Plan, and any right or obligation under the Plan, the securities, contracts, instruments, releases, indentures and other agreements or documents delivered under the Plan or contemplated thereby, including the Plan Documents) that may be asserted against the Released Parties or any of their Related Persons.

## Injunction Related to Releases

Each Person that is a holder of a Claim and/or an Equity Interest and any other party in interest and each of their respective Related Persons is permanently, forever and completely stayed, restrained, prohibited and enjoined from, directly or indirectly, derivatively or otherwise, commencing or continuing any Released Action against any Released Party. Nothing in the Plan or this Disclosure Statement shall prejudice any right, remedy, defense, claim, cross-claim or counterclaim or third-party claim that any Person may have against any Person other than with respect to the Released Actions against the Released Parties.

## No Personal Liability

No officer or director of any of the Debtors or the Reorganized Debtors who was an officer or director as of or after the Petition Date shall have any personal liability for any Claims, obligations, suits, judgments, damages, debts, rights, Causes of Action or liabilities, or any Equity Interests or rights of an equity security holder, whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, now existing or hereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other circumstance that occurred, arose, took place, existed or exists on or prior to the Effective Date in connection with or related to the Debtors or their respective Estates, or their business operations.

## Deemed Consent.

By voting to accept the Plan or accepting any Plan Distribution, each holder of a Claim will be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the exculpations, releases and injunctions set forth in the Plan.

## No Release of Willful Misconduct or Gross Negligence.

Nothing in the Plan shall be construed to release any party from willful misconduct or gross negligence as determined by Final Order.

**Section 11.19 Assumption and Rejection of Executory Contracts.**

        (a)    <u>Default Rejection.</u>

      Any Executory Contract (i) which is not listed on the Schedule of Assumed Executory Contracts that will be included in the Plan Supplement; (ii) which has not expired by its own terms on or prior to the Confirmation Date; (iii) which has not been assumed or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date; and (iv) which is not the subject of a motion to reject pending as of the Confirmation Date, shall be deemed to be rejected by the applicable Reorganized Debtor effective on the Confirmation Date, and the Plan shall constitute a motion to reject such Executory Contract; provided, however, that the Equity Sponsor reserves the right, on or prior to the Confirmation Date, to amend the Schedule of Assumed Executory Contracts, to delete any Executory Contract therefrom or add any Executory Contract thereto, in which event such Executory Contract(s) shall be deemed to be, respectively, rejected or assumed by the Reorganized Debtors. The Equity Sponsor shall provide notice of any amendments to the Schedule of Assumed Executory Contracts to the parties to the Executory Contracts affected thereby. The listing of a document on the Schedule of Assumed Executory Contracts shall not constitute an admission by the Debtors or the Equity Sponsor that such document is an Executory Contract or that the Debtors have any liability thereunder.

        (b)    <u>Real Property Related Contracts, Leases and Interests.</u>

      Each Executory Contract that is rejected or assumed that relates to the use or occupancy of real property shall include (i) modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract, without regard to whether such agreement, instrument or other document is listed on the Schedule of Assumed Executory Contracts and (ii) all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vault, tunnel or bridge agreements or franchises, and any other interests in real estate or rights <u>in rem</u> relating to such premises to the extent any of the foregoing are Executory Contracts.

      The Plan shall constitute a motion to reject all Executory Contracts not set forth on the Schedule of Assumed Executory Contracts and the Debtors shall have no liability thereunder <u>except</u> that any Claim related to a rejected Executory Contract shall be treated as a General Unsecured Claim. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code, and a finding by the Bankruptcy Court that each rejection is in the best interests of the Debtors and their Estates.

      The Plan shall constitute a motion to assume all Executory Contracts set forth on the Schedule of Assumed Executory Contracts. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumptions pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors and their estates.

Any non-Debtor counterparty to any Executory Contract designated as being assumed pursuant to section 11.1.4 that disputes the assumption of such Executory Contract must file with the Bankruptcy Court, and serve upon the Debtors and the Equity Sponsor, a written objection to assumption, which objection shall set forth the basis for the dispute by no later than ten (10) days prior to the Confirmation Hearing. The failure to timely object shall be deemed a waiver of any and all objections to the assumption of Executory Contracts designated as being assumed in section 11.1.4 of the Plan.

      (c)    <u>Cure</u>.

With respect to each Assumed Executory Contract, any monetary amounts required as Cure Payments shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash as soon as practicable after and in no event later than 30 days after the latest of: (a) the Effective Date; (b) the date following notice to Reorganized White Energy, Inc. of the amount due; or (c) upon such other terms as the parties to such Assumed Executory Contract may agree, or, in each case, as soon thereafter as is practicable. In the event of a dispute regarding (i) the amount of any Cure Payment, (ii) the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Assumed Executory Contract or (iii) any other matter pertaining to assumption of the Executory Contract, the Cure Payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such dispute.

Any non-Debtor counterparty to an Executory Contract assumed pursuant to section 11.1 that disputes the scheduled cure obligation must file with the Bankruptcy Court, and serve upon the Debtors and the Equity Sponsor a written objection to the cure obligation, which objection shall set forth the basis for the dispute and the alleged correct cure obligation, no later than ten (10) Business Days prior to the Confirmation Hearing. The Confirmation Order may contain additional provisions for notice of proposed assumptions and proposed Cure Payment amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. If a non-Debtor counterparty fails to file and serve an objection which complies with the foregoing, the cure obligation set forth on the Schedule of the Assumed Executory Contracts shall be binding on the non-Debtor counterparty, and the non-Debtor counterparty shall be deemed to have waived any and all objections to the assumption of the relevant agreement as proposed by the Equity Sponsor. If no Cure Payment amount is proposed by the Equity Sponsor, it shall be presumed that the Equity Sponsor is asserting that no Cure Payment amount is required to be paid under section 365(b)(1) of the Bankruptcy Code. In the event of a conflict between the notice and objection procedures set forth in this section 11.2 and the Confirmation Order, the terms of the Confirmation Order shall control notwithstanding anything else in the Plan to the contrary.

      (d)    <u>Claims Arising from Rejected Contracts</u>.

Claims arising from the rejection of Executory Contracts must be filed with the Bankruptcy Court and served on the Debtors, the Equity Sponsor and their respective counsels within thirty (30) days after service of (a) the Notice of Confirmation or (b) other notice that the Executory Contract has been rejected. Any Claims for which a Proof of Claim is not filed and

served within such time will be forever barred from assertion and shall not be enforceable against the Debtors, their respective Estates, Affiliates, Assets, properties or interests in property or against the Reorganized Debtors or their respective Estates, Assets, property or interests in property. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are properly filed and served shall be treated as General Unsecured Claims (Class 5) under the Plan and shall be subject to objection by the Disbursing Agent.

### Section 11.20  Retention Of Jurisdiction.

On and after the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction over all matters arising in, arising under, or related to the Chapter 11 Cases, and such other matters as set forth in Article XII of the Plan.

## ARTICLE XII.

## RISK FACTORS

### Section 12.1  Certain Bankruptcy Considerations.

If the Plan is not confirmed and consummated, there can be no assurance that any alternative plan of reorganization would be on terms as favorable to the holders of Claims as the terms of the Plan. In addition, if a protracted reorganization were to occur, there is a substantial risk that holders of Claims would receive less than they will receive under the Plan. See **Exhibit D** to the Disclosure Statement for a liquidation analysis of the Debtors.

### Section 12.2  The Reorganized Debtors' Actual Financial Results May Vary Significantly from the Projections Included in this Disclosure Statement.

The financial projections included in this Disclosure Statement are dependent upon the successful implementation of the Reorganized Debtors' business plan and the validity of the numerous assumptions contained therein. The significant assumptions underlying the Projections are discussed in greater detail in **Exhibit C** to this Disclosure Statement.

Many of these assumptions are beyond the control of the Debtors and may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the Projections may adversely affect the financial results of the Reorganized Debtors. Although the Equity Sponsor believes that the Projections and assumptions are reasonable, variations between the actual financial results and those projected may be material.

### Section 12.3  Competition, Market Considerations/Volatility and Other Variables.

Forward-looking statements involve risks and uncertainties, which could cause actual results or outcomes to differ materially from those expressed. Forward-looking statements in this Disclosure Statement or in the Projections reflect expectations regarding future revenues and expenses, the effect of state and federal regulations on our operations and revenues, ethanol plant operations, reliability and downtime, capital expenditures, commodity prices, linkage of ethanol and corn prices in the future, ethanol and distillers grain prices, corn costs, increased yields from production, hedging strategies, corn usage and ethanol production, general and administrative

costs, chemical and denaturant costs, among many other variables. The Debtors' expectations, beliefs and projections are expressed in good faith and are believed by the Debtors to have a reasonable basis, including without limitation, management's examination of historical operating trends, data contained in the Debtors' records and other data available from third parties. Nonetheless, the Debtors' expectations, beliefs or projections may not be achieved or accomplished. Forward-looking statements are subject to known and unknown risks and uncertainties.

The Debtors' results of operations, financial position and business will be highly dependent on commodity prices, which are subject to significant volatility and uncertainty, and the availability of supplies. The Debtors' business is highly sensitive to corn prices and the Debtors generally cannot pass on increases in corn prices to customers. The spread between ethanol and corn prices can vary significantly and may not continue at recent high levels. Fluctuations in the selling price and production cost of gasoline may reduce profit margins. The price of distillers grains is affected by the price of other commodity products, such as soybeans, and decreases in the price of these commodities could decrease the price of distillers grains. The Debtors' business is subject to seasonal fluctuations. The Debtors engage in hedging transactions and other risk mitigation strategies that could harm results of operations. Growth in the sale and distribution of ethanol is dependent on the changes to and expansion of related infrastructure which may not occur on a timely basis, if at all, and operations could be adversely affected by infrastructure disruptions. The Debtors have a limited operating history and business may not be as successful as envisioned. New plants under construction or decreases in the demand for ethanol may result in excess production capacity in the ethanol industry, which may cause the price of ethanol and/or distillers grains to decrease.

The Debtors' competitive position, financial position and results of operations may be adversely affected by technological advances and the Debtors' efforts to anticipate and employ such technological advances may prove unsuccessful. The U.S. ethanol industry is highly dependent upon federal and state legislation and regulation and any changes in legislation or regulation could materially and adversely affect the Debtors' results of operations and financial position. Various studies have criticized the efficiency of ethanol, in general, and corn-based ethanol in particular, which could lead to the reduction or repeal of incentives and tariffs that promote the use and domestic production of ethanol or otherwise negatively impact public perception and acceptance of ethanol as an alternative fuel. The Debtors may be adversely affected by environmental, health and safety laws, regulations and liabilities. The Debtors are dependent on their respective production facilities, and any operational disruption may result in a reduction of sales volumes, which could cause substantial losses. Competition for qualified personnel in the ethanol industry is intense and the Debtors may not be able to hire and retain qualified personnel to operate the Debtors' ethanol plants. Operations at the Debtors' facilities are subject to various uncertainties, which may cause them to not achieve results comparable to existing operational plants. The Debtors' debt level could negatively impact their financial condition, results of operations and business prospects.

### Section 12.4   Limited Liquidity of New Common Stock or New Term Loan Notes.

The New Common Stock will not qualify for listing on a securities exchange at the time it is issued on the Effective Date of the Plan, and the Equity Sponsor does not anticipate that the

New Common Stock will ever be listed or quoted on any securities exchange or quotation system or that any active trading market for them will develop in any over-the-counter market. Lack of liquidity of the New Common Stock may make it more difficult for the Reorganized Debtors to raise additional capital, if necessary, through equity financings. Similarly, the New Term Notes also will not be listed or quoted, and are not expected to be listed or quoted, on any securities exchange or quotation system.

## ARTICLE XIII.

## SECURITIES LAW MATTERS

### Section 13.1 Issuance of New Securities.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act of 1933, as amended (the "Securities Act"), and state securities laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property. The Equity Sponsor believes that the offer and sale of the New Common Stock satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code and is, therefore, exempt from registration under the Securities Act and state securities laws.

### Section 13.2 Subsequent Transfers of New Common Stock.

The New Common Stock to be issued pursuant to the Plan may (except as may be limited under any shareholder or other contractual agreement) generally be freely transferred by recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the New Common Stock are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities. Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

(a) persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

(b) persons who offer to sell securities offered under a plan for the holders of such securities;

(c) persons who offer to buy such securities from the holders of such securities, if the offer to buy is with a view to distributing such securities under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

(i)        a person who is an "issuer" with respect to the securities as the term "issuer" is defined in section 2(11) of the Securities Act.

Under section 2(11) of the Securities Act, an "issuer" includes any Person directly or indirectly controlling or controlled by the issuer, or any Person under direct or indirect common control of the issuer.

To the extent that Persons who receive New Common Stock pursuant to the Plan are deemed to be "underwriters," resales by such Persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Persons deemed to be underwriters may, <u>however</u>, be permitted to sell such New Common Stock and New Term Loan Notes without registration pursuant to the provisions of Rule 144 under the Securities Act. These provisions may permit the public sale of securities received by "underwriters" if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met.

Whether or not any particular Person would be deemed to be an "underwriter" with respect to the New Common Stock or other security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that Person. Accordingly, the Equity Sponsor, expresses no view as to whether any particular Person receiving New Common Stock or other securities under the Plan would be an "underwriter" with respect to such New Common Stock or other securities.

Pursuant to the Plan, certificates evidencing the New Common Stock received by restricted holders or by a holder that the Equity Sponsor determines is an underwriter within the meaning of section 1145 of the Bankruptcy Code will bear a legend substantially in the form below:

**THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.**

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER, THE EQUITY SPONSOR MAKES NO REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. The Equity Sponsor recommends that potential recipients of the New Common Stock consult

their own counsel concerning whether they may freely trade the New Common Stock under the Securities Act and/or state securities laws.

### Section 13.3   Delivery of Disclosure Statement.

Under section 1145(a)(4) of the Bankruptcy Code, "stockbrokers" (as that term is defined in section 101(53A) of the Bankruptcy Code) are required to deliver to their customers, for the first 40 days after the Effective Date, a copy of this Disclosure Statement (and any supplement to it ordered by the Bankruptcy Court) at or before the time of delivery of any security issued under the Plan.

### Section 13.4   SEC Reporting Requirements.

White Energy, Inc. is not currently required to file reports with the SEC under the Exchange Act of 1934 because it does not have a class of equity securities with 500 or more record holders.  The Equity Sponsor believes that the number of record holders of the New Common Stock will be less than 500 and that it will not be required to commence filing reports with the SEC as a result of the transactions provided for in the Plan.

## ARTICLE XIV.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The confirmation and execution of the Plan may have tax consequences to holders of Claims and Equity Interests.  The Equity Sponsor offers no opinion as to the tax consequences to holders of Claims and Equity Interests as a result of the confirmation and Distributions under the Plan.  All holders should satisfy themselves as to their own tax consequences by obtaining independent advice from their own tax advisors.

