## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WHITE ENERGY, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 09-11601 (CSS)<br><br>Jointly Administered |

## AMENDED DISCLOSURE STATEMENT RELATING TO THE CHAPTER 11 PLAN OF REORGANIZATION FOR WHITE ENERGY, INC. AND ITS AFFILIATED DEBTORS FILED BY THE DEBTORS AND WESTLB AG, NEW YORK BRANCH, AS <u>ADMINISTRATIVE AGENT</u>

Dated:   January 12, 2010
              Wilmington, Delaware

DUANE MORRIS LLP
Michael R. Lastowski (DE 3892)
Richard W. Riley (DE 4052)
Christopher M. Winter (DE 4163)
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone:       (302) 657-4900
Facsimile:        (302) 657-4901
E-mail: mlastowski@duanemorris.com
rwriley@duanemorris.com
cmwinter@duanemorris.com

and

ICE MILLER LLP
Henry A. Efroymson, Esq.

One American Square
Suite 2900
Indianapolis, Indiana 46282-0200
Tel:       (317) 236-2100
Fax:       (317) 236-2219

Counsel to the Debtors and Debtors in Possession

KAYE SCHOLER LLP
Madlyn Gleich Primoff
425 Park Avenue
New York, NY 10022
Telephone: (212) 836-8300
Facsimile: (212) 836-4901
E-mail: mprimoff@kayescholer.com


and

PEPPER HAMILTON
David B. Stratton (DE No. 960)
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, Delaware 19899-1709
Tel: (302) 777-6500
Fax: (302) 421-8390


Counsel to WestLB AG, New York Branch, as Lender and Administrative Agent

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: White Energy, Inc. (1083); White Energy Holding Company, LLC (3034); US Energy Partners, L.L.C. (1177); WE Hereford, LLC (9408); and Plainview BioEnergy, LLC (5553).  The corporate headquarters for each of the Debtors is 5005 LBJ Freeway, Suite 1400, Dallas, TX 75244.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "BANKRUPTCY COURT") UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN. THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.[2]

---

[2] Legend to be removed upon entry by the Clerk of the Bankruptcy Court of Order of the Bankruptcy Court approving this Disclosure Statement.

# TABLE OF CONTENTS

Page

ARTICLE I. INTRODUCTION ...................................................................................................1

ARTICLE II. NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS....................2

ARTICLE III. EXPLANATION OF CHAPTER 11 ......................................................................4

ARTICLE IV. OVERVIEW OF THE PLAN.................................................................................5
    Section 4.1        Summary of Key Components of the Terms of the Plan ...................... 5
    Section 4.2        Summary of Distributions Under the Plan ............................................ 6

ARTICLE V. THE DEBTORS' BUSINESS...................................................................................14
    Section 5.1        Overview of the Debtors' Business Operations and Facilities.............. 14
    Section 5.2        Secured Credit Facility ........................................................................ 15

ARTICLE VI. EVENTS LEADING TO CHAPTER 11 FILING.................................................15
    Section 6.1        Commodity Prices, Diminishing Margins and Other Factors .............. 15

ARTICLE VII. THE REORGANIZED COMPANIES .................................................................16
    Section 7.1        Certain Restructuring Transactions; Issuance of New Equity Interests
                           and New Debt Facilities ...................................................................... 16
    Section 7.2        Continued Corporate Existence of the Debtors .................................... 18
    Section 7.3        Revesting of Assets .............................................................................. 18
    Section 7.4        Management ......................................................................................... 18
    Section 7.5        Initial Boards of Directors, Managers and Members ........................... 18
    Section 7.6        Officers ................................................................................................ 19
    Section 7.7        Management Incentive Plan .................................................................. 19

ARTICLE VIII. SELECTED FINANCIAL INFORMATION .....................................................20
    Section 8.1        Consolidated and Year-to-Date Annual Financial Information for the
                           Debtors ................................................................................................ 20

ARTICLE IX. FINANCIAL PROJECTIONS AND ASSUMPTIONS ........................................23
    Section 9.1        Purpose and Objectives ........................................................................ 23
    Section 9.2        Projected Consolidated Financial Statements ....................................... 24

ARTICLE X. THE CHAPTER 11 CASES ...................................................................................25
    Section 10.1      Commencement of the Chapter 11 Cases.............................................. 25
    Section 10.2      Continuation of Business After the Petition Date ................................. 25
    Section 10.3      Use of Cash Collateral.......................................................................... 26
    Section 10.4      Post-Petition Reporting ........................................................................ 26
    Section 10.5      The General Claims Bar Date ............................................................... 26
    Section 10.6      Representation of the Debtors .............................................................. 27
    Section 10.7      Formation and Representation of the Committee................................... 27
    Section 10.8      Representation of the Prepetition Agent ............................................... 27

DM3\1250241.1

Section 10.9      Matters Relating to Unexpired Leases and Executory Contracts......... 27
Section 10.10     Exclusivity .................................................................................. 28
Section 10.11     Claims Administration ................................................................ 28

ARTICLE XI. THE CHAPTER 11 PLAN ......................................................................29
Section 11.1      Introduction ................................................................................ 29
Section 11.2      General Description of the Treatment of Claims and Equity Interests  29
Section 11.3      Acceptance or Rejection of the Plan; Effect of Rejection by One or
                  More Classes of Claims ......................................................... 32
Section 11.4      Substantive Consolidation ........................................................ 33
Section 11.5      Operations Between the Confirmation Date and the Effective Date.... 34
Section 11.6      Certain Transactions On or Before the Effective Date......................... 34
Section 11.7      Causes of Action/Reservation of Rights ............................... 34
Section 11.8      Causes of Action - No Waiver ............................................... 35
Section 11.9      Appointment of the Disbursing Agent ................................. 35
Section 11.10     Sources of Cash for Plan Distributions ................................ 36
Section 11.11     Distribution Provisions............................................................ 36
Section 11.12     Setoffs......................................................................................... 38
Section 11.13     Procedures for Resolving and Treating Contested Claims.................. 38
Section 11.14     Conditions Precedent to Confirmation of Plan..................... 39
Section 11.15     Conditions Precedent to the Occurrence of the Effective Date........... 40
Section 11.16     Waiver of Conditions .............................................................. 41
Section 11.17     Effect of Non-Occurrence of the Effective Date................... 41
Section 11.18     Releases by Holders of Claims and Equity Interests........................... 42
Section 11.19     Assumption and Rejection of Executory Contracts ............... 43
Section 11.20     Survival of Indemnification Obligations............................... 45
Section 11.21     Retention Of Jurisdiction........................................................ 46

ARTICLE XII. RISK FACTORS ...................................................................................46
Section 12.1      Certain Bankruptcy Considerations....................................... 46
Section 12.2      The Reorganized Debtors' Actual Financial Results May Vary
                  Significantly from the Projections Included in this Disclosure Statement
                  ............................................................................................ 46
Section 12.3      Competition, Market Considerations/Volatility and Other Variables.. 46
Section 12.4      Limited Liquidity of New Common Stock or New Term Loan Notes  47
Section 12.5      Limited Liquidity of Interests in New LLC ......................... 48

ARTICLE XIII. SECURITIES LAW MATTERS .......................................................48
Section 13.1      Issuance of New Securities..................................................... 48
Section 13.2      Subsequent Transfers of New Common Stock................................... 48
Section 13.3      Delivery of Disclosure Statement.......................................... 50
Section 13.4      SEC Reporting Requirements ................................................ 50
Section 13.5      Transfers of Interests in the New LLC ................................. 50

DM3\1250241.1

ARTICLE XIV. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES......................50

 ARTICLE XV. ALTERNATIVES TO CONFIRMATION AND  CONSUMMATION OF THE
PLAN ........................................................................................................................51
      Section 15.1      Liquidation Under Chapter 7 of the Bankruptcy Code ........................ 51
      Section 15.2      Alternative Plans of Reorganization..................................................... 51

ARTICLE XVI. CONCLUSION.................................................................................53

## EXHIBITS

Chapter 11 Joint Plan of Reorganization .........................................................................Exhibit A

Disclosure Statement Order, Solicitation Procedures Order and Notice
of the Confirmation Hearing...............................................................................................Exhibit B

Projections and Summary of Significant Assumptions Related Thereto...........................Exhibit C

Liquidation Analysis of the Debtors..................................................................................Exhibit D

DM3\1250241.1

# ARTICLE I.

## INTRODUCTION

**All capitalized terms used in this Disclosure Statement, as amended, and not otherwise defined herein shall have the meanings ascribed thereto in the Plan (see Article I of the Plan entitled "Definitions and Interpretations").**

THIS DISCLOSURE STATEMENT INCLUDES AND DESCRIBES THE AMENDED CHAPTER 11 PLAN OF REORGANIZATION, DATED JANUARY 12, 2010 (THE "PLAN"), A COPY OF WHICH IS ATTACHED AS **EXHIBIT A**, FILED BY WHITE ENERGY, INC., WHITE ENERGY HOLDING COMPANY, LLC, WE HEREFORD, LLC, U.S. ENERGY PARTNERS, LLC, AND PLAINVIEW BIOENERGY, LLC (COLLECTIVELY, THE "DEBTORS") AND WESTLB AG, NEW YORK BRANCH, AS ADMINISTRATIVE AGENT FOR THE SECURED LENDERS UNDER THE CREDIT AGREEMENT.

HOLDERS OF SECURED LENDER CLAIMS ARE IMPAIRED AND THUS ENTITLED TO VOTE THEIR CLAIMS IN CLASS 2 TO ACCEPT OR REJECT THE PLAN. HOLDERS OF OTHER SECURED CLAIMS ARE IMPAIRED AND THUS ENTITLED TO VOTE THEIR CLAIMS IN CLASS 3 TO ACCEPT OR REJECT THE PLAN. HOLDERS OF SECURED TAX CLAIMS ARE IMPAIRED AND THUS ENTITLED TO VOTE THEIR CLAIMS IN CLASS 4 TO ACCEPT OR REJECT THE PLAN. HOLDERS OF GENERAL UNSECURED CLAIMS ARE IMPAIRED AND THUS ENTITLED TO VOTE THEIR CLAIMS IN CLASS 5 TO ACCEPT OR REJECT THE PLAN.

THE SECURED LENDERS HAVE AUTHORIZED WESTLB AG, NEW YORK BRANCH, AS ADMINISTRATIVE AGENT UNDER THE CREDIT AGREEMENT, TO FILE THIS PLAN AND SOLICIT ACCEPTANCES THEREOF ON THEIR BEHALF; PROVIDED HOWEVER, THAT THE FILING OF THIS PLAN DOES NOT CONSTITUTE A VOTE IN FAVOR OF THIS PLAN BY THE SECURED LENDERS OR ANY OF THEM.

CLASS 1 PRIORITY CLAIMS ARE UNIMPAIRED UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE ACCEPTED THE PLAN. CLASS 6 SUBSIDIARY EQUITY INTERESTS, CLASS 7 PREFERRED WHITE ENERGY EQUITY INTERESTS AND CLASS 8 COMMON WHITE ENERGY EQUITY INTERESTS ARE NOT ENTITLED TO A DISTRIBUTION UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE REJECTED THE PLAN AND ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.

ACCORDINGLY, THE DEBTORS AND THE PREPETITION AGENT, ON BEHALF OF THE SECURED LENDERS, ARE SOLICITING ACCEPTANCES OF THE PLAN FROM THE HOLDERS OF SECURED LENDER CLAIMS IN CLASS 2, OTHER SECURED CLAIMS IN CLASS 3, SECURED TAX CLAIMS IN CLASS 4 AND GENERAL UNSECURED CLAIMS IN CLASS 5. THE DEBTORS AND THE PREPETITION AGENT, ON BEHALF OF THE SECURED LENDERS ARE NOT SOLICITING ACCEPTANCES FROM THE HOLDERS OF PRIORITY CLAIMS IN CLASS 1, SUBSIDIARY EQUITY

INTERESTS IN CLASS 6, PREFERRED WHITE ENERGY EQUITY INTERESTS IN CLASS 7 AND COMMON WHITE ENERGY EQUITY INTERESTS IN CLASS 8.

THE DEBTORS AND THE PREPETITION AGENT, ON BEHALF OF THE SECURED LENDERS, BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALL CLASSES OF CLAIMS. ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN. TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY **4:00 P.M., EASTERN STANDARD TIME, ON FEBRUARY 13, 2010** (THE "<u>VOTING DEADLINE</u>").

IF THE DEBTORS WITHDRAW AS A PLAN PROPONENT AT ANY TIME, THE PLAN SHALL AUTOMATICALLY BE DEEMED MODIFIED TO PROVIDE FOR THE PREPETITION AGENT TO BE THE SOLE PLAN PROPONENT. THE DEBTORS HEREBY ACKNOWLEDGE THAT SUCH MODIFICATION SHALL NOT BE A MATERIAL MODIFICATION AND THE PLAN CONFIRMATION PROCESS SHALL CONTINUE TO MOVE FORWARD ON THE SAME SCHEDULE, WITHOUT INTERRUPTION OR DELAY, UNLESS THE PREPETITION AGENT SHALL DETERMINE (AT ANY TIME UP TO THE OCCURRENCE OF THE EFFECTIVE DATE) TO REVOKE OR WITHDRAW THE PLAN. THE PREPETITION AGENT RESERVES THE RIGHT TO MODIFY THIS DISCLOSURE STATEMENT AT ANY TIME, OR FROM TIME TO TIME AFTER CONSULTATION WITH THE DEBTORS.

FOR YOUR ESTIMATED DISTRIBUTION, IF ANY, UNDER THE PLAN, PLEASE SEE THE CHART SET OUT IN "OVERVIEW OF THE PLAN – SUMMARY OF DISTRIBUTIONS UNDER THE PLAN."