## ARTICLE XV.

## ALTERNATIVES TO CONFIRMATION AND
## CONSUMMATION OF THE PLAN

The Equity Sponsor has evaluated numerous alternatives to the Plan, including, without limitation, the consummation of the Agent's Plan, the sale of the Debtors as a going concern, either in their entirety or on limited bases, and the liquidation of the Debtors.  After studying these alternatives, the Equity Sponsor has concluded that the Plan is the best alternative and will maximize recoveries of holders of Claims.  The following discussion provides a summary of the analysis supporting the conclusion that a liquidation of the Debtors or an alternative plan of reorganization for the Debtors will not provide higher value to holders of Claims.

### Section 15.1   Liquidation Under Chapter 7 of the Bankruptcy Code.

If no plan of reorganization can be confirmed, the Chapter 11 Cases of the Debtors may be converted to cases under chapter 7, in which event a trustee would be elected or appointed to liquidate the properties and interests in property of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The Equity Sponsor

believes that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because of (1) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee for bankruptcy and professional advisors to such trustee; (2) the erosion in value of assets in the context of the expeditious liquidation required under chapter 7 and the "forced sale" environment in which such a liquidation would likely occur; (3) the adverse effects on the salability of business segments as a result of the likely departure of key employees and the loss of customers; and (4) the substantial increases in claims which would have to be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases. Accordingly, the Equity Sponsor has determined that confirmation of the Plan will provide each holder of a Claim with a greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7.

Section 1129(a)(7) of the Bankruptcy Code provides that with respect to impaired classes, each holder of a claim or interest of such class must receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount such holder would so receive or retain if the debtor liquidated under chapter 7 of the Bankruptcy Code on such date. As the Plan provides for a greater recovery to holders of Claims than they would receive in a liquidation under chapter 7 of the Bankruptcy Code, the Plan satisfies section 1129(a)(7).

### Section 15.2    Alternative Plans of Reorganization.

The Debtors and the Prepetition Agent have filed the Agent's Plan, an alternative chapter 11 plan of reorganization for White Energy and its affiliated Debtors. The Equity Sponsor has carefully examined the Agent's Plan, and believes that the Plan, as described herein, offers holders of Claims a higher and better recovery than the Agent's Plan. In particular, the Plan (i) satisfies the Allowed Prepetition Lender Claims in full, (ii) provides the holder of an Allowed Fagen Claim with an estimated recovery equal to [66]% of the Allowed Fagen Claim – substantially higher than the estimated [___]% recovery provided under the Agent's Plan – and (iii) provides all other classes of claims with the same or better treatment as the Agent's Plan. Accordingly, the Equity Sponsor believes that the Plan represents the best alternative for all holders of Claims.

In addition to the Debtors and Prepetition Agent, other parties in interest can also undertake to formulate different plans of reorganization for the Debtors. Such a plan of reorganization might involve either (x) a reorganization and continuation of the business of the Debtors, (y) the sale of the Debtors as a going concern or (z) an orderly liquidation of the properties and interests in property of the Debtors. With respect to an alternative plan of reorganization, the Equity Sponsor has examined various other alternatives in connection with the process involved in the formulation and development of the Plan. The Equity Sponsor believes that the Plan, as described herein, enables holders of Claims to realize the best recoveries under the present circumstances. In a liquidation of the Debtors under chapter 11, the properties and interests in property would be sold in a more orderly fashion and over a more extended period of time than in a liquidation under chapter 7, probably resulting in marginally greater recoveries. Further, if a trustee were not appointed, since one is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than in a chapter 7 case. However, although preferable to a chapter 7 liquidation, the Equity Sponsor believes that a

liquidation under chapter 11 for the Debtors is a much less attractive alternative to holders of Claims than the Plan because the recovery realized by holders of Claims under the Plan is likely to be greater than the recovery under a chapter 11 liquidation.

*Remainder of this page intentionally left blank.*

## CONCLUSION

The Equity Sponsor believes that the Plan is in the best interest of all holders of Claims, and urge all holders of Claims in an impaired class to vote to accept the Plan and to evidence such acceptance, and a preference for the Plan over the Agent's Plan, by returning their Ballots in accordance with the instructions accompanying this Disclosure Statement.

Dated: December 31, 2009

                    **COLUMBUS NOVA ETHANOL HOLDINGS LLC**


                    By:   /s/ Andrew Intrater
                    Name:  Andrew Intrater
                    Title:   Attorney-in-Fact

# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WHITE ENERGY, INC., *et al.*,[1] | Case No. 09-11601 (CSS) |
| Debtors. | Jointly Administered |

## CHAPTER 11 PLAN OF REORGANIZATION
## FOR WHITE ENERGY, INC. AND ITS AFFILIATED DEBTORS FILED BY
## COLUMBUS NOVA ETHANOL HOLDINGS LLC

Dated: December 31, 2009
      Wilmington, Delaware

<div style="margin-left:40%">

YOUNG CONAWAY
STARGATT & TAYLOR, LLP
Michael R. Nestor, Esq.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Direct Dial: 302-571-6699
Direct Fax: 302-576-3321

and

LATHAM & WATKINS LLP
Mark Broude, Esq.
James Gorton, Esq.
Jude Gorman, Esq.
Joseph Fabiani, Esq.
885 Third Avenue
New York, New York 10022
Direct Dial: 212-906-1200
Direct Fax: 212-751-4864

Counsel for Columbus Nova Ethanol Holdings LLC

</div>

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: White Energy, Inc. (1083); White Energy Holding Company, LLC (3034); US Energy Partners, L.L.C. (1177); WE Hereford, LLC (9408); and Plainview BioEnergy, LLC (5553). The corporate headquarters for each of the Debtors is 5005 LBJ Freeway, Suite 1400, Dallas, TX 75244.

# TABLE OF CONTENTS

ARTICLE I. DEFINITIONS AND INTERPRETATION.................................................... 1
    1.1     Definitions......................................................................................................... 1
    1.2     Interpretation; Application of Definitions; Rules of Construction ...................... 12
    1.3     Exhibits, Schedules, Appendices and Plan Documents ........................................ 13

ARTICLE II. PROVISIONS FOR TREATMENT OF ADMINISTRATIVE CLAIMS
AND PRIORITY TAX CLAIMS UNDER THE PLAN .................................................... 13
    2.1     Introduction......................................................................................................... 13
    2.2     Administrative Claims and Priority Tax Claims.................................................... 14
    2.3     Time for Filing of Administrative Claims ............................................................ 14
    2.4     Allowance of Administrative Claims/Fee Claims ................................................ 15
    2.5     Treatment of Allowed Administrative Claims....................................................... 15
    2.6     Treatment of Priority Tax Claims ........................................................................ 15

ARTICLE III. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ........................ 16
    3.1     Classification of Claims and Equity Interests ....................................................... 16

ARTICLE IV. PROVISIONS FOR TREATMENT OF CLAIMS AND EQUITY
INTERESTS UNDER THE PLAN ................................................................................ 17
    4.1     Satisfaction of Claims and Equity Interests .......................................................... 17
    4.2     Class 1 – Priority Claims .................................................................................... 17
    4.3     Class 2 – Prepetition Lender Secured Claims ...................................................... 17
    4.4     Class 3 – Other Secured Claims.......................................................................... 17
    4.5     Class 4 – Secured Tax Claims. ............................................................................ 18
    4.6     Class 5 – General Unsecured Claims. .................................................................. 18
    4.7     Class 6 – Fagen Claim ........................................................................................ 18
    4.8     Class 7 –Subsidiary Equity Interests.................................................................... 19
    4.9     Class 8 – Preferred White Energy Equity Interests. ............................................. 19
    4.10    Class 9 – Common White Energy Equity Interests. ............................................. 19
    4.11    Limitation on Recovery for Claims Against More Than One Debtor .................. 19

ARTICLE V. ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
REJECTION BY ONE OR MORE CLASSES OF CLAIMS ......................................... 19
    5.1     Classes Entitled to Vote ...................................................................................... 19
    5.2     Class Acceptance Requirement............................................................................. 19
    5.3     Cramdown............................................................................................................ 20

ARTICLE VI. MEANS FOR IMPLEMENTATION OF THE PLAN ........................................ 20
    6.1     Substantive Consolidation of Debtors for Plan Purposes Only ............................ 20
    6.2     Operations Between the Confirmation Date and the Effective Date .................... 20
    6.3     Transactions on the Effective Date ...................................................................... 20

NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

6.4      Corporate Action: Certificates of Incorporation, By-laws, Formation Documents and Limited Liability Company Agreements. ............................ 21
6.5      Effectuating Documents; Further Transactions ................................... 22
6.6      Continued Corporate Existence of the Debtors ................................ 23
6.7      Revesting of Assets ..................................................................... 23
6.8      Management ................................................................................. 23
6.9      Initial Boards of Directors, Managers and Members ........................ 23
6.10     Officers ....................................................................................... 24
6.11     Management Incentive Plan ............................................................ 24
6.12     Causes of Action/Reservation of Rights ......................................... 24
6.13     Releases and Injunction Related to Releases .................................... 25
6.14     Appointment of the Disbursing Agent ............................................ 26
6.15     Sources of Cash for Plan Distributions ........................................... 26
6.16     Investment of Funds Held by the Disbursing Agent; Tax Reporting by the Disbursing Agent .................................................................. 26

ARTICLE VII. DISTRIBUTION PROVISIONS ........................................... 27
7.1      Distribution Record Date .............................................................. 27
7.2      Plan Distributions ........................................................................ 27
7.3      Timing of Plan Distributions ......................................................... 27
7.4      Address for Delivery of Plan Distributions/Unclaimed Distributions ................. 28
7.5      De Minimis Distributions .............................................................. 28
7.6      Time Bar to Cash Payments .......................................................... 28
7.7      Manner of Payment under the Plan ................................................. 28
7.8      Expenses Incurred On or After the Effective Date and Claims of the Disbursing Agent ........................................................................ 29
7.9      Fractional Plan Distributions ......................................................... 29
7.10     Setoffs 29
7.11     Compliance with Tax Requirements ............................................... 29
7.12     Hart-Scott-Rodino Compliance ..................................................... 29

ARTICLE VIII. PROCEDURES FOR RESOLVING AND TREATING CONTESTED CLAIMS ......................................................................... 30
8.1      Prosecution of Contested Claims ................................................... 30
8.2      Claims Objection Deadline ............................................................ 30
8.3      Claims Settlement ........................................................................ 30
8.4      No Plan Distributions Pending Allowance ...................................... 30
8.5      Distributions After Allowance ....................................................... 31
8.6      Contested Claims Reserve ............................................................. 31
8.7      No Recourse Against the Debtors or Reorganized Debtors ................ 31

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE OCCURRENCE OF THE EFFECTIVE DATE ............................... 31
9.1      Conditions Precedent to Entry of the Confirmation Order ................. 31
9.2      Conditions Precedent to the Occurrence of the Effective Date ........... 32
9.3      Waiver of Conditions ................................................................... 33

    9.4     Effect of Non-Occurrence of the Effective Date ................................... 33

ARTICLE X. THE DISBURSING AGENT ........................................................... 33
    10.1    Rights and Powers of Disbursing Agent ................................................ 33
    10.2    Exculpation of the Disbursing Agent ..................................................... 33

ARTICLE XI. TREATMENT OF EXECUTORY CONTRACTS ............................ 34
    11.1    Assumption and Rejection of Executory Contracts ............................... 34
    11.2    Cure    35
    11.3    Claims Arising from Rejected Contracts ................................................. 36

ARTICLE XII. RETENTION OF JURISDICTION ............................................... 36

ARTICLE XIII. MISCELLANEOUS PROVISIONS .............................................. 38
    13.1    Term of Injunctions or Stays ................................................................. 38
    13.2    Payment of Statutory Fees .................................................................... 38
    13.3    Claims and Equity Interests Satisfied ................................................... 38
    13.4    Exculpation .......................................................................................... 39
    13.5    Discharge of Liabilities ......................................................................... 39
    13.6    Discharge of Debtors ............................................................................ 39
    13.7    Injunction Against Interference With Plan ............................................ 39
    13.8    Notices ................................................................................................. 40
    13.9    Headings .............................................................................................. 41
    13.10   Governing Law ..................................................................................... 41
    13.11   Expedited Determination ...................................................................... 41
    13.12   Exemption from Transfer Taxes ........................................................... 41
    13.13   Notice of Entry of Confirmation Order and Relevant Dates ................. 42
    13.14   Interest ................................................................................................. 42
    13.15   Modification of the Plan and Amendments ........................................... 42
    13.16   Revocation, Withdrawal or Non-Consummation of Plan ...................... 42
    13.17   Injunctions ........................................................................................... 43
    13.18   Binding Effect ....................................................................................... 43
    13.19   Severability of Plan Provisions ............................................................. 43
    13.20   No Admissions ...................................................................................... 44
    13.21   Dissolution of the Committee ............................................................... 44
    13.22   Time…. ................................................................................................ 44
    13.23   Successors and Assigns ......................................................................... 44
    13.24   Conflict between Plan, Disclosure Statement and Plan Documents ...... 44
    13.25   Substantial Consummation. .................................................................. 45

Columbus Nova Ethanol Holdings LLC (the "**Equity Sponsor**") hereby proposes the following joint chapter 11 plan of reorganization:

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

**1.1**   **Definitions.**

The following terms used herein shall have the respective meanings defined below.

1.1.1   **"Administrative Claim"** means a Claim incurred by a Debtor (or its Estate) on or after the Petition Date and before the Effective Date for a cost or expense of administration in the Chapter 11 Cases that is entitled to priority under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including (x) Fee Claims and (y) any fees or charges assessed against the Debtors' Estates under section 1930 of chapter 123 of title 28 of the United States Code.

1.1.2   **"Affiliate"** means, with respect to any Person, all other Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

1.1.3   **"Allowed,"** when used with respect to any Claim, except for a Claim that is an Administrative Claim, means such Claim to the extent it is allowed pursuant to the Plan or Final Order of the Bankruptcy Court or is not in whole or in part a Contested Claim or a Disallowed Claim; with respect to any Administrative Claim, means such Administrative Claim to the extent it has become fixed in amount and priority pursuant to the procedures set forth in Article II of this Plan.

1.1.4   **"Amended White Energy By-Laws"** means the Amended and Restated By-Laws of Reorganized White Energy, Inc. to be in effect on the Effective Date, substantially in the form set forth in the Plan Supplement.

1.1.5   **"Amended White Energy Certificate of Incorporation"** means the Amended and Restated Certificate of Incorporation of Reorganized White Energy, Inc. to be effective on the Effective Date, substantially in the form set forth in the Plan Supplement.