## ARTICLE II.

## NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.**

**PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY**

**CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES.**

On [January 14], 2010, after notice and a hearing, the Bankruptcy Court issued an order (the "Disclosure Statement Order") approving the Disclosure Statement because it contains information of a kind, in sufficient detail, and adequate to enable a hypothetical, reasonable investor typical of the solicited class of Claims of the Debtors to make an informed judgment with respect to the acceptance or rejection of the Plan (a true and correct copy of the Plan is annexed hereto as **Exhibit A**). The Disclosure Statement Order and the order approving solicitation procedures are attached hereto as **Exhibit B** and should be referred to for details regarding the procedures for the solicitation of votes on the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. No Person has been authorized to use or promulgate any information concerning the Debtors, their businesses, or the Plan other than the information contained in this Disclosure Statement and if given or made, such information may not be relied

upon as having been authorized by the Debtors and the Prepetition Agent, on behalf of the Secured Lenders.  You should not rely on any information relating to the Debtors, their businesses, or the Plan other than the information contained in this Disclosure Statement and the exhibits hereto.

The Prepetition Agent is merely the Agent for the Secured Lenders under the Credit Agreement.  Accordingly, the Prepetition Agent has limited knowledge with regard to certain facts uniquely available to the Debtors.  The Prepetition Agent therefore relies on the Debtors with regard to the truth and accuracy of the statement of such facts and makes no representations regarding such statements except that the Prepetition Agent believes the statements contained herein to be true but has not conducted any due diligence of any kind or nature to confirm the truth or accuracy of statements regarding facts uniquely available to the Debtors.

After carefully reviewing this Disclosure Statement, including the attached exhibits, if you are entitled to vote to accept or reject the Plan, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot (the "<u>Ballot</u>") for acceptance or rejection of the Plan and return the same to the address set forth on the Ballot, in the enclosed, postage prepaid, return envelope so that it will be received by the Debtors' balloting agent (the "<u>Balloting Agent</u>") no later than the Voting Deadline.

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

You may be bound by the Plan if it is accepted by the requisite holders of Claims even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a Confirmation Hearing on **March 4, 2010 at 11:00 a.m.,** Eastern Time, before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before **February [____], 2010 at 4:00 p.m.** Eastern Standard Time, in the manner described in the related order.

**THE DEBTORS AND THE PREPETITION AGENT, ON BEHALF OF THE SECURED LENDERS, SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN.**

## ARTICLE III.

## EXPLANATION OF CHAPTER 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code, pursuant to which a debtor-in-possession may reorganize its business.  The formulation of a plan of reorganization is the principal purpose of a chapter 11 case.  The plan sets forth the means for satisfying the holders of claims against and interests in the debtor's estate.

Although referred to as a plan of reorganization, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple

liquidation of a debtor's assets. In either event, upon confirmation of the plan, it becomes binding on a debtor and all of its creditors and equity holders, and the obligations owed by a debtor to such parties are compromised and exchanged for the obligations specified in the plan.

After a plan of reorganization has been filed, the holders of impaired claims against and interests in a debtor may be permitted to vote to accept or reject the plan, although impaired Equity Interests in the Debtors are not permitted to vote here. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the proponent of a plan to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of Claims against and Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the solicitation of votes by the Debtors and the Prepetition Agent, on behalf of the Secured Lenders, on the Plan.**

The bankruptcy court may confirm a plan of reorganization even though fewer than all of the classes of impaired claims and equity interests accept such plan. For a plan of reorganization to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan. **The Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting class of Claims or Equity Interests and can therefore be confirmed, if necessary, over the objection of any (but not all) classes of Claims and any or all classes of Equity Interests.**

## ARTICLE IV.

## OVERVIEW OF THE PLAN

The Plan provides for the treatment of Claims against and Equity Interests in all of the Debtors in the jointly administered bankruptcy cases of <u>In re White Energy, Inc.</u>, Chapter 11 Case No. 09-11601 (CSS).

**Section 4.1     Summary of Key Components of the Terms of the Plan**.

The Plan implements and is built around the following key elements:

<u>(a)</u>     The Debtors will be reorganized from and after the Effective Date and shall be the Reorganized Debtors.

<u>(b)</u>     All of the Common and Preferred White Energy Equity Interests shall be cancelled as of the Effective Date. Each of the Reorganized Subsidiaries shall retain its Subsidiary Equity Interests.

<u>(c)</u>     Each holder of an Allowed Secured Lender Claim will receive on the Distribution Date in full satisfaction of its Allowed Secured Lender Claim, its Pro Rata Share of:

(i)     Class 2 New Common Stock, representing all of the New Common Stock in Reorganized White Energy, Inc. (except the New Common Stock to be reserved for issuance pursuant to the Management Incentive Program) which shall be delivered to the New LLC on their behalf; and

(ii)     New Term Loans in a principal amount equal to its Pro Rata share of $150 million.  The New Term Loans will be governed by the New Term Loan Facility and will (A) be issued by Reorganized WE Holding Company, LLC and the other Reorganized Debtors in an aggregate principal amount of $150 million, (B) be guaranteed by each of the other Reorganized Debtors, (C) be secured by a Lien on substantially all of the assets of the Reorganized Debtors (on the priority basis set forth in the New Term Loan Facility), (D) have a final maturity date of five (5) years after the Effective Date (but will require scheduled amortization payments and mandatory prepayments from the sale of certain Assets and certain excess cash flows and upon the occurrence of certain specified events) and (E) bear interest at fluctuating rates based on three-month LIBOR  (subject to a LIBOR floor of two (2%) percent) plus 4.0%.  Interest on the New Term Loan Facility will be payable monthly in arrears.  Any description of the New Term Loans herein or in the Plan is qualified in its entirety by reference to the New Term Loan Documents.

(d)     In addition, on the Effective Date, Reorganized White Energy, Inc., Reorganized WE Holding Company, LLC and the other Reorganized Debtors will enter into a senior secured revolving credit working capital loan and guaranty agreement, which establishes the Exit Credit Facility in the amount of $20 million.

(e)     Holders of Claims and Equity Interests will receive Plan Distributions and treatment as described herein and as set forth in the Plan.

The Plan is the product of negotiations between the Debtors, the Prepetition Agent on behalf of the Secured Lenders, and the Committee.  The Plan reflects the basic construct around which the parties have negotiated and otherwise represents, in the view of the Debtors and the Prepetition Agent, on behalf of the Secured Lenders, a reasonable and appropriate compromise that permits the value of the Debtors' business to be maximized.

## Section 4.2     Summary of Distributions Under the Plan.

The following is a summary of the distributions under the Plan.  It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as **Exhibit A**.

The claim amounts set forth below are based on information contained in the Debtors' Schedules and reflect what the Debtors believe to be reasonable estimates of the likely resolution of outstanding disputed Claims.  The amounts utilized may differ from the outstanding filed claims amounts.

The following chart summarizes the distribution to each class under the Plan:

| Types of Claims | Treatment of Unclassified Claims |
|---|---|
| **Administrative Claims** (includes costs of the chapter 11 proceedings for the Debtors and expenses of operation as specified in section 503(b) (including 503(b)(9)) and 507(a)(2) of the Bankruptcy Code including Fee Claims, Claims arising after the Petition Date, obligations with respect to assumed executory contracts and leases, and any outstanding statutory fees).<br><br>Estimated Claims: Approximately $4,854,342.50 (includes claims under 11 U.S.C. § 503(b)(9) of $3.9 million and professional fees of $1.0 million) | Except to the extent that a holder of an Allowed Administrative Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment with the consent of the Prepetition Agent, on behalf of the Secured Lenders, each holder of an Allowed Administrative Claim shall receive, in full and final satisfaction of its Allowed Administrative Claim, a Plan Distribution of Cash in the amount of such holder's Allowed Administrative Claim, without interest, on the Distribution Date or such later date or dates as may be agreed to by the Debtors and the Prepetition Agent, on behalf of the Secured Lenders; provided, however, that an Allowed Administrative Claim representing a liability incurred after the Petition Date in the ordinary course of business by the Debtors may be paid in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions; provided, further, that such treatment will not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Claim. **Estimated Recovery: 100% of Allowed Claim.** |
| **Priority Tax Claims** (includes all Claims entitled to priority under section 507(a)(8) of the Bankruptcy Code other than Secured Tax Claims).<br><br>Estimated Claims: Approximately $7,085.47 | Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, at the option of the Prepetition Agent (After Consultation with the Debtors), with the consent of the Requisite Secured Lenders, in full and final satisfaction of such holder's Allowed Priority Tax Claim (a) payments in Cash, in regular installments over a period ending on the fifth (5th) anniversary of the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claim; (b) a lesser amount in one |

Cash payment as may be agreed upon in writing by such holder and the Prepetition Agent (After Consultation with the Debtors), with the prior consent of the Requisite Secured Lenders; or (c) such other treatment as may be agreed upon in writing by such holder and the Prepetition Agent (After Consultation with the Debtors), with the prior consent of the Requisite Secured Lenders. **Estimated Recovery: 100% of Allowed Claim.**

<u>**CLASSIFIED CLAIMS AND INTERESTS**</u>

| <u>**Classes of Claims and Interests**</u> | <u>**Treatment of Classes of Claims and Interests**</u> |
| --- | --- |
| **Class 1 – Priority Claims** | Unimpaired. |
| Estimated Claims: $29,123.94 | Except to the extent that a holder of an Allowed Priority Claim agrees to a different treatment of such Allowed Priority Claim with the prior consent of the Requisite Secured Lenders and the Prepetition Agent, each holder shall receive a Plan Distribution of Cash in an amount equal to such Allowed Priority Claim, without interest, on the Distribution Date or such later date or dates as may be agreed to by the Prepetition Agent (After Consultation with the Debtors) and such holder. **Estimated Recovery: 100% of Allowed Claim.** |
| **Class 2 – Secured Lender Claims** | Impaired. |
| Estimated Claims: Approximately $307 million | Pursuant to the Plan, the Secured Lender Claims are Allowed Secured Lender Claims, not subject to offset, defense, counterclaim, reduction or credit of any kind whatsoever, in an amount equal to the sum of (i) the aggregate principal amount outstanding under the Credit Agreement as of the Petition Date, of $294,680,745, plus (ii) amounts drawn on certain Letters of Credit from the Petition Date through the Effective Date, plus (iii) $7,887,020.49 in Secured Lender Claims in respect of the Swap Agreements, plus (iv) accrued and unpaid interest on the principal amount outstanding under the Credit Agreement, the drawn Letters of Credit, and the Secured Lender Claims in respect of the Swap Agreements through the Confirmation Date, plus (v) accrued and unpaid letter of credit fees, administrative |

8

fees, and other fees and expenses (including reasonable fees and out-of-pocket expenses of attorneys and advisors incurred by the Prepetition Agent) incurred under the Credit Agreement through the Confirmation Date, plus (vi) other amounts, including those amounts required to be paid as adequate protection under the Final Cash Collateral Order, through and including the Effective Date.

Plan Distributions on the Allowed Secured Lender Claims shall be made on the Effective Date or as soon thereafter as practicable as follows:

Plan Distributions shall include Cash, without interest, in an amount equal to all reasonable fees and the reasonable out-of-pocket expenses (including reasonable fees and expenses of attorneys and advisors) incurred by, and administration fees payable to, the Prepetition Agent under the Credit Agreement, in each case to the extent not reimbursed on or prior to the Effective Date, without the necessity of filing a fee application or any other application of any kind or nature with the Bankruptcy Court.

Under the Plan, each holder of a Secured Lender Claim shall receive New Term Loans in a principal amount equal to its Pro Rata share of $150 million. The New Term Loans will be governed by the New Term Loan Facility and will (A) be issued by Reorganized WE Holding Company, LLC and the other Reorganized Debtors in an aggregate principal amount of $150 million, (B) be guaranteed by each of the other Reorganized Debtors, (C) be secured by a Lien on substantially all of the assets of the Reorganized Debtors (on the priority basis set forth in the New Term Loan Facility), (D) have a final maturity date of five (5) years after the Effective Date (but will require scheduled amortization payments and mandatory prepayments from the sale of certain Assets and certain excess cash flows and upon the occurrence of certain specified events) and (E) bear interest at fluctuating rates based on three-month LIBOR (subject to a LIBOR floor of two

(2%) percent) plus 4.0%. Interest on the New Term Loan Facility will be payable monthly in arrears.

Under the Plan, each holder of a Secured Lender Claim shall also receive the Class 2 New Common Stock, which shall be delivered to the New LLC , which shall be wholly owned by or for the benefit of the holders of Allowed Secured Lender Claims.

All security interests, Liens and other encumbrances granted to secure the Original Debt shall survive and shall continue to secure the Reorganized Debtors' obligations under the Exit Credit Facility and the New Term Loan Facility.

**Estimated Recovery: New Term Loans and Class 2 New Common Stock.**

**Class 3 – Other Secured Claims**

Estimated Claims: Approximately $[0]

Impaired.

Each holder of an Allowed Other Secured Claim shall receive, on account of its Allowed Other Secured Claim, at the option of the Prepetition Agent (After Consultation with the Debtors) with the consent of the Requisite Secured Lenders, a Plan Distribution (i) equal to the net proceeds of the sale or disposition of the Collateral securing such holder's Allowed Other Secured Claim; (ii) of the Collateral securing such holder's Allowed Other Secured Claim; (iii) of twenty (20) payments, each equal to one-twentieth (1/20) of the Allowed Other Secured Claim together with simple interest on the balance thereof calculated at a rate of six percent (6%), payable on the last day of each calendar quarter in arrears; provided, however, that the Reorganized Debtors shall have the right with the consent of the New Term Loan Facility Lenders and the Exit Facility Lenders, to prepay any amounts payable in respect of any Allowed Other Secured Claim in whole or part at any time and from time to time; or (iv) of such other Plan Distribution necessary to satisfy the requirements of the Bankruptcy Code, which Plan Distribution will be made on the Distribution

Date.  Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final payment of such Allowed Other Secured Claim is made as provided in the Plan, and upon such full and final payment, such Liens shall be deemed to have been satisfied and shall be null, void and unenforceable for all purposes.

Any portion of any Other Secured Claim that is not an Allowed Other Secured Claim shall be a General Unsecured Claim to the extent that it is an Allowed General Unsecured Claim.

**Estimated Recovery: 100% of Allowed Claim.**

**Class 4 –Secured Tax Claims**

Estimated Claims: Approximately $3,027,801.34

Impaired.