1.1.6   **"Assets"** means, with respect to each Debtor, all of such Debtor's right, title and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

1.1.7   **"Assumed Executory Contract"** means an Executory Contract entered into prior to the Petition Date, as contemplated by section 365 of the Bankruptcy Code, assumed pursuant to section 365(a) or section 1123(b)(2) of the Bankruptcy Code in accordance with Article XI of this Plan.

1.1.8 **"Avoidance Actions"** means all Causes of Action that arise under Chapter 5 of the Bankruptcy Code, including Causes of Action under section 502(d), 544, 545, 546, 547, 548, 549, 550 and 551 of the Bankruptcy Code.

1.1.9 **"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as codified at title 11 of the United States Code, as amended from time to time, and applicable to the Chapter 11 Cases.

1.1.10 **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases.

1.1.11 **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code and as applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases.

1.1.12 **"Bar Date"** means September 14, 2009, which is the date established by the Bar Date Order as the general bar date and the bar date for Section 503(b)(9) Claims in these Chapter 11 Cases, and such other deadlines for filing proofs of claim that are set forth in the Bar Date Order.

1.1.13 **"Bar Date Order"** means the order of the Bankruptcy Court entered on July 20, 2009, establishing the Bar Date.

1.1.14 **"Business Day"** means any day other than a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close for business in New York, New York.

1.1.15 **"Cash"** means legal tender of the United States of America.

1.1.16 **"Causes of Action"** means all claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections to claims, rights, actions, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, executions, judgments or demands whatsoever, whether known or unknown, choate or inchoate, existing or hereafter arising, suspected or unsuspected, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, asserted or unasserted, in law, equity or otherwise.

1.1.17 **"Chapter 11 Cases"** means the cases commenced under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court with respect to each of the Debtors and jointly administered as In re White Energy, Inc., Chapter 11 Case No. 09-11601 (CSS).

1.1.18 **"Claim"** means (a) any right to payment, whether or not such right is known or unknown, asserted, reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is known or unknown, asserted,

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

2

reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

1.1.19 **"Claims Agent"** means the entity designated by order of the Bankruptcy Court to process proofs of claim.

1.1.20 **"Claims Objection Deadline"** means the deadline for filing objections to Claims as set forth in section 8.2 of the Plan.

1.1.21 **"Class"** means a category of holders of Claims or Equity Interests classified by the Plan pursuant to section 1122(a) of the Bankruptcy Code.

1.1.22 **"Class 2 Cash Distribution"** means Cash in an amount equal to the difference between (a) the Allowed Prepetition Lender Claims less (b) the total principal amount of the New Term Loans.

1.1.23 **"Class 2 Distribution Pool"** means the New Term Loans and the Class 2 Cash Distribution.

1.1.24 **"Collateral"** means any Asset of the Estate of any Debtor that is subject to a Lien, charge or other encumbrance to secure the payment or performance of a Claim, and which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

1.1.25 **"Common White Energy Equity Interests"** means any share of common stock evidencing an ownership in White Energy, Inc. whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such common stock.

1.1.26 **"Compensation Committee"** means the compensation committee of the board of directors of Reorganized White Energy, Inc.

1.1.27 **"Confirmation Date"** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

1.1.28 **"Confirmation Hearing"** means the hearing held by the Bankruptcy Court, pursuant to section 1128 of the Bankruptcy Code, as it may be continued from time to time, to consider confirmation of the Plan.

1.1.29 **"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan, pursuant to section 1129 of the Bankruptcy Code, which Confirmation Order shall be acceptable to the Equity Sponsor.

1.1.30 **"Contested"** when used with respect to a Claim, means such Claim (i) if it is listed in the Schedules as disputed, unliquidated, and/or contingent and as to which a Proof of Claim has not been filed with the Bankruptcy Court; (ii) if it is listed in the Schedules, but not as disputed, unliquidated, or contingent and as to which a Proof of Claim has been filed with the Bankruptcy Court, and (A) the Proof of Claim amount exceeds the amount indicated in the Schedules, and/or (B) the Proof of Claim asserts priority greater than the priority set forth in

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

3

the Schedules; (iii) if it is not listed in the Schedules or was listed in the Schedules as disputed, contingent or unliquidated, in whole or in part, but as to which a Proof of Claim has been filed with the Bankruptcy Court; or (iv) to the extent such Claim is a Claim arising under a rejected Executory Contract, proof of which Claim is to be filed with the Bankruptcy Court before the deadline for filing such Claim; provided, however, that in the case of Claims falling under (ii), (iii) or (iv) above, an objection must have been filed on or before the Claims Objection Deadline; provided further, however, that a Claim that is fixed in amount and priority pursuant to the Plan or by Final Order on or before the Effective Date shall not be a Contested Claim.

1.1.31 **"Contested Claims Reserve"** means a reserve of Cash established in accordance with section 8.6 of the Plan.

1.1.32 **"Credit Agreement"** means that certain Amended and Restated Credit Agreement, dated as of July 31, 2006, by and among White Energy Holding Company, LLC, as Borrower (as defined in the Credit Agreement), the Borrower Subsidiaries (as defined in the Credit Agreement), the Subsidiary Guarantors (as defined in the Credit Agreement), each of the lenders party thereto, the Prepetition Agent and any of their respective successors or assigns, and any and all of the documents, notes, instruments and other agreements, including each of the Financing Documents (as defined in the Credit Agreement), the Ancillary Documents (as defined in the Credit Agreement), the Letters of Credit (as defined in the Credit Agreement), and the Swap Agreements, executed, delivered or filed pursuant to or in connection with the Amended and Restated Credit Agreement, as such Amended and Restated Credit Agreement, documents, notes and other agreements and instruments (including the Financing Documents, the Ancillary Documents, the Letters of Credit and the Swap Agreements) may have been amended, supplemented, modified or allonged.

1.1.33 **"Cure Payments"** means payment on an Allowed Claim arising in connection with a Debtor's obligation under section 365(b)(1)(A) or (B) of the Bankruptcy Code relating to an Assumed Executory Contract.

1.1.34 **"Disallowed"** when used with respect to a Claim, means a Claim, or such portion of a Claim, that has been disallowed by a Final Order.

1.1.35 **"Disbursing Agent"** means Reorganized White Energy, Inc. in (a) making the Plan Distributions contemplated under the Plan, the Confirmation Order, or any other relevant Final Order, and (b) performing any other act or task that is or may be delegated to the Disbursing Agent under the Plan.

1.1.36 **"Disclosure Statement"** means the Disclosure Statement filed with respect to the Plan, dated [_____], as may be further supplemented, amended or modified from time to time, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.1.37 **"Distribution Date"** means (a) with respect to a Claim (other than a General Unsecured Claim) (i) the Effective Date or a date that is as soon as reasonably practicable after the Effective Date, if such Claim is then an Allowed Claim, or (ii) a date that is as soon as reasonably practicable after the date such Claim becomes Allowed, if not Allowed on

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

4

the Effective Date; and (b) with respect to an Allowed General Unsecured Claim, the Initial Distribution Date, the dates of any Interim Distributions, and the Final Distribution Date.

1.1.38   **"Distribution Record Date"** means the record date for purposes of making Plan Distributions under the Plan on account of Allowed Claims, which Distribution Record Date shall be the Confirmation Date or such other date as may be designated in the Confirmation Order.

1.1.39   **"Effective Date"** means the first Business Day on which all of the conditions to the occurrence of the Effective Date, as specified in section 9.2 of the Plan, have been satisfied or waived in accordance with the provisions of section 9.3 of the Plan.

1.1.40   **"Equity Infusion"** means the payment by the Equity Sponsor to the Reorganized Debtors of an amount of Cash which, together with any Cash of the Debtors in excess of $25 million is sufficient to make the Cash Plan Distributions, but in no event more than $35 million, in exchange for 98.5% of the New Common Stock (subject to dilution on account of New Common Stock reserved for the Management Incentive Plan).

1.1.41   **"Equity Interest"** means any ownership interest in any of the Debtors, including any share of common stock, share of preferred stock, Common White Energy Equity Interest, Preferred White Energy Equity Interest, membership interest or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such common stock, preferred stock, White Energy Equity Interest, membership interest or other ownership interest.

1.1.42   **"Equity Sponsor"** means Columbus Nova Ethanol Holdings LLC, a Delaware limited liability company.

1.1.43   **"Estate"** means the estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

1.1.44   **"Executory Contract"** means any unexpired executory contract or unexpired lease entered into prior to the Petition Date, as contemplated by section 365 of the Bankruptcy Code, in effect on the Confirmation Date, between any of the Debtors and any other Person or Persons and which has neither been assumed or rejected prior to the Confirmation Date pursuant to section 365(a) of the Bankruptcy Code.

1.1.45   **"Fagen"** means Fagen, Inc., a Minnesota corporation.

1.1.46   **"Fagen Cash Distribution"** means the Plan Distribution to the holder of the Fagen Claim in Cash in the aggregate amount of $1,500,000.

1.1.47   **"Fagen Equity Distribution"** means Plan Distributions to the holder of the Fagen Claim of 1.5% of the New Common Stock (subject to dilution on account of New Common Stock reserved for the Management Incentive Plan).

1.1.48   **"Fagen Claims"** means the claims of Fagen against one or more of the Debtors, which shall be an Allowed Claim in the amount of $14,900,669.39.

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

5

1.1.49    **"Fagen Litigation"** means the adversary proceedings filed by WE Hereford, LLC and Plainview BioEnergy LLC against Fagen on December 27, 2009 in the Bankruptcy Court seeking to (a) object to the Proofs of Claim filed by Fagen; (b) otherwise determine the validity, extent and priority of the Liens asserted by Fagen, Inc; and (c) avoid certain liens which Fagen asserts in certain of the Debtors' assets.

1.1.50    **"Fagen Note"** means a promissory note, in the face amount of $8,500,000, to be distributed to the holder of the Fagen Claim on the terms set forth on Exhibit B to the Plan.

1.1.51    **"Fee Claim"** means a claim of a Professional Person for the allowance or compensation and reimbursement of expenses pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code.

1.1.52    **"Final Cash Collateral Order"** means the Amended Final Order (a) Authorizing Debtors to Use Cash Collateral and (b) Granting Adequate Protection to the Debtors' Prepetition Secured Parties, entered by the Bankruptcy Court in the Chapter 11 Cases on July 20, 2009.

1.1.53    **"Final Distribution"** means the Pro Rata share of the Contested Claims Reserve allocable to each holder of an Allowed General Unsecured Claim on the Final Distribution Date.

1.1.54    **"Final Distribution Date"** means with respect to an Allowed General Unsecured Claim the fifteenth day after the date that all General Unsecured Claims that are Contested Claims have been resolved by Final Order.

1.1.55    **"Final Fee Application"** means the final application for allowance and payment of a Fee Claim (including Claims for "substantial contribution" pursuant to section 503(b) of the Bankruptcy Code).

1.1.56    **"Final Order"** means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction entered by the Clerk of the Bankruptcy Court or such other court on the docket in the Chapter 11 Cases or the dockets of such other court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, motion for new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court or any other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for new trial, reargument or rehearing shall have expired; provided, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rules 3008 or 9024 may be filed with respect to such order.

1.1.57    **"Fractional Distribution"** means a Plan Distribution of a fractional share or a fraction of a dollar.

1.1.58    **"General Unsecured Claim"** means any Claim against any of the Debtors that is not an Administrative Claim, a Priority Tax Claim, a Priority Claim, a Prepetition Lender Claim, an Other Secured Claim, a Secured Tax Claim, a Fagen Claim or an Intercompany Claim.

1.1.59    **"General Unsecured Claim Cash Distribution Amount"** means an amount of Cash to be funded out of the Debtors' Cash on hand in a total aggregate amount equal to $400,000.

1.1.60    **"Governmental Unit"** shall have the meaning ascribed thereto in section 101(27) of the Bankruptcy Code.

1.1.61    **"Initial Distribution"** means with respect to an Allowed General Unsecured Claim, the Pro Rata share of the General Unsecured Claim Cash Distribution Amount allocable to such Allowed General Unsecured Claim on the Initial Distribution Date.

1.1.62    **"Initial Distribution Date"** means on or as soon as practicable after the Effective Date.

1.1.63    **"Insider"** has the meaning set forth in section 101(31) of the Bankruptcy Code.

1.1.64    **"Intercompany Claim"** means any Claim held by a Debtor against any other Debtor or an Affiliate.

1.1.65    **"Interim Distribution"** means a Plan Distribution to the holders of Allowed General Unsecured Claims after the Initial Distribution and before the Final Distribution.

1.1.66    **"Internal Revenue Code"** means the Internal Revenue Code of 1986, as amended, and any applicable rulings, regulations (including temporary and proposed regulations) promulgated thereunder, judicial decisions, and notices, announcements, and other releases of the United States Treasury Department or the IRS.

1.1.67    **"IRS"** means the United States Internal Revenue Service.

1.1.68    **"Letters of Credit"** means the Letters of Credit issued under the Credit Agreement.

1.1.69    **"Lien"** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.1.70    **"Management Incentive Plan"** means the management incentive plan to be implemented by Reorganized White Energy, Inc. for certain officers and employees of the Reorganized Debtors, substantially in the form set forth in the Plan Supplement.  Pursuant to

such plan, at the Effective Date, Reorganized White Energy, Inc. will reserve for issuance shares of New Common Stock representing 5% of the total number of shares of New Common Stock issuable under the Plan.

1.1.71     **"Material Adverse Effect"** means a material adverse effect on the business, assets, properties, financial condition, prospects or results of operations of the Debtors, taken as a whole; <u>provided</u> that the following shall not constitute a Material Adverse Effect: (A) any change in the United States or foreign economies or financial markets in general, (B) any change that generally affects the industry in which the Debtors operate which does not disproportionately affect the Debtors, (C) any changes in generally accepted accounting principles, (D) any action taken by the Debtors to comply with the terms of the Plan, or (E) any failure by the Company to meet any estimates, expectations or projections of the Debtors' revenue, earnings or other financial performance or results of operations for any period, or any failure by the Debtors to meet any internal budgets, plans or forecasts of its revenues, earnings or other financial performance or results of operations.

1.1.72     **"New Common Stock"** means the common stock, par value of $.01 per share, of Reorganized White Energy, Inc., authorized under the Amended White Energy Certificate of Incorporation.

1.1.73     **"New Term Loan Documents"** means the New Term Loan Facility, together with all documents, notes, instruments and other agreements executed, delivered or filed pursuant to or in connection therewith, as the same shall be amended, supplemented, modified or allonged at any time and from time to time. The New Term Loan Documents shall be Plan Documents.

1.1.74     **"New Term Loans"** means the secured loans to be issued by Reorganized WE Holding Company, LLC and the other Reorganized Debtors, pursuant to the New Term Loan Facility and the other New Term Loan Documents, in the principal amount of $260 million.