Except to the extent that a holder of an Allowed Secured Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Secured Tax Claim shall receive, at the option of the Prepetition Agent (After Consultation with the Debtors) with the consent of the Requisite Secured Lenders (a) a Plan Distribution of Cash in an amount equal to such Allowed Secured Tax Claim, without interest, on the Distribution Date, or (b) payments in Cash, in regular installments over a period ending on the fifth (5th) anniversary of the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Allowed Secured Tax Claim.  Each holder of an Allowed Secured Tax Claim shall retain the Lien securing its Allowed Secured Tax Claim as of the Effective Date until full and final payment of such Allowed Secured Tax Claim is made as provided in the Plan, and upon such full and final payment, such Lien shall be deemed to have satisfied and shall be null and void and unenforceable for all purposes.

**Estimated Recovery: 100% of Allowed Claim.**

**Class 5 – General Unsecured Claims**

Estimated Claims: Approximately $19,252,087.54 not including the Secured Lender Deficiency Claim in the approximate amount of $50 million

Impaired.

Each holder of an Allowed General Unsecured Claim that votes to accept the Plan or does not vote with respect to the Plan shall receive its Pro Rata share of the General Unsecured Claim Distribution Amount. Each holder of an Allowed General Unsecured Claim that votes against the Plan shall receive no Plan Distribution of any kind or nature on account of its Allowed General Unsecured Claim. Pursuant to the Plan, the Secured Lender Deficiency Claims of the Secured Lenders are Allowed General Unsecured Claims, not subject to offset, defense, counterclaim, reduction or credit of any kind whatsoever, in the approximate amount of $50 million. A holder of an Allowed Secured Lender Deficiency Claim shall be permitted to vote such Claim along with the other holders of Allowed General Unsecured Claims; provided, however, that no holder of an Allowed Secured Lender Deficiency Claim shall receive any Plan Distribution on account of such holder's Allowed Secured Lender Deficiency Claim.

  1.1.1  On the Effective Date, the Reorganized Debtors shall post $750,000 in Cash in a segregated account to support their obligation to pay the General Unsecured Claim Distribution Amount.

**Estimated Recovery: Between __% and __% of Allowed Claim.**

DM3\1250241.1

| **Class 6 – Subsidiary Equity Interests** | Unimpaired. |
| | |

Each holder of a Subsidiary Equity Interest will retain its Subsidiary Equity Interest and will not receive any Plan Distribution.

**Estimated Recovery: None.**

**Class 7 – Preferred White Energy Equity Interests**

Impaired.

On the Effective Date, all Preferred White Energy Equity Interests shall be deemed cancelled and extinguished and the holders of Preferred White Energy Equity Interests will not receive any Plan Distribution, or be entitled to retain any property or interest in property on account of such Preferred White Energy Equity Interests. Holders of Preferred White Energy Equity Interests shall not be required to surrender their certificates or their instruments evidencing ownership of such Preferred White Energy Equity Interests.

**Estimated Recovery: None**

**Class 8 – Common White Energy Equity Interests**

Impaired.

On the Effective Date, all Common White Energy Equity Interests shall be deemed cancelled and extinguished and the holders of Common White Energy Equity Interests will not receive any Plan Distribution, or be entitled to retain any property or interest in property on account of such Common White Energy Equity Interests. Holders of Common White Energy Equity Interests shall not be required to surrender their certificates or their instruments evidencing ownership of such Common White Energy Equity Interests.

**Estimated Recovery: None**

# ARTICLE V.

## THE DEBTORS' BUSINESS

### Section 5.1    Overview of the Debtors' Business Operations and Facilities.

The Debtors are one of the ten largest producers of ethanol and the second largest producer of gluten in the United States.  The Debtors' ethanol customers consist primarily of oil refineries that blend ethanol with gasoline.  The Debtors' gluten customers consist primarily of food companies, bakers, and pet food producers.  The Debtors' combined operations generated over $500 million in revenue in 2008.

The Debtors' corporate headquarters are located in Dallas, Texas, where the Debtors have 17 employees.  Debtor U.S. Energy Partners, LLC owns and operates an integrated ethanol and vital wheat gluten production facility in Russell, Kansas (the "Russell Facility"). Debtor WE Hereford, LLC owns and operates an ethanol production facility in Hereford, Texas (the "Hereford Facility").  Debtor Plainview BioEnergy, LLC owns and operates an ethanol production facility in Plainview, Texas (the "Plainview Facility").

The Debtors began operations in 2006 with the purchase of the Russell Facility, which was built in 2001.  The Company expanded its operations with the development of the Hereford Facility (which went online in February of 2008) and the Plainview Facility (which went online in May of 2008).

The Russell Facility is a unique facility in that U.S. Energy Partners, LLC produces both vital wheat gluten and ethanol on site.  The processing of wheat to make gluten produces starch that comprises one third of the total raw materials that U.S. Energy Partners, LLC uses in a year to produce ethanol.  The starch from the gluten production process which is transferred for ethanol production allows U.S. Energy Partners, LLC to maintain better margins on its ethanol than the Debtors are able to maintain at other locations.  The other two thirds of the raw material that U.S. Energy Partners, LLC uses at the Russell Facility is  "milo" (also known as sourgham).  Milo tends to be a lower cost feedstock than yellow corn.  The Debtors also use milo and corn to produce ethanol at their other production facilities.  The Russell Facility has a capacity of 40 million pounds per year of vital wheat gluten and 50 million gallons per year of ethanol.  That facility currently employs 73 employees – four management employees and 69 clerical and rank-and-file employees.  The Russell Facility is currently operating in excess of its capacity.

After beginning operations with the acquisition of the Russell Facility, the Debtors developed the Hereford Facility, which is a state of the art 100 million-gallon-per-year ethanol only production facility.  WE Hereford, LLC also markets distillers grain as a wet product.  The Hereford Facility is located adjacent to an Archer Daniels Midland ("ADM") 8-million-bushel grain storage facility, which delivers milo and corn to the Hereford Facility by a conveyer belt.  The Debtors have a long-term supply agreement in place with ADM under which the cost of milo and corn is tied to market rates.  The Hereford Facility enjoys access to a "unit train shipping facility" which allows transportation of product and incoming supplies in greater

14

volume and at lower cost. The Debtors employ 3 manager-level and 38 clerical and rank-and-file employees at the Hereford Facility.

The Plainview Facility, developed after the Hereford Facility, is a substantial duplicate of the Hereford Facility. It, too, is a 100 million gallon per year ethanol only facility. Plainview owns a 3 million bushel grain elevator adjacent to the Plainview Facility and is able to store and obtain its milo and corn through that facility. The Plainview Facility also enjoys access to a "unit train shipping facility" which allows transportation of product and incoming supplies in greater volume and at lower cost. Plainview also markets distillers grain as a wet product. The Plainview Facility, which employs 43 employees – one manager and 42 clerical and rank and file employees – was in "hot idle" from February of 2009 to October of 2009 when the Facility was re-started. The Debtors' management re-started the plant to take advantage of favorable economic conditions, including improved margins in ethanol sales.

### Section 5.2    Secured Credit Facility.

White Energy Holding Company, LLC is the borrower under that certain Amended and Restated Credit Agreement, dated as of July 31, 2006, by and among White Energy Holding Company, LLC, as Borrower (as defined in the Credit Agreement), the Borrower Subsidiaries (as defined in the Credit Agreement), each of the lenders party thereto, the Prepetition Agent and any of their respective successors or assigns. Under the Credit Agreement, the Lenders made term loans, working capital loans and issued letters of credit to fund the acquisition of the Russell Facility, the construction of the Hereford and Plainview Facilities, and the Debtors' working capital needs. The Debtors are parties to certain other documents, notes, instruments and agreements, including each of the Financing Documents (as defined in the Credit Agreement), the Ancillary Documents (as defined in the Credit Agreement), the Letters of Credit (as defined in the Credit Agreement), and the Swap Agreements, executed, delivered or filed pursuant to or in connection with the Credit Agreement.

The Debtors' primary source of funding prior to the Petition Date was loans and advances under the Credit Agreement.

## ARTICLE VI.

## EVENTS LEADING TO CHAPTER 11 FILING

### Section 6.1    Commodity Prices, Diminishing Margins and Other Factors.

When the Debtors aggressively entered the ethanol industry in 2006, there was an expectation that ethanol could be produced at a level that would generate significant profit margins. Market forces, including oversupply and investor speculation, conspired to prevent the Debtors (and other ethanol producers) from realizing their expectations. The Debtors' business was adversely affected prior to the Petition Date by skyrocketing commodity prices for corn, milo and wheat. For instance, in June of 2008, fueled by speculation in commodity markets, corn prices spiked to $7.80 per bushel, from a historic norm of less than $3 per bushel. Weather, international supply and demand, and other market forces have also impacted commodity prices. While the cost of raw materials to produce ethanol had been high, an excess of supply of ethanol

in the market place kept ethanol prices relatively low, resulting in minimal or nonexistent profit margins.

The weaker-than-expected profit margins earned by the Debtors in 2008 and the first quarter of 2009 caused significant strain to the Debtors' liquidity. The Debtors' weak cash position, coupled with significant debt service obligations under the Credit Agreement, and an inability to access additional investment capital from frozen equity markets, caused the Debtors' to initiate the Chapter 11 Cases.

As of the Petition Date, certain defaults and events of default were acknowledged to have occurred under the Credit Agreement.

## ARTICLE VII.

## THE REORGANIZED COMPANIES

**Section 7.1     Certain Restructuring Transactions; Issuance of New Equity Interests and New Debt Facilities**.

(a)      Current Company Structure.

The Debtors consist of five companies. Two are holding companies-- White Energy, Inc. and White Energy Holding Company, LLC. White Energy, Inc. owns 100 percent of White Energy Holding Company, LLC. White Energy Holding Company, LLC own 100 percent of the three operating Debtors – U.S. Energy Partners, LLC, WE Hereford, LLC and Plainview BioEnergy, LLC. White Energy, Inc. has issued and outstanding: (i) 1,100,000 shares of Series A-1 preferred stock, (ii) 69,101 shares of Series A-2 Preferred Stock, (iii) 578,100 shares of Series B Preferred Stock, and (iv) 1,096,600 shares of common stock. Columbus Nova Ethanol Holdings LLC holds more than 90 percent of the Series A-1, A-2 and B Preferred Stock and more than 85 percent of the common stock of White Energy, Inc.

Under the Plan, the Common and Preferred White Energy Equity Interests will be cancelled and no Plan Distribution will be made to the holders of such Equity Interests. The Plan further provides that each holder of a Subsidiary Equity Interest will retain its Subsidiary Equity Interest, which will survive and continue, but such holders of Subsidiary Equity Interests will not receive a Distribution.

(b)      Corporate Action Under the Plan: Certificates of Incorporation, By-laws, Formation Documents and Limited Liability Company Agreements.

On or before the Effective Date, the certificate or articles of incorporation, by-laws, formation documents and limited liability company agreements as applicable to each respective Debtor will be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code. The amended certificates of incorporation, amended by-laws, amended formation documents and amended limited liability company agreements will also include, among other things, pursuant to section 1123(a)(6) of the

16

Bankruptcy Code provisions (a) creating the New Common Stock, (b) to the extent necessary or appropriate, stating any restrictions on the transfer of the New Common Stock, (c) to the extent necessary or appropriate, effectuating the provisions of the Plan and (d) such other provisions as may be agreed by the Requisite Secured Lenders and the Prepetition Agent, After Consultation with the Debtors. The Amended White Energy Certificate of Incorporation and the Amended White Energy By-Laws shall be filed with the Bankruptcy Court at least five (5) Business Days prior to the Plan Objection Deadline.

On or before the Effective Date, Reorganized White Energy, Inc. shall file the Amended White Energy Certificate of Incorporation with the Secretary of State of its jurisdiction of organization or formation. Each of the Subsidiaries that is a limited liability company shall file an amendment to its formation documents with the Secretary of State of its jurisdiction of organization or formation on the Effective Date. The Amended White Energy By-Laws shall be deemed adopted by the board of directors of the Reorganized White Energy, Inc. as of the Effective Date.

On the Effective Date, the cancellation of all Common White Energy Equity Interests and Preferred White Energy Equity Interests, the authorization and issuance of the New Common Stock, the New Term Loan Facility, the New Term Loan Notes, and the adoption of the Management Incentive Plan and all other matters provided in the Plan involving the corporate and capital structure of the Debtors or the Reorganized Debtors or corporate action by any of the Debtors or the Reorganized Debtors shall be deemed to have occurred, and shall be in effect from and after the Effective Date without requiring further action under applicable law, regulation, order or rule, including any action by the stockholders or directors of any of the Debtors or any of the Reorganized Debtors pursuant to section 303 of the General Corporation Law of the State of Delaware and other applicable corporation law of jurisdictions in which the Reorganized Debtors are incorporated or existing. Entry of the Confirmation Order will constitute approval of the Plan, the Plan Documents and the transactions thereunder, subject to the occurrence of the Effective Date.

(c)     Effectuating Documents; Further Transactions.

The acting chief executive officer, chief restructuring officer, chief financial officer or any other appropriate officer of White Energy, Inc. or any applicable Debtor, as the case may be, shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The secretary or assistant secretary of White Energy, Inc. or any applicable Debtor, as the case may be, shall be authorized to certify or attest to any of the actions specified in the preceding sentence.

(d)     Execution of Documents and Certain Other Actions on or Prior to the Effective Date.

The Plan provides that on or prior to the Effective Date, the following Persons will take the following actions and will execute the following documents, all of which documents will become effective on the Effective Date, unless otherwise specified:

17

i.      the Reorganized Debtors, the Exit Facility Lenders and the Exit Facility Agent will execute the Exit Credit Facility and such other documents as are contemplated by the Exit Credit Facility; and

ii.     the Reorganized Debtors, the New Term Loan Facility Agent and the New Term Loan Facility Lenders will execute the New Term Loan Documents and such other documents as are contemplated by the New Term Loan Facility.