1.1.75     **"New Term Loan Facility"** means the secured term loan and guaranty agreement, to be entered into by Reorganized WE Holding Company, LLC and the other Reorganized Debtors and the New Term Loan Facility Agent and the New Term Loan Facility Lenders in connection with the consummation of the Plan as effective on the Effective Date, in the amount of $260 million, on the terms set forth on Exhibit A to the Plan.

1.1.76     **"New Term Loan Facility Agent"** means WestLB as agent under the New Term Loan Facility and its successors and assigns.

1.1.77     **"New Term Loan Facility Lenders"** means all holders of Claims in Class 2 and their successors and assigns.

1.1.78     **"New Term Loan Notes"** means the promissory notes evidencing the New Terms Loans to be issued to the holders of Allowed Prepetition Lender Claims.

1.1.79    "**Notice of Confirmation**" means the notice of entry of the Confirmation Order to be filed with the Bankruptcy Court and mailed by the Claims Agent to holders of Claims and Equity Interests.

1.1.80    "**Original Debt**" means the indebtedness outstanding under the Original Debt Documents on the Effective Date.

1.1.81    "**Original Debt Documents**" means the Credit Agreement together with all documents, notes, instruments, and any other agreements executed or entered into in connection therewith, all as amended, modified, supplemented or allonged from time to time.

1.1.82    "**Other Secured Claims**" means a Secured Claim other than a Prepetition Lender Claim, a Secured Tax Claim and the Fagen Claim.

1.1.83    "**Person**" means an individual, corporation, partnership, limited liability company, business trust, limited liability partnership, joint stock company, joint venture, trust, estate, unincorporated association, unincorporated organization, or any other entity, or any government, governmental agency, or any subdivision, department or instrumentality thereof.

1.1.84    "**Petition Date**" means May 7, 2009.

1.1.85    "**Plan**" means this chapter 11 plan, including all exhibits, supplements, appendices and schedules hereto, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time, in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.1.86    "**Plan Distribution**" means the payment or distribution under the Plan of Cash, Assets, New Common Stock, New Term Loans, Fagen Note or other instruments evidencing an obligation under the Plan to any holder of an Allowed Claim, as applicable.

1.1.87    "**Plan Documents**" means the documents that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court as specified in section 1.3 of the Plan.

1.1.88    "**Plan Objection Deadline**" means the date set forth in the order of the Bankruptcy Court by which a creditor or interest holder or other party in interest must file an objection to confirmation of the Plan or otherwise be barred from filing such an objection.

1.1.89    "**Plan Supplement**" means a separate appendix to the Plan incorporated herein by reference and containing the Plan Documents, to be filed by the Equity Sponsor with the Bankruptcy Court no later than five (5) Business Days prior to the Plan Objection Deadline.

1.1.90    "**Preferred White Energy Equity Interests**" means any share of Series A1 Preferred Stock, Series A2 Preferred Stock, or Series B Preferred Stock evidencing an ownership interest in White Energy, Inc. whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such preferred stock.

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

9

1.1.91    **"Prepetition Agent"** means WestLB, as administrative agent for the Prepetition Lenders under the Credit Agreement.

1.1.92    **"Prepetition Lender Claim"** means the Claim of the Prepetition Lender against any of the Debtors arising under, in connection with or related to the Credit Agreement, including any Claim with respect to any and all guarantees, pledges, notes and other agreements and documents executed and/or delivered by any Debtor pursuant to, in connection with or related to the Credit Agreement, including any Claim under the Financing Documents (as defined in the Credit Agreement), the Letters of Credit and the Swap Agreements, including any accrued and unpaid interest, fees and expenses, which Prepetition Lender Claim shall be allowed in the amount as agreed to by the Debtors, the Prepetition Agent and the Equity Sponsor, or as determined by the Bankruptcy Court.

1.1.93    **"Prepetition Lenders"** means, collectively, the lenders and other institutions that are parties to the Credit Agreement and their respective successors and assigns.

1.1.94    **"Priority Claim"** means any Claim, to the extent such Claim is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

1.1.95    **"Priority Tax Claim"** means a Claim against any of the Debtors that is of a kind specified in section 507(a)(8) of the Bankruptcy Code and that is not a Secured Tax Claim.

1.1.96    **"Proof of Claim"** means the Proof of Claim that must be filed by a holder of a Claim by the Bar Date.

1.1.97    **"Pro Rata"** means the proportion that an Allowed Claim in a particular class bears to the aggregate amount of all Claims in such class, including Contested Claims, but excluding Disallowed Claims, (a) as calculated by the Disbursing Agent, or (b) as determined or estimated by the Bankruptcy Court.

1.1.98    **"Professional Person"** means a Person retained or to be compensated for services rendered or costs incurred by either the Debtors or the Committee on or after the Petition Date and on or prior to the Effective Date pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in these Chapter 11 Cases.

1.1.99    **"Related Persons"** means, with respect to any Person, such Person's predecessors, successors, assigns and present and former affiliates (whether by operation of law or otherwise) and each of their respective present and former members, partners, equity-holders, officers, directors, employees, representatives, advisors (whether engaged prior to or subsequent to the Petition Date), attorneys (whether engaged prior to or subsequent to the Petition Date), agents and professionals (whether engaged prior to or subsequent to the Petition Date), acting in such capacity, and any Person claiming by or through any of them; provided, however that Related Persons shall not include any Person who was not an officer or director of any Debtor on or after the commencement of these Chapter 11 Cases.

1.1.100   **"Released Actions"** means all Claims, claims, cross-claims, counterclaims, third-party claims, obligations, suits, judgments, damages, debts, rights, Causes of Action and liabilities, and all Equity Interests and rights of an equity security holder, whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other circumstance that occurred, arose, took place, existed or exists on or prior to the Effective Date in connection with or related to the Debtors and their respective Estates, or their business operations (including the organization or capitalization of the Debtors or extensions of credit and other financial services and accommodations made or not made to the Debtors), the Reorganized Debtors and their respective Estates (including (x) Avoidance Actions and (y) any and all alter ego or derivative claims accruing to the Debtors and their Estates), the Chapter 11 Cases or the Plan.

1.1.101   **"Released Parties"** means (a) the Committee, acting in such capacity, (b) the Prepetition Agent and the Prepetition Lenders, (c) each holder of an Equity Interest in any Debtor at or prior to the Petition Date, (d) the Debtors and the Reorganized Debtors, and their respective Estates as of the Petition Date and thereafter, (e) the Equity Sponsor, (f) officers and directors of the Debtors and the Reorganized Debtors as of the Petition Date, acting solely in such capacity, and (g) the Related Persons of each of the Persons referred to in clauses (a) through (f).

1.1.102   **"Reorganized Debtors"** means Reorganized White Energy, Inc. and the Reorganized Subsidiaries from and after the Effective Date.

1.1.103   **"Reorganized Plainview BioEnergy, LLC"** means Plainview BioEnergy, LLC from and after the Effective Date.

1.1.104   **"Reorganized Subsidiaries"** means White Energy Holding Company, LLC, US Energy Partners, LLC, WE Hereford, LLC, and Plainview BioEnergy, LLC from and after the Effective Date.

1.1.105   **"Reorganized WE Holding Company LLC"** means White Energy Holding Company, LLC from and after the Effective Date.

1.1.106   **"Reorganized WE Hereford, LLC"** means WE Hereford, LLC from and after the Effective Date.

1.1.107   **"Reorganized US Energy Partners, LLC"** means US Energy Partners, LLC from and after the Effective Date.

1.1.108   **"Reorganized White Energy, Inc."** means White Energy, Inc. from and after the Effective Date.

1.1.109   **"Schedules"** means the schedules of assets and liabilities, the list of holders of Equity Interests and the statements of financial affairs filed by each of the Debtors with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

11

have been or may be amended or supplemented by the Debtors from time to time in accordance with Bankruptcy Rule 1009.

      1.1.110    **"Schedule of Assumed Executory Contracts"** means the schedule of rejected Executory Contracts included in the Plan Supplement.

      1.1.111    **"Section 503(b)(9) Claims"** means any Claim, to the extent Allowed, against any of the Debtors that is entitled to administrative expense status pursuant to section 503(b)(9) of the Bankruptcy Code.

      1.1.112    **"Secured Claim"** means any Claim against a Debtor secured by a Lien on Collateral, which is not void or voidable under the Bankruptcy Code or any other applicable law, to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

      1.1.113    **"Subsidiaries"** means White Energy Holding Company, LLC, US Energy Partners, LLC, WE Hereford, LLC, and Plainview BioEnergy, LLC.

      1.1.114    **"Subsidiary Equity Interest"** means the equity interests in each Subsidiary.

      1.1.115    **"Swap Agreements"** means that certain ISDA Master Agreement, dated as of March 30, 2007 (together with the Schedule and Confirmation related thereto) between White Energy Holding Company, LLC and WestLB, and that certain ISDA Master Agreement dated April 23, 2007 (together with the Schedule and Confirmation related thereto) between White Energy Holding Company, LLC and Rabobank International Utrecht Branch.

      1.1.116    **"U.S. Trustee"** means the Office of the United States Trustee for Region 3.

      1.1.117    **"WestLB"** means WestLB AG, New York Branch.

    **1.2**      **Interpretation; Application of Definitions; Rules of Construction.**

      Whenever from the context it appears appropriate, each term stated in either the singular or plural shall include both the singular and the plural and pronouns stated in the masculine, feminine or neutral gender shall include the masculine, feminine and neutral. Unless otherwise specified, all article, section, schedule or exhibit references in the Plan are to the respective article in, section in, schedule to, or exhibit to this Plan, as the same may be amended, waived, supplemented or modified from time to time. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular article, section, subsection or clause contained herein. Except as otherwise expressly provided herein, a term used herein that is not defined herein and that is defined in the Bankruptcy Code shall have the meaning assigned to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Plan; provided, however, that "or" is disjunctive. The words "includes" and

"including" are without limitation. Use of the terms "Debtor" or Debtors" shall be interchangeable with the terms "Reorganized Debtor" and "Reorganized Debtors" with the term "Reorganized" used for convenience to refer to a Debtor or Debtors on or after the Effective Date.

### 1.3    Exhibits, Schedules, Appendices and Plan Documents.

All exhibits, schedules and appendices to the Plan as well as the Plan Documents are incorporated into the Plan by this reference and are a part of the Plan as if set forth in full herein. All Plan Documents shall be filed with the Clerk of the Bankruptcy Court no later than five (5) Business Days prior to the Plan Objection Deadline. The Equity Sponsor explicitly reserves the right to modify or make additions to or subtractions from this Plan or any exhibit, schedule or appendix to this Plan or any Plan Document until the Plan Objection Deadline. Holders of Claims and Equity Interests may obtain a copy of the Plan Documents, once filed, by a written request sent to the following addresses:

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Michael R. Nestor, Esq.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

## ARTICLE II.

## PROVISIONS FOR TREATMENT OF
## ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS UNDER THE PLAN

### 2.1    Introduction.

The Plan is premised upon the substantive consolidation of the Debtors as set forth in more detail in section 6.1 below, for the purposes of voting, determining which Claims and Equity Interests will be entitled to vote to accept or reject the Plan, determining and calculating quarterly fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930, confirmation of the Plan and the resultant discharge of and cancellation of Claims and Equity Interests and distribution of Assets, interests and other property under the terms herein. Substantive consolidation under the Plan will not result in the merger of, or the transfer or commingling of, any Assets of any of the Debtors, and all Assets will continue to be owned by their respective Debtors. Based on the substantive consolidation of the Debtors under this Plan, Intercompany Claims shall not be classified and no Plan Distribution shall be made in respect of Intercompany Claims.

A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in another Class or Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Class(es). A Claim is also placed in a particular Class for the purpose of receiving Plan Distributions only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

**2.2** **Administrative Claims and Priority Tax Claims.** In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not designated as Classes of Claims for purposes of this Plan.

**2.3** **Time for Filing of Administrative Claims.**

All requests for payment of Administrative Claims (other than (i) Administrative Claims incurred by a Debtor in the ordinary course of business after the Petition Date, (ii) Administrative Claims that have been Allowed by order of the Bankruptcy Court on or before the Effective Date, (iii) Section 503(b)(9) Claims and other Administrative Claims for which a Proof of Claim was filed on or before the Bar Date, and (iv) fees or charges assessed against the Debtors under section 1930 of title 28 of the United States Code) must be filed with the Bankruptcy Court and served on the Debtors, the Equity Sponsor, the Committee, the Prepetition Agent and the U.S. Trustee not later than (x) thirty (30) days after service of the Notice of Confirmation, in the case of requests for payment of Administrative Claims other than Fee Claims and (y) forty-five (45) days after the Effective Date, in the case of Final Fee Applications seeking payment of Fee Claims; provided, however, that (A) any Section 503(b)(9) Claim or other Administrative Claim that was required pursuant to the terms of the Bar Date Order to be filed on or before the Bar Date and was not filed on or before the Bar Date is barred based on the Bar Date Order and shall remain forever barred and discharged; and (B) any Administrative Claim or Fee Claim that is not filed on or before the deadline set forth in this section 2.3 shall result in the Administrative Claim or Fee Claim being forever barred and discharged. Any request for payment of an Administrative Claim must include at a minimum the name of the Debtor(s) which are alleged to be liable for the Administrative Claim, the name of the holder of the alleged Administrative Claim, the amount of the alleged Administrative Claim, and the basis of the alleged Administrative Claim, and must be mailed by the applicable deadline set forth in this section 2.3:

(i) If by First Class U.S. mail, to:

The Garden City Group, Inc.
Attn: White Energy, Inc.
P.O. Box 9379
Dublin, Ohio 43017-4279

(ii) If by messenger or overnight courier, to:

The Garden City Group, Inc.
Attn: White Energy, Inc.
5151 Blazer Parkway, Suite A
Dublin, Ohio 43017

The Claims Agent will not accept any request for payment of an Administrative Claim sent by facsimile or email.

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

14

**2.4    Allowance of Administrative Claims/Fee Claims.**

Unless the Debtors or the Equity Sponsor object, in whole or in part, to a timely filed request for payment of an Administrative Claim within sixty (60) days after the Effective Date, such request for payment of an Administrative Claim shall be deemed Allowed in the amount requested. If the Debtors or the Equity Sponsor object to a request for payment of an Administrative Claim in whole or in part, the requested Administrative Claim shall become an Allowed Administrative Claim only to the extent allowed by a Final Order. A Fee Claim in respect of which a Final Fee Application has been properly and timely filed and served shall become an Allowed Administrative Claim only to the extent allowed by Final Order.