**Section 7.2      Continued Corporate Existence of the Debtors**.

Following confirmation and consummation of the Plan, the Reorganized Debtors will continue to exist as separate corporate entities or limited liability companies, as applicable to each respective Debtor, in accordance with the laws of their respective states of incorporation or formation and pursuant to their respective certificates, articles of incorporation, by-laws, formation documents and limited liability company agreements in effect prior to the Effective Date, except to the extent such certificates, articles of incorporation, bylaws, formation documents and limited liability company agreements are amended pursuant to the Plan or upon or after the Effective Date.

**Section 7.3      Revesting of Assets**.

Pursuant to section 1141(b) of the Bankruptcy Code, all property of the Estate of each Debtor, together with any property of the Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Plan, shall vest in such Reorganized Debtor on the Effective Date without the payment or incursion of transfer tax liability pursuant to section 1146(a) of the Bankruptcy Code.  Thereafter, subject to the terms of the Plan (including those of Article IV of the Plan), the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court.  As of the Effective Date, all property of each Reorganized Debtor shall be free and clear of all Liens, Claims and Equity Interests, except as specifically provided in the Plan, the Confirmation Order, the Exit Credit Facility or the New Term Loan Facility.

**Section 7.4      Management**.

Upon the occurrence of the Effective Date, the management, control, and operation of each of the Reorganized Debtors shall be the general responsibility of each such entity's then, as applicable, current board, managing member, manager, member(s) and management as set forth in such Reorganized Debtor's governing documents and according to applicable law.  Entry of the Confirmation Order shall ratify and approve all actions taken by each of the Debtors from the Petition Date through and until the Effective Date.

**Section 7.5      Initial Boards of Directors, Managers and Members**.

The Plan provides that the initial Board of Directors of Reorganized White Energy, Inc. shall be comprised of 3 to 5 members, as determined in the sole and absolute discretion of the Requisite Secured Lenders prior to the Confirmation Hearing.  The members of the initial Board of Directors of Reorganized White Energy, Inc. shall be appointed solely by the Requisite Secured Lenders, and shall include one officer of Reorganized White Energy, Inc.  The

Prepetition Agent or the Debtors, with the prior written consent of the Requisite Secured Lenders, shall file with the Bankruptcy Court the identities of the initial members on a date not less than five (5) Business Days prior to the Plan Objection Deadline. After the Effective Date, the holders of the New Common Stock will elect members of the Board of Directors of Reorganized White Energy, Inc. in accordance with the Amended White Energy Certificate of Incorporation, Amended White Energy By-laws, the Stockholders' Agreement, if any, and applicable nonbankruptcy law.

The Plan provides that the sole member of Reorganized WE Holding Company, LLC shall be Reorganized White Energy, Inc. The sole member of each of Reorganized U.S. Energy Partners, LLC, Reorganized WE Hereford, LLC, and Reorganized Plainview BioEnergy, LLC, shall be Reorganized WE Holding Company, LLC, in accordance with the provisions of their respective organizational documents and applicable law.

**Section 7.6     Officers**.

The Prepetition Agent or the Debtors will provide, with the prior written consent of the Requisite Secured Lenders and the Prepetition Agent (which consent may be given or withheld by the Prepetition Agent or the Requisite Secured Lenders in the exercise of the sole and absolute discretion of each of them), After Consultation with the Debtors, the identity of each Person that shall serve as the initial officers of the Reorganized White Energy, Inc. and the Reorganized Subsidiaries on and after the Effective Date in the Plan Supplement. Such officers shall serve in accordance with the by-laws of Reorganized White Energy, Inc. or the Reorganized Subsidiary, as applicable, any employment agreement with such Reorganized Debtor and applicable nonbankruptcy law. The Prepetition Agent or the Debtors will provide, with the prior written consent of the Requisite Secured Lenders and the Prepetition Agent (which consent may be given or withheld by the Prepetition Agent or the Requisite Secured Lenders in the exercise of the sole and absolute discretion of each of them), After Consultation with the Debtors, the identity of each Insider that will be employed or retained by a Reorganized Debtor and the nature of any compensation for such Insider in the Plan Supplement. On the Effective Date, the officers of the Reorganized Subsidiaries shall be determined by the respective boards of directors, managers or members, as applicable, of the Reorganized Debtors.

**Section 7.7     Management Incentive Plan**.

On the Effective Date, Reorganized White Energy, Inc. shall adopt the Management Incentive Plan. The solicitation of votes on the Plan shall be deemed a solicitation of the holders of New Common Stock for approval of the Management Incentive Plan for purposes of sections 162(m) and 422 of the Internal Revenue Code of 1986, as amended. Entry of the Confirmation Order shall constitute such approval, and the Confirmation Order shall so provide. All shares of New Common Stock issued under the Management Incentive Plan (including those issued upon the valid exercise of options issued thereunder) shall be duly authorized, validly issued, fully paid for, non assessable shares of New Common Stock, free of preemptive rights.

On the Effective Date, 500 unissued shares of New Common Stock equal to 5% on a fully diluted basis shall be reserved for issuance to the Reorganized Debtors' management

team under the Management Incentive Plan. Awards of shares of New Common Stock or grants of options therefor will be subject to the Reorganized Debtors meeting certain financial performance or other criteria to be established by the board of directors of Reorganized White Energy, Inc. or the Compensation Committee of the board of directors of Reorganized White Energy, Inc. The Compensation Committee of the board of directors of Reorganized White Energy, Inc. will make the individual awards and establish the terms and conditions of each award.

# ARTICLE VIII.

## SELECTED FINANCIAL INFORMATION

**Section 8.1     Consolidated and Year-to-Date Annual Financial Information for the Debtors**.

The Debtors have prepared the following unaudited consolidated financial statements, year-to-date as of November 30, 2009.

*[Remainder of this page intentionally left blank]*

## WHITE ENERGY INCORPORATED                    UNAUDITED

**Consolidated Balance Sheet**

*($ in thousands)*

| | As of November 30, 2009 |
|---|---:|
| **Assets** | |
| Current assets | |
| Cash and cash equivalents | $ 32,933 |
| Accounts receivable | |
| Trade | 19,904 |
| Other | 277 |
| Inventories | 16,796 |
| Derivative assets | 818 |
| Restricted cash | 428 |
| Prepaid and other current assets | 2,735 |
| **Total current assets** | 73,891 |
| | |
| Property, plant and equipment, net | 128,690 |
| Restricted cash | 1 |
| Deferred financing fees, net | 6,944 |
| Other assets | 708 |
| Investment in unconsolidated subsidiaries | 987 |
| **Total assets** | $ 211,221 |
| | |
| **Liabilities and Equity** | |
| Current liabilities | |
| Accounts payable - trade | $ 4,397 |
| Deferred revenue | 7,276 |
| Other accrued expenses | 4,235 |
| Pre-petition accounts payable | 31,210 |
| Pre-petition related party payable | 3,457 |
| Pre-petition dividends payable | 73,605 |
| Pre-petition debt-related | 293,658 |
| **Total current liabilities** | 417,838 |
| | |
| Other long-term liabilities | 47 |
| **Total liabilities** | 417,885 |
| | |
| Equity | |
| Series A-1 preferred shares, par value $100 per share, authorized 1,169,101 shares, issued 1,100,000 shares | 102,424 |
| Series A-2 preferred shares, par value $100 per share, authorized 69,101 shares, issued 69,101 shares | - |
| Series B preferred shares, par value $100 per share, authorized 3,000,000 shares, issued 658,110 shares and 478,110 shares, respectively | 65,811 |
| Common shares, par value $0.0001 per share, authorized 2,000,000 shares, issued 1,057,559 shares and 982,834 shares, respectively | - |
| Additional paid-in capital | 29,079 |
| Accumulated deficit | (403,978) |
| **Total shareholders' equity/(deficit)** | (206,664) |
| **Total liabilities and equity/(deficit)** | $ 211,221 |

DM3\1250241.1

## WHITE ENERGY INCORPORATED — UNAUDITED

**Consolidated Income Statement**

*($ in thousands)*

|  |  | YTD as of November 30, 2009 |
|---|---|---|
| Net sales | $ | 324,180 |
| Other revenue |  | - |
| **Total revenue** |  | 324,180 |
| Cost of sales |  | 309,511 |
| **Gross profit (loss)** |  | 14,669 |
| General and administrative expense |  | 14,794 |
| **Operating income (loss)** |  | (125) |
| Other income (expense): |  |  |
| Interest expense |  | (7,432) |
| Interest income |  | 139 |
| Other income (expense) |  | 1,394 |
| **Income (loss) before income taxes** |  | (6,024) |
| Income tax expense (benefit) |  | (706) |
| **Income (loss) before equity interest** |  | (5,318) |
| Loss from |  |  |
| Unconsolidated subsidiaries |  | (27) |
| **Net income (loss)** | $ | (5,345) |

| **EBITDA Calculation** |  |  |
|---|---|---|
| Net income |  | (5,345) |
| Interest expense & interest rate swap |  | 6,055 |
| Interest income |  | (139) |
| Tax benefit |  | (706) |
| Depreciation |  | 16,742 |
| **EBITDA** | $ | 16,607 |

DM3\1250241.1

**Consolidated Statement of Cash Flows**

*($ in thousands)*

| | | YTD<br>November 30, 2009 |
|---|---|---:|
| Cash flows from operating activities | | |
| Net income (loss) | $ | (5,345) |
| Adjustments to reconcile net income (loss) to net cash | | |
| from operating activities: | | |
| Depreciation and amortization | | 17,365 |
| Equity compensation | | 37 |
| Equity (income) from unconsolidated subsidiaries, net of dividends | | 17 |
| (Gain) on sale of assets | | (30) |
| Asset and liability changes | | |
| Accounts receivable | | 6,911 |
| Inventories | | (400) |
| Derivative assets | | (877) |
| Other asset changes | | (1,941) |
| Accounts payable | | 1,356 |
| Deferred revenue | | 7,276 |
| Other accrued expenses | | 1,419 |
| **Net cash provided by operating activities** | | 25,788 |
| Cash flows from investing activities | | |
| Capital expenditures | | (940) |
| Changes in restricted cash | | 6,371 |
| Proceeds from sale of assets | | 48 |
| Cash paid for investments | | (12) |
| **Net cash provided by investing activities** | | 5,467 |
| Cash flows from financing activities | | |
| Net change in short-term debt | | (29) |
| Payment of long-term debt | | (4,887) |
| Payment of deferred financing fees | | (234) |
| **Net cash used in financing activities** | | (5,150) |
| **Net increase in cash and cash equivalents** | | 26,105 |
| Cash and cash equivalents | | |
| Beginning of the period | | 6,828 |
| End of the period | $ | 32,933 |

# ARTICLE IX.

# FINANCIAL PROJECTIONS AND ASSUMPTIONS

## Section 9.1      Purpose and Objectives.

The Debtors' long term business plan (the "Business Plan") and the underlying projections and assumptions serve as the basis for the Plan.  The Debtors and the Prepetition Agent, on behalf of the Secured Lenders, believe that the assumptions that underlie the

projections are reasonable under the circumstances and that achieving the projections set forth herein will maximize the value of the Debtors' businesses.

### Section 9.2      Projected Consolidated Financial Statements.

The Debtors have prepared the projected operating and financial results (the "Projections") on a consolidated basis for the period ending December 31, 2012, assuming the effects of certain transactions that will occur in connection with and upon consummation of the Plan. The Projections, and a summary of significant assumptions related thereto, are attached to this Disclosure Statement as **Exhibit C.**

The Projections should be read in conjunction with the assumptions, qualifications, and the footnotes to the tables containing the Projections, the historical consolidated financial information (including the notes and schedules thereto), and the information contained in "Selected Financial Information."

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS NOR IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES. THE DEBTORS' ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH THEIR BUSINESS PLANS AND STRATEGIES OR PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. ACCORDINGLY, THE DEBTORS AND THE PREPETITION AGENT, ON BEHALF OF THE SECURED LENDERS, DO NOT INTEND, AND DISCLAIM ANY OBLIGATION, TO (1) FURNISH UPDATED BUSINESS PLANS OR PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE, OR TO HOLDERS OF SECURITIES, OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE, (2) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC, OR (3) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THE PROJECTIONS HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT AND PROFESSIONALS. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS AND THE PREPETITION

AGENT, ON BEHALF OF THE SECURED LENDERS, CAUTION THAT NO ASSURANCES CAN BE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR THE ABILITY OF THE REORGANIZED DEBTORS TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

THE ASSUMPTIONS AND RESULTANT COMPUTATIONS WERE MADE SOLELY FOR PURPOSES OF PREPARING THE PROJECTIONS. THE DEBTORS AND THE PREPETITION AGENT, ON BEHALF OF THE SECURED LENDERS,WILL BE REQUIRED TO DETERMINE THE ENTERPRISE VALUE, THE FAIR VALUE OF THE DEBTORS' ASSETS, AND THEIR ACTUAL LIABILITIES AS OF THE EFFECTIVE DATE. SUCH DETERMINATION WILL BE BASED UPON THE FAIR VALUES AS OF THAT DATE, WHICH COULD BE MATERIALLY GREATER OR LOWER THAN THE VALUES ASSUMED IN THE FOREGOING COMPUTATIONS. IN ALL EVENTS, THE ENTERPRISE VALUE, AS WELL AS THE DETERMINATION OF THE FAIR VALUE OF THE DEBTORS' PROPERTY, EQUIPMENT, AND INVENTORIES AND THE DETERMINATION OF THEIR ACTUAL LIABILITIES, WILL BE MADE AS OF THE EFFECTIVE DATE. ALTHOUGH THE DEBTORS EXPECT TO UTILIZE A CONSISTENT METHODOLOGY, THE CHANGES BETWEEN THE AMOUNTS OF ANY OR ALL OF THE FOREGOING ITEMS AS ASSUMED IN THE PROJECTIONS AND THE ACTUAL AMOUNTS THEREOF AS OF THE EFFECTIVE DATE MAY BE MATERIAL.

## ARTICLE X.

## THE CHAPTER 11 CASES

**Section 10.1     Commencement of the Chapter 11 Cases**.

On May 7, 2009, each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

**Section 10.2     Continuation of Business After the Petition Date**.

From and after the Petition Date, the Debtors have maintained operations with minimal disruption. In addition, the Debtors re-started their 100-million-gallon-per-year Plainview Facility in October of 2009. The Plainview plant had been in "hot idle" since before the Petition Date. The Debtors re-started the plant to take advantage of favorable economic conditions, including improved margins in ethanol sales.