**2.5    Treatment of Allowed Administrative Claims.**

Except to the extent that a holder of an Allowed Administrative Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Administrative Claim shall receive, in full and final satisfaction of its Allowed Administrative Claim, a Plan Distribution of Cash in the amount of such holder's Allowed Administrative Claim, without interest, on the Distribution Date or such later date or dates as may be agreed to by the Debtors (with the prior written consent of the Equity Sponsor) and such holder; provided, however, that an Allowed Administrative Claim representing a liability incurred after the Petition Date in the ordinary course of business by the Debtors may be paid in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

**2.6    Treatment of Priority Tax Claims.**

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, at the option of the Equity Sponsor, in full and final satisfaction of such holder's Allowed Priority Tax Claim (a) payments in Cash, in regular installments over a period ending on the fifth (5th) anniversary of the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claim; (b) a lesser amount in one Cash payment as may be agreed upon in writing by such holder and the Debtors, with the prior written consent of the Equity Sponsor; or (c) such other treatment as may be agreed upon in writing by the Debtors (with the prior written consent of the Equity Sponsor) and such holder. The Confirmation Order shall enjoin any holder of an Allowed Priority Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer or director of the Debtors that otherwise would be liable to such holder for payment of an Allowed Priority Tax Claim so long as the Debtors are in compliance with this section 2.6. So long as the holder of an Allowed Priority Tax Claim is enjoined from commencing or continuing any action or proceeding against any responsible person, officer or director under this section 2.6 or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or proceeding shall be tolled.

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

15

# ARTICLE III.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

**3.1**     **Classification of Claims and Equity Interests.**

    3.1.1     Class 1 – Priority Claims

Class 1 shall consist of all Priority Claims against the Debtors. Class 1 is unimpaired.

    3.1.2     Class 2 – Prepetition Lender Claims

Class 2 shall consist of all Prepetition Lender Claims against the Debtors. Class 2 is impaired.

    3.1.3     Class 3 – Other Secured Claims

Class 3 shall consist of all Other Secured Claims against the Debtors. Class 3 is unimpaired.

    3.1.4     Class 4 – Secured Tax Claims

Class 4 shall consist of all Secured Tax Claims against the Debtors. Class 4 is unimpaired.

    3.1.5     Class 5 – General Unsecured Claims

Class 5 shall consist of all General Unsecured Claims against the Debtors. Class 5 is impaired.

    3.1.6     Class 6 – Fagen Claims

Class 6 shall consist of the Fagen Claims. Class 6 is impaired.

    3.1.7     Class 7 – Subsidiary Equity Interests

Class 7 shall consist of all Subsidiary Equity Interests. Class 7 is unimpaired.

    3.1.8     Class 8 –Preferred White Energy Equity Interests

Class 8 shall consist of all Preferred White Energy Equity Interests. Class 8 is impaired.

    3.1.9     Class 9 – Common White Energy Equity Interests

Class 9 shall consist of all Common White Energy Equity Interests. Class 9 is impaired.

# ARTICLE IV.

## PROVISIONS FOR TREATMENT OF CLAIMS
## AND EQUITY INTERESTS UNDER THE PLAN

**4.1     Satisfaction of Claims and Equity Interests.**

The treatment of and consideration to be received by holders of Allowed Claims or Equity Interests pursuant to this Article 4 and the other provisions of this Plan shall be in full satisfaction, settlement, release and discharge of each holder's respective Claims or Equity Interests. To the extent that any Allowed Claim is comprised of indebtedness and accrued but unpaid interest thereon, any property distributed in satisfaction of Allowed Claims shall be allocated first to the principal portion and thereafter to accrued but unpaid interest.

**4.2     Class 1 – Priority Claims.**

Allowed Priority Claims are unimpaired under the Plan. Except to the extent that a holder of an Allowed Priority Claim agrees to a different treatment of such Allowed Priority Claim, each holder shall receive a Plan Distribution of Cash in an amount equal to such Allowed Priority Claim, without interest, on the Distribution Date or such later date or dates as may be agreed to by the Equity Sponsor and such holder.

**4.3     Class 2 – Prepetition Lender Secured Claims.**

4.3.1     *Class 2 Distribution Pool.* The holders of Allowed Prepetition Lender Claims shall receive, on account of such Allowed Claims, Plan Distributions as follows:

(i)     *New Term Loans.* On the Effective Date, or as soon thereafter as is practicable, each holder of an Allowed Prepetition Lender Claim shall receive New Term Loans in a principal amount equal to its Pro Rata share of $260 million. The New Term Loans will be governed by the New Term Loan Facility.

(ii)    *Class 2 Cash Distribution.* On the Effective Date, or as soon thereafter as is practicable, each holder of an Allowed Prepetition Lender Claim shall receive its Pro Rata share of the Class 2 Cash Distribution.

**4.4     Class 3 – Other Secured Claims.**

4.4.1     *Distribution.* Each holder of an Allowed Other Secured Claim shall receive, on account of its Allowed Other Secured Claim, at the option of the Equity Sponsor, a Plan Distribution (i) equal to the net proceeds of the sale or disposition of the Collateral securing such holder's Allowed Other Secured Claim; (ii) of the Collateral securing such holder's Allowed Other Secured Claim; or (iii) of such other Plan Distribution necessary to satisfy the requirements of the Bankruptcy Code, which Plan Distribution will be made on the Distribution Date.

4.4.2     *Liens.* Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final payment of such Allowed Other Secured Claim is made as provided in the Plan, and upon such

full and final payment, such Liens shall be deemed to have been satisfied and shall be null, void and unenforceable for all purposes.

**4.5    Class 4 – Secured Tax Claims.**

Except to the extent that a holder of an Allowed Secured Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Secured Tax Claim shall receive, at the option of the Equity Sponsor (a) a Plan Distribution of Cash in an amount equal to such Allowed Secured Tax Claim, without interest, on the Distribution Date, or (b) payments in Cash, in regular installments over a period ending on the fifth (5th) anniversary of the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Allowed Secured Tax Claim.  Each holder of an Allowed Secured Tax Claim shall retain the Lien securing its Allowed Secured Tax Claim as of the Effective Date until full and final payment of such Allowed Secured Tax Claim is made as provided in this section 4.5 of the Plan, and upon such full and final payment, such Lien shall be deemed to have satisfied and shall be null and void and unenforceable for all purposes.

**4.6    Class 5 – General Unsecured Claims.**

4.6.1    Each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the General Unsecured Claim Cash Distribution Amount.

4.6.2    *Initial Distribution.*  Subject to section 4.6.1, each holder of an Allowed General Unsecured Claim shall receive on the Initial Distribution Date an Initial Distribution.

4.6.3    *Interim Distributions.*  Subject to section 4.6.1, each holder of an Allowed General Unsecured Claim may receive Interim Distributions on a date after the Initial Distribution Date and before the Final Distribution Date, in the discretion of the Distribution Agent.

4.6.4    *Final Distribution.*  Subject to section 4.6.1, each holder of an Allowed General Unsecured Claim shall receive on the Final Distribution Date a Final Distribution.

4.6.5    On the Effective Date, the Reorganized Debtors shall segregate in a separate bank account Cash equal to the General Unsecured Claim Cash Distribution Amount.

**4.7    Class 6 – Fagen Claim.**

On the Effective Date, or as soon thereafter as is practicable, the holder of the Fagen Claim shall receive, in full and complete satisfaction and release of the Fagen Claim, (i) the Fagen Cash Distribution, (ii) the Fagen Note and (iii) the Fagen Equity Distribution.  In addition, the Reorganized Debtors shall dismiss the Fagen Litigation on, or as soon as practicable after, the Effective Date.

**4.8    Class 7 –Subsidiary Equity Interests.**

Each holder of a Subsidiary Equity Interest will retain its Subsidiary Equity Interest and will not receive any Plan Distribution.

**4.9    Class 8 – Preferred White Energy Equity Interests.**

On the Effective Date, all Preferred White Energy Equity Interests shall be deemed cancelled and extinguished and the holders of Preferred White Energy Equity Interests will not receive any Plan Distribution, or be entitled to retain any property or interest in property on account of such Preferred White Energy Equity Interests. Holders of Preferred White Energy Equity Interests shall not be required to surrender their certificates or their instruments evidencing ownership of such Preferred White Energy Equity Interests

**4.10    Class 9 – Common White Energy Equity Interests.**

On the Effective Date, all Common White Energy Equity Interests shall be deemed cancelled and extinguished and the holders of Common White Energy Equity Interests will not receive any Plan Distribution, or be entitled to retain any property or interest in property on account of such Common White Energy Equity Interests. Holders of Common White Energy Equity Interests shall not be required to surrender their certificates or their instruments evidencing ownership of such Common White Energy Equity Interests

**4.11    Limitation on Recovery for Claims Against More Than One Debtor.**

A holder of Claims asserted against more than one Debtor but arising under the same facts, shall receive not more than one Plan Distribution hereunder on account of such holder's Allowed Claim and shall be enjoined from seeking any further Plan Distribution.

<div align="center">

**ARTICLE V.**

**ACCEPTANCE OR REJECTION OF THE PLAN;
EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS**

</div>

**5.1    Classes Entitled to Vote.**

Holders of Allowed Prepetition Lender Claims (Class 2), General Unsecured Claims (Class 5) and Allowed Fagen Claims (Class 6) are entitled to vote on the Plan. Class 1, Class 3, Class 4 and Class 7 are deemed to have accepted the Plan. Classes 8 and 9 are deemed to have rejected the Plan.

**5.2    Class Acceptance Requirement.**

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan.

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6  JMG--White Energy Plan of Reorg (Committee Draft)

19

**5.3**     **Cramdown.**

In the event that any impaired Class of Claims or Equity Interests rejects the Plan or is deemed to have rejected the Plan, the Equity Sponsor hereby seeks to confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class.

## ARTICLE VI.

## MEANS FOR IMPLEMENTATION OF THE PLAN

**6.1**     **Substantive Consolidation of Debtors for Plan Purposes Only**

6.1.1     Entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Chapter 11 Cases for certain purposes related to the Plan, including for purposes of voting, confirmation, Plan Distributions and determining and calculating post-confirmation quarterly fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930. On and after the Effective Date: (i) no Plan Distributions shall be made under the Plan on account of Intercompany Claims; (ii) all guarantees by any of the Debtors of the obligations of any other Debtor arising prior to the Effective Date shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the deemed consolidated Debtors; and (iii) each and every Claim filed or to be filed in the Chapter 11 Cases shall be deemed filed against the consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors.

· 6.1.2     The substantive consolidation referred to in section 6.1.1 shall not (other than for purposes related to funding Plan Distributions and as set forth above in section 6.1.1) affect: (i) the legal and organizational structure of the Reorganized Debtors; or (ii) pre- and post-Petition Date Liens, guarantees and security interests that are required to be maintained (x) in connection with Executory Contracts that were entered into during the Chapter 11 Cases or that have been or will be assumed pursuant to section 365 of the Bankruptcy Code, (y) pursuant to the Plan, or (z) in connection with the New Term Loan Facility or the Fagen Note. As of the Effective Date, each of the Reorganized Debtors shall be deemed to be properly capitalized, legally separate and distinct entities.

**6.2**     **Operations Between the Confirmation Date and the Effective Date.**

During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to operate their businesses as debtors-in-possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules and all orders of the Bankruptcy Court that are then in full force and effect.

**6.3**     **Transactions on the Effective Date.**

6.3.1     Payment of the Equity Infusion, Issuance of New Common Stock, and Entry Into the New Term Loan Facility and the Fagen Note.

On the Effective Date:

(i)     the Equity Sponsor shall make the Equity Infusion to Reorganized White Energy, Inc.; and

(ii)     Reorganized White Energy, Inc. shall issue to (i) the Equity Sponsor, or its designee the New Common Stock representing at the time of issuance 98.5% of the equity interests in the Reorganized White Energy, Inc. (subject to dilution by the New Common Stock to be reserved for issuance pursuant to the Management Incentive Plan) and (ii) to the holder of an Allowed Fagen Claim, New Common Stock representing at the time of issuance 1.5% of the equity interests in Reorganized White Energy, Inc. (subject to dilution by the New Common Stock to be reserved for issuance pursuant to the Management Incentive Plan). The issuance of the New Common Stock shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.

6.3.2     New Term Loan Facility.

(i)     Reorganized WE Holding Company, LLC and the Reorganized Debtors shall enter into the New Term Loan Facility and issue to the holders of Allowed Prepetition Lender Claims the New Term Loan Notes evidencing the New Term Loans. The issuance of the New Term Loans and the delivery of the New Term Loan Notes shall be in accordance with the terms of the New Term Loan Documents.

6.3.3     Fagen Note.

(i)     Reorganized WE Holding Company, LLC and the Reorganized Debtors shall enter into the Fagen Note and issue to the holder of an Allowed Fagen Claim the Fagen Note. The issuance of the Fagen Note and the delivery of the Fagen Note shall be in accordance with the terms of the documents establishing the Fagen Note.

6.3.4     Continuation of Liens of Prepetition Lenders and Fagen.

(i)     All security interests, Liens and other encumbrances granted to secure the Original Debt shall survive and shall continue to secure the Reorganized Debtors' secured obligations under the New Term Loan Facility.

(ii)     All security interests, Liens and other encumbrances granted to Fagen to secure the Fagen Claims shall survive and continue to secure the Reorganized Debtors' secured obligations under the Fagen Note.

**6.4     Corporate Action: Certificates of Incorporation, By-laws, Formation Documents and Limited Liability Company Agreements.**

6.4.1     *Certificate of Incorporation, By-Laws, Formation Documents and Limited Liability Agreements: Amendment.* On or before the Effective Date, the certificate or articles of incorporation, by-laws, formation documents and limited liability company agreements as applicable to each respective Debtor will be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting

equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code. The amended certificates of incorporation, amended by-laws, amended formation documents and amended limited liability company agreements will also include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code provisions (a) creating the New Common Stock, (b) to the extent necessary or appropriate, stating any restrictions on the transfer of the New Common Stock, (c) to the extent necessary or appropriate, effectuating the provisions of the Plan and (d) such other provisions as may be agreed by the Debtors and the Equity Sponsor. The Amended White Energy Certificate of Incorporation and the Amended White Energy By-Laws shall be filed with the Bankruptcy Court at least five (5) Business Days prior to the Plan Objection Deadline.

6.4.2 *Certificate of Incorporation, By-Laws, Formation Documents and Limited Liability Agreements: Filing.* On or before the Effective Date, Reorganized White Energy, Inc. shall file the Amended White Energy Certificate of Incorporation with the Secretary of State of its jurisdiction of organization or formation. Each of the Subsidiaries that is a limited liability company shall file an amendment to its formation documents with the Secretary of State of its jurisdiction of organization or formation on the Effective Date. The Amended White Energy By-Laws shall be deemed adopted by the board of directors of the Reorganized White Energy, Inc. as of the Effective Date.