On or after the Petition Date, the Debtors and their counsel expended significant time and resources preparing, filing and supporting motions with the Court essential to the Debtors' continued operations, administration of the Chapter 11 Cases and restructuring efforts,

including "first day" and administrative motions, the consensual resolution of which has required negotiations with the Debtors' secured lenders, the Office of the United States Trustee, and unsecured creditors. The Debtors sought and obtained a full spectrum of first-day relief, including the entry of orders providing for joint administration of the Chapter 11 Cases (Docket No. 21), continuing use of the Debtors' cash management system (Docket No. 22), prohibiting utilities from discontinuing service (Docket No. 26 and 37), maintaining postpetition financing of insurance premiums and authorizing payment thereof (Docket No. 23), authorizing payment of prepetition wages, benefits and related compensation to employees (Docket No. 24), authorizing the use of cash collateral (Docket No. 15 and 31), retaining Garden City Group as claims agent (Docket No. 25), and authorizing payment of certain prepetition taxes (Docket No. 126).

Following the Petition Date, the Debtors and their professionals engaged in extensive discussions and negotiations with employees, vendors, utilities, customers, taxing authorities, and the Committee to resolve consensually issues and claims arising from the Debtors' pre- and post-petition business operations. The Debtors and their professionals responded to and resolved a myriad of issues, including requests for adequate assurance and the assertion of liens, reclamation claims, requests for administrative priority under section 503(b)(9) of the Bankruptcy Code, and setoff claims.

### Section 10.3    Use of Cash Collateral.

The Debtors commenced the Chapter 11 Cases without lender consent to use cash collateral and immediately began negotiating with the Prepetition Agent, as agent for the Secured Lenders. The Debtors came before the Court on an emergency basis on May 8, 2009, seeking authorization to use cash collateral to pay suppliers in order to continue operation of the Debtors' Hereford and Russell Facilities. The Debtors and the Prepetition Agent reached agreement on the consensual use of cash collateral minutes before the emergency hearing. See Docket No. 15. After that, the Debtors faced no fewer than four hearings where the use of cash collateral was contested until shortly before the hearing. The Debtors have prepared and negotiated updated cash collateral budgets at least every four weeks and enter into new stipulations providing for the continued use of cash collateral every month.

### Section 10.4    Post-Petition Reporting.

The Debtors' financial and accounting staff have been fully engaged throughout the cases in preparing the Debtors' statements of financial affairs and schedules of assets, liabilities, executory contracts and unexpired leases, Bankruptcy Rule 2015.3 reports, budgets, monthly operating reports, and responses to various requests from vendors, suppliers, current and former employees and secured and unsecured creditors.

### Section 10.5    The General Claims Bar Date.

On June 26, 2009, the Debtors filed their Motion for Entry of an Order Establishing Bar Dates and Related Procedures for Filing Proofs of Claims and Approving the Form, Manner and Sufficiency of Notice of the Bar Dates pursuant to Fed. R. Bankr. P. 3003 and 9007 (Docket No. 147). On July 29, 2009, the Court entered the Bar Date Order, establishing,

among other things, the general bar date and the bar date for section 503(b)(9) administrative claims as September 14, 2009. The Bar Date Order established the Bar Date.

### Section 10.6 Representation of the Debtors.

The Debtors retained Duane Morris LLP ("Duane Morris") as lead bankruptcy counsel to the Debtors in connection with the Chapter 11 Cases. The Debtors also retained Ice Miller LLP to serve as bankruptcy co-counsel. The Debtors retained Jefferies & Co. as the Debtors' investment banker and financial advisor.

### Section 10.7 Formation and Representation of the Committee.

On May 27, 2009, the U.S. Trustee appointed the Committee comprised of Nexen Marketing U.S.A., Inc., Archer Daniels Midland Company, The Scoular Company, Occidental Chemical Corporation, and Atmos Energy Marketing. The Committee retained Lowenstein Sandler PC and Polsinelli Shughart PC, as counsel. Carl Marks Advisory Group LLC has acted as the Committee's financial advisor.

### Section 10.8 Representation of the Prepetition Agent.

The Prepetition Agent is represented in the Chapter 11 Cases by Kaye Scholer LLP and Pepper Hamilton LLP. Capstone Advisory Group, LLC has acted as the Prepetition Agent's financial advisor.

### Section 10.9 Matters Relating to Unexpired Leases and Executory Contracts.

Section 365 of the Bankruptcy Code grants a debtor the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. Section 365(d)(4) of the Bankruptcy Code provides that if a debtor does not assume or reject an unexpired lease of nonresidential real property under which a debtor is the lessee (i) within 120 days after the Petition Date (the "365(d)(4) Deadline"), (ii) within an additional 90-day period as the bankruptcy court, for cause, may allow, or (iii) within such additional time as the bankruptcy court may permit with the consent of the landlord of the leased premises, then such lease is deemed rejected.

On Motion of the Debtors, the Court entered an Order on September 11, 2009 (Docket No. 254), extending the deadline for the Debtors to assume or reject certain real property leases to December 3, 2009. On December 3, 2009, the Debtors filed a motion seeking an extension of their deadline to assume or reject certain real property leases to the earlier of the effective date of a plan of reorganization or April 2, 2010. The Motion is scheduled to be heard on January 14, 2010. As of the date hereof, the Debtors have not sought to assume or reject any Executory Contracts. See Article XI of the Plan for the proposed treatment of Executory Contracts thereunder.

DM3\1250241.1

**Section 10.10   Exclusivity**.

Pursuant to sections 1121(b) and (c)(3) of the Bankruptcy Code, the Debtors have a certain amount of time in which they have the exclusive right (a) to file their Plan (the "Filing Period"); and (b) to solicit acceptances of a timely filed Plan (the "Solicitation Period").  On September 15, 2009, the Court entered an Order (Docket No. 263) that provided for an extension by 30 days of the Filing Period and the Solicitation Period.  On October 14, 2009, the Court entered a second Order (Docket No. 325) that provided for an extension of the Filing Period to November 16, 2009 and the Solicitation Period by 30 days through and including January 4, 2010.  On November 13, 2009, the Debtors filed their Third Motion of Debtors for an Order Extending Exclusive Periods During which Debtors May File and Solicit Acceptances of a Plan of Reorganization (Docket No. 366) (the "Third Motion"), seeking a further extension of the Filing Period and the Solicitation Period.  The filing of that motion caused an automatic extension, under Rule 9006-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, of the Filing Period to such time that the Court acts on the motion.  On December 3, 2009, the Court entered an order denying the Third Motion.  Accordingly, the Filing Period lapsed on December 1, 2009.

**Section 10.11   Claims Administration**.

(a)      Claim Objections

In the ordinary course of business, the Debtors maintain books and records (the "Books and Records") that reflect, among other things, the Debtors' liabilities and the amounts owed to their creditors in connection with such liabilities.  The Debtors, the Disbursing Agent and their Professional Persons will review the proofs of claim submitted in the Chapter 11 Cases, including any supporting documentation, and compare the Claims asserted in the proofs of claim with the Books and Records and will otherwise analyze the Claims to determine the validity of such Claims.  The Debtors and the Disbursing Agent may file substantive and/or procedural objections based upon such review.

(b)      The Fagen Litigation

On or about September 2, 2009, Fagen, Inc., filed a Proof of Claim asserting a Claim in the amount of $8,883,919.84 against WE Hereford, Inc. and contending that the Claim was fully secured by Liens in substantially all of the real estate and improvements comprising the Hereford Facility.  At the same time, Fagen, Inc. filed a Proof of Claim against Plainview BioEnergy, LLC, asserting a claim in the amount of $6,016,749.55, allegedly secured by Liens in substantially all of the real estate and improvements comprising the Plainview Facility.

The Debtors or the Prepetition Agent, on behalf of the Secured Lenders have filed an action in the Bankruptcy Court under applicable authority, including but not limited to Rule 7001 of the Federal Rules of Bankruptcy Procedure and sections 502, 506, 544 and 545 of the Bankruptcy Code, to: (a) object to the Proofs of Claim filed by Fagen, Inc.; and (b) otherwise determine the validity, extent and priority of the Liens asserted by Fagen, Inc.

The Debtors and the Prepetition Agent, on behalf of the Secured Lenders, believe, among other things, that (i) the amounts asserted in the Proof of Claims filed by Fagen, Inc. are overstated; and (ii) are unsecured.

## ARTICLE XI.

## THE CHAPTER 11 PLAN

**Section 11.1    Introduction**.

The following is a summary of certain terms and provisions of the Plan.  This summary of the Plan is qualified in its entirety by reference to the full text of the Plan, which is annexed to this Disclosure Statement as **Exhibit A.**

**Section 11.2    General Description of the Treatment of Claims and Equity Interests**.

(a)    Unclassified Claims Generally.

Administrative Claims and Priority Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively.  Such Claims are not designated as classes of Claims for the purposes of the Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

(b)    Treatment of Allowed Administrative Claims

(i)    *Administrative Claims Defined.*

Administrative Claims are rights to payment constituting a cost or expense of administration of any of the Chapter 11 Cases allowed under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the estates of each of the Debtors, any actual and necessary costs and expenses of operating the businesses of each of the Debtors, any indebtedness or obligations incurred or assumed by any of the Debtors in connection with the conduct of its business on or after the Petition Date, any allowances of compensation and reimbursement of expenses to the extent allowed by a Final Order under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the estates of the Debtors under 28 U.S.C. § 1930.

(ii)    *Time for Filing Administrative Claims.*

All requests for payment of Administrative Claims (other than (i) Administrative Claims incurred by a Debtor in the ordinary course of business after the Petition Date, (ii) Administrative Claims that have been Allowed by order of the Bankruptcy Court on or before the Effective Date, (iii) Section 503(b)(9) Claims and other Administrative Claims for which a Proof of Claim was filed on or before the Bar Date, and  (iv) fees or charges assessed against the Debtors under section 1930 of title 28 of the United States Code) must be filed with the Bankruptcy Court and served on the Debtors, the Committee, the Prepetition Agent and the U.S. Trustee not later than (x) thirty (30) days after service of the Notice of Confirmation, in the case

of requests for payment of Administrative Claims other than Fee Claims and (y) forty-five (45) days after the Effective Date, in the case of Final Fee Applications seeking payment of Fee Claims; provided, however, that (A) any Section 503(b)(9) Claim or other Administrative Claim that was required pursuant to the terms of the Bar Date Order to be filed on or before the Bar Date and was not filed on or before the Bar Date is barred based on the Bar Date Order and shall remain forever barred and discharged; and (B) any Administrative Claim or Fee Claim that is not filed on or before the deadline shall result in the Administrative Claim or Fee Claim being forever barred and discharged. Any request for payment of an Administrative Claim must include at a minimum the name of the Debtor(s) which are alleged to be liable for the Administrative Claim, the name of the holder of the alleged Administrative Claim, the amount of the alleged Administrative Claim, and the basis of the alleged Administrative Claim, and must be mailed by the applicable deadline set forth in the Plan:

> (i) If by First Class U.S. mail, to:
> The Garden City Group, Inc.
> Attn: White Energy, Inc.
> P.O. Box 9379
> Dublin, Ohio 43017-4279

> (ii) If by messenger or overnight courier, to:

> The Garden City Group, Inc.
> Attn: White Energy, Inc.
> 5151 Blazer Parkway, Suite A
> Dublin, Ohio 43017

The Claims Agent will not accept any request for payment of an Administrative Claim sent by facsimile or email.

**THE FAILURE TO FILE TIMELY A REQUEST FOR AN ADMINISTRATIVE CLAIM AND TO SERVE SUCH REQUEST WILL RESULT IN THE ADMINISTRATIVE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

> (iii)  *Time for Filing Fee Claims.*

Each Professional Person who holds or asserts a Fee Claim will be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Final Fee Application within forty-five (45) days after the Effective Date.

**THE FAILURE TO FILE TIMELY AND SERVE SUCH FEE APPLICATION WILL RESULT IN THE FEE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

> (iv)  *Allowance of Administrative Claims/Fee Claims.*

Unless the Debtors or the Prepetition Agent object, in whole or in part, to a timely filed request for payment of an Administrative Claim within sixty (60) days after the Effective

Date, such request for payment of an Administrative Claim shall be deemed Allowed in the amount requested. If the Debtors or the Prepetition Agent object to a request for payment of an Administrative Claim in whole or in part, the requested Administrative Claim shall become an Allowed Administrative Claim only to the extent allowed by a Final Order. A Fee Claim in respect of which a Final Fee Application has been properly and timely filed and served shall become an Allowed Administrative Claim only to the extent allowed by Final Order.

*(v)     Payment of Allowed Administrative Claims.*

Except to the extent that a holder of an Allowed Administrative Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Administrative Claim shall receive, in full and final satisfaction of its Allowed Administrative Claim, a Plan Distribution of Cash in the amount of such holder's Allowed Administrative Claim, without interest, on the Distribution Date or such later date or dates as may be agreed to by the Prepetition Agent (After Consultation with the Debtors) with the consent of the Requisite Secured Lenders, and such holder; provided, however, that an Allowed Administrative Claim representing a liability incurred after the Petition Date in the ordinary course of business by the Debtors may be paid in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

(c)     Treatment of Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, at the option of the Prepetition Agent (After Consultation with the Debtors), with the consent of the Requisite Secured Lenders, in full and final satisfaction of such holder's Allowed Priority Tax Claim (a) payments in Cash, in regular installments over a period ending on the fifth (5th) anniversary of the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claim; (b) a lesser amount in one Cash payment as may be agreed upon in writing by such holder and the Prepetition Agent (After Consultation with the Debtors), with the prior consent of the Requisite Secured Lenders; or (c) such other treatment as may be agreed upon in writing by such holder and the Prepetition Agent (After Consultation with the Debtors), with the prior consent of the Requisite Secured Lenders. The Confirmation Order shall enjoin any holder of an Allowed Priority Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer or director of the Debtors that otherwise would be liable to such holder for payment of an Allowed Priority Tax Claim so long as the Debtors are in compliance with this section 2.6. So long as the holder of an Allowed Priority Tax Claim is enjoined from commencing or continuing any action or proceeding against any responsible person, officer or director under this section 2.6 or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or proceeding shall be tolled.