6.4.3 On the Effective Date, (i) the cancellation of all Preferred White Energy Equity Interests and Common White Energy Equity Interests, (ii) the authorization and issuance of the New Common Stock, the New Term Loan Facility, the New Term Loan Notes and the Fagen Note, (iii) the adoption of the Management Incentive Plan and (iv) all other matters provided in the Plan involving the corporate and capital structure of the Debtors or the Reorganized Debtors or corporate action by any of the Debtors or the Reorganized Debtors shall be deemed to have occurred, be authorized, and shall be in effect from and after the Effective Date without requiring further action under applicable law, regulation, order or rule, including any action by the stockholders or directors of any of the Debtors or any of the Reorganized Debtors pursuant to section 303 of the General Corporation Law of the State of Delaware and other applicable corporation law of jurisdictions in which the Reorganized Debtors are incorporated or existing. Entry of the Confirmation Order will constitute approval of the Plan Documents and all such transactions subject to the occurrence of the Effective Date.

**6.5    Effectuating Documents; Further Transactions.**

The acting chief executive officer, chief restructuring officer, chief financial officer or any other appropriate officer of White Energy, Inc. or any applicable Debtor, as the case may be, shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions herein. The secretary or assistant secretary of White Energy, Inc. or any applicable Debtor, as the case may be, shall be authorized to certify or attest to any of the actions specified in the preceding sentence.

**6.6     Continued Corporate Existence of the Debtors.**

Following confirmation and consummation of the Plan, the Reorganized Debtors will continue to exist as separate corporate entities or limited liability companies, as applicable to each respective Debtor, in accordance with the laws of their respective states of incorporation or formation and pursuant to their respective certificates, articles of incorporation, by-laws, formation documents and limited liability company agreements in effect prior to the Effective Date, except to the extent such certificates, articles of incorporation, bylaws, formation documents and limited liability company agreements are amended pursuant to the Plan or upon or after the Effective Date.

**6.7     Revesting of Assets.**

Pursuant to section 1141(b) of the Bankruptcy Code, all property of the Estate of each Debtor, together with any property of the Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Plan, shall revest in such Reorganized Debtor on the Effective Date without the payment or incursion of transfer tax liability pursuant to section 1146(a) of the Bankruptcy Code. Thereafter, subject to the terms of this Plan (including those of Article IV of this Plan), the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court. As of the Effective Date, all property of each Reorganized Debtor shall be free and clear of all Liens, Claims and Equity Interests, except as specifically provided in the Plan, the Confirmation Order, the New Term Loan Facility, or the Fagen Note.

**6.8     Management.**

Upon the occurrence of the Effective Date, the management, control, and operation of each of the Reorganized Debtors shall be the general responsibility of each such entity's then, as applicable, current board, managing member, manager, member(s) and management as set forth in such Reorganized Debtor's governing documents and according to applicable law. Entry of the Confirmation Order shall ratify and approve all actions taken by each of the Debtors from the Petition Date through and until the Effective Date.

**6.9     Initial Boards of Directors, Managers and Members.**

6.9.1     The initial Board of Directors of Reorganized White Energy, Inc. shall be comprised of 3 to 5 members, as determined in the sole and absolute discretion of the Equity Sponsor prior to the Confirmation Hearing. The Debtors shall file with the Bankruptcy Court the identities of the initial members on a date not less than five (5) Business Days prior to the Plan Objection Deadline. After the Effective Date, the holders of the New Common Stock will elect members of the Board of Directors of Reorganized White Energy, Inc. in accordance with the Amended White Energy Certificate of Incorporation, Amended White Energy By-laws, the Stockholders' Agreement, if any, and applicable nonbankruptcy law.

6.9.2     The sole member of Reorganized WE Holding Company, LLC shall be Reorganized White Energy, Inc. The sole member of each of Reorganized US Energy Partners, LLC, Reorganized WE Hereford, LLC, and Reorganized Plainview BioEnergy, LLC, shall be

Reorganized WE Holding Company, LLC, in accordance with the provisions of their respective organizational documents and applicable law.

### 6.10    Officers.

The Equity Sponsor will provide in the Plan Supplement the identity of each Person that shall serve as an initial officer of Reorganized White Energy, Inc. and the Reorganized Subsidiaries on and after the Effective Date. Such officers shall serve in accordance with the by-laws of Reorganized White Energy, Inc. or the Reorganized Subsidiary, as applicable, any employment agreement with such Reorganized Debtor and applicable nonbankruptcy law. The Equity Sponsor will provide in the Plan Supplement the identity of each Insider that will be employed or retained by a Reorganized Debtor and the nature of any compensation for such Insider in the Plan Supplement. On or after the Effective Date, the officers of the Reorganized Subsidiaries shall be determined by the respective boards of directors, managers or members, as applicable, of the Reorganized Debtors.

### 6.11    Management Incentive Plan

6.11.1    On the Effective Date, Reorganized White Energy, Inc. shall adopt the Management Incentive Plan. All shares of New Common Stock issued under the Management Incentive Plan (including those issued upon the valid exercise of options issued therunder) shall be duly authorized, validly issued, fully paid for, non assessable shares of New Common Stock, free of preemptive rights.

6.11.2    On the Effective Date, unissued shares of New Common Stock equal to 5% on a fully diluted basis shall be reserved for issuance to the Reorganized Debtors' management team under the Management Incentive Plan. Awards of shares of New Common Stock or options therefor will be subject to the Reorganized Debtors meeting certain financial performance criteria to be established by the board of directors of Reorganized White Energy, Inc. or the Compensation Committee of the board of directors of Reorganized White Energy, Inc. The Compensation Committee of the board of directors of Reorganized White Energy, Inc. will make the individual awards and establish the terms and conditions of each award.

### 6.12    Causes of Action/Reservation of Rights.

6.12.1    *Causes of Action Generally Reserved.*    The Reorganized Debtors shall, in accordance with section 1123(b) of the Bankruptcy Code, reserve, retain and may enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) all rights, claims, Causes of Action, rights of setoff, suits, proceedings or other legal or equitable defenses accruing to the Debtors or the Estates pursuant to the Bankruptcy Code or pursuant to any statute or legal theory, including any Avoidance Actions, except (i) as otherwise provided in the Plan or the Confirmation Order, (ii) with respect to the Released Parties and (iii) preference claims under section 547 of the Bankruptcy Code.

6.12.2    *Causes of Action - No Waiver.*    Except as otherwise expressly set forth herein (including in sections 6.13.1 and 6.14.1), nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any right or Causes of Action that the Debtors or the Reorganized Debtors may have or which the Debtors or the

Disbursing Agent may choose to assert on behalf of the Debtors' respective Estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including (i) any and all Claims against any Person, to the extent such Person asserts a Claim, cross-claim, counterclaim and/or Claim for setoff which seeks affirmative relief against any of the Debtors, the Reorganized Debtors, their officers, directors or representatives and (ii) the turnover of any property of any of the Debtors' or the Reorganized Debtors' Estates.

6.12.3    The Disbursing Agent shall be deemed the appointed representative to the Reorganized Debtors, and may pursue, litigate, compromise, settle, transfer or assign any such rights, claims, causes of action, suits or proceedings as appropriate, in accordance with the best interests of the Reorganized Debtors or their respective successors who hold such rights.

6.12.4    No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Disbursing Agent will not pursue any and all available Causes of Action against them. The Debtors, the Disbursing Agent and the Estates expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise provided in the Plan.

6.12.5    All Claims and Causes of Action under section 547 of the Bankruptcy Code are hereby waived and released.

**6.13    Releases and Injunction Related to Releases.**

6.13.1    *Releases by Debtors.* Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Debtors and Reorganized Debtors and their respective Estates and each of their respective Related Persons, and the Committee or any other representative of the Estates will be deemed to completely and forever release, waive, void, extinguish and discharge all Released Actions (other than (x) the rights to enforce the Plan and any right or obligation under the Plan, and (y) the securities, contracts, instruments, releases, indentures and other agreements or documents delivered hereunder or contemplated hereby, including the Plan Documents) that may be asserted against the Released Parties or any of their respective Related Persons by or on behalf of the Debtors or Reorganized Debtors or their respective Estates.

6.13.2    *Releases by Holders of Claims and Equity Interests.* Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, the Committee and each Person receiving a Plan Distribution, and each of their respective Related Persons will be deemed to completely and forever release, waive, void, extinguish and discharge all Released Actions (other than the rights to enforce the Plan, and any right or obligation under the Plan, the securities, contracts, instruments, releases, indentures and other agreements or documents delivered hereunder or contemplated hereby, including the Plan Documents) that may be asserted against the Released Parties or any of their Related Persons.

6.13.3    *Injunction Related to Releases.*  Each Person that is a holder of a Claim and/or an Equity Interest and any other party in interest and each of their respective Related Persons is permanently, forever and completely stayed, restrained, prohibited and enjoined from, directly or indirectly, derivatively or otherwise, commencing or continuing any Released Action against any Released Party.  Nothing herein shall prejudice any right, remedy, defense, claim, cross-claim or counterclaim or third-party claim that any Person may have against any Person other than with respect to the Released Actions against the Released Parties.

6.13.4    *No Personal Liability.*  No officer or director of any of the Debtors or the Reorganized Debtors who was an officer or director as of or after the Petition Date shall have any personal liability for any Claims, obligations, suits, judgments, damages, debts, rights, Causes of Action or liabilities, or any Equity Interests or rights of an equity security holder, whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, now existing or hereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other circumstance that occurred, arose, took place, existed or exists on or prior to the Effective Date in connection with or related to the Debtors or their respective Estates, or their business operations.

6.13.5    *Deemed Consent.*  By voting to accept the Plan or accepting any Plan Distribution, each holder of a Claim will be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the exculpations, releases and injunctions set forth in the Plan.

6.13.6    *No Release of Willful Misconduct or Gross Negligence.*  Nothing in this section 6.14 shall be construed to release any party from willful misconduct or gross negligence as determined by Final Order.

### 6.14    Appointment of the Disbursing Agent.

Upon the occurrence of the Effective Date, Reorganized White Energy, Inc. shall be appointed to serve as the Disbursing Agent, and shall have all powers, rights, duties and protections afforded the Disbursing Agent under the Plan.

### 6.15    Sources of Cash for Plan Distributions.

All Cash necessary for the Disbursing Agent to make payments and Plan Distributions shall be obtained from proceeds of the Debtors' existing Cash balances and/or proceeds of the Equity Infusion.

### 6.16    Investment of Funds Held by the Disbursing Agent; Tax Reporting by the Disbursing Agent.

The Disbursing Agent may, but shall not be required to, invest any funds held by the Disbursing Agent pending the distribution of such funds pursuant to the Plan in investments that are exempt from federal, state, and local taxes.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Disbursing Agent of a private letter ruling if the Disbursing Agent so requests one, or the receipt of an

adverse determination by the IRS upon audit if not contested by the Disbursing Agent), the Disbursing Agent may (a) treat the funds and other property held by it as held in a single trust for federal income tax purposes in accordance with the trust provisions of the Internal Revenue Code (sections 641 et seq.), and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

## ARTICLE VII.

## DISTRIBUTION PROVISIONS

### 7.1    Distribution Record Date.

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors or their agents shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Equity Interests. The Debtors shall have no obligation to recognize any transfer of any Claims or Equity Interests occurring on or after the Distribution Record Date. The Debtors or Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date.

### 7.2    Plan Distributions.

7.2.1    Reorganized White Energy, Inc. as Disbursing Agent shall make all Plan Distributions on behalf of itself and each Debtor. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

7.2.2    In the event a Plan Distribution shall be payable on a day other than a Business Day, such Plan Distribution shall instead be paid on the immediately succeeding Business Day, but shall be deemed to have been made on the date otherwise due.

7.2.3    The Disbursing Agent shall make all Plan Distributions on account of Allowed Prepetition Lender Claims to the Prepetition Agent, which Plan Distributions the Prepetition Agent shall distribute to the holders of Allowed Prepetition Lender Claims pursuant to the Plan.

7.2.4    Interim Distributions may be made from time to time at the discretion of the Disbursing Agent.

### 7.3    Timing of Plan Distributions.

Each Plan Distribution shall be made on the relevant Distribution Date therefor and shall be deemed to have been timely made if made on such date or within ten (10) days thereafter.

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

27

### 7.4 Address for Delivery of Plan Distributions/Unclaimed Distributions.

Notwithstanding Bankruptcy Rule 9010, any Plan Distribution or delivery to a holder of an Allowed Claim shall be made at the last known address of such holder as set forth (a) in the Schedules filed with the Bankruptcy Court unless the Debtors have been notified in writing of a change of address, including by the filing of a Proof of Claim by such holder that contains an address for such holder different from the address reflected in such Schedules for such holder, (b) on the Proof of Claim filed by such holder, (c) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e), or (d) in any notice served by such holder giving details of a change of address. If any Plan Distribution is returned to the Disbursing Agent as undeliverable, no Plan Distributions shall be made to such holder unless the Disbursing Agent is notified of such holder's then current address within ninety (90) days after such Plan Distribution was returned. After such date, if such notice was not provided, a holder shall have forfeited its right to such Plan Distribution, and the undeliverable Plan Distributions shall be returned to Reorganized White Energy, Inc. for distribution.

### 7.5 De Minimis Distributions.

Notwithstanding anything to the contrary in the Plan, any holder of an Allowed Claim that would have received a Plan Distribution of less than twenty-five dollars ($25.00) with respect to such Allowed Claim shall not receive any Plan Distribution.

### 7.6 Time Bar to Cash Payments.

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued. Any claim in respect of such a voided check shall be made within ninety (90) days after the date of issuance of such check. If no request is made as provided in the preceding sentence, any claims in respect of such voided check shall be discharged and forever barred and such unclaimed Plan Distribution shall revert to the Disbursing Agent for distribution to holders of Allowed General Unsecured Claims on a Pro Rata basis.

### 7.7 Manner of Payment under the Plan.

7.7.1 All Plan Distributions of Cash, New Common Stock, New Term Loan Notes and the Fagen Note, as applicable, to the creditors of each of the Debtors under the Plan (or to the Equity Sponsor and Fagen in the case of the New Common Stock) shall be made by the Disbursing Agent or its designee on behalf of the applicable Debtor.

7.7.2 Unless the Person receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may, in addition to the foregoing, be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**7.8    Expenses Incurred On or After the Effective Date and Claims of the Disbursing Agent.**

Except as otherwise ordered by the Bankruptcy Court or as provided in the Plan, the amount of any reasonable fees and expenses incurred (or to be incurred) by the Disbursing Agent on or after the Effective Date (including taxes) shall be paid when due. Professional fees and expenses incurred by the Disbursing Agent from and after the Effective Date in connection with the effectuation of the Plan shall be paid in the ordinary course of business. Any dispute regarding compensation shall be resolved by agreement of the parties or, if the parties are unable to agree, as determined by the Bankruptcy Court.

**7.9    Fractional Plan Distributions.**

7.9.1    *No Fractional Cash Distributions.*  Except as provided in section 7.9.2 herein, no payments of fractions of dollars shall be made under the Plan. Fractions of dollars shall be rounded to the nearest whole dollar (up and down) with any half dollar rounded down.