(d)     Classified Claims and Equity Interests.

The classified Claims against, and Equity Interests in, the Debtors are classified in the Plan as follows:

  i.  Class 1 — Priority Claims

  ii.  Class 2 — Secured Lender Claims

  iii.  Class 3 — Other Secured Claims

  iv.  Class 4 — Secured Tax Claims

  v.  Class 5 — General Unsecured Claims

  vi.  Class 6 — Subsidiary Equity Interests

  vii.  Class 7 — Preferred White Energy Equity Interests

  viii.  Class 8 — Common White Energy Equity Interests

The treatment of each class of claims is summarized in Article IV hereof.

  (e)  <u>Treatment of Intercompany Claims.</u>

Intercompany Claims shall not be classified and no Plan Distribution shall be made in respect of Intercompany Claims.

**Section 11.3  Acceptance or Rejection of the Plan; Effect of Rejection by One or More Classes of Claims**.

  (a)  <u>Class Entitled to Vote.</u>

Holders of Secured Lender Claims are entitled to vote their Claims in Class 2 to accept or reject the Plan. Holders of Other Secured Claims are entitled to vote their Claims in Class 3 to accept or reject the Plan. Holders of Secured Tax Claims are entitled to vote their Claims in Class 4 to accept or reject the Plan. Holders of General Unsecured Claims, including Secured Lender Deficiency Claims, are entitled to vote their Claims in Class 5 to accept or reject the Plan.

  (b)  <u>Class Acceptance Requirement.</u>

A class of Claims shall have accepted the Plan if it is accepted by holders of Claims in such Class representing at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Claims in such Class that have voted on the Plan.

  (c)  <u>Cramdown</u>

In the event that any impaired Class of Claims or Equity Interests rejects the Plan or is deemed to have rejected the Plan, the Debtors and the Prepetition Agent, on behalf of the

Secured Lenders, seek to confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class.

        (d)      <u>Feasibility</u>

The Bankruptcy Code conditions confirmation of a plan of reorganization on, among other things, a finding that it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor.  For purposes of determining whether the Plan satisfies this condition, the Debtors have analyzed the capacity of each Debtor to service its obligations under the Plan.  Based upon its analysis of their Projections, the Debtors and the Prepetition Agent, on behalf of the Secured Lenders, believe that the Debtors or their successors pursuant to the Plan will be able to make all payments required to be made under the Plan.  <u>See</u> Article VIII hereof – "Selected Financial Information."

**Section 11.4    Substantive Consolidation**.

Entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Chapter 11 Cases for certain purposes related to the Plan, including for purposes of voting, confirmation, Plan Distributions and determining and calculating post-confirmation quarterly fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930.  On and after the Effective Date:  (i) no Plan Distributions shall be made under the Plan on account of Intercompany Claims; (ii) all guarantees by any of the Debtors of the obligations of any other Debtor arising prior to the Effective Date shall be deemed eliminated so that any Claim against any  Debtor and any guarantee thereof executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the deemed consolidated Debtors; and (iii) each and every Claim filed or to be filed in the Chapter 11 Cases shall be deemed filed against the consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated  Debtors.

Substantive consolidation proposed by the Plan shall not (other than for purposes related to funding Plan Distributions and as set forth in section 6.1.1 of the Plan) affect:  (i) the legal and organizational structure of the Reorganized Debtors; or (ii) pre- and post-Petition Date Liens, guarantees and security interests that are required to be maintained (x) in connection with Executory Contracts that were entered into during the Chapter 11 Cases or that have been or will be assumed pursuant to section 365 of the Bankruptcy Code, (y) pursuant to the Plan, or (z) in connection with the Exit Credit Facility or the New Term Loan Facility.  As of the Effective Date, each of the Reorganized Debtors shall be deemed to be properly capitalized, legally separate and distinct entities.

A holder of Claims asserted against more than one Debtor but arising under the same facts, shall receive not more than one Plan Distribution under the Plan on account of such holder's Allowed Claim and shall be enjoined from seeking any further Plan Distribution.

DM3\1250241.1

**Section 11.5    Operations Between the Confirmation Date and the Effective Date**.

During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to operate their businesses as Debtors-in-Possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules and all orders of the Bankruptcy Court that are then in full force and effect.

**Section 11.6    Certain Transactions On or Before the Effective Date**.

(a)    Pursuant to section 1123(a)(5) of the Bankruptcy Code:

(i)    Reorganized White Energy, Inc. shall issue to the New LLC the Class 2 New Common Stock representing at the time of issuance 100 percent of the equity interests in the Reorganized White Energy, Inc. (excluding the New Common Stock to be reserved for issuance pursuant to the Management Incentive Plan).  The issuance of the Class 2 New Common Stock shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.;

(ii)    Reorganized WE Holding Company, LLC and the Reorganized Debtors shall enter into the New Term Loan Facility and such other documents as are contemplated by the New Term Loan Facility and issue to the holders of Allowed Secured Lender Claims the New Term Loans;

(iii)    The Reorganized Debtors, shall enter into the Exit Credit Facility and such other documents as are contemplated by the Exit Credit Facility.  The issuance of the New Term Loans shall be in accordance with the terms of the New Term Loan Documents.;

(iv)    On the Effective Date, as a condition to the occurrence of the Effective Date pursuant to section 9.2 of the Plan, the New LLC shall enter into the Stockholders' Agreement and the Secured Lenders as holders of the interests in the New LLC shall enter into the New LLC Agreement with respect to the New LLC; and

(v)    All security interests, Liens and other encumbrances granted to secure the Original Debt shall survive and shall continue to secure the Reorganized Debtors' obligations under the Exit Credit Facility and the New Term Loan Facility.

**Section 11.7    Causes of Action/Reservation of Rights**.

The Reorganized Debtors shall, in accordance with section 1123(b) of the Bankruptcy Code, reserve, retain and may enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) all rights, claims, Causes of Action, rights of setoff, suits, proceedings or other legal or equitable defenses accruing to the Debtors or the Estates pursuant to the Bankruptcy Code or pursuant to any statute or legal theory, including any Avoidance

Actions, except (i) as otherwise provided in the Plan or the Confirmation Order, (ii) with respect to the Released Parties and (iii) preference claims under section 547 of the Bankruptcy Code.

### Section 11.8    Causes of Action - No Waiver.

Except as otherwise expressly set forth in the Plan (including in sections 6.13.1 and 6.14.1 of the Plan), nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any right or Cause of Action that the Debtors or the Reorganized Debtors may have or which the Debtors or the Disbursing Agent may choose to assert on behalf of the Debtors' respective Estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including (i) any and all Claims against any Person (including against Fagen, Inc. in connection with the Fagen Litigation), to the extent such Person asserts a Claim, cross-claim, counterclaim and/or Claim for setoff which seeks affirmative relief against any of the Debtors, the Reorganized Debtors, their officers, directors or representatives and (ii) the turnover of any property of any of the Debtors' or the Reorganized Debtors' Estates.

The Disbursing Agent shall be deemed the appointed representative to the Reorganized Debtors, and may pursue, litigate, compromise, settle, transfer or assign any such rights, claims, causes of action, suits or proceedings as appropriate, in accordance with the best interests of the Reorganized Debtors or their respective successors who hold such rights.

No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Disbursing Agent will not pursue any and all available Causes of Action against them. The Debtors, the Disbursing Agent and the Estates expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise provided in the Plan.

All Claims and Causes of Action under section 547 of the Bankruptcy Code are waived and released under the Plan.

The Debtors (or the Prepetition Agent) will pursue and prosecute the Fagen Litigation and expressly reserve any and all Claims against Fagen, Inc. The Prepetition Agent is hereby authorized to pursue any and all claims against Fagen, Inc. including any action under section 544, 545, 546, 547, 548 and/or 550 of the Bankruptcy Code. In addition, the Prepetition Agent is hereby deemed to have automatically intervened in the Fagen Litigation, whether or not expressly named as a party, without the need for any further filing or Order of the Bankruptcy Court.

### Section 11.9    Appointment of the Disbursing Agent.

Upon the occurrence of the Effective Date, Reorganized White Energy, Inc. will be appointed to serve as the Disbursing Agent, and will have all powers, rights, duties and protections afforded the Disbursing Agent under the Plan.

DM3\1250241.1

**Section 11.10   Sources of Cash for Plan Distributions**.

All Cash necessary for the Disbursing Agent to make payments and Plan Distributions shall be obtained from proceeds of the Debtors' existing Cash balances and/or proceeds of the Exit Credit Facility.

**Section 11.11   Distribution Provisions**.

(a)   Distribution Record Date.

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors or their agents shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Equity Interests. The Debtors and the Prepetition Agent shall have no obligation to recognize any transfer of any Claims or Equity Interests occurring on or after the Distribution Record Date. The Debtors or Reorganized Debtors, as applicable, and the Prepetition Agent shall be entitled to recognize and deal for all purposes under the Plan only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date.

(b)   Plan Distributions.

Reorganized White Energy, Inc. as Disbursing Agent shall make all Plan Distributions. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

(c)   Timing of Plan Distributions.

Each Plan Distribution shall be made on the relevant Distribution Date therefor and shall be deemed to have been timely made if made on such date or within ten (10) days thereafter.

(d)   The Disbursing Agent shall make all Plan Distributions on account of Allowed Secured Lender Claims to the Prepetition Agent, which Plan Distributions the Prepetition Agent shall distribute to the holders of Allowed Secured Lender Claims pursuant to the Plan.

(e)   Interim Distributions may be made from time to time at the discretion of the Disbursing Agent.

(f)   Address for Delivery of Plan Distributions/Unclaimed Distributions.

Subject to Bankruptcy Rule 9010, any Plan Distribution or delivery to a holder of an Allowed Claim shall be made at the last known address of such holder as set forth (a) in the Schedules filed with the Bankruptcy Court unless the Debtors have been notified in writing of a change of address, including by the filing of a Proof of Claim by such holder that contains an address for such holder different from the address reflected in such Schedules for such holder, (b) on the Proof of Claim filed by such holder, (c) in any notice of assignment filed with the

Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e) on or before the Distribution Record Date, or (d) in any notice served by such holder giving details of a change of address. If any Plan Distribution is returned to the Disbursing Agent as undeliverable, no Plan Distributions shall be made to such holder unless the Disbursing Agent is notified of such holder's then current address within ninety (90) days after such Plan Distribution was returned. After such date, if such notice was not provided, a holder shall have forfeited its right to such Plan Distribution, and the undeliverable Plan Distributions shall be returned to Reorganized White Energy, Inc. for distribution.

(g)     De Minimis Distributions.

Notwithstanding anything to the contrary in the Plan, any holder of an Allowed Claim that would have received a Plan Distribution of less than twenty-five dollars ($25.00) with respect to such Allowed Claim shall not receive any Plan Distribution. The unpaid Plan Distributions of under $25.00 shall be redistributed to the other holders of Allowed General Unsecured Claims.

(h)     Time Bar to Cash Payments.

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued. Any claim in respect of such a voided check shall be made within ninety (90) days after the date of issuance of such check. If no request is made as provided in the preceding sentence, any claims in respect of such voided check shall be discharged and forever barred and such unclaimed Plan Distribution shall revert to the Reorganized Debtors.

(i)     Manner of Payment under the Plan.

All Plan Distributions of Cash, New Common Stock and New Term Loans, as applicable, to the creditors of each of the Debtors under the Plan (or to the New LLC in the case of the Class 2 New Common Stock) shall be made by the Disbursing Agent or its designee on behalf of the applicable Debtor.

Unless the Person receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may, in addition to the foregoing, be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

(j)     Fractional Plan Distributions.

Except as provided in section 7.9.4 of the Plan, no payments of fractions of dollars shall be made under the Plan. Fractions of dollars shall be rounded to the nearest whole dollar (up and down) with any half dollar rounded down. No fractional shares of New Common Stock shall be issued or distributed under the Plan. If any Plan Distribution would result in the

issuance of shares of New Common Stock that is not a whole number, the actual Plan Distribution of shares of New Common Stock shall be rounded to the next higher or lower number, with fractions of one-half or less being rounded down. The total number of shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the rounding provided for in the Plan. No consideration shall be provided in lieu of fractional shares that are rounded down. The New Term Loan Notes shall be issued in dollars and cents.

### Section 11.12   Setoffs.

Other than with respect to the Secured Lender Claims (as to which any and all rights of setoff or recoupment have been waived), the Debtors or the Reorganized Debtors may, but shall not be required to, apply setoff or recoupment against any Claim (for purposes of determining the Allowed amount of such Claim on which a Plan Distribution shall be made), any claims, rights, or Causes of Action of any nature whatsoever that the Debtors or Reorganized Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such claim, right or Cause of Action the Debtors or Reorganized Debtors may have against the holder of such Claim.

### Section 11.13   Procedures for Resolving and Treating Contested Claims.

(a)   Prosecution of Contested Claims.

Unless otherwise ordered by the Bankruptcy Court, only the Disbursing Agent shall be entitled to object to, settle, compromise, withdraw or litigate objections to Claims. Any objections to Claims shall be served and filed on or before the Claims Objection Deadline (subject to being extended by the order of the Bankruptcy Court upon motion of the Disbursing Agent without notice or a hearing).

(b)   Claims Objection Deadline.

As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date (subject to being extended by order of the Bankruptcy Court upon motion of the Disbursing Agent without notice or a hearing to all creditors), objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made. If an objection has not been filed to a Proof of Claim or a Scheduled Claim by the Claims Objection Deadline, the Claim to which the Proof of Claim or Scheduled Claim relates will be treated as an Allowed Claim, if such Claim has not been previously Allowed.

(c)   Claims Settlement.

From and after the Effective Date, the Disbursing Agent shall have authority to settle or compromise all Claims and Causes of Action (except for Claims and Causes of Action asserted by or against Fagen, Inc.) without further review or approval of the Bankruptcy Court, other than any settlement or compromise of a Claim or Cause of Action that involves an Insider.