7.9.2    *No Fractional New Common Stock Distributions.*  No fractional shares of New Common Stock shall be issued or distributed under the Plan. If any Plan Distribution would result in the issuance of shares of New Common Stock that is not a whole number, the actual Plan Distribution of shares of New Common Stock shall be rounded to the next higher or lower number, with fractions of one-half or less being rounded down. The total number of shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the rounding provided for herein.

7.9.3    *New Term Loan Notes and the Fagen Note.*  The New Term Loan Notes and the Fagen Note shall be issued in dollars and cents.

**7.10    Setoffs.**

The Debtors or Reorganized Debtors may, but shall not be required to, apply setoff or recoupment against any Claim (for purposes of determining the Allowed amount of such Claim on which a Plan Distribution shall be made), any claims, rights, or Cause of Action of any nature whatsoever that the Debtors or Reorganized Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such claim, right or Cause of Action the Debtors or Reorganized Debtors may have against the holder of such Claim.

**7.11    Compliance with Tax Requirements.**

To the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Plan Distributions shall be subject to such withholding and reporting requirements.

**7.12    Hart-Scott-Rodino Compliance.**

Any shares of New Common Stock to be distributed under the Plan to any Person required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

29

Improvements Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such Person shall have expired or been terminated.

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING AND TREATING CONTESTED CLAIMS

### 8.1    Prosecution of Contested Claims.

Unless otherwise ordered by the Bankruptcy Court, only the Disbursing Agent shall be entitled to object to, settle, compromise, withdraw or litigate objections to Claims. Any objections to Claims shall be served and filed on or before the Claims Objection Deadline (subject to being extended by the order of the Bankruptcy Court upon motion of the Disbursing Agent without notice or a hearing).

### 8.2    Claims Objection Deadline.

As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date (subject to being extended by order of the Bankruptcy Court upon motion of the Disbursing Agent without notice or a hearing to all creditors), objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made. If an objection has not been filed to a Proof of Claim or a Claim listed on the Schedules by the Claims Objection Deadline, the Claim to which the Proof of Claim or Claim listed on the Schedules relates will be treated as an Allowed Claim, if such Claim has not been previously Allowed.

### 8.3    Claims Settlement.

From and after the Effective Date, the Disbursing Agent shall have authority to settle or compromise all Claims and Causes of Action without further review or approval of the Bankruptcy Court, other than any settlement or compromise of a Claim or Cause of Action that involves an Insider.

### 8.4    No Plan Distributions Pending Allowance.

Notwithstanding any other provision of the Plan, no payments or Plan Distributions shall be made with respect to all or any portion of a Claim that is Contested in whole or in part, unless and until all objections to such Claim have been settled or withdrawn or have been determined by Final Order, and the Claim or some portion thereof, has become an Allowed Claim.

**8.5     Distributions After Allowance.**  Subject to the setoff rights as provided in section 7.10, and subject to section 8.4, after such time as a Contested Claim becomes, in whole or in part, an Allowed Claim, the Disbursing Agent shall distribute to the holder thereof the Plan Distributions if any to which such holder is entitled under the Plan.  No interest shall be paid on any Contested Claim that later becomes an Allowed Claim.

**8.6     Contested Claims Reserve.**

8.6.1     The Disbursing Agent shall establish appropriate reserves for Contested Claims by withholding the lesser of (a) 100% of the Plan Distribution to which holders of Contested Claims would be entitled under the Plan if such Contested Claims were Allowed Claims, or (b) such other amount as may be approved by the Bankruptcy Court.

8.6.2     On, or as soon as practicable after the Initial Distribution Date, Reorganized White Energy, Inc. shall transmit to the Disbursing Agent the Cash that would otherwise be distributable to a holder of a General Unsecured Claim if such Claim were not a Contested Claim.

**8.7     No Recourse Against the Debtors or Reorganized Debtors.**

Any holder of a Contested Claim that ultimately becomes an Allowed Claim shall be entitled to receive its applicable Plan Distribution solely from the Contested Claim Reserve established on account of such Contested Claim.  In no event shall any holder of a Contested Claim have any recourse with respect to Plan Distributions made, or to be made, under the Plan to holders of such Claims, to any Debtor or Reorganized Debtor or their Related Persons on account of such Contested Claim, regardless of whether such Contested Claim shall ultimately become an Allowed Claim, and regardless of whether sufficient Cash remains available for distribution in the Contested Claim Reserve established on account of such Contested Claim at the time such Claim becomes entitled to receive a Plan Distribution.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE OCCURRENCE OF THE EFFECTIVE DATE

**9.1     Conditions Precedent to Entry of the Confirmation Order.**

The Plan will not be confirmed and the Confirmation Order will not be entered until and unless each of the following conditions has occurred or been waived in accordance with the terms of the Plan:

9.1.1     The clerk of the Bankruptcy Court shall have entered an order or orders:

(i)     approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(ii)     determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan;

(iii)    confirming and giving effect to the terms and provisions of the Plan;

(iv)    determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Debtors and the Plan;

(v)    approving the Plan Documents, including the New Term Loan Documents; and

(vi)    authorizing the Debtors to execute, enter into, and deliver the Plan Documents and to execute, implement, and to take all actions otherwise necessary or appropriate to give effect to, the transactions contemplated by the Plan and the Plan Documents.

9.1.2    The Confirmation Order shall be entered no later than March 8, 2010, time being strictly of the essence.

**9.2    Conditions Precedent to the Occurrence of the Effective Date.**

The Effective Date of the Plan shall not occur unless and until each of the following conditions has occurred or has been waived in accordance with the terms of the Plan:

(i)    the Confirmation Order shall have been entered and shall have become a Final Order;

(ii)    the Debtors shall in the aggregate have no less than $25 million in unreserved, unrestricted Cash available for working capital after giving effect to all payments required by the Plan, notwithstanding any reasonable and customary restrictions provided in the New Term Loan Documents;

(iii)    all necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan, including satisfaction or waiver of all conditions to the obligations of the Debtors under the Plan and the Plan Documents;

(iv)    all actions, documents and agreements necessary to implement the Plan and the transactions contemplated by the Plan shall have been effected or executed;

(v)    the New Term Loan Facility shall have been entered into by all of the parties thereto, and the New Term Loan Notes shall have been issued thereunder;

(vi)    The Fagen Note shall have been entered into by the parties thereto and shall have been issued to the holder of the Fagen Claims;

(vii)    the New Common Stock shall have been duly authorized, issued and transferred to the Equity Sponsor or its designee and Fagen, in accordance with the terms of this Plan;

(viii)    Since [January 14], 2010, there shall not have occurred an event, matter, change, occurrence or circumstance that, individually or in the aggregate with any such other events, changes, occurrences or circumstances, has had or is reasonably likely to result in a Material Adverse Effect; and

(ix)     the Effective Date shall have occurred no later than April 8, 2010, time being strictly of the essence.

**9.3     Waiver of Conditions.**

The Equity Sponsor may waive, in whole or in part, any of the conditions to confirmation of the Plan or the effectiveness of the Plan. Any such waiver of a condition may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

**9.4     Effect of Non-Occurrence of the Effective Date.**

In the event that the conditions specified in section 9.2 of this Plan have not been satisfied or waived in accordance with section 9.3 of this Plan, and upon notification submitted by the Equity Sponsor to the Bankruptcy Court, (a) the Confirmation Order shall be vacated; (b) no Plan Distributions shall be made; (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (d) all of the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims or claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any proceedings further involving the Debtors.

## ARTICLE X.

## THE DISBURSING AGENT

**10.1     Rights and Powers of Disbursing Agent.**

Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall be empowered and directed to: (a) take all steps and execute all instruments and documents necessary to make Plan Distributions to holders of Allowed Claims; (b) comply with the Plan and the obligations thereunder; (c) employ, retain, or replace professionals to represent it with respect to its responsibilities; (d) object to Claims as specified in Article VIII, and prosecute such objections; (e) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment, or Allowance of any Claim as provided in Article VIII; (f) make annual and other periodic reports regarding the status of Plan Distributions to the holders of Allowed Claims that are outstanding at such time; such reports to be made available upon request to the holder of any Contested Claim; and (g) exercise such other powers as may be vested in the Disbursing Agent pursuant to the Plan, the Plan Documents or order of the Bankruptcy Court.

**10.2     Exculpation of the Disbursing Agent.**

Except as otherwise provided in this section 10.2, pursuant to section 1125(e) of the Bankruptcy Code, the Disbursing Agent, together with each of its officers, directors, employees, agents, and representatives, are exculpated pursuant to the Plan by all Persons, holders of Claims and Equity Interests, and all other parties in interest, from any and all Causes of Action arising out of the discharge of the powers and duties conferred upon the Disbursing

Agent by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the Disbursing Agent's willful misconduct or gross negligence. No holder of a Claim or an Equity Interest, or representative thereof, shall have or pursue any Cause of Action (a) against the Disbursing Agent or its respective officers, directors, employees, agents, and representatives for making Plan Distributions in accordance with the Plan, or (b) against any holder of a Claim for receiving or retaining Plan Distributions as provided for by the Plan.

## ARTICLE XI.

## TREATMENT OF EXECUTORY CONTRACTS

**11.1     Assumption and Rejection of Executory Contracts.**

11.1.1     *General.* Any Executory Contract (i) which is not listed on the Schedule of Assumed Executory Contracts that will be included in the Plan Supplement; (ii) which has not expired by its own terms on or prior to the Confirmation Date; (iii) which has not been assumed or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date; and (iv) which is not the subject of a motion to reject pending as of the Confirmation Date, shall be deemed to be rejected by the applicable Reorganized Debtor effective on the Confirmation Date, and the Plan shall constitute a motion to reject such Executory Contract; provided, however, that the Equity Sponsor reserves the right, on or prior to the Confirmation Date, to amend the Schedule of Assumed Executory Contracts, to delete any Executory Contract therefrom or add any Executory Contract thereto, in which event such Executory Contract(s) shall be deemed to be, respectively, rejected or assumed by the Reorganized Debtors. The Equity Sponsor shall provide notice of any amendments to the Schedule of Assumed Executory Contracts to the parties to the Executory Contracts affected thereby. The listing of a document on the Schedule of Assumed Executory Contracts shall not constitute an admission by the Debtors or the Equity Sponsor that such document is an Executory Contract or that the Debtors have any liability thereunder.

11.1.2     *Real Property Related Contracts, Leases and Interests.* Each Executory Contract that is assumed that relates to the use or occupancy of real property shall include (i) modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract, without regard to whether such agreement, instrument or other document is listed on the Schedule of Assumed Executory Contracts and (ii) all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vault, tunnel or bridge agreements or franchises, and any other interests in real estate or rights in rem relating to such premises to the extent any of the foregoing are Executory Contracts.

11.1.3     This Plan shall constitute a motion to reject all Executory Contracts not set forth on the Schedule of Assumed Executory Contracts and the Debtors shall have no liability thereunder except that any Claim related to a rejected Executory Contract shall be treated as a General Unsecured Claim. Subject to the occurrence of the Effective Date, entry of the

Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code, and a finding by the Bankruptcy Court that each rejection is in the best interests of the Debtors and their Estates.

11.1.4    The Plan shall constitute a motion to assume all Executory Contracts set forth on the Schedule of Assumed Executory Contracts. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumptions pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors and their estates.

11.1.5    Any non-Debtor counterparty to any Executory Contract designated as being assumed pursuant to section 11.1.4 that disputes the assumption of such Executory Contract must file with the Bankruptcy Court, and serve upon the Debtors and the Equity Sponsor, a written objection to assumption, which objection shall set forth the basis for the dispute by no later than ten (10) days prior to the Confirmation Hearing. The failure to timely object shall be deemed a waiver of any and all objections to the assumption of Executory Contracts designated as being assumed in section 11.1.4.

**11.2    <u>Cure.</u>**

With respect to each Assumed Executory Contract, any monetary amounts required as Cure Payments shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash as soon as practicable after and in no event later than 30 days after the latest of: (a) the Effective Date; (b) the date following notice to Reorganized White Energy, Inc. of the amount due; or (c) upon such other terms as the parties to such Assumed Executory Contract may agree, or, in each case, as soon thereafter as is practicable. In the event of a dispute regarding (i) the amount of any Cure Payment, (ii) the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Assumed Executory Contract or (iii) any other matter pertaining to assumption of the Executory Contract, the Cure Payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such dispute.

Any non-Debtor counterparty to an Executory Contract assumed pursuant to section 11.1 that disputes the scheduled cure obligation must file with the Bankruptcy Court, and serve upon the Debtors and the Equity Sponsor a written objection to the cure obligation, which objection shall set forth the basis for the dispute and the alleged correct cure obligation, no later than ten (10) Business Days prior to the Confirmation Hearing. The Confirmation Order may contain additional provisions for notice of proposed assumptions and proposed Cure Payment amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. If a non-Debtor counterparty fails to file and serve an objection which complies with the foregoing, the cure obligation set forth on the Schedule of Assumed Executory Contracts shall be binding on the non-Debtor counterparty, and the non-Debtor counterparty shall be deemed to have waived any and all objections to the assumption of the relevant agreement as proposed by the Equity Sponsor. If no Cure Payment amount is proposed by the Equity Sponsor, it shall be presumed that the Equity Sponsor is

asserting that no Cure Payment amount is required to be paid under section 365(b)(1) of the Bankruptcy Code. In the event of a conflict between the notice and objection procedures set forth in this section 11.2 and the Confirmation Order, the terms of the Confirmation Order shall control notwithstanding anything else in the Plan to the contrary.

**11.3    Claims Arising from Rejected Contracts.**

Claims arising from the rejection of Executory Contracts must be filed with the Bankruptcy Court and served on the Debtors, the Equity Sponsor and their respective counsels within thirty (30) days after service of (a) the Notice of Confirmation or (b) other notice that the Executory Contract has been rejected. Any Claims for which a Proof of Claim is not filed and served within such time will be forever barred from assertion and shall not be enforceable against the Debtors, their respective Estates, Affiliates, Assets, properties or interests in property or against the Reorganized Debtors or their respective Estates, Assets, property or interests in property. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are properly filed and served shall be treated as General Unsecured Claims (Class 5) under the Plan and shall be subject to objection by the Disbursing Agent.

## ARTICLE XII.

## RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction over all matters arising in, arising under, or related to the Chapter 11 Cases, or that relate to any of the following:

(i)    To hear and determine all matters with respect to the assumption or rejection of Executory Contracts, resolution of disputes pertaining to Cure Payment amounts and the allowance of Claims resulting therefrom.

(ii)    To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof.