(d)     No Plan Distributions Pending Allowance.

Notwithstanding any other provision of the Plan, no payments or Plan Distributions shall be made with respect to all or any portion of a Claim that is Contested in whole or in part, unless and until all objections to such Claim have been settled or withdrawn or have been determined by Final Order, and the Claim or some portion thereof, has become an Allowed Claim.

(e)     Distributions After Allowance.

Subject to setoff rights under section 7.10 of the Plan, and subject to section 8.4 of the Plan, after such time as a Contested Claim becomes, in whole or in part, an Allowed Claim, the Disbursing Agent shall distribute to the holder thereof the Plan Distributions if any to which such holder is entitled under the Plan.  No interest shall be paid on any Contested Claim that later becomes an Allowed Claim.

(f)     Contested Claims Reserve.

The Disbursing Agent shall establish appropriate reserves for Contested Claims by withholding the lesser of (a) 100% of the Plan Distribution to which holders of Contested Claims would be entitled under the Plan if such Contested Claims were Allowed Claims, or (b) such other amount as may be approved by the Bankruptcy Court.

On, or as soon as practicable after the Initial Distribution Date, Reorganized White Energy, Inc. shall transmit to the Disbursing Agent the Cash that would otherwise be distributable to a holder of a General Unsecured Claim if such Claim were not a Contested Claim.

(g)     No Recourse Against the Debtors or Reorganized Debtors.

Any holder of a Contested Claim that ultimately becomes an Allowed Claim shall be entitled to receive its applicable Plan Distribution solely from the Contested Claim Reserve established on account of such Contested Claim.  In no event shall any holder of a Contested Claim have any recourse with respect to Plan Distributions made, or to be made, under the Plan to holders of such Claims, to any Debtor or Reorganized Debtor or their Related Persons on account of such Contested Claim, regardless of whether such Contested Claim shall ultimately become an Allowed Claim, and regardless of whether sufficient Cash remains available for distribution in the Contested Claim Reserve established on account of such Contested Claim at the time such Claim becomes entitled to receive a Plan Distribution.

**Section 11.14   Conditions Precedent to Confirmation of Plan.**

The Plan will not be confirmed and the Confirmation Order will not be entered until and unless each of the following conditions has occurred or been waived in accordance with the terms of the Plan:

(a)     The clerk of the Bankruptcy Court shall have entered an order or orders:

(i)     approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(ii)     determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan;

(iii)     confirming and giving effect to the terms and provisions of the Plan;

(iv)     determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Debtors and the Plan;

(v)     approving the Plan Documents, including the New Financing Documents; and

(vi)     authorizing the Debtors to execute, enter into, and deliver the Plan Documents and to execute, implement, and to take all actions otherwise necessary or appropriate to give effect to, the transactions contemplated by the Plan and the Plan Documents.

(b)     Each of the Confirmation Order, the Plan Documents and the Plan shall be in form and substance satisfactory to the Prepetition Agent (After Consultation with the Debtors), the Requisite Secured Lenders, the Exit Facility Lenders and the Exit Facility Agent, each in the exercise of their sole and absolute discretion.

(c)     The Schedule of Assumed Executory Contracts shall be acceptable to the Requisite Secured Lenders and the Prepetition Agent (After Consultation with the Debtors), each in the exercise of its sole and absolute discretion.

(d)     The Confirmation Order shall be entered no later than March 8, 2010, time being strictly of the essence.

**Section 11.15    Conditions Precedent to the Occurrence of the Effective Date**.

The Effective Date of the Plan shall not occur unless and until each of the following conditions has occurred or has been waived in accordance with the terms of the Plan:

(a)     the Confirmation Order shall have been entered, shall have become a Final Order, and shall be acceptable to the Prepetition Agent (After Consultation with the Debtors), the Requisite Secured Lenders, the Exit Facility Lenders and the Exit Facility Agent, each in the exercise of their sole and absolute discretion;

(b)     all necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan, including satisfaction or waiver of all conditions to (i) the obligations of the Debtors under the Plan and the Plan Documents and (ii) the obligations of the holders of Allowed Secured Lenders under the New Financing Documents;

(c)    the Exit Credit Facility shall have been entered into by all parties thereto and all conditions to the initial draw thereunder shall have been satisfied in accordance with the terms thereof such that the Reorganized Debtors shall have credit available to them to provide financing sufficient to meet their Cash obligations under the Plan and have sufficient borrowing capacity to satisfy their working capital requirements as of the Effective Date;

(d)    all agreements and other instruments that are exhibits to the Plan or included in the Plan Supplement shall be acceptable to the Requisite Secured Lenders and the Prepetition Agent (After Consultation with the Debtors), each in the exercise of its sole and absolute discretion;

(e)    all actions, documents and agreements necessary to implement the Plan and the transactions contemplated by the Plan shall have been effected or executed;

(f)    the New Term Loan Facility shall have been entered into by all of the parties thereto, and the New Term Loan Notes shall have been issued thereunder;

(g)    the New Common Stock to be issued under the Plan shall have been duly authorized and, upon issuance, shall be validly issued and outstanding;

(h)    the New LLC shall have been formed by filing a certificate of formation with the Delaware Secretary of State;

(i)    the Effective Date shall have occurred no later than April 8, 2010, time being strictly of the essence;

(j)    all fees, reasonable costs and expenses of the Prepetition Agent incurred under the Credit Agreement on or prior to the Effective Date shall have been paid in full;

(k)    the Stockholders' Agreement shall have been entered into by all the parties thereto; and

(l)    the deposit of Cash required by section 4.6.5 of the Plan.

**Section 11.16   Waiver of Conditions**.

The Requisite Secured Lenders and the Prepetition Agent, in the exercise of their sole and absolute discretion, may waive, in whole or in part, any of the conditions to confirmation of the Plan or the effectiveness of the Plan. Any such waiver of a condition may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

**Section 11.17   Effect of Non-Occurrence of the Effective Date**.

In the event that the conditions specified in section 9.2 of the Plan have not been satisfied or waived in accordance with section 9.3 of the Plan, and upon notification submitted

by the Debtors or the Prepetition Agent to the Bankruptcy Court, (a) the Confirmation Order shall be vacated; (b) no Plan Distributions shall be made; (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (d) all of the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained in the Plan or Disclosure Statement shall be deemed to constitute a waiver or release of any Claims or Causes of Action by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any proceedings further involving the Debtors.

<b>Section 11.18   Releases by Holders of Claims and Equity Interests</b>.

(a)      Releases and Injunction Related to Releases.

**Releases by Debtors**

**Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Debtors and Reorganized Debtors and their respective Estates and each of their respective Related Persons, and the Committee and their Professional Persons or any other representative of the Estates will be deemed to completely and forever release, waive, void, extinguish and discharge all Released Actions (other than (x) the rights to enforce the Plan and any right or obligation under the Plan, (y) the securities, contracts, instruments, releases, indentures and other agreements or documents delivered under the Plan or contemplated thereby, including the Plan Documents, and (z) the Fagen Litigation) that may be asserted against the Released Parties or any of their respective Related Persons by or on behalf of the Debtors or Reorganized Debtors or their respective Estates.**

**Releases by Holders of Claims and Equity Interests**

**Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, the Committee and each Person receiving a Plan Distribution, and each of their respective Related Persons will be deemed to completely and forever release, waive, void, extinguish and discharge all Released Actions (other than (x) the rights to enforce the Plan, and any right or obligation under the Plan, the securities, contracts, instruments, releases, indentures and other agreements or documents delivered under the Plan or contemplated thereby, including the Plan Documents, and (y) the Fagen Litigation) that may be asserted against the Released Parties or any of their Related Persons.**

**Injunction Related to Releases**

**Each Person that is a holder of a Claim and/or an Equity Interest and any other party in interest and each of their respective Related Persons is permanently, forever and completely stayed, restrained, prohibited and enjoined from, directly or indirectly, derivatively or otherwise, commencing or continuing any Released Action against any Released Party.  Nothing in the Plan or Disclosure Statement shall prejudice any right, remedy, defense, claim, cross-claim or counterclaim or third-party claim that any Person**

may have against any Person other than with respect to the Released Actions against the Released Parties.

## No Personal Liability

No officer or director of any of the Debtors or the Reorganized Debtors who was an officer or director as of or after the Petition Date shall have any personal liability for any Claims, obligations, suits, judgments, damages, debts, rights, Causes of Action or liabilities, or any Equity Interests or rights of an equity security holder, whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, now existing or hereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other circumstance that occurred, arose, took place, existed or exists on or prior to the Effective Date in connection with or related to the Debtors or their respective Estates, or their business operations.

## Deemed Consent.

By voting to accept the Plan or accepting any Plan Distribution, each holder of a Claim will be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the exculpations, releases and injunctions set forth in the Plan.

No Release of Willful Misconduct or Gross Negligence.

Nothing in the Plan shall be construed to release any party from willful misconduct or gross negligence as determined by Final Order.

### Section 11.19   Assumption and Rejection of Executory Contracts.

(a)      Default Rejection.

Any Executory Contract (i) which is not listed on the Schedule of Assumed Executory Contracts that will be included in the Plan Supplement; (ii) which has not expired by its own terms on or prior to the Confirmation Date; (iii) which has not been assumed or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date; and (iv) which is not the subject of a motion to reject pending as of the Confirmation Date, shall be deemed to be a rejected Executory Contract by the applicable Reorganized Debtor effective on the Confirmation Date, and the Plan shall constitute a motion to reject each such Executory Contract; provided, however, that the Prepetition Agent (After Consultation with the Debtors) with the consent of the Requisite Secured Lenders reserves the right, on or prior to the Confirmation Date, to amend the Schedule of Assumed Executory Contracts, to delete any Executory Contract therefrom or add any Executory Contract thereto, in which event such Executory Contract(s) shall be deemed to be, respectively, rejected by the Reorganized Debtors or assumed.  The Debtors or the Prepetition Agent shall provide notice of any amendments to the Schedule of Assumed Executory Contracts to the parties to the Executory Contracts affected thereby and to the Prepetition Agent on behalf of the Secured Lenders.  The listing of a document on the Schedule of Assumed Executory Contracts shall not constitute an admission by

43

the Debtors that such document is an Executory Contract or that the Debtors have any liability thereunder.

(b)    <u>Real Property Related Contracts, Leases and Interests.</u>

Each Executory Contract that is rejected or assumed that relates to the use or occupancy of real property shall include (i) modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract, without regard to whether such agreement, instrument or other document is listed on the Schedule of Assumed Executory Contracts and (ii) all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vault, tunnel or bridge agreements or franchises, and any other interests in real estate or rights <u>in rem</u> relating to such premises to the extent any of the foregoing are Executory Contracts.

The Plan shall constitute a motion to reject all Executory Contracts not set forth on the Schedule of Assumed Executory Contracts and the Debtors shall have no liability thereunder except that any Claim related to a rejected Executory Contract shall be treated as a General Unsecured Claim. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each rejection is in the best interests of the Debtors and their Estates.

The Plan shall constitute a motion to assume all Executory Contracts set forth on the Schedule of Assumed Executory Contracts. Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumption pursuant to sections 365(a) and (b) of the Bankruptcy Code and a finding by the Bankruptcy Court that each assumption is in the best interests of the Debtors and their Estate.

Any non-Debtor counterparty to any Executory Contract designated as being assumed that disputes the assumption of such Executory Contract must file with the Bankruptcy Court, and serve upon the Debtors, the Committee and the Prepetition Agent, a written objection to assumption, which objection shall set forth the basis for the dispute by no later than ten (10) days prior to the Confirmation Hearing. The failure to timely object shall be deemed a waiver of any and all objections to the assumption of Executory Contracts designated as being assumed in section 11.1.4 of the Plan.

(c)    <u>Cure.</u>

With respect to each Assumed Executory Contract, any monetary amounts required as Cure Payments shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash as soon as practicable after and in no event later than 30 days after the latest of: (a) the Effective Date; (b) the date following notice to Reorganized White Energy, Inc. of the amount due; or (c) upon such other terms as may be agreed upon by the non-Debtor party to such Assumed Executory Contract and the Prepetition Agent (After Consultation with the Debtors), or in each case, as soon thereafter as is practicable. In the event of a dispute regarding (i) the amount of any Cure Payment, (ii) the ability of the

44

applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Assumed Executory Contract or (iii) any other matter pertaining to assumption of the Executory Contract, the Cure Payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such dispute.

Any non-Debtor counterparty to an Executory Contract assumed pursuant to the Plan that disputes the scheduled cure obligation must file with the Bankruptcy Court, and serve upon the Debtors, the Committee and the Prepetition Agent, a written objection to the cure obligation, which objection shall set forth the basis for the dispute and the alleged correct cure obligation, no later than ten (10) Business Days prior to the Confirmation Hearing. The Confirmation Order may contain additional provisions for notice of proposed assumptions and proposed Cure Payment amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. If a non-Debtor counterparty fails to file and serve an objection which complies with the foregoing, the cure obligation set forth on the Schedule of Assumed Executory Contracts shall be binding on the non-Debtor counterparty, and the non-Debtor counterparty shall be deemed to have waived any and all objections to the assumption of the relevant agreement. If no Cure Payment amount is proposed by the Debtors or the Prepetition Agent, it shall be presumed that the Debtors are asserting that no Cure Payment amount is required to be paid under section 365(b)(1) of the Bankruptcy Code. In the event of a conflict between the notice and objection procedures set forth in the Plan and the Confirmation Order, the terms of the Confirmation Order shall control notwithstanding anything else in the Plan to the contrary.

(d)     Claims Arising from Rejected Contracts.

Claims arising from the rejection of Executory Contracts must be filed with the Bankruptcy Court and served on the Debtors, their counsel and counsel for the Prepetition Agent within thirty (30) days after service of (a) the Notice of Confirmation or (b) other notice that the Executory Contract has been rejected. Any Claims for which a Proof of Claim is not filed and served within such time will be forever barred from assertion and shall not be enforceable against the Debtors, their respective Estates, Affiliates, Assets, properties or interests in property or against the Reorganized Debtors or their respective Estates, Assets, property or interests in property. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are properly filed and served shall be treated as General Unsecured Claims (Class 5) under the Plan and shall be subject to objection by the Disbursing Agent.