(iii)    To hear and determine all applications under sections 327, 328, 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred to professionals prior to the Effective Date, provided, however, that from and after the Effective Date, the payment of fees and expenses of the retained professionals of the Reorganized Debtors shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

(iv)    To hear and determine any dispute or reconcile any inconsistency arising in connection with the Plan, any of the Plan Documents or the Confirmation Order or the interpretation, implementation or enforcement of the Plan, any of the Plan Documents, the Confirmation Order, any transaction or payment contemplated hereby or any agreement, instrument or other document governing or relating to any of the

foregoing; provided, that with respect to disputes or inconsistencies relating to documents evidencing the New Term Loan Facility, or any post-Effective Date issue of corporate governance, the Bankruptcy Court shall have jurisdiction but not exclusive jurisdiction.

(v)     To hear and determine any matter concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

(vi)     To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code.

(vii)     To hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtors or the Reorganized Debtors pursuant to the Bankruptcy Code.

(viii)     To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court.

(ix)     To take any action, and issue such orders as may be necessary or appropriate, to construe, enforce, implement, execute and consummate the Plan or to maintain the integrity of the Plan following consummation.

(x)     To ensure that all Plan Distributions are accomplished as provided herein.

(xi)     To allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, Administrative Claim or Equity Interest.

(xii)     To enter, implement or enforce such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated.

(xiii)     To recover all Assets of the Debtors and property of the Debtors' Estates, wherever located.

(xiv)     To enter a final decree closing the Chapter 11 Cases.

(xv)     To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or Cause of Action by, on behalf of, or against the Estates.

(xvi)     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with any setoff and/or recoupment rights of the Debtors or any Person under the Plan.

(xvii)     To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases.

(xviii)     To hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge.

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

37

(xix)   To determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, any of the Plan Documents or any other contract, instrument, release or other agreement or document related to the Plan or the Disclosure Statement; provided, that with respect to any matter relating to documents evidencing the New Term Loan Facility, the Bankruptcy Court shall have jurisdiction but not exclusive jurisdiction.

## ARTICLE XIII.

## MISCELLANEOUS PROVISIONS

### 13.1   Term of Injunctions or Stays.

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 13.2   Payment of Statutory Fees.

On the Effective Date, and thereafter as may be required, the Reorganized Debtors shall pay all fees required to be paid pursuant to section 1930 of title 28 of the United States Code and all fees required to be paid to the office of the U.S. Trustee until the Chapter 11 Cases are closed.

### 13.3   Claims and Equity Interests Satisfied.

Except as otherwise provided in the Plan or Confirmation Order, the rights afforded in the Plan and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any accrued postpetition interest, that arose at any time before the Effective Date against the Debtors, or any of their Estates, Assets, properties, or interests in property, to the fullest extent permitted by section 1141(d) of the Bankruptcy Code. Except as otherwise provided herein or in the Confirmation Order, on the Effective Date, all Claims against and Equity Interests in the Debtors shall be satisfied, discharged, released, terminated and extinguished in full. Neither the Debtors nor the Reorganized Debtors shall be responsible for any pre-Effective Date obligations of the Debtors, except those expressly assumed by any such Debtor, as applicable. Except as otherwise provided herein, all Persons shall be precluded and forever barred from asserting against the Debtors, their respective successors or assigns, or their Estates, Assets, properties, or interests in property any Claim or Causes of Action arising from or related to any event, occurrence, condition, thing, or circumstance, or any other Claims or Causes of Action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

38

### 13.4   Exculpation.

Pursuant to section 1125(e) of the Bankruptcy Code, the Released Parties and each of their respective Related Persons shall not be liable for any Cause of Action arising in connection with or out of the administration of the Chapter 11 Cases, pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for gross negligence or willful misconduct as determined by Final Order of the Bankruptcy Court. The Confirmation Order shall enjoin all holders of Claims and Equity Interests from asserting or prosecuting any Claim or cause of action against the Debtors, the Committee, any Released Party and each of their respective Related Persons as to which such Person has been exculpated from liability pursuant to the preceding sentence.

### 13.5   Discharge of Liabilities.

All debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code; or (c) the holder of a Claim based upon such debt has accepted the Plan shall be automatically discharged forever. Except as otherwise provided in the plan, the Reorganized Debtors shall not have, and shall not be construed to have or maintain any liability, Claim, or obligation, that is based in whole or in part on any act, omission, transaction, event, other occurrence or thing occurring or in existence on or prior to the Effective Date of the Plan (including any liability or Claims arising under applicable non-bankruptcy law as a successor to the Debtors) and no such liabilities, claims, or obligations for any acts shall attach to the Reorganized Debtors.

### 13.6   Discharge of Debtors.

Except as otherwise provided in the Plan, upon the occurrence of the Effective Date, the Debtors shall be discharged from all Claims and Causes of Action that occurred or came into existence prior to the Effective Date to the fullest extent permitted by section 1141 of the Bankruptcy Code, and all holders of Claims and Equity Interests shall be precluded from asserting against the Debtors and the Reorganized Debtors, the Disbursing Agent, the Estates, the Assets, or any property dealt with under the Plan, any further or other Cause of Action based upon any act or omission, transaction, event, thing, or other activity of any kind or nature.

The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors, their Estates, and all successors thereto. As provided in section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtors, their Estates, or any successor thereto at any time obtained to the extent it relates to a Claim discharged, and operates as an injunction against the prosecution of any action against the Debtors, Reorganized Debtors or property of the Debtors or their Estates to the extent it relates to a discharged Claim.

### 13.7   Injunction Against Interference With Plan.

Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employers,

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

39

agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

**13.8**     **Notices.**

Any notices, requests, and demands to or upon the Debtors, to be effective, shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed and sent by email to the following:

> White Energy, Inc.
> Attention:
> 5005 LBJ Freeway, Suite 1400
> Dallas, Texas 75244
> Telephone: (972) 715-____
> Telecopier: (972) 715-____
> Email:_____

> with a copy to:

> Attorneys for the Debtors

> Duane Morris LLP
> Michael R. Lastowski
> Christopher M. Winter
> 1100 North Market Street, Suite 1200
> Wilmington, Delaware 19801
> Telephone: (302) 657-4900
> Telecopier: (302) 657-5001
> mrlastowski@duanemorris.com
> cmwinter@duabemorris.com

> and

> Columbus Nova Ethanol Holdings, LLC
> Attention: Andrew Intrater
> 153 East 53rd Street
> New York, NY 10022

> with a copy to:

> Latham & Watkins LLP
> Mark A. Broude
> James C. Gorton
> 885 Third Avenue
> New York, NY 10022

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

40

and

Young Conaway Stargatt & Taylor, LLP
Michael R. Nestor, Esq.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

### 13.9 Headings.

The headings and other captions used in the Plan are for reference purposes only, and shall not affect the meaning or interpretation of the Plan in any way.

### 13.10 Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a document in the Plan Supplement provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

### 13.11 Expedited Determination.

The Disbursing Agent is hereby authorized to file a request for expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed with respect to the Debtors.

### 13.12 Exemption from Transfer Taxes.

Pursuant to section 1146(a) of the Bankruptcy Code, any issuance, transfer or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any instrument of transfer from a Debtor to a Reorganized Debtor or any other Person or entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Without limiting the foregoing, any issuance, transfer or exchange of a security or any making or delivery of an instrument of transfer pursuant to the Plan shall be exempt from the imposition and payment of any and all transfer taxes (including any and all stamp taxes or similar taxes and any interest, penalties and addition to the tax that may be required to be paid in connection with the consummation of the Plan and the Plan Documents) pursuant to sections 1146(a), 505(a), 106 and 1141 of the Bankruptcy Code.

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

41

**13.13  Notice of Entry of Confirmation Order and Relevant Dates.**

Promptly upon entry of the Confirmation Order, the Debtors shall publish as directed by the Bankruptcy Court and serve on all known parties in interest and holders of Claims and Equity Interests, notice of the entry of the Confirmation Order and all relevant deadlines and dates under the Plan.

**13.14  Interest.**

Interest and will not accrue after the Petition Date on any Claims, unless otherwise expressly required by the Plan, the Confirmation Order, the Bankruptcy Court or by applicable law.

**13.15  Modification of the Plan and Amendments.**

The Plan may be amended, modified or supplemented by the Equity Sponsor or Reorganized Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct.  In addition, after the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Equity Interests under the Plan, the Reorganized Debtors may institute proceedings in the Bankruptcy Court, with the prior written consent of the Equity Sponsor, to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

**13.16  Revocation, Withdrawal or Non-Consummation of Plan.**

13.16.1    The Equity Sponsor reserves the right to revoke and withdraw the Plan with respect to any one or more of the Debtors prior to the occurrence of the Effective Date and to all subsequent plans of reorganization.  If the Equity Sponsor revokes or withdraws the Plan with respect to any one or more of the Debtors, or if confirmation or consummation of the Plan does not occur as to any Debtor, then, as to such Debtor, (a) the Plan shall be null and void in all respects and (b) any settlements and compromises embodied in the Plan (including the fixing or limiting to an amount certain any claim or class of claims), assumption or rejection of Executory Contracts affected by the Plan, and any document or agreement executed pursuant the Plan and not otherwise approved by a separate Final Order shall be deemed null and void and nothing contained in the Plan and no acts taken in preparation for consummation of the Plan shall (i) constitute or be deemed to constitute a waiver or release of any Claims against or Equity Interests in such Debtor or any other Person, (ii) prejudice in any manner the rights of any of the Debtors or any other Person in any other further proceedings involving such Debtor or (iii) constitute or be deemed to constitute an admission of any sort by the Debtors or any other Person.  None of the filing of the Plan or the taking by the Equity Sponsor of any action with respect to the Plan or any statement or provision contained herein shall be deemed to be an admission by the Equity Sponsor against interest, or be or be deemed to be a waiver of any rights, claims or remedies that the Equity Sponsor may have, and until the Effective Date all such rights and remedies are and shall be specifically reserved.  In the event the Plan is not confirmed

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

42

and the Confirmation Order is not entered, the Plan and the Plan Documents, and any statement contained herein or therein, may not be used by any Person, party or entity against the Equity Sponsor.

### 13.17 Injunctions.

13.17.1    On the Effective Date and except as otherwise provided herein, all Persons who have been, are, or may be holders of Claims against or Equity Interests in the Debtors shall be permanently enjoined from taking any of the following actions against or affecting the Debtors, the Released Parties, the Estates, the Assets, the Disbursing Agent or any of their current or former respective members, directors, managers, officers, employees, agents, and professionals, successors and assigns or their respective assets and property with respect to such Claims or Equity Interests (other than actions brought to enforce any rights or obligations under the Plan):

(i)    commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including all suits, actions, and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);

(ii)    enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order;

(iii)    creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance; and

(iv)    asserting any setoff, right of subrogation or recoupment of any kind; provided, that any defenses, offsets or counterclaims which the Debtors may have or assert in respect of the above referenced Claims are fully preserved in accordance with Article XI.

### 13.18 Binding Effect.

The Plan shall be binding upon and inure to the benefit of the Debtors, the holders of all Claims and Equity Interests and their respective successors and assigns, including the Reorganized Debtors.

### 13.19 Severability of Plan Provisions.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Equity Sponsor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

43

shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 13.20 No Admissions.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CAUSES OF ACTION OR THREATENED CAUSES OF ACTION, THIS PLAN SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS PLAN SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, AND OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS OR THEIR AFFILIATES, AS DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CHAPTER 11 CASES.

### 13.21 Dissolution of the Committee.

On the Effective Date, the Committee will dissolve and its members will be released and discharged from all duties and obligations arising from or related to the Reorganized Cases.

### 13.22 Time.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 as in effect on the Petition Date shall apply. With regard to all dates and the periods of time set forth or referred to in the Plan, time is of the essence.

### 13.23 Successors and Assigns.

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person.

### 13.24 Conflict between Plan, Disclosure Statement and Plan Documents.

13.24.1    Except as provided in section 13.25.2 below, in the event of any conflict between the terms and provisions in the Plan and the terms and provisions in the Disclosure Statement, any Plan Document or any document in the Plan Supplement, the terms and provisions of the Plan shall control and govern.

13.24.2    In the event of any conflict between the terms and provisions in the Plan and the terms and provisions in the New Term Loan Facility, then the terms and provisions of the New Term Loan Facility shall control and govern.

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

44

13.24.3    In the event of any conflict between the terms and provisions in the Plan and the terms and provisions in the Fagen Note, then the terms and provisions of the Fagen Note shall control and govern.

## 13.25    <u>Substantial Consummation.</u>

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

Dated:  December 31, 2009

> **COLUMBUS NOVA ETHANOL HOLDINGS LLC**
>
>
> By:   /s/ Andrew Intrater
> Name:  Andrew Intrater
> Title:    Attorney-in-Fact

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

45

## Exhibit A

### Indicative Terms and Conditions of New Term Loan Facility

Borrower............................................. Reorganized WE Holding Company, LLC

Guarantors......................................... Reorganized White Energy, Inc., Reorganized
US Energy Partners, LLC, Reorganized
Plainview BioEnergy, LLC, and Reorganized
WE Hereford, LLC

Amount.............................................. $260,000,000

Interest Rate...................................... [____]²

Collateral........................................... Secured by all or substantially all of the
Reorganized Debtors' assets, consistent with
Credit Agreement (including with respect to
the priority thereof)

Maturity............................................ Five years from Effective Date

Amortization...................................... N/A

Cash Sweep........................................ Annual cash sweep, subject to $40,000,000
minimum cash balance, applied Pro Rata with
the cash sweep in respect of the Fagen Note

---

² The rate of interest in respect of the New Term Loan Facility will be inserted prior to solicitation of the Plan.

## Exhibit B

### Indicative Terms and Conditions of Fagen Note

| | |
|---|---|
| **Obligor**............................................ | Reorganized WE Holding Company, LLC |
| **Guarantors**...................................... | Reorganized White Energy, Inc., Reorganized US Energy Partners, LLC, Reorganized Plainview BioEnergy, LLC, and Reorganized WE Hereford, LLC |
| **Amount**........................................... | $8,500,000 |
| **Interest Rate**.................................. | [ ___ ][3] |
| **Collateral**....................................... | Secured by the same collateral (the "**Fagen Collateral**") securing the mechanic's lien held by Fagen, and with the same validity, priority, force and effect that such mechanic's lien had on the Fagen Collateral immediately prior to the chapter 11 filing |
| | Senior in right of payment |
| **Maturity**......................................... | Five years from the Effective Date |
| **Amortization**.................................. | N/A |
| **Cash Sweep**.................................... | Annual cash sweep, subject to $40,000,000 minimum cash balance, applied Pro Rata with the cash sweep in respect of the New Term Loan Facility |

---

[3] The rate of interest in respect of the Fagen Note will be inserted prior to solicitation of the Plan.

JMG--White Energy Plan of Reorg (CN Sponsor)(1600403_6_NY).DOC
NY\1600403.6 JMG--White Energy Plan of Reorg (Committee Draft)

47

# EXHIBIT B

TO BE SUPPLIED

# EXHIBIT C



TO BE SUPPLIED

# EXHIBIT D



TO BE SUPPLIED