**Section 11.20   Survival of Indemnification Obligations**.

The provisions of the Credit Agreement governing the relationship of the Prepetition Agent and the Secured Lenders, including those provisions relating to the Prepetition Agent's rights of indemnification from the Secured Lenders, shall not be affected by and shall survive the Plan, entry of the Confirmation Order and the occurrence of the Effective Date.

DM3\1250241.1

**Section 11.21   Retention Of Jurisdiction**.

On and after the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction over all matters arising in, arising under, or related to the Chapter 11 Cases, and such other matters as set forth in Article XII of the Plan.

# ARTICLE XII.

# RISK FACTORS

**Section 12.1    Certain Bankruptcy Considerations**.

If the Plan is not confirmed and consummated, there can be no assurance that any alternative plan of reorganization would be on terms as favorable to the holders of Claims as the terms of the Plan.  In addition, if a protracted reorganization were to occur, there is a substantial risk that holders of Claims would receive less than they will receive under the Plan.  See **Exhibit D** to the Disclosure Statement for a liquidation analysis of the Debtors.

**Section 12.2    The Reorganized Debtors' Actual Financial Results May Vary Significantly from the Projections Included in this Disclosure Statement**.

The financial projections included in this Disclosure Statement are dependent upon the successful implementation of the Reorganized Debtors' business plan and the validity of the numerous assumptions contained therein.  The significant assumptions underlying the Projections are discussed in greater detail in **Exhibit C** to this Disclosure Statement.

Many of these assumptions are beyond the control of the Debtors and may not materialize.  In addition, unanticipated events and circumstances occurring subsequent to the preparation of the Projections may adversely affect the financial results of the Reorganized Debtors.  Although the Debtors and the Prepetition Agent believe that the Projections and assumptions are reasonable, variations between the actual financial results and those projected may be material.

**Section 12.3    Competition, Market Considerations/Volatility and Other Variables**.

Forward-looking statements involve risks and uncertainties, which could cause actual results or outcomes to differ materially from those expressed. Forward-looking statements in this Disclosure Statement or in the Projections reflect expectations regarding future revenues and expenses, the effect of state and federal regulations on our operations and revenues, ethanol plant operations, reliability and downtime, capital expenditures, commodity prices, linkage of ethanol and corn prices in the future, ethanol and distillers grain prices, corn costs, increased yields from production, hedging strategies, corn usage and ethanol production, general and administrative costs, chemical and denaturant costs, among many other variables.  The Debtors' expectations, beliefs and projections are expressed in good faith and are believed by the Debtors to have a reasonable basis, including without limitation, management's examination of historical operating trends, data contained in the Debtors' records and other data available from third parties. Nonetheless, the Debtors' expectations, beliefs or projections may not be achieved or

accomplished. Forward-looking statements are subject to known and unknown risks and uncertainties.

The Debtors' results of operations, financial position and business will be highly dependent on commodity prices, which are subject to significant volatility and uncertainty, and the availability of supplies. The Debtors' business is highly sensitive to corn prices and the Debtors generally cannot pass on increases in corn prices to customers. The spread between ethanol and corn prices can vary significantly and may not continue at recent high levels. Fluctuations in the selling price and production cost of gasoline may reduce profit margins. The price of distillers grains is affected by the price of other commodity products, such as soybeans, and decreases in the price of these commodities could decrease the price of distillers grains. The Debtors' business is subject to seasonal fluctuations. The Debtors engage in hedging transactions and other risk mitigation strategies that could harm results of operations. Growth in the sale and distribution of ethanol is dependent on the changes to and expansion of related infrastructure which may not occur on a timely basis, if at all, and operations could be adversely affected by infrastructure disruptions. The Debtors have a limited operating history and business may not be as successful as envisioned. New plants under construction or decreases in the demand for ethanol may result in excess production capacity in the ethanol industry, which may cause the price of ethanol and/or distillers grains to decrease.

The Debtors' competitive position, financial position and results of operations may be adversely affected by technological advances and the Debtors' efforts to anticipate and employ such technological advances may prove unsuccessful. The U.S. ethanol industry is highly dependent upon federal and state legislation and regulation and any changes in legislation or regulation could materially and adversely affect the Debtors' results of operations and financial position. Various studies have criticized the efficiency of ethanol, in general, and corn-based ethanol in particular, which could lead to the reduction or repeal of incentives and tariffs that promote the use and domestic production of ethanol or otherwise negatively impact public perception and acceptance of ethanol as an alternative fuel. The Debtors may be adversely affected by environmental, health and safety laws, regulations and liabilities. The Debtors are dependent on their respective production facilities, and any operational disruption may result in a reduction of sales volumes, which could cause substantial losses. Competition for qualified personnel in the ethanol industry is intense and the Debtors may not be able to hire and retain qualified personnel to operate the Debtors' ethanol plants. Operations at the Debtors' facilities are subject to various uncertainties, which may cause them to not achieve results comparable to existing operational plants. The Debtors' debt level could negatively impact their financial condition, results of operations and business prospects.

### Section 12.4    Limited Liquidity of New Common Stock or New Term Loan Notes.

The New Common Stock will not qualify for listing on a securities exchange at the time it is issued on the Effective Date of the Plan, and the Debtors and Prepetition Agent do not anticipate that the New Common Stock will ever be listed or quoted on any securities exchange or quotation system or that any active trading market for them will develop in any over-the-counter market. Lack of liquidity of the New Common Stock may make it more difficult for the Reorganized Debtors to raise additional capital, if necessary, through equity

DM3\1250241.1

financings.  Similarly, the New Term Notes also will not be listed or quoted, and are not expected to be listed or quoted, on any securities exchange or quotation system.

### Section 12.5    Limited Liquidity of Interests in New LLC.

The interests in the New LLC will not qualify for listing on a securities exchange at the time they are issued and it is not anticipated that they will ever be listed on any securities exchange or quotation system.  In addition, the agreement governing the New LLC will restrict the transferability of interests in the New LLC in a number of ways, including by requiring that such interests may not be transferred except in connection with the transfer by the holder of such holder's interest in the New Term Loan Notes and by subjecting any proposed transfer to a right of first refusal and certain co-sale rights.

## ARTICLE XIII.

## SECURITIES LAW MATTERS

### Section 13.1    Issuance of New Securities.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act of 1933, as amended (the "Securities Act"), and state securities laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.  The Debtors and the Prepetition Agent believe that the offer and sale of the New Common Stock satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code and is, therefore, exempt from registration under the Securities Act and state securities laws.

### Section 13.2    Subsequent Transfers of New Common Stock.

The New Common Stock to be issued pursuant to the Plan may (except as may be limited under any shareholder or other contractual agreement) generally be freely transferred by recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the New Common Stock are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities.  Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

> (a)     persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

> (b)     persons who offer to sell securities offered under a plan for the holders of such securities;

(c)　　　persons who offer to buy such securities from the holders of such securities, if the offer to buy is with a view to distributing such securities under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

(i)　　　a person who is an "issuer" with respect to the securities as the term "issuer" is defined in section 2(11) of the Securities Act.

Under section 2(11) of the Securities Act, an "issuer" includes any Person directly or indirectly controlling or controlled by the issuer, or any Person under direct or indirect common control of the issuer.

To the extent that Persons who receive New Common Stock pursuant to the Plan are deemed to be "underwriters," resales by such Persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Persons deemed to be underwriters may, however, be permitted to sell such New Common Stock and New Term Loan Notes without registration pursuant to the provisions of Rule 144 under the Securities Act. These provisions may permit the public sale of securities received by "underwriters" if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met.

Whether or not any particular Person would be deemed to be an "underwriter" with respect to the New Common Stock or other security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors and the Prepetition Agent, on behalf of the Secured Lenders, express no view as to whether any particular Person receiving New Common Stock or other securities under the Plan would be an "underwriter" with respect to such New Common Stock or other securities.

Pursuant to the Plan, certificates evidencing the New Common Stock received by restricted holders or by a holder that the Debtors and the Prepetition Agent determine is an underwriter within the meaning of section 1145 of the Bankruptcy Code will bear a legend substantially in the form below:

**THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.**

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER, NONE OF THE DEBTORS OR THE PREPETITION AGENT ON BEHALF OF THE SECURED LENDERS MAKES ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN.  The Debtors and the Prepetition Agent, on behalf of the Secured Lenders,  recommend that potential recipients of the New Common Stock consult their own counsel concerning whether they may freely trade the New Common Stock under the Securities Act and/or state securities laws.

### Section 13.3     Delivery of Disclosure Statement.

Under section 1145(a)(4) of the Bankruptcy Code, "stockbrokers" (as that term is defined in section 101(53A) of the Bankruptcy Code) are required to deliver to their customers, for the first 40 days after the Effective Date, a copy of this Disclosure Statement (and any supplement to it ordered by the Bankruptcy Court) at or before the time of delivery of any security issued under the Plan.

### Section 13.4     SEC Reporting Requirements.

White Energy, Inc. is not currently required to file reports with the SEC under the Exchange Act of 1934 because it does not have a class of equity securities with 500 or more record holders.  The Debtors and the Prepetition Agent, on behalf of the Secured Lenders, believe that the number of record holders of the New Common Stock will be less than 500 and that it will not be required to commence filing reports with the SEC as a result of the transactions provided for in the Plan.

### Section 13.5     Transfers of Interests in the New LLC.

Transfers of Interests in the New LLC will be subject to a number of restrictions, including those described in section 12.5.  In addition to those restrictions, the agreement governing the New LLC will provide that such interests may not be transferred except pursuant to an effective registration statement under the Securities Act or unless an exemption from registration under the Securities Act is available with respect thereto.

## ARTICLE XIV.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The confirmation and execution of the Plan may have tax consequences to holders of Claims and Equity Interests.  The Debtors and the Prepetition Agent, on behalf of the Secured Lenders, offer no opinion as to the tax consequences to holders of Claims and Equity Interests as a result of the confirmation and Distributions under the Plan.  All holders should satisfy themselves as to their own tax consequences by obtaining independent advice from their own tax advisors.

# ARTICLE XV.

## ALTERNATIVES TO CONFIRMATION AND

## CONSUMMATION OF THE PLAN

The Debtors and the Prepetition Agent have evaluated numerous alternatives to the Plan, including, without limitation, the sale of the Debtors as a going concern, either in their entirety or on limited bases, and the liquidation of the Debtors. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries of holders of Claims. The following discussion provides a summary of the analysis supporting the conclusion that a liquidation of the Debtors or an alternative plan of reorganization for the Debtors will not provide higher value to holders of Claims.

### Section 15.1    Liquidation Under Chapter 7 of the Bankruptcy Code.

If no plan of reorganization can be confirmed, the Chapter 11 Cases of the Debtors may be converted to cases under chapter 7, in which event a trustee would be elected or appointed to liquidate the properties and interests in property of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because of (1) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee for bankruptcy and professional advisors to such trustee; (2) the erosion in value of assets in the context of the expeditious liquidation required under chapter 7 and the "forced sale" environment in which such a liquidation would likely occur; (3) the adverse effects on the salability of business segments as a result of the likely departure of key employees and the loss of customers; and (4) the substantial increases in claims which would have to be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases. Accordingly, the Debtors have determined that confirmation of the Plan will provide each holder of a Claim with a greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7.

Section 1129(a)(7) of the Bankruptcy Code provides that with respect to impaired classes, each holder of a claim or interest of such class must receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount such holder would so receive or retain if the debtor liquidated under chapter 7 of the Bankruptcy Code on such date. As the Plan provides for a greater recovery to holders of Claims than they would receive in a liquidation under chapter 7 of the Bankruptcy Code, the Plan satisfies section 1129(a)(7).

### Section 15.2    Alternative Plans of Reorganization.

Other parties in interest can undertake to formulate different plans of reorganization for the Debtors. Such a plan of reorganization might involve either (x) a reorganization and continuation of the business of the Debtors, (y) the sale of the Debtors as a going concern or (z) an orderly liquidation of the properties and interests in property of the Debtors. With respect to an alternative plan of reorganization, the Debtors and the Prepetition

Agent have examined various other alternatives in connection with the process involved in the formulation and development of the Plan. The Debtors and the Prepetition Agent believe that the Plan, as described herein, enables holders of Claims to realize the best recoveries under the present circumstances. In a liquidation of the Debtors under chapter 11, the properties and interests in property would be sold in a more orderly fashion and over a more extended period of time than in a liquidation under chapter 7, probably resulting in marginally greater recoveries. Further, if a trustee were not appointed, since one is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than in a chapter 7 case. However, although preferable to a chapter 7 liquidation, the Debtors and the Prepetition Agent believe that a liquidation under chapter 11 for the Debtors is a much less attractive alternative to holders of Claims than the Plan because the recovery realized by holders of Claims under the Plan is likely to be greater than the recovery under a chapter 11 liquidation.

*[Remainder of this page intentionally left blank.]*

DM3\1250241.1

# ARTICLE XVI.

## CONCLUSION

The Debtors and the Prepetition Agent, on behalf of the Secured Lenders, believe that the Plan is in the best interest of all holders of Claims, and urge all holders of Claims in an impaired class to vote to accept the Plan and to evidence such acceptance by returning their Ballots in accordance with the instructions accompanying the Disclosure Statement.

Dated:  January 12, 2010

DM3\1250241.1

**White Energy, Inc.**

**By:** _____

John Castle
Chief Financial Officer

Dated: January 12, 2010

**White Energy Holding Company, LLC**

By: _____
John Castle
Chief Financial Officer

Dated: January 12, 2010

**U.S. Energy Partners, LLC**

By:  _____

John Castle
Chief Financial Officer

Dated:  January 12, 2010

**WE Hereford, LLC**

By: _____
John Castle
Chief Financial Officer

Dated:  January 12, 2010

**Plainview BioEnergy, LLC**

By: _____

John Castle
Chief Financial Officer

Dated: January 12, 2010

**WestLB, AG, New York Branch, as Administrative Agent**

**By:** _____


Dated:  January _____, 2010


**By:** _____


  Dated:  January _____, 2010