# EXHIBIT B

**$150,000,000**

**SENIOR SUBORDINATED TERM FACILITY AGREEMENT**

Dated as of [_____], 2010

among

**WHITE ENERGY HOLDING COMPANY, LLC**,

as the Borrower,

**WHITE ENERGY, INC.,**

as the Pledgor**,**

**SUBSIDIARIES OF THE BORROWER**
**PARTY TO THIS AGREEMENT**
**FROM TIME TO TIME**,

as Borrower Subsidiaries,

**WESTLB AG, NEW YORK BRANCH**,

as the Agent,

and

**LENDERS**
**THAT HAVE SIGNED A SIGNATURE PAGE TO THIS AGREEMENT OR**
**PARTY TO THIS AGREEMENT**
**FROM TIME TO TIME**,

as Lenders

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY AND WHETHER OR NOT OTHERWISE EXPRESSLY SET FORTH HEREIN, THE RIGHTS AND REMEDIES OF THE LENDERS SET FORTH HEREIN AND THE LIENS AND SECURITY INTERESTS CREATED HEREBY ARE SUBORDINATE IN THE MANNER AND TO THE EXTENT SET FORTH IN THE SUBORDINATION AGREEMENT (AS DEFINED BELOW) TO THE RIGHTS AND REMEDIES AND LIENS AND SECURITY INTERESTS IN FAVOR OF THE SENIOR EXIT FACILITY CREDITORS UNDER AND PURSUANT TO THE SENIOR EXIT FINANCING DOCUMENTS (EACH AS DEFINED IN THE SUBORDINATION AGREEMENT). IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THE SUBORDINATION AGREEMENT AND THIS AGREEMENT, THE TERMS OF THE SUBORDINATION AGREEMENT SHALL GOVERN AND CONTROL.

# TABLE OF CONTENTS

This Table of Contents is not part of the Agreement to which it is attached but is inserted for convenience only.

Page

ARTICLE I DEFINITIONS AND INTERPRETIVE MATTERS ............................................. 2
    1.01    Certain Defined Terms............................................................................. 2
    1.02    Accounting Terms and Determinations ................................................. 37
    1.03    Types of Loans...................................................................................... 38
    1.04    Certain Principles of Interpretation...................................................... 38

ARTICLE II LOAN INCURRED AMOUNTS................................................................. 39
    2.01    Loans..................................................................................................... 39
    2.02    Fees ....................................................................................................... 39
    2.03    Lending Offices .................................................................................... 39
    2.04    Remedies Independent .......................................................................... 39
    2.05    Notes ..................................................................................................... 39
    2.06    Holdings of Loans and Equity Interests................................................ 40

ARTICLE III PAYMENTS OF PRINCIPAL AND INTEREST ............................................. 41
    3.01    Repayment of Loans ............................................................................. 41
    3.02    Interest................................................................................................... 41
    3.03    Prepayments and Conversions or Continuations of Loans ................... 42
    3.04    Mandatory Prepayments ....................................................................... 42

ARTICLE IV PAYMENTS; PRO RATA TREATMENT; COMPUTATIONS; ETC............... 44
    4.01    Payments............................................................................................... 44
    4.02    Pro Rata Treatment ............................................................................... 45
    4.03    Computations ........................................................................................ 46
    4.04    Minimum Amounts................................................................................ 46
    4.05    Certain Notices...................................................................................... 46
    4.06    Non-Receipt of Funds by the Agent ..................................................... 47
    4.07    Sharing of Payments; Etc...................................................................... 48

ARTICLE V YIELD PROTECTION; ETC. ................................................................... 49
    5.01    Alternate Rate of Interest...................................................................... 49
    5.02    Increased Costs ..................................................................................... 49
    5.03    Taxes..................................................................................................... 50
    5.04    Illegality ............................................................................................... 51
    5.05    Mitigation of Secured Obligations; Replacement of Lenders............... 52
    5.06    Break Funding Payments ...................................................................... 53

ARTICLE VI CONDITIONS PRECEDENT ................................................................. 53

    6.01    Conditions to Closing ............................................................... 53

ARTICLE VII REPRESENTATIONS AND WARRANTIES. ................................. 61

    7.01    Existence ...................................................................................... 61

    7.02    Financial Condition................................................................... 61

    7.03    Action........................................................................................... 62

    7.04    No Breach ................................................................................... 62

    7.05    Government Approvals; Government Rules.......................... 62

    7.06    Proceedings................................................................................ 63

    7.07    Environmental Matters............................................................ 63

    7.08    Taxes ........................................................................................... 64

    7.09    Tax Status................................................................................... 64

    7.10    ERISA; ERISA Event; Labor Relations ............................. 64

    7.11    Nature of Business; Property ................................................. 65

    7.12    Security Documents.................................................................. 66

    7.13    Subsidiaries ............................................................................... 66

    7.14    Status; Investment Company Regulation ............................ 66

    7.15    Material Project Documents; Licenses ................................ 66

    7.16    Use of Proceeds........................................................................ 67

    7.17    Disclosure .................................................................................. 67

    7.18    Fees .............................................................................................. 68

    7.19    Insurance.................................................................................... 68

    7.20    Investments ............................................................................... 68

    7.21    No Material Adverse Effect .................................................... 68

    7.22    Absence of Default ................................................................... 68

    7.23    Event of Loss ............................................................................. 68

    7.24    Real Property ............................................................................ 68

    7.25    Plan Effective Date .................................................................. 71

    7.26    Patriot Act ................................................................................. 71

ARTICLE VIII COVENANTS................................................................................... 72

    8.01    Reporting Requirements ......................................................... 72

    8.02    Maintenance of Existence; Etc.............................................. 75

    8.03    Compliance with Government Rules; Etc............................. 76

    8.04    Environmental Compliance .................................................... 76

    8.05    Insurance; Events of Loss ...................................................... 77

    8.06    Proceedings................................................................................ 80

    8.07    Taxes ........................................................................................... 81

    8.08    Books and Records; Inspection Rights ................................ 81

    8.09    Maintenance of Lien ................................................................ 81

    8.10    Prohibition of Fundamental Changes.................................. 81

    8.11    Liens............................................................................................ 82

    8.12    Investments ............................................................................... 83

    8.13    Hedging Arrangements ........................................................... 84

    8.14    Indebtedness.............................................................................. 85

    8.15    Restricted Payments................................................................ 86

8.16    Nature of Business ................................................................................. 86
8.17    Maintenance of Properties ..................................................................... 87
8.18    Project Documents; Etc........................................................................... 87
8.19    Operating and Capital Budgets .............................................................. 88
8.20    Operating Statements and Reports.......................................................... 89
8.21    Transactions with Affiliates ................................................................... 90
8.22    Other Documents and Information ......................................................... 90
8.23    Board Observer Rights ........................................................................... 91
8.24    Financial Covenants................................................................................ 91
8.25    Deposit Accounts .................................................................................... 92
8.26    Non-circumvention ................................................................................. 92
8.27    Cooperation; Further Assurances ........................................................... 93

ARTICLE IX EVENTS OF DEFAULT............................................................... 93
9.01    Events of Default; Remedies .................................................................. 93

ARTICLE X THE AGENT .................................................................................. 97
10.01   Appointment, Powers and Immunities.................................................... 97
10.02   Reliance by the Agent ............................................................................ 97
10.03   Defaults ................................................................................................... 98
10.04   Rights as a Lender .................................................................................. 98
10.05   Indemnification ....................................................................................... 98
10.06   Non-Reliance on the Agent and Other Lenders...................................... 99
10.07   Failure to Act ......................................................................................... 99
10.08   Resignation or Removal of the Agent.................................................... 100
10.09   Consents under Transaction Documents ................................................ 100
10.10   Appointment of the Collateral Agent..................................................... 100
10.11   Reports, Etc............................................................................................. 101
10.12   Appointment; Subordination Agreement ............................................... 101

ARTICLE XI GUARANTEE ............................................................................... 101
11.01   The Guarantee ......................................................................................... 101
11.02   Obligations Unconditional ...................................................................... 101
11.03   Reinstatement........................................................................................... 102
11.04   Subrogation .............................................................................................. 103
11.05   Remedies.................................................................................................. 103
11.06   Instrument for the Payment of Money .................................................... 103
11.07   Continuing Guarantee ............................................................................. 103
11.08   Rights of Contribution ............................................................................ 103
11.09   General Limitation on Guarantee Obligations ....................................... 104
11.10   Additional Borrower Subsidiaries .......................................................... 104

ARTICLE XII MISCELLANEOUS ..................................................................... 105
12.01   Waiver...................................................................................................... 105
12.02   Notices ..................................................................................................... 105
12.03   Expenses; Indemnification; Etc .............................................................. 105
12.04   Amendments; Etc..................................................................................... 107

12.05 Successors and Assigns.................................................................................. 108
12.06 Assignments and Participations ...................................................................... 108
12.07 SUBMISSION TO JURISDICTION; WAIVERS ........................................... 110
12.08 Marshalling; Recapture ................................................................................... 111
12.09 Treatment of Certain Information; Confidentiality.......................................... 111
12.10 Interest Rate Limitation .................................................................................. 112
12.11 Limitation of Liability..................................................................................... 112
12.12 Survival ........................................................................................................... 113
12.13 Captions .......................................................................................................... 113
12.14 Counterparts; Integration; Effectiveness........................................................ 113
12.15 Reinstatement.................................................................................................. 114
12.16 Severability ..................................................................................................... 114
12.17 Remedies ......................................................................................................... 114
12.18 NO THIRD PARTY BENEFICIARIES ......................................................... 114
12.19 SPECIAL EXCULPATION ........................................................................... 114
12.20 Execution of Lender Signature Pages ............................................................. 115
12.21 Governing Law ................................................................................................ 115
12.22 Waiver of Jury Trial........................................................................................ 115
12.23 Jointly Drafted ................................................................................................ 115

## APPENDICES, SCHEDULES AND EXHIBITS

APPENDIX A      –    Loan Incurred Amounts

APPENDIX B      –    Wire Transfer Details of the Agent

APPENDIX C      –    Borrower Subsidiaries

APPENDIX D      –    Project Documents with Affiliates

APPENDIX E      –    Amortization Schedule

SCHEDULE 6.01(a)    –    Financing Documents

SCHEDULE 7.05(a)    –    Government Approvals

SCHEDULE 7.06    –    Proceedings

SCHEDULE 7.07    –    Environmental Matters

SCHEDULE 7.10    –    ERISA

SCHEDULE 7.11(g)    –    Lease and Occupation Rights

SCHEUDLE 7.11(h)    –    Service, Maintenance and Repair Contracts

SCHEDULE 7.15    –    Material Project Documents

SCHEDULE 8.05    –    Insurance Requirements

SCHEDULE 8.13    –    Commodity Hedging Agreements

EXHIBIT A      –    Plan of Reorganization

EXHIBIT B      –    Disclosure Statement

EXHIBIT C      –    Form of Collateral Agency Agreement

EXHIBIT D      –    Form of Consent and Agreement

EXHIBIT E      –    Form of Security Agreement

EXHIBIT F      –    Form of Pledge and Security Agreement

EXHIBIT G      –    Form of Pledge Agreement

EXHIBIT H      –    Terms of Subordination

EXHIBIT I      –    Form of Note

EXHIBIT J      –    Form of Loan Notice

EXHIBIT K      –    Form of Borrower Subsidiary Accession Agreement

EXHIBIT L      –    Form of Subordination Agreement

EXHIBIT M      –    Form of Assignment and Acceptance

EXHIBIT N      –    Form of Confidentiality Agreement

This SENIOR SUBORDINATED TERM FACILITY (this "**Agreement**" or this "**Term Facility**"), dated as of [_____], 2010, is made among WHITE ENERGY HOLDING COMPANY, LLC, a Delaware limited liability company (the "**Borrower**"), WHITE ENERGY, INC., a Delaware corporation (the "**Pledgor**"), each Borrower Subsidiary, each of the lenders that is a signatory to this Agreement identified as a "Lender" on the signature pages to this Agreement or that, pursuant to Section 12.06(b), shall become a "Lender" under this Agreement (individually, a "**Lender**" and, collectively, the "**Lenders**"), and WESTLB AG, NEW YORK BRANCH ("**WestLB**"), as administrative agent for the Lenders (in such capacity, the "**Agent**").

## WHEREAS

White Energy Inc., White Energy Holding Company, LLC, US Energy Partners, L.L.C., WE Hereford, LLC and Plainview BioEnergy, LLC (collectively, the "**Debtors**") commenced the chapter 11 cases (the "**Chapter 11 Cases**") with the filing by the Debtors of petitions for voluntary protection under chapter 11 of the Bankruptcy Code on May 7, 2009 (the "**Petition Date**"). By order of the Bankruptcy Court, the Chapter 11 Cases have been consolidated for administrative purposes and are jointly administered under Case No. 09-11601 (CSS).

Immediately prior to the Petition Date, the Borrower was party to (i) the Amended and Restated Credit Agreement among the Borrower, the Borrower Subsidiaries party thereto, WestLB AG, New York Branch, as agent, and the lenders party thereto (the "**Prepetition Lenders**"), dated as of July 31, 2006 (as amended, supplemented, modified or otherwise in effect from time to time, the "**Prepetition Credit Facility**").

On January 10, 2010, the Debtors and WestLB AG, as Administrative Agent, filed with the Bankruptcy Court the Amended Chapter 11 Plan of Reorganization for White Energy, Inc. and its Affiliated Debtors (as defined in such Plan) under Chapter 11 of the Bankruptcy Code (in the form of Exhibit A attached hereto, as it may be amended, modified or otherwise supplemented from time to time in accordance therewith and herewith, the "**Plan**") and the Disclosure Statement relating to the Plan (in the form of Exhibit B attached hereto, as it may be amended, modified or otherwise supplemented from time to time in accordance therewith and herewith, the "**Disclosure Statement**").

Substantially all of the Debtors' assets are subject to a Lien securing the obligations owing to the Prepetition Lenders under the Prepetition Credit Facility.

In connection with the implementation of the Plan and in full satisfaction of all of the Prepetition Lenders' claims under the Prepetition Credit Facility (except as otherwise set forth in the Plan), on the Plan Effective Date, (i) Reorganized White Energy, Inc. shall issue to New WEI, the New Common Stock representing 100% of the Equity Interests in Reorganized White Energy, Inc. (except for shares reserved for issuance pursuant to the Reorganized White Energy, Inc. management incentive plan) being issued by Reorganized White Energy, Inc. pursuant to the Plan, (ii) the Prepetition Lenders shall

receive 100% of the new term loans in the aggregate principal amount equal to $150,000,000, on the terms and conditions of the Term Loan Facility, and (iii) the Lenders agreed to incur such Loans in accordance with the terms of this Financing Facility.

Accordingly, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

# ARTICLE I

## DEFINITIONS AND INTERPRETIVE MATTERS

1.01    <u>Certain Defined Terms</u>.  In addition to the terms defined in the preamble above, and unless otherwise specified in this Agreement, capitalized terms used in this Agreement shall have the meanings assigned to such terms below.  Capitalized terms and other terms used in this Agreement shall be interpreted in accordance with Sections 1.02, 1.03 and 1.04 as applicable.

"**Acceptable Bank**" means any bank or trust company which is organized or licensed under the laws of the United States or any state thereof which has capital, surplus and undivided profits of at least $500,000,000 and has outstanding unguaranteed and unsecured long-term indebtedness which is rated "A" or better by S&P and "A3" or better by Moody's (or an equivalent rating by another nationally recognized statistical rating organization of similar standing if neither such corporation is in the business of rating unsecured bank indebtedness).

"**Acceptable Insurance Broker**" means any nationally recognized independent insurance broker reasonably satisfactory to the Agent, after consultation with the Insurance Consultant and the Borrower.

"**Account Control Agreement**" means any agreement entered into by and among the Collateral Agent, any Credit Party and a third party depository bank or other institution (including a securities intermediary ) in which such Credit Party maintains a Securities Account or Deposit Account and which grants the Collateral Agent a perfected second-priority security interest in and Lien on the subject account or accounts.

"**Additional Project Document**" means any contract or agreement relating to any Project entered into by any Obligor, or by an agent on behalf of such Obligor, subsequent to the Closing Date.

"**Additional Term Lender**" has the meaning given to such term in <u>Section 2.08</u>.

"**ADM**" means the Archer-Daniels-Midland Company, a Delaware corporation.

"**ADM Agreement**" means the Real Estate Purchase and Through Put Agreement entered into as of July 15, 2005 by and between WE Hereford (as successor in interest to W.E. Hereford, Ltd., a Texas limited partnership) by and through its general partner White Energy Hereford, LLC and ADM, as such agreement is amended, restated, supplemented and modified from time to time.

"**Adjusted LIBOR**" means, for the Interest Period for any Eurodollar Loan, an interest rate per annum (rounded upwards, if necessary, to the next 1/100th of 1%) equal to LIBOR for such Interest Period <u>multiplied by</u> the Statutory Reserve Rate for such Interest Period.[1]

"**Advance Date**" has the meaning given to such term in <u>Section 4.06</u>.

"**Affiliate**" means any Person that directly or indirectly Controls, or is under common Control with, or is Controlled by, a specified Person and, if such Person is an individual, any member of the immediate family (including parents, spouse, children and siblings) of such individual and any trust whose principal beneficiary is such individual or one or more members of such immediate family and any Person who is Controlled by any such member or trust. Notwithstanding the foregoing, the definition of "Affiliate" shall not encompass (a) any individual solely by reason of his or her being a director, officer or employee of any Person and (b) the Agent or any Lender.

"**Agent**" has the meaning given to such term in the preamble.

"**Agreement**" has the meaning given to such term in the preamble.

"**Amended Certificate of Incorporation**" means the certificate of incorporation of White Energy, Inc. as amended in a manner acceptable to the Majority Lenders.

"**Applicable Lending Office**" means, for each Lender and for each Type of Loan, the "Lending Office" of such Lender (or of an affiliate of such Lender) designated for such Type of Loan on <u>Appendix A</u> or such other office of such Lender (or of an affiliate of such Lender) as such Lender may from time to time specify to the Agent and the Borrower as the office for its Loans of such Type; *provided*, that any Lender may from time to time change its "Applicable Lending Office" for each Type of Loan by delivering notice of such change to the Agent and the Borrower.

"**Applicable Loss Proceeds Accounts**" means the Hereford Loss Proceeds Account, USEP Loss Proceeds Account or the Plainview Loss Proceeds Account, as applicable.

"**Applicable Margin**" means 4 percent.

---

[1] Confirm whether the LIBOR floor amount would be adjusted by the Statutory Reserve Rate.

"**Applicable Percentage**" means, with respect to any Lender, its share of the aggregate Loan Incurred Amount, expressed as a percentage.

"**Applicable Revenue Accounts**" means the Revenue Account, Hereford Revenue Account, USEP Revenue Account or Plainview Revenue Account, as applicable.

"**Authorized Officer**" means:

(a)     with respect to any Person that is a corporation, the chairman, chief executive officer, president, vice president, treasurer, assistant treasurer, attorney-in-fact, secretary or assistant secretary of such Person;

(b)     with respect to any Person that is a partnership, each general partner of such person or the chairman, chief executive officer, president, vice president, treasurer, assistant treasurer, attorney-in-fact, secretary or assistant secretary of a general partner of such Person; and

(c)     with respect to any Person that is a limited liability company, the manager, the managing partner or a duly appointed officer of such Person or the chairman, chief executive officer, president, vice president, treasurer, assistant treasurer, attorney-in-fact, secretary or assistant secretary of a manager or managing member of such Person.

"**Balances**" means the aggregated balances (determined at the end of each day) of cash held in all Collateral Accounts on such date, plus any other cash, plus all Investments specified under Section 8.12(a) through (e).

"**Bankruptcy**" means, with respect to any Person, the occurrence of any of the following events, conditions or circumstances:

(a)     such Person shall file a voluntary petition in bankruptcy or shall be adjudicated bankrupt or insolvent, or shall file any petition or answer or consent seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under the Bankruptcy Code or any present or future applicable federal, state or other statute or law relating to bankruptcy, insolvency, reorganization or other relief for debtors, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver, conservator or liquidator of such Person or of all or any substantial part of its properties (the term "acquiesce," as used in this definition, includes the failure to file in a timely manner a petition or motion to vacate or discharge any order, judgment or decree after entry of such order, judgment or decree);

(b)     an involuntary case or other proceeding shall be commenced against such Person seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief with respect to such Person or its debts under the Bankruptcy Code or any present or future

applicable federal, state or other statute or law relating to bankruptcy, insolvency, reorganization or other relief for debtors, or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed or unstayed for a period of 60 consecutive days;

(c)     a court of competent jurisdiction shall enter an order, judgment or decree approving a petition filed against such Person seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Bankruptcy Code, or any other present or future applicable federal, state or other statute or law relating to bankruptcy, insolvency, reorganization or other relief for debtors, and such Person shall acquiesce in the entry of such order, judgment or decree or such order, judgment or decree shall remain unvacated and unstayed for an aggregate of 60 days (whether or not consecutive) from the date of entry thereof, or any trustee, receiver, conservator or liquidator of such Person or of all or any substantial part of its property shall be appointed without the consent or acquiescence of such Person and such appointment shall remain unvacated and unstayed for an aggregate of 30 days (whether or not consecutive);

(d)     such Person shall admit in writing its inability to pay its debts as they mature or shall generally not be paying its debts as they become due;

(e)     such Person shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors; or

(f)     such Person shall take any corporate or partnership action for the purpose of effecting any of the foregoing.

"**Bankruptcy Code**" means the United States Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 11 et seq.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, or such other court having jurisdiction over the Chapter 11 Cases.

"**Base Rate**" means, for any day, the higher of (a) the Federal Funds Rate for such day plus [3.0]% per annum and (b) the Prime Rate for such day. Each change in any interest rate provided for in this Agreement based upon the Base Rate resulting from a change in the Base Rate shall take effect at the time of such change in the Base Rate.[2]

"**Base Rate Loans**" means Loans that bear interest at rates based upon the Base Rate plus the Applicable Margin.

---

[2]     Appropriate Base Rate to be confirmed.

"**Board**" means the Board of Governors of the Federal Reserve System.

"**Borrower**" has the meaning given to such term in the preamble.

"**Borrower Subsidiary**" means each of the Persons set forth on Appendix C and each other Person that, after the Closing Date, becomes a "Borrower Subsidiary" pursuant to Section 11.10, and "**Borrower Subsidiaries**" means all of such Persons, collectively.

"**Borrower's Knowledge**" means:

(a)    to the extent related to the knowledge of any Obligor of any event, fact or circumstance related to any Material Project Party, receipt of notice by an Authorized Officer of the Borrower or a Person employed by an Affiliate of the Borrower, which employee is responsible for the management or day to day operations of the Borrower of such event, fact or circumstance or of information supporting a reasonable conclusion that such event, fact or circumstance has occurred and is continuing; and

(b)    to the extent related to the knowledge of the Borrower of any other event, fact or circumstance related to any Obligor or any Project, actual knowledge by an Authorized Officer of the Borrower or a Person employed by an Affiliate of the Borrower, which employee is responsible for the management or day to day operations of the Borrower or other Obligor, of the occurrence and continuance of such event, fact or circumstance, without any duty of specific inquiry as to any such event, fact or circumstance.

 "**Business Day**" means any day on which:

(a)    commercial banks are not authorized or required to be closed in New York, New York; and

(b)    if such day relates to a borrowing of, a payment or prepayment of principal of or interest on, a Conversion of or into, a Continuation of, or an Interest Period for, a Eurodollar Loan or a notice by the Borrower with respect to any of the foregoing, a day on which dealings in Dollar deposits are carried out by and between banks in the London interbank market.

"**Capital Expenditures**" means, for any period after the Closing Date, expenditures (including the aggregate amount of Capital Lease Obligations incurred during such period) made by (or on behalf of) the Borrower or other Obligor to acquire or construct fixed assets, plants and Equipment in the ordinary course of business (including renewals, improvements and replacements, but excluding repairs) during such period computed in accordance with GAAP (other than such expenditures paid out of casualty insurance proceeds).

"**Capital Lease Obligations**" means, for any Person, the obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) Property of such Person to the extent such obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP (including Statement of Financial Accounting Standards No. 13 of the Financial Accounting Standards Board) and, for purposes of this Agreement, the amount of such obligations shall be the capitalized amount of such obligations, determined in accordance with GAAP (including such Statement No. 13).

"**Change in Control**" means an event or series of events by which:

(a)      any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934), directly or indirectly, of 50% or more of the equity securities of New WEI entitled to vote for members of the board of directors or equivalent governing body of New WEI on a fully-diluted basis;

(b)      a majority of the members of the board of directors or other equivalent governing body of New WEI cease to be composed of individuals who previously have been selected by the Lenders;

(c)      New WEI fails to own 100% of the New Equity Interests in the Pledgor or the Pledgor fails to own 100% of the Equity Interests in the Borrower; or

(d)      the Borrower fails to own, directly or indirectly, 100% of the Equity Interests in each Borrower Subsidiary.

"**Change in Law**" means, with respect to any Lender (or its Applicable Lending Office), the occurrence after the date of the execution and delivery of this Agreement of the following events: (a) the adoption of any applicable Government Rule, (b) any change in any applicable Government Rule (including Regulation D) or in the interpretation or administration of any Government Rule (including Regulation D) by any Government Authority charged with its interpretation or administration or (c) the adoption or making of any interpretation, directive, guideline, policy or request applying to a class of Lenders including such Lender of or under any Government Rule or in the interpretation or administration of any Government Rule (including Regulation D) (whether or not having the force of law and whether or not failure to comply would be unlawful, but with respect to which similarly situated banks generally comply) by any Government Authority charged with its interpretation or administration.

"**Charges**" has the meaning given to such term in <u>Section 12.10</u>.

"**Closing Date**" means the date on which all of the conditions set forth in Section 6.01 have been satisfied (or waived by the Agent with the consent of the Lenders).

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" means: (a) the "Collateral" as defined in the Security Agreements and the Pledge Agreement, (b) the Collateral Accounts, (c) the Deposit Accounts, (d) the Mortgaged Property and (e) all other Property of any Credit Party, now owned or hereafter acquired, upon which a Lien (including any Liens granted in any proceeding under any Debtor Relief Laws) is now or hereafter granted or created or purported to be granted or created by any Security Document.

"**Collateral Accounts**" means the Borrower Accounts, the Hereford Accounts, the USEP Accounts, and the Plainview Accounts, as each such term is defined in the Collateral Agency Agreement.

"**Collateral Agency Agreement**" means the Collateral Agency and Security Deposit Agreement dated as of the date hereof, among the Collateral Agent, the Depositary, the Agent and the Obligors substantially in the form of Exhibit C.

"**Collateral Agent**" means The Bank of New York – Mellon.

"**Commodity Hedging Agreement**" means, for any Obligor, any commodity swap, cap or collar agreement or similar arrangement between such Obligor and a Commodity Hedging Provider providing for the transfer or mitigation of commodity risks either generally or under specific contingencies, in each case in accordance with Section 8.15.

"**Commodity Hedging Provider**" means any Person that is an Acceptable Bank or a Lender (or an affiliate of a Lender) and that enters into a Commodity Hedging Agreement in accordance with Section 8.15.

"**Confirmation Order**" means the order of the Bankruptcy Court Confirming the Plan, dated [_____], 2010

"**Consent and Agreement**" means a Consent and Agreement among a Material Project Party, any Obligor and the Collateral Agent substantially in the form attached to this Agreement as Exhibit D (or such other form as is acceptable to the Agent).

"**Contest**" means, with respect to any Person, with respect to any Taxes or any Lien imposed on Property of such Person (or the related underlying claim for labor, material, supplies or services) by any Government Authority for Taxes or with respect to obligations under ERISA or any Mechanics' Lien (each, a "**Subject Claim**"), a contest of the amount, validity or application, in whole or in part, of such Subject Claim pursued in good faith and by appropriate legal, administrative or other proceedings diligently conducted so long as: (a) adequate reserves have been established with respect to

such Subject Claim in accordance with GAAP, (b) during the period of such contest the enforcement of such Subject Claim is effectively stayed and any Lien (including any inchoate Lien) arising by virtue of such Subject Claim shall, if required by applicable Government Rule, be effectively secured by posting of cash collateral or a surety bond (or similar instrument) by a reputable surety company, (c) neither the Agent nor any Lender could reasonably be expected to be exposed to any risk of criminal liability or civil liability as a result of such contest and (d) the failure to pay such Subject Claim under the circumstances described above could not otherwise reasonably be expected to have a Material Adverse Effect.  The term "**Contest**" or "**Contested**" used as a verb shall have a correlative meaning.

"**Continue**", "**Continuation**" and "**Continued**" shall refer to the continuation pursuant to Section 3.03 of a Eurodollar Loan as a Eurodollar Loan from one Interest Period to the next Interest Period.

"**Control**" (including, with its correlative meanings, "**Controlled by**" and "**under common Control with**") means possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) and, in any event, any Person owning at least thirty percent (30%) of the voting securities of another Person shall be deemed to Control that Person.

"**Convert**", "**Conversion**" and "**Converted**" shall refer to a conversion pursuant to Section 3.03 of one Type of Loan to another, which may be accomplished by the transfer by a Lender, at its sole discretion, of a Loan from one Applicable Lending Office to another.

"**Covered Tax Liabilities**" means, for any calendar quarter, an amount equal to the sum of (A)(x) the lesser of (i) the state income or franchise taxes that would be payable by the Borrower in respect of income from the USEP Project earned during such calendar quarter assuming the Borrower were taxed as a corporation filing a standalone tax return and doing business solely in Russell, Kansas and taxable at the highest marginal income tax rates imposed by the State of Kansas and city of Russell and (ii) the Borrower's allocable share of any actual Kansas state income or franchise taxes to be paid by the Pledgor or any other consolidated, combined or unitary group that includes the results of the Borrower's activities, plus (y) the lesser of (i) the federal income taxes that would be payable by the Borrower in respect of income from the USEP Project earned during such calendar quarter assuming the Borrower were taxed as a corporation filing a standalone tax return and taxable at the highest marginal federal income tax rate and (ii) the Borrower's allocable share of any actual federal income taxes to be paid by the Pledgor or, if the Pledgor files a consolidated federal income tax return, the consolidated group that includes the Pledgor, (B)(x) the lesser of (i) the state income (or "margin") or franchise taxes that would be payable by the Borrower in respect of income from the Hereford Project earned during such calendar quarter assuming the Borrower were taxed as a corporation filing a standalone tax return and doing business solely in Hereford, Texas and taxable at the highest marginal income (or "margin") tax rates imposed by the State of Texas and city of Hereford and (ii) the Borrower's allocable share of any actual

Texas state income (or "margin") or franchise taxes to be paid by the Pledgor or any other consolidated, combined or unitary group that includes the results of the Borrower's activities, plus (y) the lesser of (i) the federal income taxes that would be payable by the Borrower in respect of income from the Hereford Project earned during such calendar quarter assuming the Borrower were taxed as a corporation filing a standalone tax return and taxable at the highest marginal federal income tax rate and (ii) the Borrower's allocable share of any actual federal income taxes to be paid by the Pledgor or, if the Pledgor files a consolidated federal income tax return, the consolidated group that includes the Pledgor and (C)(x) the lesser of (i) the state income (or "margin") or franchise taxes that would be payable by the Borrower in respect of income from the Plainview Project earned during such calendar quarter assuming the Borrower were taxed as a corporation filing a standalone tax return and doing business solely in Plainview, Texas and taxable at the highest marginal income (or "margin") tax rates imposed by the State of Texas and city of Plainview and (ii) the Borrower's allocable share of any actual Texas state income (or "margin") or franchise taxes to be paid by the Pledgor or any other consolidated, combined or unitary group that includes the results of the Borrower's activities, plus (y) the lesser of (i) the federal income taxes that would be payable by the Borrower in respect of income from the Hereford Project earned during such calendar quarter assuming the Borrower were taxed as a corporation filing a standalone tax return and taxable at the highest marginal federal income tax rate and (ii) the Borrower's allocable share of any actual federal income taxes to be paid by the Pledgor or, if the Pledgor files a consolidated federal income tax return, the consolidated group that includes the Pledgor; *provided*, that, for the avoidance of doubt, in determining the amount payable pursuant to (x) and (y) in clauses (A), (B) and (C), any net operating loss or capital loss carryovers or carrybacks and any tax credits that would, in each case, be available to reduce Borrower taxable income or taxes payable, as the case may be, if Borrower were to be taxed as a corporation continuously from the Closing Date, shall be taken into account; provided further, that for purposes of (x)(ii) and (y)(ii) of clauses (A), (B) and (C), any losses or credits of the Pledgor or members of a consolidated, combined or unitary group that includes the Borrower's activities will also be taken into account.  For purposes of (x)(ii) and (y)(ii) of clauses (A), (B) and (C), the Borrower's allocable share of the Pledgor's, or a consolidated, combined or unitary group's, actual tax liability shall be equal to such actual liability multiplied by a fraction, the numerator of which is the Borrower's positive taxable income determined on a standalone basis and the denominator of which is the sum of the positive taxable incomes, if any, of the Pledgor and each other entity, if any, included in a consolidated, combined or unitary group that includes the Borrower's activities.

"**CPI**" means the nonseasonally adjusted Consumer Price Index for urban wage earners and clerical workers as published by the United States Bureau of Labor Statistics, or if no longer published, an index comparable to the Consumer Price Index that is published by the United States Bureau of Labor Statistics.

"**Credit Party**" means each Obligor and each Pledgor.

"**Current Ratio**" means, at any time, the ratio of current assets of the Borrower to current liabilities of the Borrower calculated on a consolidated basis, as such terms are defined in GAAP.

"**DB Contract**" means the Hereford DB Contract and/or the Plainview DB Contract, as applicable.

"**DB Contractor**" means Fagen, Inc.

"**Debt Service**" means, for any period, the sum, computed without duplication, of the following:  (a) all amounts payable by the Borrower in respect of scheduled payments of principal of Permitted Indebtedness for such period (and excluding prepayments of Loans payable during such period pursuant to Section 3.03) plus (b) all amounts payable by the Borrower in respect of Interest Expense under this Agreement for such period plus (c) all amounts payable by the Borrower in respect of Interest Expense under the Exit Financing Facility plus (d) all commitment fees, agency fees, trustee fees or other fees and expenses payable in connection with the Indebtedness referred to in clause (a) above during such period plus (e) all amounts, if any, due and payable to the applicable Permitted Swap Providers in respect of termination payments under Permitted Swap Agreements.

"**Debt Service Coverage Ratio**" means, for any period, the ratio of (a) the excess (if any) of (i) Project Revenues for such period over (ii) Operation and Maintenance Expenses for such period to (b) Debt Service for such period.[3]

"**Debt Service Reserve Account**" has the meaning given such term in the Collateral Agency Agreement.

["**Debt to Equity Ratio**" means, at any time, the ratio of (a) the sum of aggregate outstanding Permitted Indebtedness (including all Loans) to (b) the Pledgors' total equity contributed to the Borrower.]

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means an Event of Default or an event which with notice or lapse of time or both would become an Event of Default.

"**Deposit Accounts**" has the meaning given such term in the Collateral Agency Agreement.

---

[3]     Confirm DSCR definition.

"**Depositary**" has the meaning given such term in the Collateral Agency Agreement.

"**Distilled Grain**" means either dried distillers grain or wet distillers grain or dried distillers grain with solubles. With respect to products of the Projects, Distilled Grain means the aggregate amount of distilled grain produced by the Projects, regardless of type of grain.

"**Distribution Account**" means have the meaning given to such term in the Collateral Agency Agreement.

"**Dollars**" and "**$**" means lawful money of the United States.

"**Easement Properties**" means all easements, cross easements, licenses, air rights and rights-of-way or other similar property interests necessary for the full utilization of the Facility Sites for their intended purposes.

"**Environmental Claim**" means, with respect to the Projects or any Environmental Party, any notice, inquiry, request for information, investigation, claim, administrative, regulatory or judicial action, suit, judgment, demand or other communication, in each case, requesting injunctive or equitable relief, or alleging or asserting a liability or obligation arising under any Environmental Law, including any liability or obligations for investigatory costs, corrective, rehabilitation, reclamation or restoration costs, cleanup costs, governmental response costs, contribution, cost recovery, damages to natural resources or other Property, personal injuries, fines, penalties or restrictions pursuant to an Environmental Law arising out of or based on (a) the presence, Use, exposure to, or Release or threatened Release of any Hazardous Material at any location, or (b) any violation or alleged violation of any Environmental Law.

"**Environmental Laws**" means any and all Government Rules relating to pollution or the protection of the environment, human health or safety or natural resources, including any and all Government Rules regulating or imposing liability or standards of conduct with respect to (a) emissions, discharges, Releases or threatened Releases of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or wastes, (b) the Use of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or wastes, (c) human exposure to chemicals, contaminants, additives or hazardous materials or conditions or (d) occupational safety and health requirements, including any standards or requirements of the Occupational Safety and Health Administration.

"**Environmental Party**" means: (a) any Obligor, (b) any predecessor or Affiliate of any Obligor, (c) any Material Project Party or any Person indemnified by a Material Project Party (other than the Agent or any Lender) and (d) any officer, director, employee or agent of any of the foregoing.

"**Equator Principles**" means the set of guidelines developed by a group of banks in conjunction with the International Finance Corporation (IFC), the private sector lending arm of the World

Bank Group, for assessing and managing environmental and social issues related to private-sector project financings, as amended or in effect prior to, on or after the Closing Date.

"**Equipment**" means all "equipment," as such term is defined in Article 9 of the UCC now owned or hereafter acquired by an Obligor, which is used at or in connection with Project or is located on or in a Facility Site (including, but not limited to, all machinery, equipment, furnishings, and electronic data-processing and other office equipment now owned or hereafter acquired by Borrower and any and all additions, substitutions and replacements of any of the foregoing), together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

"**Equity Interests** " means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any corporation or trade or business which is a member of any group of organizations: (a) described in Section 414(b) or (c) of the Code of which the Borrower (or any Borrower Subsidiary) is a member and (b) solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the lien created under Section 302(f) of ERISA and Section 412(n) of the Code, described in Section 414(m) or (o) of the Code of which the Borrower (or any Borrower Subsidiary) is a member.

"**ERISA Event**" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Pension Plan (other than an event for which the 30 day notice period is waived), (b) the existence with respect to any Pension Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived, (c) the filing pursuant to Section 412(d) of the Code or Section 303 of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan, (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Pension Plan, (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Pension Plan or Pension Plans or to appoint a trustee to administer any Pension Plan, (f) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Pension Plan or Multiemployer Plan, (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is

expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA or (h) the occurrence of one event that could result in the Termination of a Pension Plan by the PBGC.

"**Ethanol**" means the fuel produced by the Projects through processing of acceptable feedstock provided by grain suppliers.

"**Eurodollar Loans**" means Loans which bear interest at the Adjusted LIBOR <u>plus</u> the Applicable Margin.

"**Event of Abandonment**" means a formal, public announcement by any Credit Party of a decision to abandon or indefinitely defer, or the abandonment of, the operation of any material portion of any Project for any reason; *provided,* that delays in operation of any Project solely caused by the failure of any Government Authority to provide in a timely manner a Government Approval that was properly and timely applied for in a timely manner shall not constitute an "**Event of Abandonment**".

"**Event of Default**" has the meaning given to such term in <u>Section 9.01</u>.

"**Event of Loss**" means any loss of, destruction of or damage to, or any condemnation or other taking of (including an Event of Taking), any Property of any Obligor.

"**Event of Taking**" means any taking, seizure, confiscation, requisition, exercise of rights of eminent domain, public improvement, inverse condemnation, condemnation or similar action or threat of any such action of or proceeding by any Government Authority or other Person relating to all or any part of the Projects.

"**Excess Cash Flow**" means all amounts remaining on deposit in the Revenue Account on each of the Quarterly Dates ending in June and December in each year (after giving effect to Operation and Maintenance Expenses, Debt Service and reserves for the period immediately preceding such Quarterly Dates.

"**Excess Funding Guarantor**" has the meaning given to such term in <u>Section 11.08</u>.

"**Excess Payment**" has the meaning given to such term in <u>Section 11.08</u>.

"**Excluded Taxes**" means, with respect to the Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Obligor hereunder, (a) income or franchise taxes imposed on (or measured by) its net income by the United States, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its Applicable Lending Office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which the Borrower is located (other than an Applicable Lending Office designated at the request of the Borrower pursuant to <u>Section 5.05</u> hereof), (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by

the Borrower under Section 5.05(b)), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement or is attributable to such Foreign Lender's failure or inability to comply (other than as a result of a Change in Law after the date hereof) with Section 5.03(e) or Section 5.05(b), except to the extent that such Foreign Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from the Borrower with respect to such taxes pursuant to Section 5.03(a).

"**Exit Financing Facility**" means the Senior Secured Exit Financing Facility Agreement, dated as of the date hereof, between the Borrower, White Energy, Inc., the Borrower Subsidiaries, the lenders party thereto and WestLB, as agent.

"**Facility Sites**" means each of the Hereford Facility Site, the USEP Facility Site and the Plainview Facility Site.

"**Federal Funds Rate**" means, for any day, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided*, that (a) if the day for which such rate is to be determined is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if such rate is not so published for any day, the Federal Funds Rate for such day shall be the average of the quotations for such day on such transactions received by the Agent from three federal funds brokers of recognized standing selected by it.

"**Final Maturity Date**" means the date falling on the fifth anniversary of the Closing Date.

"**Financial Covenants**" means, collectively, the financial covenants set forth in Section 8.24.

"**Financing Documents**" means this Agreement, each of the Notes, each of the Security Documents, the Subordination Agreement, the Permitted Swap Agreements (to the extent the Permitted Swap Provider is a Lender), the Commodity Hedging Agreements (to the extent the Commodity Hedging Provider is a Lender) and each other agreement executed in connection herewith and therewith.

"**Foreign Lender**" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"**GAAP**" means generally accepted accounting principles in the United States applied on a basis consistent with those principles set forth in Section 1.02(a).

"**Government Approval**" means (a) any authorization, consent, approval, license, lease, ruling, permit, certification, waiver, exemption, filing, variance, claim, order, judgment or decree of, by or with, (b) any required notice to, (c) any declaration of or with or (d) any registration by or with, any Government Authority, in each case relating to the Projects to the extent (i) not ministerial in nature or (ii) not otherwise immaterial to the Projects or an Obligor's compliance with any Government Rule or obtaining or maintaining any Government Approval.

"**Government Authority**" means any United States federal, state, county, municipal, local, territorial, or other governmental department, commission, board, bureau, agency, regulatory authority, instrumentality, judicial or administrative body.

"**Government Rule**" means any statute, law, regulation, ordinance, rule, judgment, order, decree, permit, concession, grant, franchise, license, agreement, directive, injunction, requirement of, or other governmental restriction or any similar binding form of decision of or determination by, or any binding interpretation or administration of any of the foregoing by, any Government Authority, including all common law, whether now or hereafter in effect, affecting an Obligor, a Project or any part of a Facility Site, or the construction, use, alteration or operation thereof, or any part thereof, including all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to an Obligor, at any time in force affecting Obligor, a Project or any part of the Facility Site, including any which may require repairs, modifications or alterations in or to a Project or any part of a Facility Site, or in any way limit the use and enjoyment thereof.

"**Guarantee**" means a guarantee, an endorsement, a contingent agreement to purchase or to furnish funds for the payment or maintenance of, or otherwise to be or become contingently liable under or with respect to, the Indebtedness, other obligations, net worth, working capital or earnings of any Person, or a guarantee of the payment of dividends or other distributions upon the stock or equity interests of any Person, or an agreement to purchase, sell or lease (as lessee or lessor) Property of any Person, products, materials, supplies or services primarily for the purpose of enabling a debtor to make payment of his, her or its obligations or an agreement to assure a creditor against loss, and including causing a bank or other financial institution to issue a letter of credit or other similar instrument for the benefit of another Person, but excluding (a) endorsements for collection or deposit in the ordinary course of business and (b) indemnity or hold harmless provisions included in contracts with non-Affiliates entered into in the ordinary course of business. The terms "**Guarantee**" and "**Guaranteed**" used as verbs shall have correlative meanings.

"**Guaranteed Obligations**" has the meaning given in Section 11.01.

"**Hazardous Material**" means:  (a) any petroleum or petroleum products, flammable materials, explosives, radioactive materials, friable asbestos, urea formaldehyde foam insulation,

polychlorinated biphenyls (PCBs) and, to the extent regulated by Environmental Laws, noise and odors, (b) any chemicals, other materials, substances or wastes which are now or hereafter become defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "extremely hazardous wastes", "restricted hazardous wastes", "toxic substances", "toxic pollutants", "contaminants", "pollutants" or words of similar import under any Environmental Law and (c) any other chemical, material, substance or waste which is now or hereafter regulated under or with respect to which liability or standards of conduct are imposed under any Environmental Law.

"**Hereford DB Contract**" means the First Amended and Restated Lump Sum Design Build Agreement, dated as of April 14, 2006 (as amended, modified and waived from time to time) between the DB Contractor and the Obligor party thereto.

"**Hereford Facility**" means the Ethanol production facility, together with all Equipment necessary for the receipt of grain and the generation and transportation of Ethanol and Distilled Grain for resale, located in Hereford, Texas.

"**Hereford Facility Site**" means, collectively, the Hereford Leased Property and the Hereford Owned Property.

"**Hereford Leased Property**" means each parcel of real property described on Schedule II of the Hereford Mortgage and all appurtenant rights attached thereto and Improvements thereon (to the extent leased), including any leased portion of the Hereford Facility and all other Property (to the extent leased) reasonably necessary for the operation of the Hereford Facility.

"**Hereford Loss Proceeds Account**" has the meaning given such term in the Collateral Agency Agreement.

"**Hereford Mortgage**" means the Deed of Trust, Assignments of Rents, Security Agreement and Fixture Filing, dated as of [_____], 2010, by WE Hereford, as mortgagor, in favor of the Collateral Agent, as mortgagee, encumbering the Hereford Facility Site.

"**Hereford Owned Property**" means each parcel of real property described on Schedule I of the Hereford Mortgage and all appurtenant rights attached thereto and Improvements thereon, including any owned portion of the Hereford Facility either located thereon or located on the Hereford Leased Property and all other Property (other than the Hereford Leased Property) reasonably necessary for the operation of the Hereford Facility.

"**Hereford Project**" means the operation of the Hereford Facility.

"**Hereford Project Revenues**" means, for any period, all cash revenues (without duplication) received by WE Hereford during such period from: (a) the sales of Ethanol and Distilled Grain during such period, (b) all interest earned with respect to such period on Permitted Investments held

in the Hereford Accounts, (c) the proceeds of any business interruption insurance and other payments received for interruption of operations during such period and (d) all other income or revenue, however earned or received, by WE Hereford during such period, including any Government Authority incentives received pursuant to VEETC or otherwise, whether as tax credits, tax deductions or otherwise. Hereford Project Revenues shall exclude, to the extent included: (i) net amounts receivable under Permitted Swap Agreements and Commodity Hedging Agreements earned in respect of the Hereford Project and (ii) the Net Available Amount in respect of an Event of Loss at the Hereford Facility.

"**Hereford Revenue Account**" has the meaning given such term in the Collateral Agency Agreement.

"**Hereford Survey**" means an as-built survey of the Hereford Facility Site which survey shall:

(a) be a current "as-built" metes and bounds survey of the Hereford Facility Site, including Easement Properties that benefit such site;

(b) be made in accordance with the "Minimum Standard Detail Requirement for ALTA/ACSM Land Title Surveys" jointly established and adopted by ALTA, ACSM and NSPS in 2005 with all measurements made in accordance with the "Minimum Angle, Distance and Closure Requirements for Survey Measurements Which Control Land Boundaries for ALTA/ACSM Land Title Surveys";

(c) be prepared by a surveyor acceptable to the Lenders;

(d) contain "Optional Survey Responsibilities and Specifications" 1, 2, 3, 4, 6, 7(a), 7(b), 7(c), 8, 9, 10, 11(b), 13, 16, 17 and 18 as specified on Table A to the "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys"; and

(e) contain a certification from said surveyor in form and substance satisfactory to each of the Agent and the Title Company.

"**Hereford Title Policy**" means a Title Policy insuring that the Lien created by the Hereford Mortgage constitutes a valid second mortgage lien on the Hereford Facility Site, free and clear of all Liens and title defects except Permitted Exceptions.

"**Hypothetical Tax Obligations**" means, with respect to the Borrower, as estimated by an independent certified public accounting firm of recognized national standing that is reasonably acceptable to the Agent for any calendar quarter:

(a) the projected Covered Tax Liabilities for such calendar quarter; <u>plus</u>

(b)     except to the extent previously credited, any underestimation of the Covered Tax Liabilities for any preceding calendar quarter (or calendar month thereof) for which the relevant information is available; underline minus

(c)     except to the extent previously debited, any overestimation of the Covered Tax Liabilities for any preceding calendar quarter (or calendar month thereof) for which the relevant information is available.

"**Impairment**" means, with respect to any Material Project Document or Government Approval, (a) the rescission, early termination, cancellation, repeal or invalidity thereof, (b) the suspension or injunction thereof or (c) the inability to satisfy in a timely manner stated conditions to effectiveness thereof or (d) the amendment, modification or supplement (other than, in the case of a Material Project Document, any such amendment, modification or supplement effected in accordance with Section 8.18 and, in the case of a Government Approval, any such amendment, modification or supplement effected in accordance with Section 8.03(b)) of such Material Project Document or Government Approval in whole or in part.  The verb "Impair" shall have a correlative meaning.

"**Improvements**" means buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on a Facility Site.

"**Indebtedness**" means, for any Person, without duplication:

(a)     indebtedness created, issued or incurred by such Person for borrowed money (whether by loan or the issuance and sale of debt securities or the sale of Property of such Person to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Property of such Person from such Person);

(b)     obligations of such Person to pay the deferred purchase or acquisition price of Property of such Person or services;

(c)     obligations of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for account of such Person;

(d)     obligations of such Person in respect of surety bonds or similar instruments;

(e)     indebtedness of others described in clauses (a) through (d) above secured by a Lien on the Property of such Person, whether or not the respective indebtedness so secured has been assumed by such Person;

(f)     Capital Lease Obligations of such Person; and

(g)     indebtedness of others described in clauses (a) through (f) above Guaranteed by such Person.

"**Indemnified Taxes**" means Taxes other than Excluded Taxes.

"**Indemnitee**" has the meaning given to such term in Section 12.03.

"**Independent Engineer**" means Luminate, LLC or such other Person, so long as no Default has occurred and is continuing, reasonably acceptable to the Borrower, as the Agent may engage on behalf of the Lenders to act as Independent Engineer for the purposes of this Agreement.

"**Independent Environmental Consultant**" means [_____] or such other Person, so long as no Default has occurred and is continuing, reasonably acceptable to the Borrower, as the Agent may engage on behalf of the Lenders to act as Independent Environmental Consultant for the purposes of this Agreement.

"**Independent Market Consultant**" means such Person(s) as the Agent may engage on behalf of the Lenders to act as Independent Market Consultant and, so long as no Default has occurred and is continuing, reasonably acceptable to the Borrower, for the purposes of this Agreement.

"**Insurance Consultant**" means Moore-McNeil, LLC or such other Person, so long as no Default has occurred and is continuing, reasonably acceptable to the Borrower, as the Agent may engage on behalf of the Lenders to act as Insurance Consultant for the purposes of this Agreement.

"**Interest Expense**" means, for any period, the sum, computed without duplication, of the following:  (a) all interest in respect of Permitted Indebtedness  (other than in respect of Indebtedness identified in Section 8.14(b)(ii)) accrued or capitalized during such period (whether or not actually paid during such period) plus (b) the net amounts payable (or minus the net amounts receivable) under Permitted Swap Agreements accrued during such period (whether or not actually paid or received during such period).

"**Interest Payment Date**" means the date accrued interest on each Loan shall be due and payable, as follows:  (a) in the case of a Base Rate Loan, monthly on the last Business Day of each month and (b) in the case of a Eurodollar Loan, on the last day of each monthly Interest Period therefor.

"**Interest Period**" means, with respect to any Eurodollar Loan, each monthly period commencing on:

(a)     the date such Eurodollar Loan is made or Converted to or Continued as a Eurodollar Loan; or

(b)     the last day of the immediately preceding Interest Period for such Loan and ending on the numerically corresponding day in the first month thereafter;

except that, in each case:

(i)     each Interest Period that commences on the last Business Day of a calendar month (or on any day for which there is no numerically corresponding day in the appropriate subsequent calendar month) shall end on the last Business Day of the appropriate subsequent calendar month;

(ii)     no Interest Period may end after the Final Maturity Date;

(iii)     each Interest Period which would otherwise end on a day which is not a Business Day shall end on the next succeeding Business Day (or, if such next succeeding Business Day falls in the immediately succeeding calendar month, on the next preceding Business Day);

(iv)     notwithstanding clause (a) or (b) above, no Interest Period shall have a duration of less than one month and, if the Interest Period would otherwise be a shorter period, such Loan shall not be available under this Agreement; and

(v)     the Borrower may not select a Eurodollar Loan or an Interest Period for a Eurodollar Loan during the continuation of a Default or Event of Default.

"**Interest Rate Protection Agreement**" means, for any Person, any interest rate swap, cap or collar agreement or similar arrangement between such Person and one or more financial institutions providing for the transfer or mitigation of interest rate risks either generally or under specific contingencies.

"**Investment**" means, for any Person:

(a)     the acquisition (whether for cash, Property of such Person, services or securities or otherwise) of capital stock, bonds, notes, debentures, partnership or other ownership interests or other securities of any other Person or any agreement to make any such acquisition (including any "short sale" or any other sale of any securities at a time when such securities are not owned by the Person entering into such sale);

(b)     the making of any deposit with, or advance, loan or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such

advance, loan or extension of credit having a term not exceeding 90 days representing the purchase price of inventory or supplies sold in the ordinary course of business);

(c)     the entering into of any Guarantee of, or other contingent obligation with respect to, Indebtedness or other liability of any other Person;

(d)     the entering into of any Interest Rate Protection Agreement; and

(e)     the entering into of any Commodity Hedging Agreement.

"**Lender**" means each Lender with an outstanding (i) Loan or (ii) Loan Incurred Amounts, or both.

"**LIBOR**" means, with respect to any Eurodollar Loan (and, in all cases, subject to the provisions set forth at the end of this defined term) for any Interest Period, the rate per annum determined as the rate for the offering of Dollar deposits with a maturity comparable to such Interest Period which appears on Page 3750, titled as "British Banker Association Interest Settlement Rate," of the Dow Jones Markets (Telerate) Service (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided on such page of such service, as determined by the Agent from time to time for purposes of providing quotations of interest rates applicable to Dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, on the day that is two Business Days prior to the commencement of such Interest Period.  In the event that such rate is not available at such time for any reason, then LIBOR for such Interest Period shall be the rate at which Dollar deposits of $[5,000,000] and for a maturity comparable to such Interest Period are offered by the principal London office of the Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; *provided*, that in all case, if LIBOR determined as provided above is equal to or less than 2%, then LIBOR for all purposes of this Agreement shall be deemed to equal 2%.

"**Lien**" means, with respect to any Property of any Person, any mortgage, lien (statutory or other), pledge, charge, lease, easement, servitude, security interest or encumbrance or any preference, priority or other security agreement or preferential arrangement of any kind in respect of such Property of such Person.  For purposes of this Agreement and the other Financing Documents, a Person shall be deemed to own subject to a Lien any Property which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement (other than an operating lease) relating to such Property.

"**Loan**" means any loan incurred by a Lender pursuant to Section 2.01.

"**Loan Incurred Amount**" means, as to each Lender, the aggregate amount of the Loan incurred by the Borrower, with respect to such Lender, as set forth opposite such Lender's name on Appendix A to this Agreement, under the heading "Loan Incurred".

"**Loan Notice**" means the notice referred to in <u>Section 4.05</u>.

"**Loss Proceeds**" means insurance proceeds, condemnation awards or other compensation, awards, damages and other payments or relief (exclusive, in each case, of the proceeds of liability insurance and business interruption insurance and other payments for interruption of operations) with respect to any Event of Loss.

"**Loss Proceeds Account**" has the meaning given such term in the Collateral Agency Agreement.

"**Majority Lenders**" means, subject to the last paragraph of <u>Section 12.04</u>, Lenders holding over 50% of the aggregate outstanding Loans  (or, if any such Loan has terminated or been prepaid, the aggregate unpaid principal amount of the Loans).

"**Management Incentive Plan**" means the White Energy, Inc. Long-Term Incentive Plan pursuant to which stock options will be granted to certain employees of the Obligors.

"**Margin Stock**" means margin stock within the meaning of Regulation U  and Regulation X.

"**Material Adverse Effect**" means a material adverse effect on one or more of the following:

(a)      the business, assets, operations, financial condition or prospects of the Obligors taken as a whole or any Project;

(b)      the ability of any Credit Party to perform its obligations under any Material Project Document to which it is a party in accordance with the terms thereof;

(c)      the ability of a Credit Party to perform its obligations under any Transaction Document to which it is a party;

(d)      the validity or enforceability of the obligations of any Credit Party or the rights of the Agent or Lenders under this Agreement or under any other Transaction Document; or

(e)      the value of the Collateral or the validity, enforceability or priority of the security interests granted to the Collateral Agent pursuant to the Security Documents.

"**Material Project Documents**" means the [DB Contracts, each other Construction Contract, the] ADM Agreement, each grain supply agreement, each natural gas supply agreement (other than agreements for which such service is required to be provided at specified tariff rates determined by Government Rule), each electricity supply agreement (other than agreements for which such service is required to be provided at specified tariff rates determined by Government Rule), each Ethanol sales agreement, all relevant Project permits, each Commodity Hedging Agreement, each document representing a material interest in real property related to the Project, and each Additional Project Document (other than any Non-Material Project Document described in clauses (a) or (c) of the definition thereof), and each credit support instrument provided in connection with any of the foregoing (and any replacement of any of the foregoing).

"**Material Project Parties**" means each Pledgor, [the DB Contractor,] each grain supplier, ADM, each Person party to a credit support instrument provided in connection with any Material Project Document and each other Person (other than an Obligor) party to a Material Project Document.

"**Maximum Rate**" has the meaning given to such term in Section 12.10.

"**Mechanics' Liens**" means carriers', warehousemen's, mechanics', workmen's, materialmen's, construction or other like statutory Liens (other than Liens described in paragraphs (a) and (b) of Section 8.11).

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgaged Property**" means the Mortgage Estate and the Trust Estate (each, as defined in the Mortgages).

"**Mortgages**" means the Hereford Mortgage, the USEP Mortgage and the Plainview Mortgage.

"**Multiemployer Plan**" means a multiemployer plan defined as such in Section 3(37) of ERISA to which contributions have been made by the Borrower or any ERISA Affiliate and which is covered by Title IV of ERISA.

"**Net Available Amount**" means the aggregate amount of Loss Proceeds received by an Obligor in respect of an Event of Loss related to a Project net of reasonable expenses incurred by such Obligor or the Borrower in connection with the collection of such Loss Proceeds.

"**New Common Stock**" means the common stock, par value of $0.01 per share of Reorganized White Energy, Inc., authorized under the Amended Certificate of Incorporation.

"**New Equity Interests**" means, all of the Equity Interests in Reorganized White Energy, Inc., except for the Equity Interests retained by the Pledgor pursuant to the Management Incentive Plan.

"**New WEI**" means White Energy Holdco, LLC, a Delaware limited liability company that will acquire all the New Common Stock issued by Reorganized White Energy, Inc. except for those shares reserved for issuance pursuant to the Management Incentive Plan (as defined in the Plan).

"**Non-Material Project Documents**" means:

(a)        contracts or agreements entered into by an Obligor, or by an agent on behalf of such Obligor, in the ordinary course of its business in connection with the Projects under which such Obligor could not reasonably be expected to have aggregate obligations or liabilities in excess of $250,000 under any such agreement;

(b)        contracts or agreements that are used in connection with the acquisition and/or disposition of Permitted Investments; and

(c)        contracts or agreements entered into by the Borrower in the ordinary course of its business for legal, accounting, engineering, environmental consulting or other professional services in connection with the Projects which could not reasonably be expected to have aggregate obligations or liabilities in excess of $250,000 under any such agreement (other than to the extent such are Material Project Documents or contracts or agreements in substitution of any Material Project Document).

"**Nonrecourse Persons**" has the meaning given to such term in <u>Section 12.11</u>.

"**Non-Voting Observer**" has the meaning given to such term in Section 8.25(b).

"**Notes**" has the meaning given to such term in <u>Section 2.05(a)</u>.

"**Notice of Plan Effective Date**" means [_____]

"**NPL**" means the National Priorities List established pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601 <u>et</u> <u>seq.</u>

"**Obligor**" means the Borrower and each Borrower Subsidiary.

"**Operating Account**" has the meaning given such term in the Collateral Agency Agreement.

"**Operating and Capital Budget**" means a budget, prepared and certified by the Borrower, and approved in accordance with <u>Section 8.19</u>, of Operation and Maintenance Expenses and

Permitted Capital Expenditures expected to be incurred by the Borrower during the relevant fiscal year to which such budget applies.[4]

"**Operation and Maintenance Expenses**" means, for any period, the sum, computed without duplication, of the following:

(a)     general and administrative expenses;

(b)     expenses for operating the Projects and maintaining them in good repair and operating condition payable during such period (including any deposits required to be made to Project Parties);

(c)     insurance costs payable during such period;

(d)     applicable sales and excise taxes (if any) payable by an Obligor with respect to sales of Ethanol and Distilled Grain (and, in respect of the USEP Facility, gluten (and related by-products)) generated by the Projects during such period;

(e)     franchise taxes payable by an Obligor during such period;

(f)     property taxes payable by an Obligor during such period;

(g)     costs and fees attendant to the obtaining and maintaining in effect the Government Approvals payable during such period;

(h)     legal, accounting and other professional fees attendant to any of the foregoing items payable during such period;

(i)     any fees, expenses and indemnities of the Secured Parties during such period payable ratably among them in proportion to the amounts described in this clause (i) due and payable to them and that are not included in Debt Service; *provided*, that Operation and Maintenance Expenses shall exclude, to the extent included:

(i)     payments into any of the Collateral Accounts or Deposit Accounts during such period;

(ii)     depreciation for such period;

---

[4]     Confirm whether a business plan should also be delivered.

(iii)    any Capital Expenditures made during such period that are properly chargeable to fixed capital accounts for such period in accordance with GAAP;

(iv)    any payments of any kind with respect to any Restoration during such period; and

(v)    payments that are in contravention of <u>Section 8.18(c)</u>.

Notwithstanding the foregoing, for the purpose of calculating the Debt Service Coverage Ratio, Operation and Maintenance Expenses shall not include the actual cash expenditures for items (c), (e) and (f) above, but shall instead include the appropriate accrual for such items to the extent the same are reflected as accrual items in the Operating and Capital Budget.

"**Other Taxes**" means any and all present or future transfer taxes, stamp or documentary taxes, intangible taxes or other amounts in the nature of transfer taxes or any other excise or property taxes, charges or similar levies arising from any payment made under any Financing Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Financing Document.

"**Participant**" has the meaning given to such term in <u>Section 12.06(c)</u>.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor trustee.

"**Pension Plan**" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Permitted Capital Expenditures**"[5] means Capital Expenditures that are specified for such purpose in the applicable Operating and Capital Budget; *provided*, that each of WE Hereford, USEP and Plainview shall not incur in any fiscal year more than (A)(1) $[500,000] per incurrence of Capital Expenditures required to comply with applicable Government Rules, including Environmental Laws for such Obligor's property and (2) $[1,000,000] in aggregate in any fiscal year of Capital Expenditures required to comply with applicable Government Rules, including Environmental Laws for such Obligor's property and (B) $[2,000,000] in aggregate in any fiscal year of Capital Expenditures for any purpose not described in clause (A) above.

"**Permitted Exceptions**" means all Liens, burdens and title defects described or referred to in the relevant Title Policy.

---

[5]    Confirm thresholds in brackets.

"**Permitted Indebtedness**" means the Indebtedness permitted under <u>Section 8.14</u>.

"**Permitted Investments**" means the Investments permitted under <u>Section 8.12</u>.

"**Permitted Liens**" means the Liens permitted under <u>Section 8.11</u>.

"**Permitted Swap Agreement**" means any Interest Rate Protection Agreement between the Borrower and any Permitted Swap Provider.

"**Permitted Swap Provider**" means any Person that is an Acceptable Bank or Lender or an affiliate of a Lender and that enters into a Permitted Swap Agreement with the Borrower in accordance with <u>Section 8.13</u>.

"**Person**" means any individual, corporation, company, voluntary association, partnership, joint venture, trust, limited liability company, unincorporated organization or Government Authority.

"**Plainview**" means Plainview BioEnergy, LLC, a Delaware limited liability company, a Borrower Subsidiary.

"**Plainview DB Contract**" means the Lump Sum Design Build Agreement, dated as of July 27, 2006 (as amended, modified and waived from time to time) between the DB Contractor and the Obligor party thereto.

"**Plainview Facility**" means the fuel-grade ethanol production facility, together with all Equipment necessary for the receipt of grain and the generation and transportation of Ethanol and Distilled Grain for resale, located in Plainview, Texas.

"**Plainview Facility Site**" means each parcel of real property described on Schedule I of the Plainview Mortgage and all appurtenant rights attached thereto and improvements thereon, including the Plainview Facility and all other Property reasonably necessary for the operation of the Plainview Facility.

"**Plainview Loss Proceeds Account**" has the meaning given such term in the Collateral Agency Agreement.

"**Plainview Mortgage**" means the Deed of Trust, Assignments of Rents, Security Agreement and Fixture Filing, dated as of [_____], 2010, by Plainview, as mortgagor, in favor of the Collateral Agent, as mortgagee, encumbering the Plainview Facility Site.

"**Plainview Project**" means the operation of the Plainview Facility.

"**Plainview Project Revenues**" means, for any period, all cash revenues (without duplication) received by Plainview during such period from:  (a) the sales of Ethanol and Distilled Grain during such period, (b) all interest earned with respect to such period on Permitted Investments held in the Plainview Accounts, (c) the proceeds of any business interruption insurance and other payments received for interruption of operations during such period and (d) all other income or revenue, however earned or received, by Plainview during such period, including any Government Authority incentives received pursuant to VEETC or otherwise, whether as tax credits, tax deductions or otherwise.  Plainview Project Revenues shall exclude, to the extent included:  (i) net amounts receivable under Permitted Swap Agreements and Commodity Hedging Agreements earned in respect of the Plainview Project and (ii) the Net Available Amount in respect of an Event of Loss at the Plainview Facility.

"**Plainview Revenue Account**" has the meaning given such term in the Collateral Agency Agreement.

"**Plainview Survey**" means an as-built survey of the Plainview Facility Site which survey shall:

(a)     be a current "as-built" metes and bounds survey of the Plainview Facility Site, including Easement Properties that benefit such site;

(b)     be made in accordance with the "Minimum Standard Detail Requirement for ALTA/ACSM Land Title Surveys" jointly established and adopted by ALTA, ACSM and NSPS in 2005 with all measurements made in accordance with the "Minimum Angle, Distance and Closure Requirements for Survey Measurements Which Control Land Boundaries for ALTA/ACSM Land Title Surveys";

(c)     be prepared by a surveyor acceptable to the Lenders;

(d)     contain "Optional Survey Responsibilities and Specifications" 1, 2, 3, 4, 6, 7(a), 7(b), 7(c), 8, 9, 10, 11(b), 13, 16, 17 and 18 as specified on Table A to the "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys"; and

(e)     contain a certification from said surveyor in form and substance satisfactory to each of the Agent and the Title Company.

"**Plainview Title Policy**" means a Title Policy insuring that the Lien created by Plainview Mortgage constitutes a valid second mortgage lien on the Plainview Facility Site, free and clear of all Liens and title defects except Permitted Exceptions.

"**Plan**" has the meaning given to such term in the recitals hereto.

"**Plan Effective Date**" means the first Business Day on which all of the conditions to the occurrence of the Effective Date (as defined in the Plan), as specified in Section 9.2 of the Plan, have been satisfied or waived in accordance with the provisions of Section 9.3 of the Plan.

"**Pledge Agreement**" means (a) the Pledge Agreement substantially in the form set forth in Exhibit E entered into as of the Closing Date by the Pledgor and (b) after the Closing Date, any pledge agreements substantially in the form of Exhibit E executed by any new members of the Borrower.

"**Pledgor**" means White Energy, Inc.

"**Post Default Rate**" means:

(a)      subject to clause (b) below, a rate per annum equal to 2% above the Base Rate as in effect from time to time plus the Applicable Margin;

(b)      with respect to any Eurodollar Loan (for as long as it is a Eurodollar Loan), if the date of the occurrence of the relevant Event of Default is any day other than the last day of an Interest Period for such Loan, the "Post-Default Rate" for the principal amount of such Loan shall be 2% above the interest rate applicable to such Loan as provided in Section 3.02 for the period from and including the date of occurrence of the relevant Event of Default to but excluding the date that is the earlier of (i) the date that is the last day of the Interest Period and (ii) if pursuant to Article IX such Loan is accelerated, the date of such acceleration, and

(c)      after the last day of the Interest Period or date of acceleration identified in clause (b) above, the rate provided for in clause (a) of this definition.

"**Prepetition Credit Facility**" has the meaning given to such term in the preamble.

"**Prepetition Lenders**" has the meaning given to such term in the preamble.

"**Prime Rate**" means the rate of interest from time to time publicly announced by the Agent as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced.

"**Principal Payment Dates**" means each Quarterly Date and the Final Maturity Date.

"**Pro Rata Share**" has the meaning given in Section 11.08.

"**ProGold**" means Pro Gold Plus, Inc., a Delaware corporation.

"**Projects**" means the Hereford Project, the Plainview Project, and the USEP Project.

"**Project Documents**" means each Material Project Document, Non-Material Project Document and Additional Project Document.

"**Project Party**" means each Person from time to time party to a Project Document.

"**Project Revenues**" means, for any period, with respect to the Borrower, all cash (without duplication) received by the Borrower during such period from: (a) distributions from USEP, WE Hereford and Plainview that are characterized as USEP Project Revenues, WE Hereford Project Revenues, Plainview Project Revenues or proceeds from intercompany loans to the Borrower from such Borrower Subsidiaries that are characterized as Subordinated Indebtedness, as the case may be, (b) all interest earned with respect to such period on Permitted Investments held in the Borrower Accounts, and (c) all other income or revenue, however earned or received by the Borrower during such period, including any Government Authority incentives received pursuant to VEETC or otherwise, whether as tax credits, tax deductions or otherwise. Project Revenues shall exclude, to the extent included: (i) net amounts receivable by the Borrower under Permitted Swap Agreements and Commodity Hedging Agreements, (ii) proceeds of Permitted Indebtedness and (iii) contributions to capital of the Borrower.

"**Property**" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"**Quarterly Dates**" means the last Business Day of March, June, September and December in each year, the first of which shall be the first such day after the date of this Agreement, each as set forth on the amortization schedule attached as Appendix D to this Agreement.

"**Regulation A**, **Regulation D**, **Regulation U** and **Regulation X**" means, respectively, Regulation A, Regulation D, Regulation U and Regulation X of the Board.

"**Release**" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration of any Hazardous Material into the environment, including the movement of such Hazardous Material through ambient air, soil, surface water, ground water, wetlands, land or subsurface strata.

"**Reorganized White Energy, Inc.**" means White Energy, Inc. from and after the Effective Date (as defined in the Plan).

"**Required Debt Service Reserve Amount**" means as of any date, an amount projected by the Agent (such amount and supporting calculations advised by the Agent to the Borrower at least five Business Days prior to such date) equal to the amount necessary to pay the forecasted Debt Service in respect of Loans through (and including) the next Principal Payment Dates (assuming that no Default will occur during such period and taking into account, with respect to interest, the maximum amount of

interest that could accrue during any [three] month period from the date of calculation to the Final Maturity Date).

"**Required Payment**" has the meaning given to such term in <u>Section 4.06</u>.

"**Restore**" means, with respect to any Affected Property, to rebuild, repair, restore or replace such Affected Property. The term "<u>Restoration</u>" shall have a correlative meaning.

"**Restricted Payment**" shall mean (a) all distributions by the Borrower (in cash, Property of the Borrower or obligations) on, or other payments or distributions on account of, or the setting apart of money for a sinking or other analogous fund for, or the purchase, redemption, retirement or other acquisition by the Borrower of, any portion of any membership interest in the Borrower, (b) all payments (in cash, Property of the Borrower or obligations) of principal of, interest on and other amounts with respect to, or other payments on account of, or the setting apart of money for a sinking or other analogous fund for, or the purchase, redemption, retirement or other acquisition by the Borrower of, any Subordinated Indebtedness, and (c) all distributions by the Borrower (in cash, Property of the Borrower or obligations) to the holder of its membership interests (other than distributions in cash to permit the Pledgor and New WEI to pay taxes incurred by such entities and ministerial expenses in connection with the operation of such Pledgor and New WEI, including fees and expenses of accountants, legal counsel and other professional advisors).

"**Restructuring Transactions**" means, collectively, the following transactions to occur on the Plan Effective Date: (i) the consummation of the Plan; (ii) the Credit Parties entering into the Financing Documents; and (iii) the consummation of the other restructuring transactions contemplated under the Plan to take place on the Plan Effective Date.

"**Revenue Account**" has the meaning given such term in the Collateral Agency Agreement.

"**S&P**" means Standard & Poor's Ratings Group, a division of McGraw Hill, Inc.

"**Secured Obligations**" means, as at any date, the sum, computed without duplication, of the following:

(a)    the aggregate outstanding principal amount of the Loans <u>plus</u> all accrued but unpaid interest on such amount;

(b)    all other amounts from time to time payable under the Financing Documents (including the Permitted Swap Agreements, with respect to each Permitted Swap Provider that is a Lender, and Commodity Hedging Agreements, with respect to each Commodity Hedging Provider that is a Lender) plus accrued interest on such amounts; and

(c)      any and all obligations of the Borrower to the Agent, the Collateral Agent or any other Secured Party for the performance of its agreements, covenants or undertakings under or in respect of any Financing Document whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against the Borrower of any proceeding under any Debtor Relief Laws naming such Borrower as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"**Secured Parties**" means the Agent, the Collateral Agent, each Lender, and, to the extent such party is a Lender, each Permitted Swap Provider and each Commodity Hedge Provider.

"**Securities Account**" means any "securities account" as such term is defined in the UCC, and includes any account in which Investment Property is maintained.

"**Security Agreement**" means the (a) Pledge and Security Agreement between the Borrower and the Collateral Agent, substantially in the form of <u>Exhibit F</u> and (b) each other security agreement substantially in the form of <u>Exhibit G</u> or pledge and security agreement substantially in the form of <u>Exhibit F</u> between each Borrower Subsidiary and the Collateral Agent.

"**Security Documents**" means the collective reference to each Consent and Agreement, each Security Agreement, the Collateral Agency Agreement, each Pledge Agreement, each Mortgage, any such other security agreement, control agreement, patent and trademark assignment, lease assignment and other similar agreement securing the Secured Obligations between any Person and the Collateral Agent on behalf of the Secured Parties, and all financing statements, agreements or other instruments to be filed in respect of the Liens created under each such agreement.

"**Senior Exit-Financing Facility Obligations**" means the "Secured Obligations" as defined in the Exit Financing Facility.

"**Statutory Reserve Rate**" means, for the Interest Period for any Eurodollar Loan, a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the arithmetic mean, taken over each day in such Interest Period, of the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Agent is subject for eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Subordinated Indebtedness**" means any unsecured Indebtedness of the Borrower to any Person that is subordinated to the Secured Obligations.

"**Subordination Agreement**" means the Subordination and Intercreditor Agreement dated as of the date hereof, among the Borrower, the Borrower Subsidiaries, the Agent (in its capacity as Agent under this Agreement and as Agent under the Term Loan Facility) and the Collateral Agent substantially in the form of Exhibit L.

"**Subsidiary**" means, for any Person, any corporation, partnership or other entity of which at least a majority of the securities or other ownership interests having by their terms ordinary voting power to elect a majority of the board of directors or other persons performing similar functions of such corporation, partnership or other entity (irrespective of whether or not at the time securities or other ownership interests of any other class or classes of such corporation, partnership or other entity shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or Controlled by such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person.

"**Supermajority Lenders**" means, subject to the last paragraph of Section 12.04, Lenders holding over 66⅔% of the aggregate outstanding Loan Incurred Amounts (or, if any such Loan Incurred Amounts have terminated, the aggregate unpaid principal amount of the Loans).

"**Taxes**" means, with respect to any Person, all taxes, assessments, imposts, duties, withholdings, or other governmental charges or levies imposed directly or indirectly on such Person or its income, profits or sales or Property by any Taxing Authority.

"**Taxing Authority**" means any United States federal, state, municipal, local, territorial, or other governmental department, commission, board, bureau, agency, regulatory authority, instrumentality, judicial or administrative body that is responsible for the levying and collection of Taxes.

"**Technologies**" means White Energy Technologies, Inc., a Delaware corporation, a Borrower Subsidiary.

"**Termination Date**" means the date on which (a) the Agent, the Collateral Agent and the other Secured Parties shall have received final indefeasible payment in full in cash of all of the Secured Obligations and all other amounts owing to the Agent, the Collateral Agent and the other Secured Parties under the Financing Documents, (b) all Loan Incurred Amounts shall have terminated, expired or been reduced to zero and (c) each Permitted Swap Agreement in which such Permitted Swap Provider is a Lender, and each Commodity Hedging Agreement in which such Commodity Hedging Provider is a Lender, and which agreements would constitute Secured Obligations, shall have terminated or expired.

"**Title Company**" means First American Title Insurance Company.

"**Title Policy**" means an ALTA mortgagee title insurance policy in form and substance acceptable to the Collateral Agent issued with respect to each Facility Site and its related Easement Properties, insuring the lien of each of the Mortgages together with such endorsements and affirmative coverages as the Collateral Agent may require.

"**Transaction Documents**" means each Financing Document and each Project Document.

"**Type**" has the meaning given to such term in <u>Section 1.03</u>.

"**UCC**" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of New York; *provided,* that in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "<u>UCC</u>" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions related to such provisions.

"**United States**" and "**U.S.**" means the United States of America.

"**Unsigned Lender**" means a Person who is a Lender as of the Closing Date but has not delivered to the Agent a signature page to this Agreement duly executed by an Authorized Officer of such Lender.

"**Use**" means the generation, manufacture, processing, distribution, handling, use, treatment, recycling, storage, disposal, arrangement for or permitting the disposal, transportation or Release of any Hazardous Material.

"**USEP**" means US Energy Partners, L.L.C., a limited liability company formed under the laws of the state of Kansas, a Borrower Subsidiary.

"**USEP Facility**" means the nameplate fuel-grade ethanol production plant, together with all Equipment necessary for the receipt of grain and the generation and transportation of Ethanol, Distilled Grain and gluten (and related by-products) for resale, located in Russell, Kansas.

"**USEP Facility Site**" means each parcel of real property described on Schedule I of the USEP Mortgage and all appurtenant rights attached thereto and Improvements thereon, including the USEP Facility and all other Property reasonably necessary for the operation of the USEP Facility.

"**USEP Loss Proceeds Account**" has the meaning given such term in the Collateral Agency Agreement.

"**USEP Mortgage**" means the Mortgage, dated as of [_____], 2010, by USEP, as mortgagor, in favor of the Collateral Agent, as mortgagee, encumbering the USEP Facility Site.

"**USEP Project**" means the operation of the USEP Facility.

"**USEP Project Revenues**" means, for any period, all cash revenues (without duplication) received by USEP during such period from:  (a) the sales of Ethanol, Distilled Grain and gluten (and related by-products) during such period, (b) all interest earned with respect to such period on Permitted Investments held in the USEP Accounts, (c) the proceeds of any business interruption insurance and other payments received for interruption of operations during such period and (d) all other income or revenue, however earned or received, by USEP during such period, including any Government Authority incentives received pursuant to VEETC or otherwise, whether as tax credits, tax deductions or otherwise. USEP Project Revenues shall exclude, to the extent included:  (i) net amounts receivable under Permitted Swap Agreements and Commodity Hedging Agreements earned in respect of the USEP Project and (ii) the Net Available Amount in respect of an Event of Loss at the USEP Facility.

"**USEP Revenue Account**" has the meaning given such term in the Collateral Agency Agreement.

"**USEP Survey**" means an as-built survey of the USEP Facility Site which survey shall:

(a)      be a current "as-built" metes and bounds survey of the USEP Facility Site, including Easement Properties that benefit such site;

(b)      be made in accordance with the "Minimum Standard Detail Requirement for ALTA/ACSM Land Title Surveys" jointly established and adopted by ALTA, ACSM and NSPS in 2005 with all measurements made in accordance with the "Minimum Angle, Distance and Closure Requirements for Survey Measurements Which Control Land Boundaries for ALTA/ACSM Land Title Surveys";

(c)      be prepared by a surveyor acceptable to the Lenders;

(d)      contain "Optional Survey Responsibilities and Specifications" 1, 2, 3, 4, 6, 7(a), 7(b), 7(c), 8, 9, 10, 11(b), 13, 16, 17 and 18 as specified on Table A to the "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys"; and

(e)      contain a certification from said surveyor in form and substance satisfactory to each of the Agent and the Title Company.

"**USEP Title Policy**" means a Title Policy insuring that the Lien created by the USEP Mortgage constitutes a valid second mortgage lien on the USEP Facility Site, free and clear of all Liens and title defects except Permitted Exceptions.

"**VEETC**" means the Volumetric Ethanol Excise Tax Credit, codified in H.R. 4520, the American Jobs Creation Act of 2004 as heretofore and hereafter amended, and codified as 26 U.S.C. 6426.

"**WE Hereford**" means WE Hereford, LLC, a Delaware limited liability company, a Borrower Subsidiary.

"**WestLB**" has the meaning given to such term in the preamble.

"**Withdrawal Liability**" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

1.02    Accounting Terms and Determinations.

(a)    Except as otherwise expressly provided in this Agreement, all accounting terms used in this Agreement shall be interpreted, and all financial statements and certificates and reports as to financial matters required to be delivered to the Lenders under this Agreement shall (unless otherwise disclosed to the Lenders in writing at the time of delivery in the manner described in subsection (b) below) be prepared, in accordance with GAAP as in effect from time to time, including applicable statements, bulletins and interpretations issued by the Financial Accounting Standards Board, and all calculations made for the purposes of determining compliance with this Agreement shall (except as otherwise expressly provided in this Agreement) be made by application of GAAP referred to above; *provided*, that if any financial statements shall be prepared in accordance with GAAP that are not the same as the principles used for the preparation of the financial statements for the preceding applicable period (to the extent such change has a material effect) or if any calculations shall be made for the purposes of determining compliance with this Agreement on a basis that is not the same as was used for purposes of determining compliance for the preceding applicable period, then the financial statements for the comparable prior period shall be restated and the calculations re-made as specified above to enable a comparison to be made with such prior period; *provided further*, that the restatement and remaking of such calculations shall be made solely for comparison purposes and shall not result in any finding of non-compliance hereunder.

(b)    The Borrower shall deliver to the Lenders at the same time as the delivery of any annual or quarterly financial statement under Section 8.01 (i) a description in reasonable detail of any material variation between the application of accounting principles employed in the preparation of such statement and the application of accounting principles employed in the preparation of the next preceding annual or quarterly financial statements and (ii) reasonable estimates of the difference between such statements arising as a consequence of any such difference.

(c)     To enable the consistent determination of compliance with the terms of this Agreement, the Borrower will not change the last day of its fiscal year from December 31 of each year, or the last days of the first three fiscal quarters in each of its fiscal years from March 31, June 30 and September 30 of each year, respectively, without the prior written consent of the Agent.

1.03     <u>Types of Loans</u>.  Loans under this Agreement are distinguished by, and may be identified by, "Type".  The "Type" of Loan refers to whether such Loan is a Base Rate Loan or a Eurodollar Loan, each of which constitutes a Type.

1.04     <u>Certain Principles of Interpretation.</u>     In this Agreement, unless otherwise indicated:

(a)     the singular includes the plural and plural the singular;

(b)     words importing any gender include the other gender;

(c)     references to statutes or regulations are to be construed as including all statutory or regulatory provisions consolidating, amending or replacing the statute or regulation referred to;

(d)     references to "writing" include printing, typing, lithography and other means of reproducing words in a tangible visible form;

(e)     the words "including," "includes" and "include" shall be deemed to be followed in each instance by the words "without limitation";

(f)     references to articles, sections (or subdivisions of sections), exhibits, annexes or schedules are to this Agreement (unless otherwise specified);

(g)     references to agreements and other contractual instruments shall be deemed to include all subsequent amendments, extensions and other modifications and substitutions thereof (including by change orders where applicable) (without, however, limiting any prohibition on any such amendments, extensions and other modifications and substitutions by the terms of this Agreement);

(h)     and references to Persons include their respective permitted successors and assigns and, in the case of Government Authorities, Persons succeeding to their respective functions and capacities.

## ARTICLE II

### LOAN INCURRED AMOUNTS

2.01    Loans.   Each Lender had, prior to the Plan Effective Date, funded terms and revolving facilities under the Prepetition Credit Facility.  In connection with the implementation of the Plan and in full satisfaction of the Allowed Secured Lender Claims, on the Closing Date, the Borrower hereby incurs loans (as to each Lender, a "Loan" and collectively, the "Loans") in an initial aggregate principal amount equal to $150,000,000 as Secured Obligations hereunder.  The Loans are not revolving loans or commitments and the Borrower shall have no right to reborrow any amounts hereunder.

(b)    The aggregate amount of the Loan incurred by the Borrower, with respect to each Lender, shall equal the Loan Incurred Amount for such Lender.

(c)    Subject to the terms and conditions of this Agreement, the Loans may be Base Rate Loans or Eurodollar Loans and the Borrower may Convert Loans of one Type into Loans of another Type (as provided in Section 3.03) or Continue Loans of one Type as Loans of the same Type (as provided in Section 3.03).  Loans repaid or prepaid may not be re-borrowed.

(d)    After giving effect to all Conversions and Continuations of Loans, no more than [six] separate Interest Periods in respect of Eurodollar Loans shall be in effect at any one time.

2.02    Fees.  The Borrower shall pay to the Agent (for the account of the Person to whom such payment is owed) all fees payable in the amounts and at times separately agreed upon between the Borrower and the Agent all fees payable in the amounts and at times separately agreed upon between the Borrower and the Collateral Agent.

2.03    Lending Offices.  The Loans of each Type made by each Lender shall be made and maintained at such Lender's Applicable Lending Office for Loans of such Type..

2.04    Remedies Independent.  The amounts payable by the Borrower at any time under this Agreement, the Notes or any other Financing Document to each Lender shall be a separate and independent debt and, subject to the Collateral Agency Agreement, each Lender shall be entitled to protect and enforce its rights arising out of this Agreement and the Notes, and it shall not be necessary for any other Lender or the Agent to consent to, or be joined as an additional party in, any proceedings for such purposes.

2.05    Notes.

(a)    Notes.  The Loans of each Lender shall, at the request of such Lender, be evidenced by one or more promissory notes of the Borrower (each, a "**Note**") substantially in the form of

<u>Exhibit I</u> to this Agreement for such Lender's Loans.  Each Note shall be dated the Closing Date in the case of Notes issued on such date, or the effective date of assignment pursuant to <u>Section 12.06(b),</u> in the case of any Note issued in connection with such assignment.

(b)     <u>Loan Records</u>.  The date, amount, Type, interest rate and duration of Interest Period (if applicable) of each Loan in respect of each Lender hereunder, and each payment made in respect of principal of such Loan, shall be recorded by such Lender on its books and, prior to any transfer of the Note evidencing the Loans held by it, endorsed by such Lender on the schedule attached to such Note or any continuation of such schedule; *provided*, that the failure of such Lender to make any such recordation or endorsement shall not affect the obligations of the Borrower to make a payment when due of any amount owing under such Note.

(c)     <u>Subdivision</u>.  No Lender shall be entitled to have any of its Notes subdivided, by exchange for promissory notes of lesser denominations or otherwise, except in connection with a permitted assignment of all or any portion of such Lender's related Loans and related Note pursuant to <u>Section 12.06(b)</u>.

(d)     <u>Maintenance of Records by the Agent</u>. The Agent shall maintain records in which it shall record (i) the amount of each Loan hereunder and each Interest Period therefor, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder, (iii) the amount of any sum received by the Agent hereunder for the account of the Lenders and each Lender's share thereof and (iv) a copy of each assignment and acceptance delivered to it pursuant to <u>Section 12.06(b)</u>.  Upon reasonable notice to the Agent, the Borrower and each Lender shall have the right to inspect such records from time to time during normal business hours.

(e)     <u>Effect of Entries</u>.   Absent manifest error, the entries made in the records maintained pursuant to <u>paragraph (b)</u> or <u>(d)</u> of this <u>Section 2.04</u> shall be <u>prima facie</u> evidence of the existence and amounts of the obligations recorded therein; *provided*, that the failure of any Lender or the Agent to maintain such records or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

2.06     <u>Holdings of Loans and Equity Interests</u>.[6]   Each Lender agrees that, for a period of one calendar year commencing on the Closing Date, it shall not assign or transfer all or a portion of its Loan (or Loan Incurred Amount) hereunder to any Person unless it also assigns or transfers the percentage of its Equity Interests (whether held directly by such Lender or through one or more of its Affiliates) in New WEI equal to the percentage of the Loan (or Loan Incurred Amount) assigned or transferred by it to such Person (or an Affiliate of such Person established to hold Equity Interests).  Each

---

[6]     Provisions dealing with Participations of Loans to be confirmed and further restrictions on transfer to be added.

Lender shall ensure that any of its Affiliates that holds Equity Interests in New WEI shall not transfer or assign all or any portion of such Equity Interests except pursuant to a transfer or all or a portion of such Lender's Loan hereunder.

ARTICLE III

**PAYMENTS OF PRINCIPAL AND INTEREST**

3.01    <u>Repayment of Loans</u>.

(a)    <u>Loans</u>.  The Borrower hereby agrees to pay to the Agent for the account of each Lender the principal of such Lender's Loans outstanding on each Principal Payment Date in accordance with the amortization schedule attached as Appendix D to this Agreement.  All unpaid principal of each outstanding Loan not previously paid in accordance with such amortization schedule or prepaid shall be due and payable in full in a single installment on the Final Maturity Date.

3.02    <u>Interest</u>.

(a)    The Borrower hereby agrees to pay to the Agent for account of each Lender interest on the unpaid principal amount of each Loan in respect of such Lender for the period from and including the date of incurrence of such Loan to but excluding the date such Loan shall be paid in full, at the following rates per annum:

(i)    during such periods as such Loan is a Base Rate Loan, the Base Rate (as in effect from time to time) <u>plus</u> the Applicable Margin;

(ii)    during such periods as such Loan is a Eurodollar Loan, for each Interest Period relating to such Loan, the Adjusted LIBOR for such Loan for such Interest Period <u>plus</u> the Applicable Margin; and

(iii)    during such periods that a Default or Event of Default has occurred and is continuing, all outstanding Loans shall bear interest at a rate per annum equal to the Post-Default Rate to but excluding the dates such Default or Event Default is remedied or waived.

(b)    Accrued interest on each Loan shall be payable in arrears (i) on each Interest Payment Date and (ii) upon the payment or prepayment of any Loan or the Conversion of any Loan to a Loan of another Type (but only on the principal amount so paid, prepaid or Converted); *provided*, that interest payable at the Post Default Rate shall be payable from time to time on demand (or, if no demand is made during any month, on the last Business Day of such month).  Promptly after the determination of

any interest rate provided for in this Agreement or any change in any such rate, the Agent shall give notice of such interest rate to the Lenders to which such interest is payable and to the Borrower.

3.03 <u>Prepayments and Conversions or Continuations of Loans</u>. Subject to <u>Section 4.04</u>, the Borrower shall have the right to voluntarily prepay Loans, or to Convert Loans of one Type into Loans of another Type or Continue Loans of one Type as Loans of the same Type, at any time or from time to time; *provided*, that: (i) the Borrower shall give the Agent notice of each such prepayment, Conversion or Continuation as provided in Section 4.05, and (ii) upon the date specified in any such notice of prepayment, the amount to be prepaid shall become due and payable. [Any prepayment by the Borrower pursuant to this <u>Section 3.03</u> shall be made simultaneously with, and is conditioned upon, (A) the prepayment under any Permitted Swap Agreement (if then in effect) to the extent the aggregate notional amount under all such Permitted Swap Agreements exceeds the aggregate amount of Loans outstanding after giving effect to the prepayment contemplated by this <u>Section 3.03</u> and (B) the payment by the Borrower of any costs, expenses or other amounts incurred by any Lender and Permitted Swap Provider in connection with such prepayment.][7]

3.04 <u>Mandatory Prepayments</u>.

(a) In addition to mandatory repayments of principal of Loans as set forth in Section 3.01 above and following the payment in full of all Senior Exit-Financing Facility Obligations (other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted), the Borrower shall make the following mandatory prepayments (to be effected in each case in the manner specified in paragraph (viii) below):

(i) <u>Event of Loss</u>. The Borrower shall prepay the Loans in an amount equal to 100% of the Net Available Amount not allocated to and used for Restoration in accordance with <u>Section 8.05(k)</u>.

(ii) <u>Asset Sales</u>. Except as otherwise permitted pursuant to <u>Section 8.11(b)</u>, the Borrower shall prepay the Loans in an aggregate amount equal to 100% of the net proceeds in excess of $[250,000] resulting from the disposition of any of its physical assets (other than sales of inventory in the ordinary course of business).

(iii) <u>Project Payments</u>. The Borrower shall prepay the Loans in an amount equal to 100% of the net proceeds received from Material Project Parties pursuant to Material Project Documents in connection with amounts received by the Borrower in

---

[7] Swap Arrangements to be confirmed.

respect of termination payments and liquidated damages payments due under the terms of such Material Project Documents.

      (iv)    <u>DSCR Cash Sweep</u>.  On each Quarterly Date, if the Debt Service Coverage Ratio for the [four] most recent consecutive calendar quarters immediately preceding such Quarterly Date (or such shorter period ending on a Quarterly Date subsequent to the initial Closing Date, taken as a consecutive period) is less than 1.5 to 1.0, the Borrower shall prepay the Loans in an amount equal to 100% of the amounts remaining on deposit in the Revenue Account as of such Quarterly Date.

      (v)    <u>Incurrence of Indebtedness</u>.  If any Obligor incurs or issues any Indebtedness (other than Permitted Indebtedness), the Borrower shall promptly prepay the Loans in an amount equal to 100% of all net cash proceeds received therefrom by such Person (but in any event within one Business Day thereafter).

      (vi)    <u>Issuance of Equity</u>.  If any Obligor sells or issues any of its Equity Interests (other than as expressly permitted by this Agreement and/or other than pursuant to the Management Incentive Plan), the Borrower shall promptly prepay the Loans in an amount equal to 100% of the net cash proceeds received therefrom by such Person (but in any event within one Business Day thereafter).

      (b)    In addition to mandatory repayments of principal of Loans as set forth in Section 3.01 above and following the payment in full of (A) all Senior Exit-Financing Facility Obligations then due and (B) all Secured Obligations under this Agreement then due, on or before the 5th of each of July and January of each year (or if such date is not a Business Day, the immediately following Business Day) the Borrower shall pay to the Agent the following amounts as a prepayment in respect of the Secured Obligations hereunder:

      (i)    100% of the Excess Cash Flow until the principal amount outstanding of the Loans equal $100,000,00;

      (ii)    75% of the Excess Cash Flow, until the principal amount outstanding of the Loans is reduced from $100,000,000 to $50,000,000; and

      (iii)    50% of the Excess Cash Flow, if the principal amount outstanding of the Loans falls below $50,000,000, until the Loans are paid in full.

      (c)    <u>Application of Prepayments</u>.  Mandatory Prepayments made pursuant to Section 3.04(a) and 3.04(b) above, shall be applied to the Loans in the following order:

(i)    First, to payment of that portion of the Secured Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Agent and amounts payable under Article IV) payable to the Agent and the Collateral Agreement in their capacities as such;

(ii)    Second, to payment of that portion of the Secured Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders and fees and time charges for attorneys who may be employees of any Lender and amounts payable under Article IV), ratably among them in proportion to the amounts described in this clause Second payable to them;

(iii)    Third, to payment of that portion of the Secured Obligations constituting accrued and unpaid interest on the Loans and other obligations, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

(iv)    Fourth, to payment of that portion of the Secured Obligations constituting unpaid principal of the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Fourth held by them; and

(v)    Last, the balance, if any, after all of the above payments, to the holders of the New Common Stock if so instructed in writing by the Agent and the Majority Lenders.

(d)    Transfer of Funds.  The Borrower shall transfer all amounts required for the prepayments in this Section 3.04 in accordance with Section 3.07 of the Collateral Agency Agreement at the time of each such prepayment.

(e)    Any prepayment by the Borrower pursuant to this Section 3.04 shall be made simultaneously with (A) the prepayment under any Permitted Swap Agreement (if then in effect) to the extent the aggregate notional amount under all such Permitted Swap Agreements exceeds the aggregate amount of Eurodollar Loans outstanding after giving effect to the prepayments contemplated by this Section 3.04 and (B) the payment by the Borrower of any costs, expenses or other amounts incurred by any Lender and Permitted Swap Provider in connection with such prepayment.

ARTICLE IV

**PAYMENTS; PRO RATA TREATMENT; COMPUTATIONS; ETC.**

4.01    Payments.

(a)     Except to the extent otherwise provided in this Agreement, all payments of principal, interest, fees and other amounts to be made by the Borrower under this Agreement and the Notes and, except to the extent otherwise provided in any of the other Financing Documents, all payments to be made by the Borrower under any such other Financing Documents, shall be made in Dollars, in immediately available funds, without deduction, set-off or counterclaim, to the Agent by wire transfer to the account specified on Appendix B.  No payment shall be made later than 11:00 a.m. New York time on the date on which such payment is due.  Each such payment made after such time on such due date shall be deemed to have been made on the next succeeding Business Day.

(b)     The Borrower shall, at the time of making each payment under this Agreement or any Note for account of any Lender, specify to the Agent the Loans or other amounts payable by the Borrower under this Agreement to which such payment is to be applied (and in the event that it fails to so specify, or if an Event of Default has occurred and is continuing, the Agent may distribute such payment to the Lenders for application in such manner as it or the Supermajority Lenders, subject to Section 4.02, may determine to be appropriate, in each case pursuant to the Collateral Agency Agreement). The Agent shall notify the intended Lender(s) of any such specification made by the Borrower.

(c)     Each payment received by the Agent under this Agreement or any Note for account of any Lender shall be paid by the Agent promptly to such Lender, in immediately available funds, for account of such Lender's Applicable Lending Office for the Loan or other obligation in respect of which such payment is made.

(d)     If the due date of any payment under this Agreement or any Note would otherwise fall on a day which is not a Business Day such date shall be extended to the next succeeding Business Day (except in the case where such payment due date is a Quarterly Date, in which case the terms set forth in Section 1.01 for "Quarterly Date" are applicable) and interest shall be payable for any principal so extended for the period of such extension.

(e)     Loans repaid or prepaid may not be reborrowed.

4.02     Pro Rata Treatment.  Except to the extent otherwise provided in this Agreement:

(a)     the borrowing of Loans under Section 2.01 shall be made from the Lenders and each payment of Fees under Section 2.02 shall be made for account of the applicable Lenders on a pro rata basis (based on their respective Loan Incurred Amounts);

(b)     the Conversion and Continuation of Loans of a particular Type shall be made pro rata among the Lenders according to the amounts of their respective Loan Incurred Amounts and the then current Interest Period for each Loan of such Type shall be coterminous;

(c)       except as otherwise specified herein, each payment or prepayment of principal of Loans by the Borrower shall be made for account of the Lenders pro rata in accordance with the respective unpaid principal amounts of the Loans held by them; *provided*, that if immediately prior to giving effect to any such payment in respect of any Loan, the outstanding principal amount of the Loans shall not be held by the Lenders pro rata in accordance with their respective Loan Incurred Amounts in effect at the time such Loans were incurred, then such payment shall be applied to the Loans in such manner as shall result, as nearly as is practicable, in the outstanding principal amount of the Loans being held by the Lenders pro rata in accordance with their respective Loan Incurred Amounts; and

(d)       each payment of interest on the Loans by the Borrower shall be made for account of the Lenders pro rata in accordance with the amounts of interest on such Loans then due and payable to the respective Lenders.

4.03      Computations.  Interest and fees on Eurodollar Loans, on Base Rate Loans that are computed on the basis of the Federal Funds Rate and on other obligations of the Borrower or the Lenders that are computed on the basis of the Federal Funds Rate, shall be computed on the basis of a year of 360 days and actual days elapsed (including the first day but excluding the last day) occurring in the period for which such amounts are payable.  Interest on Base Rate Loans that are computed on the basis of the Prime Rate and on other obligations of the Borrower or the Lenders that are computed on the basis of the Prime Rate [and the fees contemplated by Section 2.02] shall be computed on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed (including the first day but excluding the last day) occurring in the period for which such amounts are payable.

4.04      Minimum Amounts.  Except for (a) mandatory prepayments under Section 3.04, and (b) Conversions or prepayments made pursuant to Section 5.06, each Conversion, Continuation, voluntary and partial prepayment of principal of Loans shall be in an amount equal to $[500,000] (or, if less, the full amount of such Loans outstanding).  Conversions or prepayments of or into Loans of different Types or, in the case of Eurodollar Loans, having different Interest Periods at the same time shall be deemed separate Conversions and prepayments for purposes of the foregoing for each Type of Loan or Interest Period.

4.05      Certain Notices.  Notices by the Borrower to the Agent of Conversions, Continuations and prepayments of Loans, Types of Loans and of the duration of Interest Periods shall be irrevocable and shall be effective only if received by the Agent not later than 11:00 a.m. New York City time on the number of Business Days prior to the date of the relevant Conversion, Continuation or prepayment or the first day of such Interest Period specified below:

| Notice | Number of Business Days Prior |
|---|---|
| Conversions into or from, Continuations of Interest Periods for, and Prepayments of Eurodollar Loans | 5 |
| Prepayments of Base Rate Loans | 1 |

Each such notice shall be in substantially the form of Exhibit J and shall be subject to the satisfaction of the conditions set forth in Article VI (each, a "**Loan Notice**"). Each such notice of Conversion, Continuation or optional prepayment shall specify the Type of each Loan to be Converted, Continued or prepaid (and, in the case of a Conversion, the Type of Loan to result from such Conversion) and the date of Conversion, Continuation or optional prepayment (which shall be a Business Day). Each such notice of the duration of an Interest Period shall specify the Loans to which such Interest Period is to relate. The Agent shall promptly notify the Lenders of the contents of each such notice. In the event that the Borrower fails to select the Type of Loan, such Loan (i) if outstanding as a Eurodollar Loan, will remain as a Eurodollar Loan, (ii) if outstanding as a Base Rate Loan, will remain as a Base Rate Loan or (iii) if not then outstanding, will be made as a Base Rate Loan. In the event that the Borrower fails to select the duration of any Interest Period, the Borrower shall be deemed to have selected an Interest Period of one month for such Eurodollar Loan.

4.06 Non-Receipt of Funds by the Agent. Unless the Agent shall have been notified by the Borrower prior to the date on which the Borrower is to make payment to the Agent for account of one or more of the Lenders (any such payment, a "**Required Payment**"), which notice shall be effective upon receipt, that the Borrower does not intend to make the Required Payment to the Agent, the Agent may assume that the Required Payment has been made and may, in reliance upon such assumption, (but shall not be required to) make the amount of such payment available to the intended recipient (or recipients) on such date and, if the Borrower has not in fact made the Required Payment to the Agent, the recipient (or recipients) of such payment shall, on demand, repay to the Agent the amount so made available together with interest on such amount in respect of each day during the period commencing on the date (the "**Advance Date**") such amount was so made available by the Agent until the date the Agent recovers such amount at a rate per annum equal to the Federal Funds Rate for each day that such amount has been made available. If such recipient (or recipients) shall fail promptly to make such payment, the Agent shall be entitled to recover such amount, on demand, from the Borrower, together with interest as provided above; *provided*, that if neither the recipient (or recipients) nor the Borrower returns the Required Payment to the Agent within three Business Days of the Advance Date, then, retroactively to the Advance Date, the Borrower and the recipient (or recipients) shall each be obligated retroactively to the Advance Date, to pay interest in respect of the Required Payment at the Post-Default Rate (and, in case the recipient (or recipients) shall return the Required Payment to the Agent, without limiting the

obligation of the Borrower under <u>Section 3.02</u> to pay interest to such recipient (or recipients) at the Post-Default Rate in respect of the Required Payment).

4.07    <u>Sharing of Payments; Etc</u>.

(a)    The Borrower agrees that, in addition to (and without limitation of) any right of set-off, banker's lien or counterclaim a Lender may otherwise have, each Lender shall be entitled, at its option, to offset balances held by it for account of the Borrower at any of its offices, in Dollars or in any other currency, against any principal of or interest on any of such Lender's Loans or any other amount payable to such Lender under this Agreement, that is not paid when due (regardless of whether such balances are then due to the Borrower), in which case it shall promptly notify the Borrower and the Agent of such action; *provided*, that such Lender's failure to give such notice shall not affect the validity of such action.

(b)    If any Lender shall obtain from the Borrower payment of any principal of or interest on any Loan owing to it or payment of any other amount under this Agreement or any Note held by it or any other Financing Document or through the exercise of any right of set-off, banker's lien or counterclaim or similar right or otherwise (other than from the Agent as provided in this Agreement), and, as a result of such payment, such Lender shall have received a greater percentage of the principal of or interest on the Loans or such other amounts then due hereunder by the Borrower to such Lender than the percentage received by any other Lender, it shall promptly purchase from such other Lenders participations in (or, if and to the extent specified by such Lender, direct interests in) the Loans or such other amounts, respectively, owing to such other Lenders (or in interest due on such Loans or other amounts, as the case may be) in such amounts, and make such other adjustments from time to time as shall be equitable, with the effect that all the Lenders shall share the benefit of such excess payment (net of any expenses which may be incurred by such Lender in obtaining or preserving such excess payment) pro rata in accordance with the unpaid principal of or interest on the Loans or such other amounts, respectively, owing to each of the Lenders; *provided*, that if at the time of such payment the outstanding principal amount of the Loans shall not be held by the Lenders pro rata in accordance with their respective Loan Incurred Amounts in effect at the time such Loans were incurred, then such purchases of participations or direct interests shall be made in such manner as will result, as nearly as is practicable, in the outstanding principal amount of the Loans being held by the Lenders pro rata according to the amounts of such Loan Incurred Amounts. To such end all the Lenders shall make appropriate adjustments among themselves (by the resale of participations sold or otherwise) if such payment is rescinded or must otherwise be restored.

(c)    The Borrower agrees that any Lender so purchasing such a participation (or direct interest) may exercise all rights of set-off, banker's liens, counterclaims or similar rights with respect to such participation as fully as if such Lender were a direct holder of Loans or other amounts (as the case may be) owing to such Lender in the amount of such participation.

(d)     Nothing contained in this Agreement shall require any Lender to exercise any such right or shall affect the right of any Lender to exercise, and retain the benefits of exercising, any such right with respect to any other indebtedness or obligation of the Borrower.  If, under any applicable bankruptcy, insolvency or other similar law, any Lender receives a secured claim in lieu of a set-off to which this Section 4.07 applies, such Lender shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Lenders entitled under this Section 4.07 to share in the benefits of any recovery on such secured claim.

ARTICLE V

**YIELD PROTECTION; ETC.**

5.01     Alternate Rate of Interest.

(a)     If prior to the commencement of any Interest Period with respect to a making, Conversion or Continuation of Eurodollar Loans:

(i)     the Agent reasonably determines that adequate and reasonable means do not exist for ascertaining the Adjusted LIBOR for such Interest Period; or

(ii)     the Agent is advised by the Supermajority Lenders that such Lenders have reasonably determined that the Adjusted LIBOR for that Interest Period will not adequately and fairly reflect the cost to those Lenders of making or maintaining their Loans as a result of such Continuation or Conversion for such Interest Period;

then the Agent will give notice of such circumstances to the Borrower and the Lenders by telephone or telecopy as promptly as practicable.

(b)     Until the Agent notifies the Borrower and the Lenders that the circumstances giving rise to the notice in Section 5.01(a)(ii) above no longer exist (which notice of subsequent change in circumstances shall be given as promptly as practicable), any request by the Borrower to Continue the Loan shall be ineffective, any Loan Notice for a Eurodollar Loan shall be made using the Base Rate plus the Applicable Margin, and any outstanding Loan will, on the last day of its current Interest Period, Convert into a Base Rate Loan (or if such Loan is then a Base Rate Loan, Continue as a Base Rate Loan).

5.02     Increased Costs.

(a)     If any Change in Law:

(i)     imposes, modifies or deems applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit

extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBOR); and/or

(ii)     imposes on any Lender or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender;

and the result of any of the foregoing is to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender under any Financing Document, in each case by an amount that such Lender reasonably deems to be material, then the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender for the additional costs incurred or reduction suffered (except to the extent the Borrower is excused from payment pursuant to Section 5.05).

(b)     If any Lender reasonably determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or (without duplication) on the capital of its holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or its holding company could have achieved but for that Change in Law (taking into consideration such Lender's and its holding company's policies with respect to capital adequacy), in each case by an amount that such Lender reasonably deems to be material, then from time to time the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or (without duplication) its holding company for any such reduction suffered (except to the extent the Borrower is excused from payment pursuant to Section 5.05).

(c)     To claim any amount under this Section 5.02, a Lender must deliver to the Borrower a certificate setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, under Section 5.02(a) or Section 5.02(b).  The Borrower shall pay such Lender the amount due and payable and set forth on any such certificate within 30 days after its receipt.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section 5.02 shall not constitute a waiver of such Lender's right to demand that compensation; *provided*, that the Borrower shall not be required to compensate a Lender pursuant to this Section 5.02 for any increased costs or reductions incurred more than 180 days prior to the date on which such Lender notifies the Borrower of the Change in Law giving rise to those increased costs or reductions and of such Lender's intention to claim compensation for those circumstances; *provided further*, that, if the Change in Law giving rise to those increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include that period of retroactive effect.

5.03     Taxes.

(a)     Any and all payments by or on account of any Secured Obligation shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; *provided*, that if the Borrower is required to deduct any Indemnified Taxes or Other Taxes from those payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this <u>Section 5.03</u>) each Person entitled thereto receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make those deductions and (iii) the Borrower shall pay the full amount deducted to the relevant Taxing Authority in accordance with applicable Government Rule.

(b)     In addition, the Borrower shall pay any Other Taxes to the relevant Taxing Authority in accordance with any applicable Government Rule.

(c)     The Borrower shall indemnify the Agent and each Lender, within 30 days after written demand, for the full amount of any Indemnified Taxes or Other Taxes paid by such Person on or with respect to any payment by or on account of any Secured Obligation (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 5.03</u>) and any penalties, interest and expenses arising from, or with respect to, those Indemnified Taxes or Other Taxes, whether or not those Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Taxing Authority.  To claim any amount under this <u>Section 5.03(c)</u>, the Agent or a Lender must deliver to the Borrower a certificate in reasonable detail as to the amount of such payment or liability.

(d)     As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Taxing Authority, the Borrower shall deliver to the Agent the original or a certified copy of a receipt issued by such Taxing Authority evidencing such payment, a copy of the return reporting that payment or other evidence of such payment reasonably satisfactory to the Agent.

(e)     Upon the Borrower's request, any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under any applicable Government Rule or treaty between the United States and the jurisdiction in which the Borrower is located, with respect to payments of any Secured Obligations will deliver to the Borrower (with a copy to the Agent), at the time or times prescribed by applicable Government Rule, such properly completed and executed documentation prescribed by applicable Government Rule as will permit those payments to be made without withholding or at a reduced rate.

5.04     <u>Illegality</u>.  In the event that it becomes unlawful or, by reason of a Change in Law, any Lender is unable to honor its obligation to make or maintain Eurodollar Loans, then such Lender will promptly notify the Borrower of such event (with a copy to the Agent) and such Lender's obligation to make or to Continue, or to Convert Loans of any other Type into, Eurodollar Loans shall be suspended until such time as such Lender may again make and maintain Eurodollar Loans.  During such

period of suspension, the Loans that would otherwise be made by such Lender as Eurodollar Loans shall be made instead by such Lender as Base Rate Loans and each Loan made by such Lender that is outstanding will automatically, on the last day of the then-existing Interest Period therefor if such Loan may lawfully remain outstanding until the end of such Interest Period, and otherwise immediately, Convert into a Base Rate Loan (or, if such Loan is then a Base Rate Loan, will continue as a Base Rate Loan). Each Lender agrees to use reasonable efforts, including using reasonable efforts to designate a different lending office for funding or booking its Loans or to assign its rights and obligations under the Financing Documents to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (a) would eliminate or avoid such illegality and (b) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all costs and expenses incurred by any Lender in connection with any such designation or assignment; *provided*, that prior to incurring any such costs or expenses such Lender provides written notice to the Borrower setting forth in reasonable detail a good faith estimate of such costs and expenses.

5.05    Mitigation of Secured Obligations; Replacement of Lenders.

(a)    If any Lender requests compensation under Section 5.02 or if the Borrower is required to pay any additional amount to any Lender or any Government Authority for the account of any Lender pursuant to Section 5.03, then such Lender, if requested by the Borrower, will use reasonable efforts to designate a different lending office for funding or booking its Loans or to assign its rights and obligations under the Financing Documents to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 5.02 or 5.03, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    If any Lender requests compensation under Section 5.02, if the Borrower is required to pay any additional amount to any Lender or any Government Authority for the account of any Lender pursuant to Section 5.03, if Section 5.04 becomes applicable to any Lender or if any Lender defaults in its obligation to fund Loans, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions, including required consents, contained in Section 12.06), all its interests, rights and obligations under this Agreement to an assignee that assumes those obligations (which assignee may be another Lender); *provided*, that (i) such Lender receives payment of an amount equal to the Secured Obligations owing to it from the assignee (to the extent of the outstanding principal, accrued interest and fees included in those Secured Obligations) or the Borrower (in the case of all other amounts so included) and (ii) in the case of any such assignment resulting from a claim for compensation under Section 5.02 or payments required to be made pursuant to Section 5.03, such assignment will result

in a reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, as a result of a waiver by such Lender of its right under Section 5.02, 5.03 or 5.04, as applicable, the circumstances entitling the Borrower to require such assignment and delegation have ceased to apply.  If a Lender refuses to be replaced pursuant to this Section 5.05 and Section 12.06(b), the Borrower shall not be obligated to pay such Lender any of the compensation referred to in this Section 5.05 or any additional amounts incurred or accrued under Article V from and after the date that would have been reasonable for such replacement.

5.06    Break Funding Payments.

In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of the Interest Period for that Loan (including under Section 3.03 or Section 3.04 or as a result of an Event of Default), (b) the Conversion of any Eurodollar Loan other than on the last day of its Interest Period, (c) the failure to borrow, Convert, Continue or prepay any Loan on the date specified in any borrowing notice or Conversion or Continuation request or (d) the assignment of any Eurodollar Loan other than on the last day of its Interest Period as a result of a request by the Borrower pursuant to Section 5.05, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to any such event.  Such loss, cost or expense to any Lender shall be deemed to include an amount reasonably determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBOR that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period for such Loan (or, in the case of a failure to borrow, Convert or Continue, for the period that would have been the Interest Period for such Loan) over (ii) the amount of interest that would accrue on such principal amount for that period at the interest rate that such Lender would bid were it to bid, at the commencement of that period, for Dollar deposits of a comparable amount and period from other banks in the eurodollar market.  To claim any amount under this Section 5.06, the Lender must deliver to the Borrower a certificate setting forth in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section 5.06 (including calculations, in reasonable detail, showing how such Lender computed such amount or amounts).  The Borrower shall pay such Lender the amount due and payable and set forth on any such certificate within 30 days after its receipt.

ARTICLE VI

**CONDITIONS PRECEDENT**

6.01    Conditions to Closing.  The occurrence of the Closing Date is subject to the receipt by the Agent of each of the agreements and other documents, and the satisfaction of the conditions precedent, set forth below, each of which shall be in form and substance satisfactory to each of the Lenders in their sole discretion and in full force and effect, if applicable, unless in each case, waived by each of the Lenders:

(a)     <u>Financing Documents</u>.  Each Financing Document listed on <u>Schedule 6.01(a)</u> shall have been duly executed by the intended parties thereto and delivered by the parties thereto.

(b)     <u>Corporate Documents</u>. The Agent shall have received:

(i)     a copy of the Amended Certificate of Incorporation certified by the Secretary of State of Delaware;

(ii)     a copy of the certificate or articles of incorporation or formation, including all amendments thereto, of each Credit Party and New WEI, certified as of a recent date by the Secretary of State of the state of its organization (including as to good standing of such Credit Party and New WEI);

(iii)     a certificate of the Secretary or Assistant Secretary of each Credit Party and New WEI dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the by-laws or limited liability company agreement of such Credit Party and New WEI as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in clause (B) below, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors (or, if applicable, other analogous governing body) of such Credit Party and New WEI authorizing the execution, delivery and performance of the Financing Documents to which such Person is a party and, in the case of the Borrower, the Loans hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that the certificate or articles of incorporation (or other analogous organizational document) of such Credit Party and New WEI has not been amended since the date of the last amendment thereto shown on the certificate of good standing furnished pursuant to clause (i) above, and (D) as to the incumbency and signature of each Authorized Officer of such Credit Party and New WEI executing any other document delivered in connection herewith on behalf of such Credit Party and New WEI, as the case may be;

(iv)     a certificate of another Authorized Officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate pursuant to clause (iii) above;

(v)     a certificate of an Authorized Officer of the Pledgor certifying that as of the Closing Date no Person, other than the Pledgor, New WEI or an Affiliate which is a wholly owned Subsidiary or parent entity of such Pledgor, members of management of the Borrower or holders of Equity Interests in New WEI, has a direct or indirect equity interest in the Borrower; and

(vi)     a certificate of the Secretary or Assistant Secretary of the Pledgor certifying that as of the Closing Date (A) Pledgor has no Indebtedness and (B) Pledgor's sole business is owning 100% of the equity interests in the Borrower;

(c)     <u>Payment of Fees</u>.  Payment of all or any portion of such fees and expenses then due and payable by the Borrower under this Agreement, including pursuant to <u>Sections 2.02</u> and <u>12.03</u>.

(d)     <u>Financial Statements</u>. The Agent and Lenders shall have received, in form and substance satisfactory to the Majority Lenders in all respects:

(i)     the unaudited balance sheet of the Credit Parties (on a consolidated and consolidating basis) for fiscal year ended 2009 and the related consolidated statements of income or operations, shareholders' equity and cash flows; and

(ii)     the unaudited cumulative monthly balance sheet of the Credit Parties (on a consolidated and consolidating basis) from fiscal year-end 2009 through the month-end immediately preceding the Closing date (or, if the delivery of such cumulative monthly financial statements are impracticable due to the proximity of such month-end date and the Closing Date, such earlier month-end date as shall be reasonably acceptable to the Agent) and the related consolidated statements of income or operations, shareholders' equity and cash flows,

in each case prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and fairly presenting the financial condition of each of the Credit Parties, as determined in accordance with GAAP.

(e)     <u>Financial Information; Diligence Matters</u>.  The Agent and Lenders shall have received and be satisfied with the financial statements of the Credit Parties.  The Agent and the Lenders shall have had the opportunity to examine the books of account and other records and files of the Credit Parties and to perform other financial, business, collateral and environmental due diligence, and to review recent financial statements of such Persons and the results of any such examination and review shall have been satisfactory to the Majority Lenders in all respects.

(f)     <u>Capital Stock</u>.  All of the outstanding capital stock or membership interests of the Obligors has been duly issued and nonassessable, and all outstanding capital stock or membership interests in the Obligors has been pledged in the manner provided under a Pledge Agreement or other Security Document to the Collateral Agent for the benefit of the Lenders and certificates representing such capital stock or membership interests, as the case may be, accompanied by instruments of transfer and stock powers endorsed in blank, shall be in the actual possession of the Collateral Agent (or, in the case of any Subsidiary with respect to which ownership interests are evidenced by book entry, other

evidence of the perfection of and action to perfect such security interests as required by such Pledge Agreement shall have been delivered and taken).

(g)     Capital Stock of Reorganized White Energy, Inc.  Reorganized White Energy Inc. shall have issued to New WEI the New Equity Interests in Reorganized White Energy Inc.

(h)     Financing Statements.  Each document (including without limitation each UCC financing statement) required by law or the Security Documents or requested by the Collateral Agent to be filed, registered or recorded in order to create in favor of the Collateral Agent for the benefit of the Agent and Lenders a valid, legal and perfected, second-priority security interest and Lien on the Collateral described in each Security Document shall have been delivered to the Collateral Agent for filing and such other actions reasonably requested by the Collateral Agent as are necessary to cause the Liens granted under each Security Document in favor of the Collateral Agent to be perfected or second-priority security interests shall have been taken.

(i)     Insurance.  The Agent shall have received:

(i)     Insurance Policies.  Certificates of insurance evidencing the existence of all insurance required to be maintained by one or more of the Obligors pursuant to Section 8.05 and the designation of the Collateral Agent as the loss payee and the Lenders as additional named insured, as the case may be, thereunder to the extent required by Section 8.05, such certificates to be in such form and contain such information as is specified in Section 8.05, including one or more certificates from Acceptable Insurance Brokers.  In addition, each Obligor shall have delivered a certificate of an Authorized Officer of such Obligor setting forth the insurance obtained by such Person in accordance with the requirements of Section 8.05 and stating that such insurance (A) has been obtained and in each case is in full force and effect, (B) that such insurance materially complies with Section 8.05 and Schedule 8.05 and (C) that all premiums then due and payable on all insurance required to be obtained by such Obligor have been paid.

(ii)     Insurance Consultant's Report.  A report of the Insurance Consultant, in form and substance satisfactory to the Agent, dated as of the Closing Date.

(j)     Capitalization.  The Agent and each of the Lenders shall be satisfied with the corporate, partnership, limited liability company and legal structure and capitalization of the Credit Parties, including, without limitation, the charter, by-laws, limited liability company agreement, partnership agreements, certificates of partnership and other organizational documents, as appropriate, of each Credit Party, and each agreement or instrument relating thereto.

(k)     Approvals.  All material governmental and third party approvals or consents which the Agent reasonably determine are necessary in connection with the implementation of the Plan and entering into this Agreement and which are otherwise referred to herein shall have been obtained (without the imposition of any conditions that are not acceptable to the Majority Lenders) and remain in effect.

(l)     Labor Matters.  The Majority Lenders shall be satisfied with matters relating to the Credit Parties' labor relations.

(m)     Confirmation of Plan.  (i) The Majority Lenders shall have approved the Disclosure Statement, the Plan and Confirmation Order in their reasonable discretion, (ii) the Confirmation Order shall have been entered by the Bankruptcy Court and Agent shall have received a certified copy of same, and shall be in full force and effect and shall not have been reversed, stayed, modified or amended and (iii) the Majority Lenders shall be satisfied that all conditions precedent to the effectiveness, implementation or consummation of the Plan have been satisfied or waived by the appropriate Persons, and the Plan shall have been consummated and implemented.

(n)     Notice of Plan Effective Date.  The Agent shall have received and be satisfied with a copy of the Notice of the Plan Effective Date to be delivered to the Bankruptcy Court.

(o)     Representations and Warranties, Etc.  The Agent shall have received a certificate of an Authorized Officer of each Obligor certifying that as of the Closing Date, each of the representations and warranties of the Obligors contained in Article VII is (i) if such representation and warranty is qualified as to materiality or by reference to the existence of a Material Adverse Effect, true and complete to the extent of such qualification on and as of such Closing Date as if made on and as of such Closing Date (or, if stated to have been made solely as of an earlier date, as of such earlier date) or (ii) if such representation and warranty is not so qualified, true and complete in all material respects on and as of such Closing Date as if made on and as of such Closing Date (or, if stated to have been made solely as of an earlier date, as of such earlier date).

(p)     No Material Adverse Effect.  No event or series of events has occurred since the filing of the Disclosure Statement with the Bankruptcy Court or condition exists which has had a Material Adverse Effect.

(q)     Absence of Defaults.  No Default or Event of Default has occurred and is continuing or will have occurred after giving effect to the incurrence of the Loans contemplated on such date, as certified to by the Obligors.

(r)     Lien Searches.  The Collateral Agent shall have received the results of a recent lien search (including UCC search reports and tax lien, judgment and litigation search reports, if requested) in each of the jurisdictions where each Credit Party is organized and such other jurisdictions

reasonably requested by the Collateral Agent, and such search shall reveal no Liens on any of the assets and properties of any Credit Party except for (i) Permitted Liens, and (ii) Liens to be discharged or assigned to the Collateral Agent on or prior to the Effective Date pursuant to the Confirmation Order and documentation reasonably satisfactory to the Majority Lenders.

(s)     Subordination Agreement. The Agent and the Lenders shall have received the duly executed Subordination Agreement in form and substance satisfactory to the Majority Lenders.

(t)     UCC-3 Termination Statements.  The Collateral Agent shall have received duly executed UCC-3 termination statements and such other instruments, in form and substance satisfactory to the Collateral Agent, as shall be necessary to terminate and satisfy all pre-existing Liens on the assets and property of the Credit Parties (other than Permitted Liens).

(u)     Fees and Taxes.  The Collateral Agent shall have received evidence that all filing, recordation, subscription and inscription fees and all recording and other similar fees, and all recording, stamp and other taxes and other expenses related to such filings, registrations and recordings necessary for the consummation of the transactions contemplated by this Agreement and the other Transaction Documents have been paid in full by or on behalf of the Credit Parties.

(v)     Cash Management.  The Obligors and the Collateral Agent shall have entered into cash management arrangements (including without limitation the due execution of Control Agreements and other blocked account agreements or other comparable documentation) pursuant to documentation satisfactory in form and substance to the Collateral Agent.

(w)     Collateral Report.  The Collateral Agent shall have received a schedule, as of the Business Day immediately prior to the Closing Date, listing (i) the Balances of the Credit Parties, and (ii) all real property interests of the Credit Parties, duly certified by an Authorized Officer of the Credit Parties.

(x)     Opinions of Counsel.   Opinions of counsel, each in form and substance satisfactory to the Lenders:

(i)     Opinions of Counsel to the Borrower.

(A)     An opinion of [_____] as to such customary matters as the Agent may request, including as to enforceability of this Agreement and the Financing Documents.

(B)     An opinion of [_____], Texas counsel to the Borrower as to such customary matters as the Agent may request.

(C)    An opinion of [_____], Kansas counsel to the Borrower as to such customary matters as the Agent may request.

(D)    An opinion of [_____] as to the priority and perfection security interests created under the Security Documents under UCC-8.

(y)    <u>Legal Matters Generally</u>.  All legal matters incident to this Agreement, the Plan and the Loans hereunder shall be satisfactory to the Agent, the Majority Lenders and their legal counsel.

(z)    <u>Proceedings</u>.  There is (i) no action, suit or proceeding at law or in equity or by or before any Government Authority or arbitral tribunal now pending or, to the Borrower's Knowledge, threatened against any Obligor or the Projects or with respect to any Material Project Document (other than in connection with the claims by the DB Contractor against the Borrower and the Borrower Subsidiaries for payment under the DB Contracts) or Government Approval related to the Projects and (ii) no existing default by the Obligors under any applicable order, writ, injunction or decree of any Government Authority or arbitral tribunal, which in the case of <u>clause (i)</u> or <u>(ii)</u> could reasonably be expected to have a Material Adverse Effect, as certified to by the Obligors.

(aa)    <u>Debt Service Reserve Account</u>.  The Required Debt Service Reserve Amount shall have been, or shall concurrently be, deposited in the Debt Service Reserve Account.

(bb)    <u>Title Insurance; Survey</u>.

(i)    The Agent shall have received the Hereford Survey and the Hereford Title Policy,  together with evidence that the Borrower shall have paid the Title Company all of its then due and payable premiums and expenses (including fees and expenses for title and lien searches, intangibles taxes, personal property taxes, mortgage recording taxes, due diligence expenses, travel expenses, accounting firm fees, costs of appraisals, environmental reports, surveys and engineering reports) in connection with the issuance of thereof.

(ii)    The Agent shall have received the Plainview Survey and the Plainview Title Policy, together with evidence that the Borrower shall have paid the Title Company all of its then due and payable premiums and expenses (including fees and expenses for title and lien searches, intangibles taxes, personal property taxes, mortgage recording taxes, due diligence expenses, travel expenses, accounting firm fees, costs of appraisals, environmental reports, surveys and engineering reports) in connection with the issuance of thereof.

(iii)    The Agent shall have received the USEP Survey and the USEP Title Policy, together with evidence that the Borrower shall have paid the Title Company all of

its then due and payable premiums and expenses (including fees and expenses for title and lien searches, intangibles taxes, personal property taxes, mortgage recording taxes, due diligence expenses, travel expenses, accounting firm fees, costs of appraisals, environmental reports, surveys and engineering reports) in connection with the issuance of thereof.

(cc)    <u>Employment Letters</u>.  The Agent shall have received employment letters duly executed by the [Borrower] and John Castle[, Horace Ward, John Neufeld and Calvin Stewart,] each effective as of [the Closing Date].

(dd)    <u>Severance Agreement</u>.

(i)    The Agent shall have received a severance agreement for David Diwik, duly executed by the Borrower and Mr. Diwik, effective as of the Plan Effective Date.

(ii)    Between the Plan Effective Date and the Closing Date, Mr. Diwik shall not have taken any action that would be or could reasonably give rise to a violation of the terms of such severance agreement.

(ee)    <u>Loan Notice</u>.  The Agent shall have received from the Borrower, with a copy for each Lender, a Loan Notice conforming to the requirements of <u>Section 4.05</u>.

(ff)    <u>Phase I Environmental Reports</u>.  The Agent shall have received from the Independent Environmental Consultant Phase I environmental reports (completed within 30 days of the Closing Date) on each Facility Site, along with a report favorably reviewing the environmental compliance and environmental risks of the Phase I reports.

(gg)    <u>Other Documents</u>.  Such other documents necessary to effectuate the transactions contemplated hereby and in the other Financing Documents as the Agent or any Lender or counsel to the Lenders may reasonably request.

# ARTICLE VII

## REPRESENTATIONS AND WARRANTIES.

Each of the Obligors (as the context requires) represents and warrants to the Agent and the Lenders that:

7.01    Existence.

(a)    it is a limited liability company, limited partnership or a corporation (as applicable) duly formed, validly existing and in good standing under the laws of the State of its formation;

(b)    it has all the requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own its assets and carry out its business, and (ii) execute deliver and perform its obligations under the Financing Documents to which it is a party,

(c)    it is duly qualified to do business in all places where such qualification is necessary in light of the business it conducts and the Property it owns (and intends to conduct and own) and in light of the transactions contemplated by the Transaction Documents.  No filing, recording, publishing or other act by the Obligor that has not been made or done is necessary in connection with the existence or good standing of the Obligor.

7.02    Financial Condition.

(a)    The financial statements of the Borrower furnished to the Agent pursuant to Sections 6.01(d) and 8.01 (as applicable) are in each case true, complete and correct and fairly present in all material respects the financial condition of the Borrower and the Borrower Subsidiaries (on a consolidated basis) as of the date thereof, all in accordance with GAAP (subject to normal year-end adjustments).  As of such date of such financial statements, each of the Borrower and Borrower Subsidiaries have no material contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments, except as referred to or reflected or provided for in such financial statements or as arising solely from the execution and delivery of the Transaction Documents.  There has been no material adverse change in the financial condition, operations or business of the Borrower or the Borrower Subsidiaries from that set forth in such financial statements as of the date thereof.

(b)    Since the Plan Effective Date there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

(c)     Each of the Borrower and the Borrower Subsidiaries (on a consolidated basis) (after giving effect to the Restructuring Transactions) are solvent, has assets having a fair value in excess of the amount required to pay its probable liabilities on its existing debts as they become absolute and matured, and has access to adequate funds for the conduct of its business and the ability to pay its debts from time to time incurred in connection therewith as such debts mature.

7.03     <u>Action</u>.  It has full power, authority and legal right to execute and deliver, and to perform its obligations under, the Transaction Documents to which it is or is intended to be a party.  The execution, delivery and performance by each Obligor of each of the Transaction Documents to which it is or is intended to be a party have been duly authorized by all necessary action on the part of such Obligor, as applicable.  Each of the Transaction Documents to which each Obligor is a party has been duly executed and delivered by such Person and is in full force and effect and constitutes the legal, valid and binding obligation of such Obligor, enforceable against such Obligor in accordance with its terms, except as limited by general principles of equity and bankruptcy, insolvency and similar laws.

7.04     <u>No Breach</u>.  The execution, delivery and performance by each Obligor of each of the Transaction Documents to which it is or is intended to be a party do not and will not:  (a) require any consent or approval of any Person that has not been obtained and remains in full force and effect, (b) violate any provision of any Government Rule or Government Approval applicable to any Obligor or any Project, (c) violate, result in a breach of or constitute a default under any Transaction Document to which any Obligor is a party or by which it or its Property may be bound or affected or (d) result in, or create any Lien (other than a Permitted Lien) upon or with respect to any of the Properties now owned or hereafter acquired by any Obligor, except, in the case of clauses (b), where any such violation, breach or default could not reasonably be expected to have a Material Adverse Effect, with respect to such Project.

7.05     <u>Government Approvals; Government Rules</u>.

(a)     All material Government Approvals for each Project that have been obtained by an Obligor for the benefit of such Project by third parties as of the Closing Date are set forth on <u>Schedule 7.05(a)</u>.  All Government Approvals set forth on <u>Schedule 7.05(a)</u> have been duly obtained, were validly issued, are in full force and effect, and are not the subject of any pending appeal and all applicable appeal periods have expired, are held in the name of an Obligor [or such third party as indicated on such <u>Schedule 7.05(a) Part I</u>] and are (except as indicated on <u>Schedule 7.05(a) Part II</u>) free from conditions or requirements.  No Material Adverse Effect, with respect to such Project could reasonably be expected to result from any such Government Approvals being held by or in the name of Persons other than an Obligor.

(b)     No Obligor is in violation of, and not in compliance with any Government Rule or Government Approval the violation of or the non-compliance with which could reasonably be expected

to result in a Material Adverse Effect, with respect to the relevant Project, including with respect to parking and applicable zoning and land use laws, regulations and ordinances and codes.

(c)     All certifications, permits, licenses and approvals, including certificates of completion and occupancy required for the legal ownership, use, occupancy and operation of the Projects have been obtained and are in full force and effect. Each Project and other appurtenant and related uses, are in conformity with the certificate of occupancy and any other variances, restrictions or covenants (including the Permitted Exceptions) issued in respect of such Project.

7.06    <u>Proceedings</u>.  Except as otherwise specified on <u>Schedule 7.06</u> to this Agreement, there is (a) no action, suit or proceeding at law or in equity or by or before any Government Authority or arbitral tribunal now pending or, to the Borrower's Knowledge, threatened against any Obligor or the Projects or with respect to any Material Project Document or Government Approval related to the Projects and (b) no existing default by the Obligors under any applicable order, writ, injunction or decree of any Government Authority or arbitral tribunal.

7.07    <u>Environmental Matters</u>.  Except as otherwise specified on <u>Schedule 7.07</u> to this Agreement:

(a)     The Projects are and have been in compliance in all material respects with all Environmental Laws and Government Approvals required for the Projects under any Environmental Laws and have not violated any Environmental Laws.

(b)     All Government Approvals required for the Projects under Environmental Laws have been obtained and maintained in full force and effect and there are no pending or, to the Borrower's Knowledge, threatened actions to challenge, revoke, cancel, terminate, limit or modify any such Government Approvals.

(c)     There are no facts, circumstances, conditions or occurrences regarding the past or present operations or conditions of any Project or any Environmental Party that could (i) form the basis of a material Environmental Claim or (ii) to cause the Projects to be subject to any restrictions on ownership, occupancy, use or transferability under any Environmental Law that would materially hinder or restrict any Obligor or any other Person from operating the Projects as intended under the Material Project Documents (excluding restrictions on the transferability of Government Approvals upon the transfer of ownership of assets subject to such Government Approval).

(d)     There is no (i) past Environmental Claim, (ii) pending Environmental Claim or (iii) to the Borrower's Knowledge, threatened Environmental Claim, in each case against any of the Projects, any Obligor or any other Environmental Party and arising with respect to any Project, that could reasonably be expected to result in a liability in excess of $250,000.

(e)     Hazardous Materials have not at any time been Released at, on, under or from any Project other than in material compliance with all applicable Environmental Laws or as otherwise could not reasonably be expected to result in a liability in excess of $250,000 with respect to such Project.

(f)     Neither the Obligors nor, to the Borrower's Knowledge, any other Environmental Party, has transported or arranged for the transportation or disposal of Hazardous Materials (i) in a manner that could give rise to a material Environmental Claim, or (ii) from any Project to any location which is listed, or formally proposed for listing, on the NPL or on any similar state or local list of sites requiring investigation or remediation.

(g)     Each Project complies with the applicable provisions of the Equator Principles and there have been there have been no material environmental investigations, studies, audits, reviews or other analyses relating to environmental site conditions that have been conducted by, or which are in the possession of, any Obligor in relation to any Project which have not been provided to the Agent and the Lenders.

7.08    <u>Taxes</u>.  Each Person that owns or has owned an interest in the Borrower that is treated as equity for federal income tax purposes is a "United States person" within the meaning of Code Section 7701(a)(30).  As of the Closing Date, each Obligor has paid and discharged all Taxes imposed on or payable by the Obligor or any Subsidiary of an Obligor, including, but not limited to, Taxes on income or profits or on any of the Obligor's or any Subsidiary's Property and Taxes required to be withheld and paid with respect to payments or allocations to employees, independent contractors, equity holders or otherwise.  There are no Liens for Taxes on any asset of any Obligor or any Subsidiary other than any Permitted Liens.  No Obligor nor any Subsidiary of an Obligor is liable for Taxes of any other Person (other than another Obligor), whether by contract, by operation of law or otherwise.

7.09    <u>Tax Status</u>.  For federal income tax purposes, the Borrower is, and since its inception has been, a limited liability company taxable as a partnership and each Borrower Subsidiary is, and since its inception has been, an entity that is disregarded for federal income tax purposes (other than U.S. Energy Partners, LLC, which was taxed as a partnership at all times during its existence prior to it being acquired by Borrower).  Neither the execution and delivery of this Agreement or the other Transaction Documents nor the consummation of any of the transactions contemplated hereby or thereby shall affect such status.

7.10    <u>ERISA; ERISA Event; Labor Relations</u>.

(a)     Except as set forth on <u>Schedule 7.10</u>, neither the Borrower nor any ERISA Affiliate sponsors, maintains, administers, contributes to, participates in, or has any obligation to contribute to, or any liability under, any Pension Plan or Multiemployer Plan nor has the Borrower or any

ERISA Affiliate established, sponsored, maintained, administered, contributed to, participated in, or had any obligation to contribute to or liability under any Pension Plan or Multiemployer Plan.

(b)     Except as set forth on <u>Schedule 7.10</u>, no ERISA Event has occurred or is reasonably expected to occur.

(c)     Except as set forth on <u>Schedule 7.10</u>, no Obligor nor any Pledgor is party to or has any obligations under any labor, collective bargaining or employment agreement.

7.11    <u>Nature of Business; Property</u>.

(a)     No Obligor has engaged in any business other than the Projects as contemplated by the Material Project Documents, other than Technologies which has engaged solely in the business of developing next generation technology with respect to Distilled Grain production and holding equity in one or more entities engaged in such business.

(b)     Each Obligor has legal, valid title to all its Property and such Property is not subject to any Liens other than Permitted Liens described in <u>Section 8.12</u> (other than clause (f) thereof).

(c)     Pursuant to the Security Documents, WE Hereford has granted to the Collateral Agent a valid and enforceable security interest in, or a valid and enforceable mortgage lien on, all Property currently used in the operation of the Hereford Project, which Property is sufficient to operate each Project in the manner required hereunder and in the manner in which it is currently operated.

(d)     Pursuant to the Security Documents, USEP has granted to the Collateral Agent a valid and enforceable security interest in, or a valid and enforceable mortgage lien on, all Property currently used in the operation of the USEP Project, which Property is sufficient to operate each Project in the manner required hereunder and in the manner in which it is currently operated.

(e)     Pursuant to the Security Documents, Plainview has granted to the Collateral Agent a valid and enforceable security interest in, or a valid and enforceable mortgage lien on, all Property currently used in the operation of the Plainview Project, which Property is sufficient to operate each Project in the manner required hereunder and in the manner in which it is currently operated.

(f)     The Easement Properties have been obtained, are described in the applicable Title Policy and are in full force and effect without default thereunder.

(g)     Except as set forth on <u>Schedule 7.11(g)</u>, no Obligor has leased or otherwise granted to any Person the right to use or occupy its Property.

(h)     Except as set forth on Schedule 7.11(h), there are no service, maintenance or repair contracts affecting the Projects that are not terminable on one month's notice or less without cause and without penalty or premium.  All service, maintenance or repair contracts affecting a Project have been entered into an arms-length in the ordinary course of Borrower's business and provide for the payment of fees in amounts and upon terms comparable to existing market rates.

(i)     In the event that all or any part of a Facility Site is destroyed or damaged, said Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits.  No legal proceedings are pending or, to the knowledge of Borrower, threatened with respect to the zoning of any Facility Site, and no proceedings or any other changes with respect to the zoning of any Facility Site have occurred within the last six months that have not been disclosed in writing to the Agent.  Neither the zoning nor any other right to construct, use or operate any Facility Site is in any way dependent upon or related to any property other than such Facility Site.  There has not been committed by Borrower or any other Person in occupancy of or involved with the operation or use of any Facility Site, any act or omission affording the federal government or any other Government Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.  No portion of the Property has been purchased with proceeds of any illegal activity.

7.12    Security Documents.  The provisions of the Security Documents are effective to create, in favor of the Collateral Agent for the benefit of the Secured Parties, a legal, valid and enforceable Lien on and security interest in all of the Collateral purported to be covered thereby, and all necessary recordings and filings have been made in all necessary public offices, and all other necessary and appropriate action has been taken, including sending notices to each applicable Project Party pursuant to Section 8.17(d), so that each such Security Document creates a perfected Lien on and security interest in all right, title and interest of each Obligor in the Collateral covered thereby, prior and superior to all other Liens other than Permitted Liens described in Section 8.11 (other than clause (f) thereof) and all necessary and appropriate consents to the creation, perfection and enforcement of such Liens have been obtained from each of the parties to the Material Project Documents.

7.13    Subsidiaries.    The Borrower has no Subsidiaries other than the Borrower Subsidiaries, as set forth on Appendix C hereto.

7.14    Status; Investment Company Regulation.    The Borrower is not an "investment company" or a company "Controlled" by an "investment company" within the meaning of the Investment Company Act of 1940 or an "investment advisor" within the meaning of the Investment Company Act of 1940.

7.15    Material Project Documents; Licenses.

(a)     The Material Project Documents set forth on Schedule 7.15 constitute and include all contracts and agreements relating to the Projects other than Non-Material Project Documents and, other than the Financing Documents, no Obligor is and will be a party to any contract or agreement that is not a Project Document.  The Agent has received a certified copy of each Material Project Document (other than those that are not required to be delivered as of the date of the making of this representation) as in effect on the date of its delivery to the Agent and each amendment, modification or supplement to each such Material Project Document.  Except as permitted pursuant to Section 8.17, none of the Material Project Documents has been amended, modified or supplemented or has been materially Impaired, and all of the Material Project Documents (other than those that are not required to be entered into pursuant to this Agreement as of the date of the making of this representation or that have been cancelled or terminated as permitted under this Agreement) are in full force and effect.  All conditions precedent to the obligations of the Borrower under the Material Project Documents have been satisfied or waived.  No Material Project Party is in default of any material covenant or material obligation set forth in any Material Project Document and no condition has occurred that would become such a default with the giving of notice or lapse of time.

(b)     All material permits, licenses, trademarks, patents or agreements with respect to the usage of technology that are necessary for the Projects have been obtained, are final and are in full force and effect.

7.16     Use of Proceeds.  No part of the proceeds of any Loan will be used for the purpose, whether immediate, incidental or ultimate, of buying or carrying any Margin Stock or to extend credit to others for such purpose.

7.17     Disclosure.

(a)     Each Obligor has disclosed to the Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect with respect to the Project to which such agreements and other matters relate.  Neither this Agreement nor any Financing Document nor any reports, financial statements, certificates or other written information furnished to the Lenders by or on behalf of the Borrower in connection with the Restructuring Transactions or the negotiation of, and the extension of credit under, this Agreement and the other Financing Documents, the transactions contemplated by the Material Project Documents or delivered to the Agent or the Lenders hereunder or thereunder (as modified or supplemented by other information so furnished) contains any untrue statement of a material fact or omits to state a material fact, in each case, necessary to make the statements contained herein or therein, in light of the circumstances under which they were made, not misleading.

7.18 <u>Fees</u>. On the Closing Date, no Obligor has any obligation to any Person in respect of any finder's, advisory, broker's or investment banking fee other than fees payable under this Agreement.

7.19 <u>Insurance</u>. All insurance required to be obtained by each Obligor has been obtained and is in full force and effect and materially complies with <u>Section 8.05</u> and Schedule 8.05, and all premiums then due and payable on all such insurance have been paid, and to the Borrower's Knowledge, all insurance required to be obtained by a Material Project Party pursuant to a Material Project Document has been obtained and is in full force and effect and materially complies with <u>Section 8.05</u> and <u>Schedule 8.05</u>.

7.20 <u>Investments</u>. The Borrower has neither made, nor instructed the Collateral Agent to make, any Investments except Permitted Investments.

7.21 <u>No Material Adverse Effect</u>. To the Borrower's Knowledge, there are no facts or circumstances which, individually or in the aggregate, have resulted or could reasonably be expected to result in a Material Adverse Effect.

7.22 <u>Absence of Default</u>. No Default or Event of Default has occurred and is continuing.

7.23 <u>Event of Loss</u>. No Event of Loss has occurred and is continuing that could reasonably be expected to have a Material Adverse Effect.

7.24 <u>Real Property</u>.

(a) WE Hereford (i) has good, marketable and insurable fee simple title to the Hereford Owned Property and the Easement Properties used in connection with the Hereford Project, (ii) is lawfully seized and possessed of a valid and subsisting leasehold estate in and to the Hereford Leased Property and (iii) has good title to the balance of the Property (including the personal property and Equipment) owned by it, free and clear of all Liens whatsoever except the Permitted Exceptions [and except for any Liens that may arise from the claims made by the DB Contractor, that are pending as of the date hereof, against the Borrower and the Borrower Subsidiaries for payment under the DB Contracts], and such Property constitutes the only Property currently used in connection with the Hereford Project. The Hereford Mortgage, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (a) a valid, second-priority, perfected lien on the Hereford Facility Site, subject only to Permitted Exceptions and (b) perfected security interests in and to, and perfected collateral assignments of, all personalty, all in accordance with the terms thereof, in each case subject only to any applicable Permitted Exceptions. There are no mechanics', materialman's or other similar Liens or claims which have been filed for, or other claims for payment for, work, labor or materials affecting the Hereford Facility Site which are or

may become a Lien prior to, or of equal priority with, the Liens created by the Hereford Mortgage and the other Security Documents. The Permitted Exceptions do not and will not (individually or in the aggregate), materially interfere with the benefits of the security intended to be provided by the Mortgage and the other Security Documents, the value, operation or use of the Property, or Borrower's ability to repay the Loan;

(b)        USEP (i) has good, marketable and insurable fee simple title to the USEP Facility and the Easement Properties used in connection with the USEP Project, and (ii) has good title to the balance of the Property (including the personal property and Equipment) owned by it, free and clear of all Liens whatsoever except the Permitted Exceptions, and such Property constitutes the only Property currently used in connection with the USEP Project. The USEP Mortgage, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (a) a valid, second-priority, perfected lien on the USEP Facility Site, subject only to Permitted Exceptions and (b) perfected security interests in and to, and perfected collateral assignments of, all personalty, all in accordance with the terms thereof, in each case subject only to any applicable Permitted Exceptions. There are no mechanics', materialman's or other similar Liens or claims which have been filed for, or other claims for payment for, work, labor or materials affecting the USEP Facility Site which are or may become a Lien prior to, or of equal priority with, the Liens created by the USEP Mortgage and the other Security Documents. The Permitted Exceptions do not and will not (individually or in the aggregate), materially interfere with the benefits of the security intended to be provided by the Mortgage and the other Security Documents, the value, operation or use of the Property, or Borrower's ability to repay the Loan; and

(c)        Plainview (i) has good, marketable and insurable fee simple title to the Plainview Facility and the Easement Properties used in connection with the Plainview Project, and (ii) has good title to the balance of the Property (including the personal property and Equipment) owned by it, free and clear of all Liens whatsoever except the Permitted Exceptions [and except for any Liens that may arise from the claims made by the DB Contractor, that are pending as of the date hereof, against the Borrower and the Borrower Subsidiaries for payment under the DB Contracts], and such Property constitutes the only Property currently used in connection with the Plainview Project. The Plainview Mortgage, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (a) a valid, second-priority, perfected lien on the Plainview Facility Site, subject only to Permitted Exceptions and (b) perfected security interests in and to, and perfected collateral assignments of, all personalty, all in accordance with the terms thereof, in each case subject only to any applicable Permitted Exceptions. There are no mechanics', materialman's or other similar Liens or claims which have been filed for, or other claims for payment for, work, labor or materials affecting the Plainview Facility Site which are or may become a Lien prior to, or of equal priority with, the Liens created by the Plainview Mortgage and the other Security Documents. The Permitted Exceptions do not and will not (individually or in the aggregate), materially interfere with

the benefits of the security intended to be provided by the Mortgage and the other Security Documents, the value, operation or use of the Property, or Borrower's ability to repay the Loan.

(d)     The description of (x) the Hereford Facility Site in the Hereford Mortgage, (y) the USEP Facility Site in the USEP Mortgage, and (z) the Plainview Facility Site in the Plainview Mortgage, are each correct and sufficiently identify the property for the purposes of the transactions contemplated by this Agreement and the other Financing Documents.

(e)     Each Facility Site has adequate rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Facility Site for its intended uses.  All public utilities necessary or convenient to the full use and enjoyment of a Facility Site are located either in the public right-of-way abutting the Property (which are connected so as to serve such Facility Site without passing over other property) or in recorded easements serving such Facility Site and such easements are set forth in and insured by the Title Insurance Policy.  All roads necessary for the use of a Facility Site for its current purposes have been completed and dedicated to public use and accepted by all Governmental Authorities.

(f)     Each Facility Site is comprised of one or more parcels which constitute(s) a separate tax lot(s) and do(es) not constitute a portion of any other tax lot not a part of the Property.  There are no pending or proposed special or other assessments for public improvements or otherwise affecting any Facility Site, nor are there any contemplated improvements to any Facility Site that may result in such special or other assessments.

(g)     None of the Improvements located on any Facility Site are located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards and, if so located, the flood insurance required pursuant to Section 8.05 is in full force and effect with respect to the Property.

(h)     Each Facility Site, including all Improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, Equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair in all material respects; there exists no structural or other material defects or damages therein, whether latent or otherwise, and Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.  The Improvements have suffered no material casualty or damage which has not been fully repaired and the cost thereof fully paid.

(i)     All of the Improvements which were included in determining the appraised value of the Projects lie wholly within the boundaries and building restriction lines of such Project, and no Improvements on adjoining properties encroach upon the Facility Site, and no easements or other encumbrances affecting the Facility Site encroach upon any of the Improvements, except those which are insured against by the Title Policy.  The Survey does not fail to reflect any material matter affecting any Facility Site or the title thereto.

(j)     All Other Taxes required to be paid by any Person under any applicable Government Rule currently in effect in connection with the transfer of a Facility Site to an Obligor have been paid.  All mortgage, mortgage recording, stamp, intangible or other similar Taxes required to be paid by any Person currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Security Documents, including the Mortgages, have been paid or are being paid simultaneously herewith.  All Taxes and other governmental assessments due and owing in respect of each Facility Site have been paid, or an escrow of funds in an amount sufficient to cover such payments has been established hereunder.

(k)     No Project nor any part thereof is subject to any purchase options, rights of first refusal or other similar rights in favor of third parties.

7.25    <u>Plan Effective Date</u>.  On the Plan Effective Date, (i) the Restructuring Transactions shall have been consummated in full in accordance with the terms of the Plan and all applicable laws, (ii) all consents and approvals of, and filings and registrations with, and all other actions in respect of, all Governmental Authorities required in order to make or consummate the Restructuring Transactions have been obtained, given, filed or taken or waived and are or will be in full force an effect (or effective judicial relief with respect thereto has been obtained), (iii) all applicable waiting periods with respect thereto (if any) have or, prior to the time when required, will have, expired without, in all such cases, any action being taken by any competent authority which restrains, prevents, or imposes material adverse conditions upon the Restructuring Transactions, and (iv) no judgment, order or injunction shall be in effect prohibiting or imposing material adverse conditions upon the Restructuring Transactions, or the performance by the Obligors of their obligations under the Transaction Documents, the other documents related thereto and all applicable laws.

7.26    <u>Patriot Act</u>.

(a)     Neither the Borrower's borrowing of the Loans nor its use of the proceeds thereof will violate in any material respect (i) the United States Trading with the Enemy Act of October 6, 1917, as amended, (ii) any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto, (iii) Executive Order No. 13224, 66 Fed. Reg. 49,079 (2001), issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who

Commit, Threaten to Commit or Support Terrorism) (the "Terrorism Order") or (iv) the anti-money laundering provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Public Law 107-56 (October 26, 2001) amending the Bank Secrecy Act, 31 U.S.C. Section 5311 et seq. No part of the proceeds from the Loans hereunder will be used, directly or, to the Borrower's Knowledge, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in material violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(b)     Neither the Borrower nor any Pledgor (i) is or will become a "blocked person" or entity described in Schedule 1 of the Terrorism Order or described in such Department of the Treasury Rule or (ii) engages or will engage in any dealings or transactions, nor is any such Person otherwise associated, with any such blocked person or entity.

(c)     The Borrower is in compliance in all material respects with the anti-money laundering provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Public Law 107-56 (October 26, 2001) amending the Bank Secrecy Act, 31 U.S.C. Section 5311 et seq.


# ARTICLE VIII

## **COVENANTS**

Each Obligor (to the extent applicable) covenants and agrees with the Lenders and the Agent that until the Termination Date:

8.01    Reporting Requirements.[8]  The Borrower shall deliver to the Agent (in sufficient numbers for the Agent and each of the Lenders) the following reports and notices, commencing from the Closing Date:

(a)     as soon as available and in any event within 30 days after the end of each month of each fiscal year of the Borrower:

---

[8]     Lenders to confirm whether monthly financial reports would also be required to be delivered.

(i)     unaudited statements of income and cash flows of the Borrower (on a consolidated basis) for such period and for the period from the beginning of the respective fiscal year to the end of such period;

(ii)     the related balance sheet as at the end of such period, setting forth in each case in comparative form the corresponding figures for the preceding fiscal year;

(iii)     a calculation of the Financial Covenants and Hypothetical Tax Obligations for such period, accompanied by a certificate of an Authorized Officer of the Borrower, which certificate shall state that such financial statements fairly present in all material respects the financial condition and results of operations of the Borrower (on a consolidated basis), in accordance with GAAP, consistently applied, as at the end of, and for, such period (subject to normal year-end audit adjustments); and

(iv)     a report detailing any material contingencies (including the commencement of any material litigation by or against any Credit Party) or any other occurrence that would reasonably be expected to have a Material Adverse Effect; and

(v)     at the time it furnishes each set of financial statements pursuant to the above clauses, a certificate of an Authorized Officer of the Borrower to the effect that the above financial statements have been prepared in accordance with GAAP, and no Default has occurred and is continuing (or, if any Default has occurred and is continuing, describing the same in reasonable detail and describing the action that the Borrower has taken and proposes to take with respect to such Default).

(b)     as soon as available and in any event within 45 days after the end of each of the first three quarterly fiscal periods of each fiscal year of the Borrower:

(i)     unaudited statements of income and cash flows of the Borrower (on a consolidated basis) for such period and for the period from the beginning of the respective fiscal year to the end of such period;

(ii)     the related balance sheet as at the end of such period, setting forth in each case in comparative form the corresponding figures for the preceding fiscal year;

(iii)     a calculation of the Financial Covenants and Hypothetical Tax Obligations for such period, accompanied by a certificate of an Authorized Officer of the Borrower, which certificate shall state that such financial statements fairly present in all material respects the financial condition and results of operations of the Borrower (on a consolidated basis), in accordance with GAAP, consistently applied, as at the end of, and for, such period (subject to normal year-end audit adjustments);

(iv)     a report detailing any material contingencies (including the commencement of any material litigation by or against any Obligor) or any other occurrence that would reasonably be expected to have a Material Adverse Effect; and

(v)     at the time it furnishes each set of financial statements pursuant to the above clauses, a certificate of an Authorized Officer of the Borrower to the effect that the above financial statements have been prepared in accordance with GAAP, and no Default has occurred and is continuing (or, if any Default has occurred and is continuing, describing the same in reasonable detail and describing the action that the Borrower has taken and proposes to take with respect to such Default).

(c)     as soon as available and in any event within 90 days after the end of each fiscal year of the Borrower; *provided*, that in respect of the fiscal year ended 2009, the items identified in sub-clauses (i) through (iv) below shall be delivered within 90 days of the Plan Effective Date:

(i)     audited statements of income, members' equity and cash flows of the Borrower (on a consolidated basis) for such year and the related balance sheets as at the end of such year, setting forth in each case, in comparative form the corresponding figures for the preceding fiscal year;

(ii)     a calculation of the Financial Ratios and Hypothetical Tax Obligations for the fourth quarterly fiscal period and the preceding fiscal year, and accompanied by an unqualified opinion of an independent certified public accountants of recognized national standing as is reasonably acceptable to the Agent, which opinion shall state that (x) such financial statements fairly present in all material respects the financial condition and results of operations of the Borrower (on a consolidated basis) as at the end of, and for, such fiscal year in accordance with GAAP and (y) such Hypothetical Tax Obligations accurately reflect the Covered Tax Liabilities that would accrue for the account of the Borrower; a report detailing any material contingencies (including the commencement of any material litigation by or against any Credit Party) or any other occurrence that would reasonably be expected to have a Material Adverse Effect;

(iii)     a report detailing any material contingencies (including the commencement of any material litigation by or against any Credit Party) or any other occurrence that would reasonably be expected to have a Material Adverse Effect; and

(iv)     at the time it furnishes each set of financial statements pursuant to the above clauses, a certificate of an Authorized Officer of the Borrower to the effect that the above financial statements have been prepared in accordance with GAAP, and   no Default has occurred and is continuing (or, if any Default has occurred and is continuing,

describing the same in reasonable detail and describing the action that the Borrower has taken and proposes to take with respect to such Default).

(d)     promptly after an Authorized Officer of the Borrower knows or has reason to believe that a Default or Event of Default has occurred (but in any event within two Business days), a notice of such event describing the same in reasonable detail and, together with such notice or as soon thereafter as possible, a description of the action that the Borrower has taken or proposes to take with respect to such event giving rise to such Default or Event of Default;

(e)     promptly upon (i) delivery to another Material Project Party pursuant to a Material Project Document, copies of all material notices or other material documents delivered to such Material Project Party by any Obligor and (ii) such documents becoming available, copies of all material notices or other material documents received by any Obligor pursuant to any Material Project Document (such as any notice or other document relating to a failure by any Obligor to perform any of its covenants or obligations under such Material Project Document, termination of a Material Project Document or a force majeure event under a Material Project Document, but excluding any notice provided in the ordinary course of business);

(f)     at the same time and in the same manner as it gives to its directors, copies of all notices, minutes, consents and other materials that the Borrower or any of its Subsidiaries provides to its directors in connection with meetings of the Board of Directors, and within thirty days after each such meeting, minutes of such meeting, *provided*, that none of the Obligors shall be obligated to deliver such notices, minutes, consents or other materials that are subject to attorney client privilege or create in fact a conflict of interest between the Borrower and its Subsidiaries, on the one hand, and the Agent, on the other hand;

(g)     prompt notice of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(h)     prompt (but in any event within two Business Days) notice of each Subsidiary formed subsequent to the Closing Date;

(i)     within ten days following request by the Agent, copies of each federal income tax return filed by or on behalf of the Borrower or any of its Subsidiaries and requested by the Agent; and

(j)     promptly upon request of the Agent, such other information and data with respect to the Borrower or any of its Subsidiaries as from time to time may be reasonably requested by the Agent.

8.02     Maintenance of Existence; Etc.  The Borrower shall preserve and maintain (a) its legal existence as a Delaware limited liability company and (b) the legal existence of each of the Borrower Subsidiaries in the corporate forms such Borrower Subsidiaries were in as of the Closing Date

or the subsequent date such Borrower Subsidiary became a party to this Agreement, as certified by any Authorized Officer of each such Borrower Subsidiary as of such date, and (c) in each case, all of its licenses, rights, privileges and franchises necessary for the Projects.

8.03    Compliance with Government Rules; Etc.

(a)    The Obligors shall comply in all material respects with all applicable Government Rules and shall from time to time obtain and renew, and shall comply in all material respects with, Government Approvals as is or in the future shall be necessary for the Projects under applicable Government Rules; *provided*, that with prior written notice to the Agent the Borrower shall be permitted to contest the applicability to it of any such Government Rule or the need for any such Government Approval.

(b)    Except as provided in paragraph (c) below, no Obligor shall petition, request or take any legal or administrative action that seeks to amend, supplement or modify any Government Approval in any material respect unless (i) an Obligor shall have furnished to the Agent a copy (certified by an Authorized Officer of such Obligor) of the proposed amendment, supplement or modification and a description of the actions that such Obligor proposes to take and (ii) such amendment, supplement or modification could not reasonably be expected to result in a Material Adverse Effect.  The Obligor shall promptly upon receipt or publication furnish a copy (certified by an Authorized Officer of such Obligor) of each such amendment, supplement or modification to any such Government Approval to the Agent.

(c)    If any Impairment of any Government Approval of the Borrower or related to a Project which could reasonably be expected to have a Material Adverse Effect shall occur, then the Borrower shall either (i) within 60 days obtain a replacement Government Approval on terms and conditions that are in all material respects the same as those of such Impaired Government Approval or (ii) within 60 days, take such lawful action as shall be necessary so that (A) such Impairment does not become final and non-appealable or otherwise irrevocable, (B) the effectiveness of such Impairment is postponed or (C) such Impairment is revoked, amended or modified so as to eliminate the possibility of such Material Adverse Effect with respect to such Project.

(d)    The Borrower shall issue such notices of transfer and shall take such other actions as the Agent, acting for the benefit of itself and the Lenders, requests, without undue expense or delay, to secure for the Agent and the Lenders the benefit of each Government Approval related to the Projects set forth on Schedule 7.05(a) upon the exercise of remedies under the Security Documents.

8.04    Environmental Compliance.

(a)    Each Obligor and the Projects shall (i) at all times comply in all material respects with all Environmental Laws and obtain and at all times comply in all material respects with any Government Approvals required under any Environmental Laws for the construction, operation and

maintenance of the Projects, (ii) conduct and complete any investigation, study, sampling and testing, and undertake any corrective, cleanup, removal, response, remedial or other action necessary to identify, report, remove and clean up any Releases or threatened Releases of Hazardous Materials at, on, in, under or from the Projects, to the extent required by and in compliance with the requirements of all applicable Environmental Laws and (iii) maintain adequate financial assurance or guarantees as required under Environmental Laws with respect to any Project.

(b)     The Borrower shall promptly deliver to the Agent (with sufficient copies for each Lender) (but in any event within two Business days) (i) notice of (A) any pending or threatened Environmental Claim with respect to any Project or the Obligors, including any actions to challenge, revoke, cancel, terminate, limit or modify any Government Approval and (B) information that could reasonably be expected to lead to an Environmental Claim, in either case promptly upon obtaining knowledge thereof, describing the same in reasonable detail, together with such notice, or as soon thereafter as possible, a description of the action that the Borrower has taken or proposes to take with respect thereto and, thereafter, from time to time, such detailed reports with respect thereto as the Agent or any Lender may reasonably request, (ii) promptly upon their becoming available, copies of written communications with any Government Authority relating to any such material Environmental Claim and any such other matter as is reported to the Agent or the Lenders pursuant to this Section 8.04(b), and (iii) copies of all environmental audits and reports with respect to environmental matters at any facility or property used by any of the Obligors or which related to any Environmental Claims of any of the Obligors which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

8.05    Insurance; Events of Loss.

(a)     Compliance with Insurance Requirements.  The Borrower shall, and shall cause the Borrower Subsidiaries to (i) at all times comply with all insurance requirements set forth in any Material Project Document with respect to the related Project, and (ii) enforce the obligations of all Material Project Parties with respect to insurance requirements applicable to such Material Project Parties under the respective Material Project Documents.

(b)     Insurance Maintained during Operations.  The Borrower shall, and shall cause the Borrower Subsidiaries to, to the extent commercially available at reasonable terms (as confirmed by the Insurance Consultant), maintain or cause to be maintained (for, among others, its benefit and for the benefit of the Collateral Agent on behalf of the Secured Parties) the insurance policies specified on Part 2 of Schedule 8.05, such insurance policies to be maintained from the Closing Date.

(c)     Additional Insureds and Loss Payee.  The Lenders shall be named additional insureds, and the Agent shall be named loss payee, under all casualty, business interruption and builders risk insurance procured and maintained for the Projects.

(d)    Copies of Insurance Certificates.  On the Closing Date and within three Business Days following the renewal or expiration of any insurance policy required to be in effect under this Agreement, the Borrower shall furnish the Agent with approved certificates of all such required insurance.  Such certificates shall be executed by each insurer or by an authorized representative of each insurer.  Such certificates shall identify underwriters, the type of insurance, the insurance limits and the policy term and shall specifically list the special provisions enumerated for such insurance required by this Section 8.05.  Concurrently with the furnishing of any such certificate, the Borrower shall furnish the Agent with a certificate of an Acceptable Insurance Broker of the Borrower to the effect that the insurance then carried or to be renewed is in accordance with the terms of this Section 8.05, such insurance is in full force and effect and all premiums then due and payable have been paid.

(e)    Copies of Insurance Policies.  On or promptly after the Closing Date, promptly upon receipt of each such policy, the Borrower shall deliver to the Agent a duplicate, certified by an Authorized Officer of the Borrower of each policy of insurance required to be in effect under this Agreement or any other Material Project Document then in effect.  Not less than 30 days prior to the expiration date of any policy of insurance required to be in effect under this Agreement or any other Material Project Document then in effect, the Borrower shall notify the Agent of its intention to renew each expiring policy.  The Borrower shall promptly inform the Agent, prior to this period, if it is not intending to renew any policy.

(f)    Right to Procure Insurance.  In the event any Obligor fails to procure and maintain the insurance coverage required by this Section 8.05, the Agent, upon 30 days' prior notice (unless such insurance coverage would lapse within such period, in which event notice shall be given as soon as reasonably possible) to the Borrower of any such failure, may (but shall not be obligated to) take out the required policies of insurance and pay the premiums on the same.  All amounts so advanced for such purpose by the Agent and the Lenders shall become an additional obligation of the Borrower to the Agent and the Lenders, and the Borrower shall forthwith pay such amounts to the Agent, together with interest on such amounts at the Post-Default Rate from the date so advanced.

(g)    Compromise, Adjustment or Settlement. The Agent shall be entitled at its option to participate in any compromise, adjustment or settlement in connection with any Event of Loss under any policy or policies of insurance or any proceeding with respect to any Event of Taking of Property of any Obligor or otherwise in excess of $250,000 and the Borrower shall within five Business Days after the Agent's request reimburse the Agent for all out-of-pocket expenses (including attorneys' and experts' fees) incurred by the Agent in connection with such participation.  The Borrower shall not make any compromise, adjustment or settlement in connection with any such claim without the approval of the Agent, which shall not be unreasonably withheld or delayed.

(h)    Notice of Event of Loss or Change in Insurance Coverage.  The Borrower shall promptly notify the Agent of any Event of Loss which it believes will exceed $250,000, individually or in

the aggregate. The Borrower shall promptly notify the Agent of (i) each written notice received by it with respect to the cancellation of, adverse change in, or default under, any insurance policy required to be maintained in accordance with this Section 8.05 and (ii) any event specified in Schedule 8.05.

(i)     No Duty of Secured Parties to Verify.  No provision of this Section 8.05 nor any other provision of the Credit Agreement or any Material Project Document shall impose on the Secured Parties any duty or obligation to verify the existence or adequacy of the insurance coverage maintained by the Borrower, nor shall the Secured Parties be responsible for any representations or warranties made by or on behalf of the Borrower to any insurance company or underwriter.

(j)     Loss Proceeds.

(i)     Deposits to Revenue Account.  In the event that any Obligor or the Agent receives any amount of proceeds of business interruption insurance, delay in startup insurance and other payments received for interruption of operations in respect of any Event of Loss, such amounts shall be deposited in the Applicable Revenue Account.

(ii)     Deposits to Loss Proceeds Account.  In the event that any Obligor or the Agent receives an amount of Loss Proceeds in respect of any Event of Loss, the Net Available Amount shall be deposited in the Applicable Loss Proceeds Account.

(iii)     Corrections.  In the event the Borrower receives any amount specified in paragraphs (i) or (ii) above and fails to deposit such amount in the correct account pursuant to paragraphs (i) or (ii) above, the Borrower shall correct any such error within two Business Days of receipt of such amounts.

(k)     Restoration.

(i)     Amounts to be made available to the applicable Obligor from the Applicable Loss Proceeds Account for Restoration following any Event of Loss shall be remitted to the applicable Obligor by the Agent, in the event that the Net Available Amount is less than or equal to $50,000.

(ii)     Amounts to be made available to the applicable Obligor from the Applicable Loss Proceeds Account for Restoration following any Event of Loss shall be remitted to the applicable Obligor by the Agent in the event that the Net Available Amount is greater than $50,000 but less than or equal to $250,000 if the Independent Engineer shall have delivered to the Agent a certificate to the effect that the Net Available Amount deposited in the Applicable Loss Proceeds Account is sufficient (together with all other monies reasonably expected to be available to the applicable Obligor as determined by the Agent in consultation with the Independent Engineer), in

the reasonable opinion of the Independent Engineer, for such Restoration. Amounts made available to the applicable Obligor for Restoration shall only be utilized for Restoration and, if not so utilized within 90 days, shall be used to prepay the Loans.

(iii)    Amounts to be made available to the applicable Obligor from the Applicable Loss Proceeds Account for Restoration following any Event of Loss shall be remitted to the applicable Obligor by the Agent in the event that the Net Available Amount is greater than $250,000 if (A) the applicable Obligor shall submit a plan for Restoration as soon as commercially practicable, but in no event more than 60 days after the occurrence of such Event of Loss and the Independent Engineer shall have delivered a certificate to the Agent to the effect that the applicable Obligor's plan of Restoration is prudent and sound and the Net Available Amount deposited in the Applicable Loss Proceeds Account is sufficient (together with all other monies reasonably expected to be available to the applicable Obligor as determined by the Agent in consultation with the Independent Engineer), in the reasonable opinion of the Independent Engineer, for such Restoration and (B) the Supermajority Lenders have consented to such use of the Net Available Amount. Amounts made available to the applicable Obligor for Restoration shall only be utilized for Restoration and, if not so utilized in 90 days after approval of the plan of Restoration, shall be used to prepay the Loans.

(l)    Modifications to Insurance Coverage. The Supermajority Lenders may at any time amend the requirements of paragraphs (b), (c) and (d) of this Section 8.05 and the related Schedule 8.05 (unless specifically provided otherwise in Schedule 8.05) upon a change in circumstances with respect to any Project arising after the Closing Date that in the reasonable judgment of the Supermajority Lenders and the Insurance Consultant renders the coverage specified therein materially inadequate; *provided*, that such change in or additional coverage shall be commercially available at reasonable terms.

8.06    Proceedings. The Borrower shall (a) promptly upon obtaining knowledge of the institution of or the non-frivolous threat of any action, suit or proceeding at law or in equity by or before any Government Authority, arbitral tribunal or other body pending or threatened against any Obligor involving (i) claims against any Obligor or any Project in excess of $200,000 individually or (ii) injunctive or declaratory relief, (b) promptly upon becoming aware of or other circumstance, act or condition (including the adoption, amendment or repeal of any Government Rule or the Impairment of any Government Approval or written notice of the failure to comply with the terms and conditions of any Government Approval) which could reasonably be expected to result in a Material Adverse Effect with respect to the Obligors taken as a whole or any Project, or (c) promptly on becoming aware of any material development in any adverse proceeding that could reasonably be expected to have a Material Adverse Effect with respect to the Obligors taken as a whole or any Project, in each event described in clauses (a), (b) and (c) above, furnish to the Agent a notice of such event describing it in reasonable detail

and, together with such notice or as soon thereafter as possible, a description of the action that any Obligor has taken and proposes to take with respect to such event.

8.07    Taxes.  Each Obligor shall timely file all required Tax returns and shall pay and discharge all Taxes imposed on each Obligor, including, without limitation, Taxes imposed or on its income or profits or on any of its Property, prior to the date on which any penalties may attach; *provided*, that each Obligor shall have the right to Contest the validity or amount of any such Tax (provided that it shall have established and maintained reserves sufficient to pay such Tax if due).  Each Obligor shall promptly pay any valid, final judgment rendered upon the conclusion of the relevant Contest, if any, enforcing any such Tax and cause it to be satisfied of record.  The Borrower shall preserve and maintain its status as a disregarded entity for U.S. federal income tax purposes and each other Obligor shall maintain its status as disregarded as an entity separate from Borrower for U.S. federal income tax purposes and, without the prior written consent of the Agent acting on behalf of the Majority Lenders, each Obligor will (i) refrain from taking any action and (ii) ensure that no other party takes any action, in each case, that would cause any Obligor to be treated as other than a partnership or disregarded entity, as the case may be, for U.S. federal income tax purposes.

8.08    Books and Records; Inspection Rights.  The Borrower shall keep proper books of record in accordance with GAAP and permit advisors, agents, representatives and employees of the Agent or any Lender, upon reasonable notice to the Borrower (unless a Default or an Event of Default shall have occurred and be continuing, in which event no notice shall be required), to visit and inspect its and the Obligors' properties (including each Project), to examine, copy or make excerpts from its books, records and documents (at the expense of the Borrower) and to discuss its affairs, finances and accounts with its principal officers, management, engineers and independent accountants, all at such times during normal business hours as such representatives may reasonably request (unless a Default or an Event of Default shall have occurred and be continuing, in which event the Agent and any Lender shall have access to and such right to discuss with the Borrower's and the Borrower Subsidiaries' affairs, finances and accounts at any and all times during the continuance thereof).

8.09    Maintenance of Lien.  The Borrower shall take, or cause to be taken by its Borrower Subsidiaries, all action required to maintain and preserve the Liens created by the Security Documents to which it is a party and the priority of such Liens.  Each Obligor shall from time to time execute or cause to be executed any and all further instruments (including financing statements, continuation statements and similar statements with respect to any Security Document) reasonably requested by the Agent for such purposes.  The Obligors shall promptly discharge at the Borrower's cost and expense, any Lien (other than Permitted Liens) on the Collateral; *provided*, that the Borrower may Contest any such Lien.

8.10    Prohibition of Fundamental Changes.

(a)     The Pledgor shall not change its legal form, amend its operating agreement or any other organizational document (including to change its name or jurisdiction of formation), merge into or consolidate with, or acquire all or any substantial part of the assets or any class of stock of (or other equity interest in), any other Person and shall not liquidate or dissolve.  The Pledgor shall not convey, sell, lease (including by means of a synthetic lease), transfer or otherwise dispose of, in one transaction or a series of transactions, any of its assets.

(b)     Each Obligor shall not change its legal form, amend its operating agreement or any other organizational document (including to change its name or jurisdiction of formation), merge into or consolidate with, or acquire all or any substantial part of the assets or any class of stock of (or other equity interest in), any other Person and shall not liquidate or dissolve.  Each Obligor shall not convey, sell, lease (including by means of a synthetic lease), transfer or otherwise dispose of, in one transaction or a series of transactions, any assets except:  (i) sales of assets no longer used or useful in the Borrower's business in the ordinary course of the Obligor's business in an amount not exceeding $[250,000][9] in the aggregate in any calendar year, (ii) sales, transfers or other dispositions of Permitted Investments, and (iii) sales of Ethanol, Distilled Grain and, in respect of the USEP Facility, sales of gluten (and related by-products) in the ordinary course of business.

(c)     No Obligor shall purchase or acquire any assets other than:  (i) the purchase of assets reasonably required in connection with Restorations in accordance with Section 8.05(k), (ii) the purchase of assets in the ordinary course of business reasonably required in connection with the operation of the Projects contemplated by the then-effective Operating and Capital Budget, (iii) the purchase of assets reasonably required in connection with Permitted Capital Expenditures and (iv) Permitted Investments.

8.11    Liens.  Each Obligor shall preserve and maintain good and valid title to, or rights in, the Collateral and its Property and shall not create, incur, assume or suffer to exist any Lien on any of the Collateral or any of its other Property except:

(a)     Liens, pledges or deposits under worker's compensation, unemployment insurance or other social security legislation (other than ERISA);

(b)     Liens imposed by any Government Authority for Taxes that are not yet due or that are being contested;

---

[9]     Confirm threshold is appropriate.

(c)     Mechanics' Liens arising in the ordinary course of business or incident to any Restoration, in each case, in respect of obligations that are not yet due or that are being contested and that do not have a Material Adverse Effect;

(d)     defects, easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business and encumbrances, licenses, restrictions on the use of property or imperfections in title that, in each case, do not materially impair the property affected thereby for the purpose for which title was acquired or interfere with the operation of the Projects and that individually or in the aggregate could not reasonably be expected to result in a Material Adverse Effect;

(e)     Liens created pursuant to this Agreement, the Exit Financing Facility and the Security Documents;

(f)     Liens incurred in connection with Indebtedness permitted under clause (iii) of Section 8.14(b); and

(g)     judgment Liens that do not involve any reasonable risk of forfeiture of the Projects or any Material Project Document and which, within 10 days of their existence or after the entry thereof, are being Contested.

8.12     Investments.  The Borrower shall not make, and shall not instruct the Collateral Agent to make, any Investments except:

(a)     direct obligations of the United States, or of any agency of the United States backed by the full faith and credit of the United States, or obligations guaranteed as to principal and interest by the United States or any agency of the United States and backed by the full faith and credit of the United States, maturing in not more than 90 days from the date of acquisition by the Borrower;

(b)     certificates of deposit issued by any [Acceptable Bank][10] maturing in not more than 90 days from the date of acquisition by the Borrower;

(c)     commercial paper rated (on the date of acquisition by the Borrower) A1 or P1 by S&P or Moody's, respectively, maturing in not more than 90 days from the date of acquisition by the Borrower;

(d)     repurchase agreements fully secured by obligations described in paragraph (a) above with any Acceptable Bank with maturities not in excess of 90 days;

---

[10]     Confirm whether credit ratings of Acceptable Bank of at least A and A3 are sufficient.

(e)     [shares in money-market mutual funds having assets of $1,000,000,000 or more that invest solely in securities described in paragraphs (a) through (d) above that have a maximum maturity of one year or less and an average maturity of six months or less at the time of purchase;][11]

(f)     [the Permitted Swap Agreements and Commodity Hedging Agreements;][12]

(g)     trust accounts with the Collateral Agent;

(h)     the Interest Rate Protection Agreements;

(i)     investments in connection with any minority investments of the Borrower, owned as of the Closing Date, which investments shall not exceed $100,000; and

(j)     [the existing investment of Technologies in ProGold][13]

8.13    <u>Hedging Arrangements</u>.

(a)     Promptly after the Closing Date, the Borrower shall present to the Agent for the Lenders and to the Independent Market Consultant a proposed commodity hedging program for grain supply for the USEP Project, the Hereford Project and the Plainview Project to enter into new Commodity Hedging Agreements and to evaluate Commodity Hedging Agreements existing as of the Closing Date, as set forth on Schedule 8.13 hereto.  Approval of such proposals shall require the consent of the Agent and the Supermajority Lenders.   The commodity hedging program shall be structured to mitigate the Borrower's exposure to commodity spot prices and associated margin volatility with respect to the USEP Project, the Hereford Project and the Plainview Project.[14]

(b)     Promptly after the Closing Date, the Borrower will propose a plan to enter into Permitted Swap Agreements and shall present such plan to the Agent and Lenders.  The Borrower may not enter into any Interest Rate Protection Agreements other than Permitted Swap Agreements.

(c)     Notwithstanding the above provisions of <u>Sections 8.13(a)</u> and <u>(b)</u>, the Borrower may not maintain a cash margin account with any Person with an aggregate balance in excess of $2,000,000.  Furthermore, the Borrower (and the Borrower Subsidiaries) shall ensure that its Commodity Hedging Agreements shall contain a provision requiring an automatic suspension or termination of trades

---

[11]     Confirm acceptability of investments in such money market mutual funds.

[12]     To be confirmed.

[13]     Confirm whether still applicable.

[14]     Confirm whether such hedging program should be presented prior to Closing.

under such agreements in the event that the losses suffered thereunder exceed, in the aggregate, $1,000,000.

8.14    Indebtedness.

(a)    The Pledgor shall not directly or indirectly create, incur, assume, suffer to exist or otherwise be or become liable with respect to any Indebtedness.

(b)    No Obligor shall directly or indirectly create, incur, assume, suffer to exist or otherwise be or become liable with respect to any Indebtedness except:

(i)    Indebtedness under this Agreement;

(ii)    Indebtedness under the Exit Financing Facility;

(iii)    accounts payable (other than for borrowed money) arising, and accrued expenses incurred, in the ordinary course of business so long as such accounts payable are payable within 90 days of the date the respective goods are delivered or the respective services are rendered and are not more than 90 days past due; but only so long as such accounts payable are being contested in good faith and by appropriate legal, administrative or other proceedings diligently conducted and so long as adequate reserves have been established with respect thereto in accordance with GAAP, and only if the failure to pay such accounts payable could not reasonably be expected to have a Material Adverse Effect.

(iv)    purchase money or lease obligations to the extent incurred in the ordinary course of business to finance the acquisition or licensing of intellectual property or items of Equipment (and Indebtedness incurred to finance any such obligations); *provided*, that (A) if such obligations are secured, they are secured only by Liens upon the Equipment or intellectual property being financed, (B) Equipment purchased shall not become fixtures to or be considered "spare parts" for the Projects and (C) the aggregate principal amount and the capitalized lease portion of such obligations do not at any time exceed $[1,500,000][15] in the aggregate;

(v)    Indebtedness in respect of the Permitted Swap Agreements and Commodity Hedging Agreements;

---

[15]    To be confirmed.

(vi)     Indebtedness of the Borrower to any Borrower Subsidiary and of any Borrower Subsidiary to the Borrower or any other Borrower Subsidiary, containing Terms of Subordination in the form of Exhibit H; and

(vii)    guarantees by the Borrower of Indebtedness of any Borrower Subsidiary and by any Borrower Subsidiary of Indebtedness of the Borrower or any other Borrower Subsidiary, including waivers of subrogation on terms consistent with the Terms of Subordination in the form of Exhibit H.

(c)     Each Obligor shall duly and punctually pay and discharge its obligations in respect of its Indebtedness permitted by this Section 8.14, subject to the terms and conditions of this Agreement and the other Financing Documents.

(d)     Notwithstanding anything to the contrary contained herein, the Borrower shall not, nor shall it permit any Borrower Subsidiary to, directly or indirectly repay, prepay, purchase, redeem or otherwise acquire any Subordinated Indebtedness (other than any Subordinated Indebtedness acquired pursuant to Sections 3.01(b), 3.02(b) and 3.03(b) of the Collateral Agency Agreement).

8.15    Restricted Payments.  The Borrower shall not make, or agree to pay or make, directly or indirectly, any Restricted Payment unless instructed by the Agent and Majority Lenders.

8.16    Nature of Business.

(a)     No Obligor shall engage in any business other than the operation of the Projects as contemplated by the Transaction Documents, other than Technologies, which shall engage solely in the business of developing and marketing next generation technology with respect to Distilled Grain production and holding equity interests in ProGold.  The Borrower's sole business is to hold the equity interests in the Borrower Subsidiaries and, other than expressly set forth in this Agreement, the Borrower may not engage in any other business.

(b)     No Obligor shall create, acquire or permit to exist any Subsidiary of such Obligor, unless such Subsidiary is or becomes a Borrower Subsidiary concurrent with such creation or acquisition and accedes to the terms of this Agreement by completing an accession agreement in substantially the form set forth in Exhibit K.  Other than WE Hereford, USEP, Plainview and Technologies, no Borrower Subsidiary shall open any bank accounts and all equity distributions made from any of WE Hereford, USEP or Plainview shall be made to the Borrower directly and such distribution shall be deemed to be made through any intermediate Borrower Subsidiaries.

(c)     Except for the arrangements set forth on Schedule 7.10, the Borrower shall not have any employees nor enter into any contractual or other arrangements with any Person that would

require the Borrower to be subject to or to comply with ERISA or any other Government Rule concerning labor, employment, wages or worker benefits.

(d)     Each Obligor shall warrant and defend the title to its Property and every part thereof, and the validity and priority of all Liens granted or otherwise given to the Collateral Agent under the Financing Documents, subject only to Liens permitted hereunder (including Permitted Exceptions), in each case against the claims of all Persons whomsoever, and shall reimburse the Collateral Agent and Lenders for any losses, costs, damages or expenses (including attorneys' fees and court costs) incurred by the Collateral Agent and Lenders if an interest in the Property, other than as permitted hereunder, is claimed by another Person.

(e)     Each Obligor will continue to engage in the businesses currently conducted by it as and to the extent the same are necessary for the ownership, maintenance, management, and operation of its Property and the Projects, and shall at all times continue to own all of Equipment, fixtures and other Property which are necessary in connection with the Projects in the manner required hereunder and in the manner in which it is currently operated.

8.17     Maintenance of Properties.

(a)     Each Obligor shall maintain and preserve the Projects and all of its other material Properties necessary or useful in the proper conduct of its business in good working order and condition (ordinary wear and tear excepted), in accordance with generally accepted prudent U.S. ethanol production industry practices, the Material Project Documents and the operating manuals.  Each Obligor shall operate (or cause to be operated ) the Projects in accordance with generally accepted prudent U.S. ethanol production industry practices, the Material Project Documents, the Operating and Capital Budget and the operating manuals.  In the event of any conflict among such practices, documents or manuals, the more stringent provisions or requirements shall govern.

(b)     Each Obligor shall not incur any Capital Expenditures on or after the Closing Date except Permitted Capital Expenditures.

(c)     Each Obligor shall maintain and preserve its rights and interests in Easement Properties with the applicable Government Authority.

8.18     Project Documents; Etc.

(a)     Each Obligor shall (i) perform and observe all of its material covenants and material obligations contained in each of the Project Documents, (ii) take all necessary action to prevent the termination, suspension or cancellation of any Material Project Document in accordance with the terms of such Material Project Documents or otherwise (except for the expiration of any Material Project Document in accordance with its terms and not as a result of a breach or default thereunder) and

(iii) enforce against the relevant Project Party each material covenant or material obligation of each Project Document to which such Person is a party in accordance with such Agreement's terms.

(b)     Each Obligor shall not, without the prior written consent of the Agent and the Supermajority Lenders in consultation with [the Independent Engineer], (i) suspend, cancel or terminate any Material Project Document or consent to or accept any suspension, cancellation or termination thereof, (ii) sell, transfer, assign (other than pursuant to the Security Documents) or otherwise dispose of (by operation of law, capacity release or otherwise) or consent to any such sale, transfer, assignment or disposition of any part of its interest in any Material Project Document, (iii) waive any material default under, or material breach of, any Material Project Document or waive, fail to enforce, forgive, compromise, settle, adjust or release (or consent to any of the foregoing in respect of) any material right, interest or entitlement, howsoever arising, under, or in respect of, any Material Project Document, (iv) initiate or settle a material arbitration proceeding under any Material Project Document, (v) agree to or petition, request or take any other material legal or administrative action that seeks, or may reasonably be expected, to Impair any Material Project Document, (vi) amend, supplement or modify or in any way vary, or agree to the variation of, any material provision of a Material Project Document or of the performance of any material covenant or obligation by any other Person under any Material Project Document  or (vii) enter into any Additional Project Document (other than any Non-Material Project Document described in clauses (a) and (c) of the definition thereof).

(c)     Each Obligor shall cause all Project Revenues received from any Project Party or any other Person to be deposited in the Applicable Revenue Account.  Without limiting each Obligor's obligation to procure all Consent and Agreements, such Obligor shall send a letter (on such Obligor's letterhead and signed by an Authorized Officer of such Obligor) notifying each other Project Party not party to a Consent and Agreement (i) that its Project Document and all associated documents and obligations have been pledged as collateral security to the Secured Parties and are subject to the Secured Parties' Lien on such Property and (ii) if such Project Party's Project Document requires any payment of Project Revenues specified in clause (a) of the definition of Project Revenues that, in addition to the assignment specified in clause (i) above, it shall pay all such "Project Revenues" directly into the Revenue Account.

(d)     Each Obligor shall furnish the Agent, the Independent Engineer and the Lenders with (i) certified copies of (A) all amendments, supplements or modifications of any Material Project Documents, (B) all Additional Project Documents and documents ancillary thereto and (C) as reasonably requested by the Agent, Non-Material Project Documents and amendments, supplements or modifications thereto, in each case, promptly after execution and delivery of such documents to the Obligor.

8.19    Operating and Capital Budgets.

(a)     On or before the Closing Date, the Borrower shall, with the consent of the Agent and the Majority Lenders, adopt an Operating and Capital Budget for the period from such date to the conclusion of the then current fiscal year (and for each month during such period), and, no less than 15 days in advance of the beginning of each fiscal year of the Borrower thereafter, the Borrower shall adopt an Operating and Capital Budget for the succeeding fiscal year (and for each month during such period).  Copies of the proposed Operating and Capital Budget, together with a comparison of the costs in the proposed Operating and Capital Budget with the costs set forth in the Operating and Capital Budget for the current fiscal year and an explanation of the reasons for any significant increase or decrease in any category shall be furnished to the Agent at least 60 days before the beginning of the fiscal year to which such proposed Operating and Capital Budget applies.  Prior to adoption thereof, each proposed Operating and Capital Budget shall be subject to the prior approval of the Agent and the Majority Lenders.  Copies of the final Operating and Capital Budget so adopted shall be furnished to the Agent promptly upon their adoption.  In the event that any proposed Operating and Capital Budget is not approved by the Agent, the Operating and Capital Budget from the previous fiscal year increased by the CPI for the then-current fiscal year shall apply for the then-current fiscal year until an Operating and Capital Budget is approved. The Agent shall have the right to approve all or a portion of any proposed Operating and Capital Budget. To the extent the Agent does not approve a portion of a proposed Operating and Capital Budget, such portion of the Budget from the previous fiscal year increased by the CPI for the then-current fiscal year shall apply for the then-current fiscal year until such portion of the proposed Operating and Capital Budget is approved.

(b)     Each Obligor shall comply with the applicable Operating and Capital Budget.  If during any fiscal year the Borrower reasonably projects that any category of Operation and Maintenance Expenses for the Projects for such fiscal year will exceed by more than [20]% the amount budgeted for such category of Operation and Maintenance Expenses in the then- applicable Operating and Capital Budget, or if any category of Operation and Maintenance Expenses for a Project incurred to date during such fiscal year plus any Operation and Maintenance Expenses budgeted for such category for the remainder of such fiscal year in the then-applicable Operating and Capital Budget exceeds by more than [20]% the aggregate amount budgeted for such category of Operation and Maintenance Expenses in the then-applicable Operating and Capital Budget, then the Borrower shall prepare and submit for the approval of the Agent and the Majority Lenders pursuant to Section 8.18(a), an amended Operating and Capital Budget for the remainder of such fiscal year.[16]

8.20    Operating Statements and Reports.  The Borrower shall furnish to the Agent quarterly an operating statement of each Project for such period and for the portion of the Borrower's fiscal year then ended not more than 45 days after the end of such quarter, and not more than 90 days after the end of each fiscal year of the Borrower, an operating statement of each Project for such fiscal year.

---

[16]     Confirm thresholds in brackets.

Such operating statements shall correspond to the classifications and monthly periods of the current annual Operating and Capital Budget and shall show all Project Revenues and all expenditures for Operation and Maintenance Expenses. The monthly and quarterly operating statement shall include (i) updated estimates of Operation and Maintenance Expenses for the balance of such fiscal year to which the operating statement relates, (ii) any material developments during such period which could reasonably be expected to have a Material Adverse Effect, (iii) summary of statistical data relating to the operation of such Project during such period and (iv) the cause, duration and projected loss of Project Revenues attributable to each scheduled and unscheduled interruption in production and transportation of Ethanol by such Project during such period and, with respect to any interruptions caused by a material defect or failure, the cause of and cost to repair such defect or failure. The monthly, quarterly and annual operating statements shall each be certified as materially complete and correct by an Authorized Officer of the Borrower. Each operating statement will be accompanied by a statement of sources and uses of funds for the periods covered by it and a discussion of the reason for any material variance from the amount budgeted therefor in the relevant Operating and Capital Budget. The form of such operating statements shall be in form and substance satisfactory to the Agent and shall be agreed upon with the Borrower promptly after the Closing Date.

8.21    Transactions with Affiliates.  No Obligor shall directly or indirectly enter into any transaction that is otherwise permitted hereunder with or for the benefit of an Affiliate of such Obligor (including guarantees and assumptions of obligations of an Affiliate of such Obligor) except upon fair and reasonable terms no less favorable to the Obligor than would be obtained in a comparable arm's-length transaction with a Person that is not an Affiliate of such Obligor, and except as permitted under the Financing Documents.  Prior to entering into any agreement with its Affiliate, each Obligor shall deliver to the Agent (x) a certificate of an Authorized Officer of the Obligor describing such transaction in complete detail and certifying as to the satisfaction of conditions set forth in this Section 8.20 and (y) documents in connection therewith.  Each Project Document entered into with an Affiliate as of the Closing Date is listed on Appendix D.

8.22    Other Documents and Information.  The Borrower shall furnish the Agent (with sufficient copies for each Lender):

(a)    promptly after the filing thereof, a copy of each filing, certification, waiver, exemption, claim, declaration, or registration made with respect to Government Approvals to be obtained or filed by the Borrower with any Government Authority, other than such filings, certifications, waivers, exemptions, claims, declarations, or registrations that are routine or ministerial in nature and in respect of which a failure (individually or on an aggregate basis) to file could not reasonably be expected to have a Material Adverse Effect;

(b)      promptly after receipt or publication thereof, a copy of each Government Approval obtained by the Borrower (other than such Government Approvals obtained by the Borrower in the ordinary course of its business);

(c)      promptly after the delivery thereof to the addressee, a copy of each material notice, demand or other communication delivered by the Borrower pursuant to any Transaction Document; and

(d)      promptly upon obtaining knowledge thereof, a description of each material change in the status of any Government Approval identified on <u>Schedule 7.05(a)</u>.

8.23    <u>Board Observer Rights.</u>

(a)      Each Obligor shall inform the Agent at least 15 days in advance of any meeting of the board of directors or committee of the board of directors of such Obligor.

(b)      The Agent and the Lenders shall at all times have the right to appoint one or more non-voting observers to the board of directors of each Obligor (each a "**Non-Voting Observer**"). Each Non-Voting Observer shall have the right to attend and speak at meetings of the board of directors (any any committee of such board of directors) to which such Non-Voting Observer is appointed.

(c)      A Non-Voting Observer shall be given access to all the information that the directors or members of the relevant board of directors would be entitled to receive (and shall be subject to the same fiduciary and confidentiality duties that are otherwise applicable to directors of such board of directors with respect to such information) and shall be entitled to receive that information (including, without limitation, notice of meetings) as soon as practicable after such board of directors has been notified that such Non-Voting Observer would be attending the meeting.

(d)      A Non-Voting Observer may pass such information to the same persons as the directors or members of the relevant board of directors would be entitled to pass that information.

8.24    <u>Financial Covenants.</u>[17]

(a)      The Borrower shall not permit the Debt to Equity Ratio to exceed [65:35], as calculated based on the most recent balance sheet and income statement provided by the Borrower pursuant to <u>Sections 8.01(a)</u> and <u>(b).</u>

---

[17]      All financial ratios to be confirmed.

(b)    [Net Positive Working Capital.    Anytime there are outstanding Loans, the Borrower shall ensure that its current assets (as defined in accordance with GAAP) shall exceed its current liabilities (as defined in accordance with GAAP) (including its current liabilities under the Exit Financing Facility but excluding any non-cash liability under any Interest Rate Protection Agreements and Commodity Hedging Agreements), in each case calculated on a consolidated basis, by more than $5,000,000.]

(c)    Maximum Leverage Ratio.    Commencing on June 30, 2011 and on every Quarterly Date thereafter, the Borrower shall compute, for the 12-month period immediately preceding such date, the ratio of (a) the sum of (i) all outstanding principal amount of all Permitted Indebtedness under this Agreement, plus (ii) all amounts payable by the Borrower in respect of Interest Expense under this Agreement, plus (iii) all outstanding principal amount of all Permitted Indebtedness under the Exit Financing Facility, plus (iv) all amounts payable by the Borrower in respect of Interest Expense under the Exit Financing Facility, over (b) the excess of Project Revenues over Operation and Maintenance Expenses, and the Borrower shall ensure that such ratio shall not exceed [5]:1; *provided*, that, commencing on June 30, 2012, such ratio shall not exceed [3.5-4.0]:1 and commencing on June 30, 2013, such ratio shall not exceed [_____];1.

(d)    Debt Service Coverage Ratio.    On each Quarterly Date there are outstanding Loans, the Borrower shall ensure that the Debt Service Coverage Ratio for the immediately preceding quarter (or such shorter period ending on a Quarterly Date subsequent to the Closing Date) is not less than 1.5: 1.0.[18]

(e)    Maximum Capital Expenditures.    At any time, the Borrower shall not permit the aggregate amount of Capital Expenditures expended by the Borrower and the Borrower Subsidiaries to exceed Permitted Capital Expenditures as set forth in the Operating and Capital Budget, unless such excess has been approved by the Lenders in the applicable Operating and Capital Budget.

8.25    Deposit Accounts.    Neither the Borrower nor any Borrower Subsidiary shall maintain any Securities Accounts or Deposit Accounts, except with respect to which the Collateral Agent has an Account Control Agreement.

8.26    Non-circumvention.    Each Credit Party hereby covenants and agrees that it will not, by amendment of its organizational documents, or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Agreement or the other Financing Documents, and will at all times in good faith carry out all of the

---

[18]    To be confirmed.

provisions of this Agreement and the other Financing Documents and take all action as may be required to protect the rights of the Agent and the Lenders.

8.27 <u>Cooperation; Further Assurances</u>. Each Obligor shall perform such acts as are reasonably requested by the Agent to carry out the intent of, and transactions contemplated by, this Agreement and the other Transaction Documents. Each Credit Party hereby agrees to execute and deliver such other agreements, documents, assignment, statement or instruments as the Collateral Agent may from time to time reasonably request to evidence, perfect or otherwise implement the Lien created by the Security Documents and subject to the terms hereof.

ARTICLE IX

**EVENTS OF DEFAULT**

9.01 <u>Events of Default; Remedies</u>. If one or more of the following events (the "**Events of Default**") shall occur and be continuing:

(a) The Borrower shall (i) default in the payment when due of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise or (ii) default in the payment when due of any interest on any Loan or any fee or any other amount payable by it under this Agreement or under any other Financing Document; or

(b) The Borrower shall default for a period beyond any applicable grace period (i) in the payment of any principal, interest or other amount due under any agreement involving Indebtedness and the outstanding amount or amounts payable under any such agreement equals or exceeds $[1,000,000][19] in the aggregate, or (ii) in the performance of any obligation due under any agreement involving Indebtedness if in the case of this clause (ii), pursuant to such default, the holder of the obligation concerned has accelerated the maturity of any Indebtedness evidenced thereby which equals or exceeds $[1,000,000][20] in the aggregate; or

(c) (i) Any representation or warranty made or deemed made by any Obligor in this Agreement or any other Financing Document, (ii) any representation, warranty or statement in any certificate, financial statement or other document furnished to the Agent or any Lender by or on behalf of

---

[19] Threshold for cross-default to be confirmed.

[20] Threshold for cross-default to be confirmed

the Borrower, (iii) any representation or warranty made or deemed made by any Material Project Party in connection with any Transaction Document, or (iv) any representation, warranty or statement in any certificate, financial statement or other document furnished to the Agent or any Lender by or on behalf of any Material Project Party shall prove to have been false or misleading in any material respect as of the time made or deemed made, confirmed or furnished; or

(d)      (i) Any Obligor shall fail to observe or perform any covenant or agreement contained in Section 8.01(a), 8.01(b), 8.01(c), 8.01(d), 8.02, 8.03, 8.04(b), 8.05(a), 8.05(b), 8.05(j), 8.05(k), 8.06, 8.07, 8.08, 8.10, 8.11, 8.12, 8.13, 8.14(b), 8.15, 8.16(b), 8.18, 8.19, 8.22 or 8.24 or shall default in the performance of any of its obligations contained in the Security Documents and shall fail to cure such default within the grace period specified therein, if any; or (ii) any Pledgor shall fail to observe or perform any covenant or agreement contained in the Pledge Agreement entered into by such Pledgor and shall fail to cure such default within the grace period specified therein, if any; or

(e)      Any Obligor shall default in the performance of any of its covenants or obligations to be performed or observed by it under this Agreement or any other Financing Document (not otherwise addressed in this Section 9.01) and such default shall continue unremedied for a period of 15 days; or

(f)      The Confirmation Order shall have been modified in any respect without the prior written consent of the Majority Lenders, or a determination shall have been made regarding the Confirmation Order that is adverse in any respect to the Agent or Lenders.

(g)      A Bankruptcy shall occur with respect to an Obligor or any of its majority shareholders (or equivalent) or directors shall take any action to initiate a Bankruptcy with respect to an Obligor; or

(h)      A Bankruptcy shall occur with respect to the Pledgor or any other Material Project Party or any of its majority shareholders (or equivalent) or directors shall take any action to initiate a Bankruptcy with respect to the Pledgor; or

(i)      (i) The Liens in favor of the Secured Parties under the Security Documents shall (A) at any time cease to constitute valid and perfected Liens granting a second priority security interest in the Collateral (subject to Permitted Liens) to the Secured Parties, (B) be subordinated or (C) shall be asserted by any Obligor or Pledgor not to be a valid, second priority perfected security interest in the Collateral, (ii) except for expiration in accordance with its terms, any of the Security Documents shall at any time for any reason cease to be valid and binding or in full force and effect or (iii) the enforceability of any Security Document shall be contested by any Person other than a Secured Party; or

(j)     A final judgment or judgments for the payment of money in excess of $[1,000,000][21] in the aggregate, in each case in excess of the maximum amount covered by insurance required to be maintained pursuant to Section 8.05, shall be rendered by one or more Government Authorities, arbitral tribunals or other bodies having jurisdiction against any Obligor and the same shall not be discharged (or provision shall not be made for such discharge), or a stay of execution shall not be procured, within 30 days from the date of entry of such judgment or judgments; or

(k)     An ERISA Event shall have occurred that, in the opinion of the Supermajority Lenders, could reasonably be expected to result in a Material Adverse Effect; or

(l)     Any Obligor shall default in the performance of its obligation to maintain in full force and effect the insurance required under Section 8.05; or

(m)     Any Government Approval shall be Impaired and (A) such Impairment continues to exist for more than 30 days or such Government Approval is not replaced within 30 days and (B) such Impairment could reasonably be expected to have a Material Adverse Effect; or

(n)     (i) This Agreement or any other Transaction Document shall have been declared in a final non-appealable judgment to be unenforceable, (ii) any provision of any Transaction Document, except for any Security Document, shall otherwise cease to be valid and binding, or in full force and effect, or shall be declared to be null and void or shall be materially Impaired (in each case, except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default hereunder)), (iii) any party to a Transaction Document shall have expressly repudiated its obligations thereunder, (iv) any Credit Party shall contest the enforceability or the validity of any provision of any Transaction Document, (v) any Person shall contest in writing or in any judicial proceeding the enforceability or the validity of any provision of the Transaction Documents, or (vi) a proceeding shall be commenced by any Credit Party or any Government Authority having jurisdiction over such Credit Party, seeking to establish the invalidity or unenforceability of any provision of the Transaction Documents; or

(o)     (i) any Material Project Document shall at any time for any reason cease to be valid and binding or in full force and effect or shall be materially Impaired (in each case, except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder)) or (ii) any Material Project Party shall be in material default under any Material Project Document and, in each such event set forth in clause (i) or (ii), such event could reasonably be expected to result in a Material Adverse Effect; or

---

[21]     To be confirmed.

(p)     An Event of Abandonment shall have occurred; or

(q)     An Environmental Claim shall have been brought against an Obligor which individually or in the aggregate could reasonably be expected to have a Material Adverse Effect; or

(r)     An Event of Taking shall have occurred with respect to all or substantially all of the Project, or otherwise could reasonably be expected to have a Material Adverse Effect; or

(s)     A Change in Control shall have occurred; or

(t)     Any Obligor shall cease operations of its business as such business has normally been conducted or terminate substantially all of its employees; or

(u)     Any portion of a Credit Party's assets is attached or seized, or a levy is filed against any such assets, or a judgment or judgments is/are entered for the payment of money, individually or in the aggregate, of at least $1,000,000, or a Credit Party is enjoined or in any way prevented by court order from conducting any part of its business; or

(v)     A circumstance has occurred that would reasonably be expected to have a Material Adverse Effect

THEREUPON:  (1) in the case of an Event of Default other than the one referred to in paragraph (g) above with respect to the Borrower, the Agent may, and, upon request of the Supermajority Lenders, shall, by notice to the Borrower, take either or both of the following actions, at the same or different times, (x) terminate the Loan, and thereupon the Loan shall terminate immediately and (y) declare the principal amount then outstanding of, and the accrued interest on, the Loans and all other amounts payable by the Borrower hereunder and under the Notes (including any amounts payable under Section 5.03) to be forthwith due and payable (or both), whereupon such amounts shall be immediately due and payable without presentment, demand, protest or other formalities of any kind, all of which are hereby expressly waived by the Borrower and (2) in the case of the occurrence of an Event of Default referred to in paragraph (g) of this Article IX, with respect to the Borrower, the principal amount then outstanding of, and the accrued interest on, the Loans and all other amounts payable by the Borrower under this Agreement and under the Notes and the other Financing Documents (including any amounts payable under Section 5.03) shall automatically become immediately due and payable without presentment, demand, protest or other formalities of any kind, all of which are hereby expressly waived by the Borrower.  In the case of any Event of Default, in addition to the exercise of remedies set forth in clauses (1) and (2) above, the Collateral Agent shall have the right, upon the consent or at the request of the Supermajority Lenders, to exercise any and all rights of a secured creditor with respect to the Collateral.

## ARTICLE X

## THE AGENT

10.01   Appointment, Powers and Immunities.  Each Lender hereby irrevocably appoints and authorizes the Agent to act as its agent under this Agreement and the other Financing Documents with such powers as are specifically delegated to the Agent by the terms of the Financing Documents, together with such other powers as are reasonably incidental to such powers. The Agent (which term as used in this sentence and in Section 10.05 and the first sentence of Section 10.06 shall include reference to its affiliates and its own and its affiliates' officers, directors, employees, representatives and agents): (a) shall have no duties or responsibilities except those expressly set forth in the Financing Documents, and shall not by reason of any Financing Document be a trustee for any Lender; (b) shall not be responsible to the Lenders for any recitals, statements, representations or warranties contained in any Financing Document, or in any certificate or other document referred to or provided for in, or received by any of them under, any Financing Document, or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of any Financing Document or any other document referred to or provided for in any Financing Document or for any failure by the Borrower or any other Person to perform any of its obligations under any Financing Document; (c) shall not be required to initiate or conduct any litigation or collection proceedings under any Financing Document and (d) shall not be responsible for any action taken or omitted to be taken by it under any Financing Document or under any other document or instrument referred to or provided for in any Financing Document or in connection with any Financing Document, except for its own gross negligence or willful misconduct. The Agent may employ agents and attorneys-in-fact and shall not be responsible for the negligence or misconduct of any such agents or attorneys-in-fact reasonably selected by it in good faith. The Agent may deem and treat the payee of any Note as the holder of such Note for all purposes of the Financing Documents unless and until a notice of the assignment or transfer of such Note shall have been filed with the Agent, together with the consent of the Borrower to such assignment or transfer (to the extent provided in Section 12.06(b)).

10.02   Reliance by the Agent. The Agent shall be entitled to rely upon any certification, notice or other communication (including any made by telephone, telecopy, telex, telegram or cable) reasonably believed by it to be genuine and correct and to have been signed or sent by or on behalf of the proper Person or Persons, and upon advice and statements of legal counsel, independent accountants and other experts selected by the Agent.  As to any matters not expressly provided for by any Financing Document, the Agent shall in all cases be fully protected in acting, or in refraining from acting, under any Financing Document in accordance with instructions given by the Supermajority Lenders or, if provided in this Agreement, in accordance with the instructions given by all of the Lenders as is required in such circumstance, and such instructions of such Lenders and any action taken or failure to act pursuant to such instructions shall be binding on all of the Lenders.

10.03    Defaults.  The Agent shall not be deemed to have knowledge or notice of the occurrence of a Default (other than the nonpayment of principal of or interest on Loans or of fees payable hereunder) unless the Agent has received notice from a Lender or the Borrower specifying such Default and stating that such notice is a "Notice of Default".  In the event that the Agent receives such a notice of the occurrence of a Default, the Agent shall give prompt notice of such receipt to the Lenders (and shall give each Lender prompt notice of each such nonpayment). The Agent shall (subject to Section 10.07) take such action with respect to such Default as shall be directed by the Supermajority Lenders or all of the Lenders; *provided*, that unless and until the Agent shall have received such directions, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default as it shall deem advisable in the best interest of the Lenders except to the extent that this Agreement expressly requires that such action be taken, or not be taken, only with the consent or upon the authorization of the Supermajority Lenders or all of the Lenders.

10.04    Rights as a Lender.  With respect to its Loan Incurred Amounts and the Loans made by it, WestLB (and any successor acting as the Agent) in its capacity as a Lender under the Financing Documents shall have the same rights, privileges and powers under the Financing Documents as any other Lender and may exercise the same as though it were not acting as the Agent, and the term "Lender" or "Lenders" shall, unless the context otherwise indicates, include the Agent in its individual capacity.   WestLB (and any successor acting as the Agent) and its affiliates may (without having to account for the same to any Lender) accept deposits from, lend money to, make investments in and generally engage in any kind of banking, trust or other business with the Borrower (and any of Borrower's Subsidiaries or Affiliates) as if it were not acting as the Agent, and WestLB and its affiliates may accept fees and other consideration from the Borrower for services in connection with this Agreement or otherwise without having to account for the same to the Lenders.

10.05    Indemnification.  The Lenders agree to indemnify (x) the Agent (to the extent not reimbursed under Section 12.03, but without limiting the obligations of the Borrower under such Section 12.03) and (y) the Indemnified Persons (as such term is defined in the Collateral Agency Agreement, to the extent not reimbursed under Section 7.02 of the Collateral Agency Agreement, but without limiting the obligations of the Borrower under such Section 7.02), in each case, ratably in accordance with the aggregate principal amount of the Loans held by the Lenders (or, if no Loans are at the time outstanding, ratably in accordance with their respective Loan Incurred Amounts), for any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind and nature whatsoever which may be imposed on, incurred by or asserted against such Person (including by any Lender) arising out of or by reason of any investigation or any way relating to or arising out of this Agreement or any other Transaction Document or any other documents contemplated by or referred to in this Agreement or in the other Transaction Documents or the transactions contemplated by this Agreement under Section 12.03, but excluding, unless a Default has occurred and is continuing, normal administrative costs and expenses incident to the performance of its agency duties) or the enforcement of any of the terms of this Agreement or of the other Transaction

Documents or of any such other documents; *provided*, that no Lender shall be liable for any of the foregoing to the extent they arise from the gross negligence or willful misconduct of the Person to be indemnified.

10.06 <u>Non-Reliance on the Agent and Other Lenders</u>.  Each Lender agrees that it has, independently and without reliance on the Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis of the Borrower and decision to enter into this Agreement and that it will, independently and without reliance upon the Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own analysis and decisions in taking or not taking action under this Agreement or any other Transaction Document. The Agent shall not be required to keep itself informed as to the performance or observance by the Borrower or any other Person of this Agreement or any other Transaction Document or any other document referred to or provided for in this Agreement or in any other Transaction Document or to inspect the Properties or books of the Borrower or such other Person.  Except for notices, reports and other documents and information expressly required to be furnished to the Lenders by the Agent or the Collateral Agent under this Agreement, neither the Agent nor the Collateral Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the affairs, financial condition or business of the Borrower (or any of its Affiliates) which may come into the possession of the Agent, the Collateral Agent or any of their affiliates.

10.07 <u>Failure to Act</u>.  Except for action expressly required of the Agent under this Agreement and under the other Transaction Documents to which the Agent is intended to be a party, the Agent shall in all cases be fully justified in failing or refusing to act under this Agreement and under the other Transaction Documents unless it shall receive further assurances to its reasonable satisfaction from the Lenders of their indemnification obligations under <u>Section 10.05</u> against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.

10.08 <u>Resignation or Removal of the Agent</u>.  Subject to the appointment and acceptance of a successor Agent as provided below, the Agent may resign at any time by notice to the Lenders and the Borrower, and the Agent may be removed at any time with or without cause by the Supermajority Lenders.  Upon any such resignation or removal, the Supermajority Lenders shall have the right to appoint a successor Agent, which successor Agent shall (so long as no Event of Default has occurred and is continuing) be reasonably acceptable to the Borrower.  If no successor Agent shall have been so appointed by the Supermajority Lenders and shall have accepted such appointment within 30 days after the retiring Agent's giving of notice of resignation or the Supermajority Lenders' removal of the retiring Agent, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent, which shall be an Acceptable Bank which has an office in New York, New York, which successor Agent shall (so long as no Event of Default has occurred and is continuing) be reasonably acceptable to the Borrower.  Upon the acceptance of any appointment as the Agent by a successor Agent, such successor Agent shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under this Agreement and the other Transaction Documents to which it is intended to be a party.  After any retiring Agent's resignation or removal as the Agent, the provisions of this Article X shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as the Agent.

10.09 <u>Consents under Transaction Documents</u>.  Except as otherwise provided in <u>Section 12.04</u> with respect to any modification, supplement or waiver under this Agreement, the Agent shall, upon the prior consent of the Supermajority Lenders (except to the extent otherwise provided in this Agreement), consent to (and shall direct the Collateral Agent, if applicable, to enter into) any modification, supplement or waiver under any other such Transaction Document to which the Agent or the Collateral Agent is intended to be a party; *provided*, that without the prior consent of each Lender, the Agent shall not (and, if applicable, shall not direct the Collateral Agent to), except as contemplated in this Agreement or in the Security Documents, release any Collateral or otherwise terminate any Lien under any Security Document, or agree to additional obligations being secured by the Collateral (unless the Lien for such additional obligations shall be junior to the Lien in favor of the other obligations secured by such Security Document and is otherwise permitted under this Agreement, the Exit Financing Facility or the Security Documents), except that no such consent shall be required, and the Agent is hereby authorized, to release (and to direct the Collateral Agent to release) any Lien covering Property of the Borrower or any other Person which is the subject of a disposition of Property of the Borrower or such other Person which is permitted or contemplated under this Agreement or under the relevant Security Document or to which the Lenders have otherwise consented.

10.10 <u>Appointment of the Collateral Agent</u>.  Each Lender hereby irrevocably authorizes the Agent to act as its agent under the Collateral Agency Agreement to appoint the Collateral Agent and the Securities Intermediary thereunder on behalf of such Lender and the other Secured Parties, such appointment subject to the terms and conditions of such agreement.

10.11 <u>Reports, Etc</u>. The Agent shall deliver to each Lender a copy of each budget, financial statement and other report delivered by the Borrower to it pursuant to the terms of this Agreement promptly following receipt of such information.

10.12 <u>Appointment; Subordination Agreement</u>. [Bank of New York - Mellon] has been appointed to act as the Collateral Agent under the Security Documents. In such capacity, the Collateral Agent has entered into or will concurrently herewith enter into the Subordination Agreement, which shall establish the prior and superior rights in all Collateral in favor of the Collateral Agent for the Lenders hereunder over the rights of the lenders under the Term Loan Facility. The Agent is hereby authorized to execute and deliver the Security Documents and any Subordination Agreement on behalf of the Lenders.

ARTICLE XI

**GUARANTEE**

11.01 <u>The Guarantee</u>. The Borrower Subsidiaries (the "**Borrower Subsidiaries**") hereby jointly and severally guarantee to each of the Secured Parties and their respective successors and assigns the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of:

(a)     the principal of and interest on the Loans made by the Lenders to the Borrower and all fees, indemnification payments and other amounts whatsoever, whether direct or indirect, absolute or contingent, now or hereafter from time to time owing to the Lenders or the Agent by the Borrower under this Agreement and by any Borrower Subsidiary under any of the Financing Documents; and

(b)     [all obligations of the Borrower to any Lender (or any affiliate thereof) under any Permitted Swap Agreement or Commodity Hedging Agreement to which such Lender or affiliate is a party],

in each case strictly in accordance with the terms thereof and including all interest and expenses accrued or incurred subsequent to the commencement of any bankruptcy or insolvency proceeding with respect to the Borrower, whether or not such interest or expenses are allowed as a claim in such proceeding (such obligations being herein collectively called the "**Guaranteed Obligations**"). The Borrower Subsidiaries hereby further jointly and severally agree that if the Borrower shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Borrower Subsidiaries will promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

11.02 <u>Obligations Unconditional</u>. Obligations of the Borrower Subsidiaries under <u>Section 11.01</u> are absolute and unconditional, joint and several, irrespective of the value, genuineness,

validity, regularity or enforceability of the obligations of the Borrower under this Agreement or any other agreement or instrument referred to herein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 11.02 that the obligations of the Borrower Subsidiaries hereunder shall be absolute and unconditional, joint and several, under any and all circumstances. Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Borrower Subsidiaries hereunder, which shall remain absolute and unconditional as described above:

(a)     at any time or from time to time, without notice to the Borrower Subsidiaries, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b)     any of the acts mentioned in any of the provisions of this Agreement or any other agreement or instrument referred to herein shall be done or omitted;

(c)     the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be modified, supplemented or amended in any respect, or any right under this Agreement or any other agreement or instrument referred to herein shall be waived or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with; or

(d)     any Lien or security interest granted to, or in favor of, any Secured Party as security for any of the Guaranteed Obligations shall fail to be perfected.

The Borrower Subsidiaries hereby expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrower under this Agreement or any other agreement or instrument referred to herein, or against any other Person under any other guarantee of, or security for, any of the Guaranteed Obligations.

11.03   Reinstatement.   The obligations of the Borrower Subsidiaries under this Section 11 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and the Borrower Subsidiaries jointly and severally agree that they will indemnify the Secured Parties on demand for all costs and expenses (including fees of counsel) incurred by the Secured Parties in connection with such rescission or restoration, including any such costs

and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

11.04   Subrogation.  The Borrower Subsidiaries hereby jointly and severally agree that until the payment and satisfaction in full of all Guaranteed Obligations and the expiration or termination of the Loan Incurred Amounts of the Lenders under this Agreement they shall not exercise any right or remedy arising by reason of any performance by them of their guarantee in Section 11.01, whether by subrogation or otherwise, against the Borrower or any other guarantor of any of the Guaranteed Obligations, or any security for any of the Guaranteed Obligations.

11.05   Remedies.   The Borrower Subsidiaries jointly and severally agree that, as between the Borrower Subsidiaries and the Lenders, the obligations of the Borrower under this Agreement may be declared to be forthwith due and payable as provided in Article IX of this Agreement (and shall be deemed to have become automatically due and payable in the circumstances provided in said Article IX) for purposes of Section 11.01 notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Borrower Subsidiaries for purposes of Section 11.01.

11.06   Instrument for the Payment of Money.   Each Borrower Subsidiary hereby acknowledges that the guarantee in this Article XI constitutes an instrument for the payment of money, and consents and agrees that any Secured Party, at its sole option, in the event of a dispute by such Borrower Subsidiary in the payment of any moneys due hereunder, shall have the right to bring motion-action under New York CPLR Section 3213.

11.07   Continuing Guarantee.   The guarantee in this Article XI is a continuing guarantee, and shall apply to all Guaranteed Obligations whenever arising.

11.08   Rights of Contribution.  The Borrower Subsidiaries hereby agree, as between themselves, that if any Borrower Subsidiary shall become an Excess Funding Guarantor (as defined below) by reason of the payment by such Borrower Subsidiary of any Guaranteed Obligations, then each other Borrower Subsidiary shall, on demand of such Excess Funding Guarantor (but subject to the next sentence), pay to such Excess Funding Guarantor an amount equal to such Borrower Subsidiary's Pro Rata Share (as defined below and determined, for this purpose, without reference to the properties, debts and liabilities of such Excess Funding Guarantor) of the Excess Payment (as defined below) in respect of such Guaranteed Obligations.  The payment obligation of a Borrower Subsidiary to any Excess Funding Guarantor under this Section 11.08 shall be subordinate and subject in right of payment to the prior payment in full of the obligations of such Borrower Subsidiary under the other provisions of this

<u>Section 11</u> and such Excess Funding Guarantor shall not exercise any right or remedy with respect to such excess until payment and satisfaction in full of all of such obligations.

For purposes of this <u>Section 11.08</u>, (i) "**Excess Funding Guarantor**" means, in respect of any Guaranteed Obligations, a Borrower Subsidiary that has paid an amount in excess of its Pro Rata Share of such Guaranteed Obligations, (ii) "**Excess Payment**" means, in respect of any Guaranteed Obligations, the amount paid by an Excess Funding Guarantor in excess of its Pro Rata Share of such Guaranteed Obligations and (iii) "**Pro Rata Share**" means, for any Borrower Subsidiary, the ratio (expressed as a percentage) of (x) the amount by which the aggregate fair saleable value of all properties of such Borrower Subsidiary (excluding any shares of stock or other equity interest of any other Borrower Subsidiary) exceeds the amount of all the debts and liabilities of such Borrower Subsidiary (including contingent, subordinated, unmatured and unliquidated liabilities, but excluding the obligations of such Borrower Subsidiary hereunder and any obligations of any other Borrower Subsidiary that have been Guaranteed by such Borrower Subsidiary) to (y) the amount by which the aggregate fair saleable value of all properties of the Borrower and all of the Borrower Subsidiaries exceeds the amount of all the debts and liabilities (including, without duplication, contingent, subordinated, unmatured and unliquidated liabilities, but excluding the obligations of the Borrower Subsidiaries hereunder and under the other Financing Documents) of all of the Borrower Subsidiaries, determined as of the Closing Date.

11.09    <u>General Limitation on Guarantee Obligations</u>.    In any action or proceeding involving any state corporate law, or any state or Federal bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Borrower Subsidiary under <u>Section 11.01</u> would otherwise, taking into account the provisions of <u>Section 11.08</u>, be held or determined to be void, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under <u>Section 11.01</u>, then, notwithstanding any other provision hereof to the contrary, the amount of such liability shall, without any further action by such Borrower Subsidiary, any Secured Party or any other Person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

11.10    <u>Additional Borrower Subsidiaries</u>.    Subsidiaries of the Borrower formed or acquired after the date hereof will be required to become a "Borrower Subsidiary" under this Agreement by completing an accession agreement in substantially the form set forth in <u>Exhibit K</u> and the Credit Parties shall cause the applicable Person that owns the Equity Interests of such Subsidiary to pledge to the Collateral Agent, for the benefit of the Lenders, 100% of the Equity Interests owned by such person of each Subsidiary and execute and deliver all documents or instruments required thereunder or appropriate to perfect the security interest created thereby.  Upon becoming a Borrower Subsidiary, the new Borrower Subsidiary makes the representations and warranties set forth in Article VII of this Agreement.

ARTICLE XII

**MISCELLANEOUS**

12.01 <u>Waiver</u>.  No failure on the part of the Agent or any Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, remedy, power or privilege under this Agreement, any Note or any other Financing Document shall operate as a waiver of such right, remedy, power or privilege, and no single or partial exercise of any right, remedy, power or privilege under this Agreement, any Note or any other Financing Document shall preclude any other or further exercise of such right, remedy, power or privilege, or the exercise of any other right, power or privilege. The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law.  All covenants of the Borrower and the Pledgors set forth in this Agreement and the other Financing Documents and all Events of Default set forth in <u>Section 9.01</u> shall be given independent effect so that, in the event that a particular action or condition is not permitted by the terms of any such covenant or would result in a Default, the fact that such event or condition could be permitted by an exception to, or be otherwise within the limitations of, another covenant or another Event of Default shall not avoid the occurrence of a Default or an Event of Default in the event that such action is taken or condition exists.

12.02 <u>Notices</u>.  All notices, requests and other communications provided for in this Agreement and under the other Financing Documents (including any modifications of, or waivers or consents under, this Agreement) shall be given or made in writing (including by facsimile) delivered to the intended recipient at the "Address for Notices" specified below its name on the signature pages of this Agreement or in the relevant section as specified in other Financing Documents, or as to any party, at such other address as shall be designated by such party in a notice to each other party.  Except as otherwise provided in this Agreement, all such communications shall be deemed to have been duly given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of facsimile or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed; *provided*, that no notice to the Agent shall be effective until received by the Agent.

12.03 <u>Expenses; Indemnification; Etc</u>.  The Borrower agrees to pay or reimburse each of the Lenders and the Agent for:  (a) all out-of-pocket costs and expenses of the Agent (including the fees and expenses of Kaye Scholer LLP, counsel to the Agent (or such other counsel that the Agent may select from time to time which, so long as no Default has occurred and is continuing, shall be reasonably satisfactory to the Borrower)) and experts (including the Independent Market Consultant, the Independent Engineer, the Independent Environmental Consultant and the Insurance Consultant) engaged by the Agent or the Lenders from time to time, in connection with (i) the negotiation, preparation, execution and delivery of this Agreement and the other Transaction Documents and the extension of credit under this Agreement, (ii) any amendment, modification or waiver of any of the terms of this Agreement or any other Transaction Document and (iii) the syndication of Loan Incurred Amounts or Loans, (b) all costs and expenses of the Lenders and the Agent (including counsels' fees and expenses and experts' fees and

expenses incurred by or on behalf of the Agent) in connection with (i) any Default and any enforcement or collection proceedings resulting from such Default or in connection with the negotiation of any restructuring or "work-out" (whether or not consummated) of the obligations of the Borrower under this Agreement or the obligations of any Project Party under any Project Document and (ii) the enforcement of this Section 12.03(b), and (c) all transfer, stamp, documentary or other similar taxes, assessments or charges levied by any Government Authority in respect of this Agreement or any other Transaction Document or any other document referred to in this Agreement or in any such other Transaction Document and all costs, expenses, taxes, assessments and other charges incurred in connection with any filing, registration, recording or perfection of any Lien contemplated by this Agreement or any other Transaction Document to which the Agent or the Collateral Agent is intended to be a party or any other document referred to in this Agreement or in any such other Transaction Document.

The Borrower hereby agrees to indemnify the Agent and each Lender and their respective officers, directors, employees, representatives, attorneys and agents (each, an "**Indemnitee**") from, and shall hold each of them harmless against, any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever (including the fees and expenses of counsel for each Indemnitee in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnitee shall be designated a party to any such proceeding) that may at any time (including at any time following the Termination Date) be imposed on, asserted against or incurred by an Indemnitee as a result of, or arising out of, or in any way related to or by reason of any claim with respect to (a) any of the transactions contemplated by this Agreement or by any other Transaction Document or the execution, delivery or performance of this Agreement or any other Transaction Document, (b) the extensions of credit under this Agreement or the actual or proposed use by the Borrower of any of the extensions of credit under this Agreement or the grant to the Agent or the Collateral Agent for the benefit of, or to any of, the Secured Parties of any Lien on the Collateral or in any other Property of the Borrower or any other Person or any membership, partnership or equity interest in the Borrower or any other Person and (c) the exercise by the Agent or the Collateral Agent (or the other Secured Parties) of their rights and remedies (including foreclosure) under any Security Document (but excluding, as to any Indemnitee, any Excluded Taxes, any such losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements incurred solely by reason of the gross negligence or willful misconduct of such Indemnitee as finally determined by a court of competent jurisdiction or attributable to actions or events occurring after the Borrower is divested of the applicable Collateral).  Without limiting the generality of the foregoing, the Borrower hereby agrees to indemnify each Indemnitee from, and shall hold each Indemnitee harmless against, any losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements described in the preceding sentence (including any Lien filed against the Project by any Government Authority but excluding, as provided in the preceding sentence, any such losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements incurred directly and primarily by reason of the gross negligence

or willful misconduct of such Indemnitee as finally determined by a court of competent jurisdiction) (collectively, "**Losses**") arising under any Environmental Law including any Losses arising as a result of the past, present or future operations of the Borrower or any predecessors to Borrower, or the past, present or future condition of the Project, or any Release, threatened Release or Use of any Hazardous Materials with respect to the Project (including any such Release, threatened Release or Use which occurs during any period when such Indemnitee shall be in possession of any such site or facility following the exercise by the Agent or any other Secured Party of any of its rights and remedies under this Agreement or under any Financing Document or any other Transaction Document where such Release, threatened Release or Use commenced or occurred prior to such period)*; provided,* that the Borrower shall have no such obligation to indemnify any Indemnitee to the extent that any such Release or Use is caused by such Indemnitee's gross negligence or willful misconduct as determined by a final non-appealable judgment.

12.04   <u>Amendments; Etc.</u>   Except as otherwise expressly provided in this Agreement, any provision of this Agreement may be amended or modified only by an instrument in writing signed by each of the Obligors, the Agent and the Supermajority Lenders, or by each of the Obligors and the Agent with the consent of the Supermajority Lenders, and any provision of this Agreement may be waived by the Supermajority Lenders or by the Agent acting with the consent of the Supermajority Lenders; *provided*, that (a) no amendment, modification or waiver shall, unless by an instrument signed by all of the Lenders or by the Agent acting with the consent of all of the Lenders (i) increase or extend the term, or extend the time or waive any requirement for the termination of the Loan Incurred Amounts, (ii) extend the date fixed for the payment of principal of or interest on any Loan or any fee under this Agreement, (iii) reduce the amount of any such payment of principal, (iv) reduce the rate at which interest is payable on any such amount or any fee is payable under this Agreement, (v) alter the rights or obligations of the Borrower to prepay Loans, (vi) alter the terms of this <u>Section 12.04</u> or (vii) amend the definition of the term "Supermajority Lenders", "Majority Lenders" or modify in any other manner the number or percentage of the Lenders required to give any consent or make any determinations or waive any rights under this Agreement or to modify any provision of this Agreement, (b) any amendment, modification, waiver or supplement of Article X shall require the consent of the Agent and, only to the extent <u>Section 10.05</u> or <u>Section 10.06</u> would be amended, modified or supplemented as a result thereof, the Collateral Agent and (c) any amendment of the definition of the term "Permitted Swap Provider", "Commodity Hedging Provider" or "Secured Party" shall require the consent of each Permitted Swap Provider and Commodity Hedging Provider that is a Lender hereunder.

Anything in this Agreement to the contrary notwithstanding, if at any time when the conditions precedent set forth in <u>Article VI</u> to any extension of credit under this Agreement are, in the opinion of the Supermajority Lenders, satisfied, any Lender that fails to fulfill its obligations to make such extension of credit, shall, for so long as such failure shall continue (unless the Supermajority Lenders, determined as if such Lender were not a "Lender" under this Agreement, shall otherwise consent in writing) be deemed for all purposes relating to amendments, modifications, waivers or consents under this Agreement (including under this <u>Section 12.04</u> and under <u>Section 10.09</u>) and any other Financing

Document to have no Loans or Loan Incurred Amounts, shall not be treated as a "Lender" under this Agreement when performing the computation of Supermajority Lenders, Majority Lenders or each Lender, and shall have no rights under the preceding paragraph of this Section 12.04; *provided*, that any action taken by the other Lenders with respect to the matters referred to in clause (a) of the preceding paragraph shall not be effective as against such Lender.

12.05   Successors and Assigns.   This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and permitted assigns.

12.06   Assignments and Participations.

(a)      No Obligor may assign its rights or obligations under this Agreement or under the Notes without the prior consent of all of the Lenders and the Agent.

(b)      Subject to Section 2.06, each Lender, other than an Unsigned Lender, may assign any of its Loans, its Notes and its Loan Incurred Amounts (i) during the continuance of an Event of Default, with the consent of the Agent (not to be unreasonably withheld or delayed) and (ii) at any time not otherwise included in clause (i), with the consent of the Agent (not to be unreasonably withheld or delayed) and, at any time prior to the occurrence and continuation of an Event of Default, the consent of the Borrower (not to be unreasonably withheld or delayed); *provided*, that in each case, (A) no such consent by the Agent shall be required in the case of any assignment to another Lender so long as such assignment is not expected to result in increased costs to the Borrower under Section 5.02, (B) any such partial assignment shall be in an amount at least equal to $[5,000,000][22] (taking into account such Lender's pro rata assignment of all of its Loans and Loan Incurred Amounts), or such other amount determined by the Agent, and (C) each assignment by a Lender of its Loans, Note or Loan Incurred Amount shall be made in such a manner so that the same portion of its Loans, Note or Loan Incurred Amount is assigned to the respective assignee.   Upon execution and delivery by the assignee to the Borrower and the Agent of an assignment and acceptance substantially in the form of the attached Exhibit M, and upon consent to such assignment and acceptance by the Agent and the Borrower, to the extent required above, the assignee shall have, to the extent of such assignment (unless otherwise provided in such assignment with the consent of the Borrower and the Agent), the obligations, rights and benefits of a Lender under this Agreement holding the Loan Incurred Amount and Loans (or portions thereof) assigned to it (in addition to the Loan Incurred Amount and Loans, if any, previously held by such assignee) and the assigning Lender shall, to the extent of such assignment, be released from its Loan Incurred Amount (or portion thereof) so assigned.   Upon each such assignment (other than such an assignment by WestLB) the assigning Lender shall pay the Agent an assignment fee of $5,000.   In furtherance of the foregoing, on the date of any such assignment pursuant to this Section 12.06(b), the

---

[22]      To be confirmed.

Borrower shall deliver to the assigning Lender and the assignee Lender, in exchange for the Notes previously delivered by the Borrower to the assigning Lender, appropriately completed Notes, dated the effective date of such assignment, payable to such assigning Lender and to such assignee Lender, in an aggregate amount equal to their respective Loans and Loan Incurred Amounts, after giving effect to such assignment, and otherwise duly completed.

(c)      A Lender, other than an Unsigned Lender, without the consent of the Borrower or the Agent, may sell or agree to sell to one or more other Persons a participation in all or any part of any Loan held by it, or in its Loan Incurred Amounts (provided that partial participations shall be in an amount at least equal to $[5,000,000][23] (taking into account such Lender's pro rata participation of all of its Loans and Loan Incurred Amounts), or such other amount determined by the Agent, in which event each purchaser of a participation (a "**Participant**") shall have the rights, benefits and obligations of the provisions of Section 5.02 (except that any such Participant shall be entitled only to the extent that the Lender from which such Participant acquired its participation is entitled, and such Lender makes such claim on its own behalf because it would have otherwise incurred the same costs) with respect to its participation in such Loans and Loan Incurred Amounts (and the Borrower shall be directly obligated to such Participant under such provisions) as if such Participant were a "Lender" for purposes of such Section, but, except as otherwise provided in Section 4.07(c), shall not have any other rights or benefits under this Agreement or any Note or any other Financing Document (the Participant's rights against such Lender in respect of such participation to be those set forth in the agreements executed by such Lender in favor of the Participant).  All amounts payable by the Borrower to any Lender under Article V in respect of Loans held by it, and its Loan Incurred Amounts, shall be determined as if such Lender had not sold or agreed to sell any participations in such Loans and Loan Incurred Amounts, and as if such Lender were funding each of such Loan and Loan Incurred Amounts in the same way that it is funding the portion of such Loan and Loan Incurred Amounts in which no participations have been sold.  In no event shall a Lender that sells a participation agree with the Participant to take or refrain from taking any action under this Agreement or under any other Financing Document except that such Lender may agree with the Participant that it will not, without the consent of the Participant, agree to (i) increase or extend the term, or extend the time or waive any requirement for the reduction or termination, of such Lender's Loan Incurred Amount, (ii) extend the date fixed for the payment of principal of or interest on the related Loan or Loans, or any portion of any fee payable to the Participant, (iii) reduce the amount of any such payment of principal, (iv) reduce the rate at which interest is payable on any amount under this Agreement, or reduce any fee or other amount payable to the Participant to a level below the rate at which the Participant is entitled to receive such interest or fee, (v) alter the rights or obligations of the Borrower to prepay the related Loans or (vi) consent to any modification or waiver of this Agreement or of any

---

[23]      To be confirmed.

Security Document to the extent that such waiver or modification requires the consent of each Lender under Section 10.09.

(d)     Anything in this Section 12.06 to the contrary notwithstanding, any Lender may assign or pledge all or any portion of its rights under this Agreement to secure any obligations of such Lender, including any such pledge or assignment to any federal reserve lender or any assignment to a special purpose trust or other entity for purposes of securitization of such Lender's loans.  No such assignment shall release the assigning Lender from its obligations hereunder.

(e)     A Lender may furnish any information concerning any Obligor in the possession of such Lender from time to time to assignees and participants (including prospective assignees and participants), subject, however, to the provisions of Section 12.09(b).

(f)     In connection with any assignment or sale of a participation pursuant to this Article XII, such assignee or Participant shall comply with Section 5.03(e).

(g)     Anything in this Section 12.06 to the contrary notwithstanding, no Lender may assign or participate any interest in any Loan held by it to the Borrower or any of its Affiliates without the prior consent of each Lender.

12.07     SUBMISSION TO JURISDICTION; WAIVERS.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT AND ANY ACTION FOR ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HERETO HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS AND APPELLATE COURTS FROM ANY THEREOF.  EACH OF THE PARTIES HERETO IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE PARTIES HERETO AT ITS ADDRESS REFERRED TO IN THIS AGREEMENT OR THE COLLATERAL AGENCY AGREEMENT.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY DO SO UNDER APPLICABLE LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT BROUGHT IN THE COURTS REFERRED TO ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

NOTHING HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED IN ANY OTHER JURISDICTION.

12.08 <u>Marshalling; Recapture</u>.  None of the Agent or any Lender shall be under any obligation to marshal any assets in favor of any Obligor or any other party or against or in payment of any or all of the Secured Obligations.  To the extent any Lender receives any payment by or on behalf of the Borrower, all or a portion of which payment is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to the Borrower, any Borrower Subsidiary or its estate, trustee, receiver, custodian or any other party under any bankruptcy or insolvency law, state or federal law, common law or equitable cause, then to the extent of such payment or repayment, the obligation or part thereof which has been paid, reduced or satisfied by the amount so repaid shall be reinstated by the amount so repaid and shall be included within the liabilities of the Borrower to such Lender as of the date such initial payment, reduction or satisfaction occurred.

12.09 <u>Treatment of Certain Information; Confidentiality</u>.

(a)    Each Obligor acknowledges that (i) from time to time financial advisory, investment banking and other services may be offered or provided to it (in connection with this Agreement or otherwise) by each Lender or by one or more subsidiaries or affiliates of such Lender and (ii) information delivered to each Lender by the Borrower may be provided to each such subsidiary and affiliate, it being understood that any such subsidiary or affiliate receiving such information shall be bound by the provisions of <u>Section 12.09(b)</u> as if it were a Lender under this Agreement.

(b)    Each of the Lenders hereby agrees (on behalf of itself and each of its affiliates, directors, officers, employees and representatives) to keep confidential, in accordance with its customary procedures for handling confidential information of this nature and in accordance with safe and sound banking practices, any non-public information supplied to it by any Obligor pursuant to this Agreement that is identified by any Obligor as being confidential at the time the same is delivered to such Lender or the Agent; *provided*, that nothing in this Agreement shall limit the disclosure of any such information (i) to the extent required by any Government Rule or judicial process, (ii) to counsel for any of the Lenders or the Agent, so long as counsel to such parties agrees to maintain the confidentiality of the information as provided in this <u>Section 12.09(b)</u>, (iii) to bank examiners, auditors or accountants, (iv) to the Agent or any other Lender (or any subsidiary or affiliate of any Lender referred to in <u>Section 12.09(a)</u>), (v) after notice to any Obligor (to the extent such prior notice is legally permitted), in connection with any litigation to which any one or more of the Lenders or the Agent is a party and pursuant to which such Lender or the Agent has been compelled or required to disclose such information in the reasonable opinion of counsel to such Lender or the Agent, (vi) to experts engaged by the Agent or any Lender in connection with the Agreement and the transactions contemplated by this Agreement and the other Financing Documents, so long as such parties agree to maintain the confidentiality of the

information as provided in this Section 12.09(b), (vii) to the extent that such information is required to be disclosed to a Government Authority in connection with a tax audit or dispute, (viii) in connection with any Default and any enforcement or collection proceedings resulting from such Default or in connection with the negotiation of any restructuring or "work-out" (whether or not consummated) of the obligations of any Obligor under this Agreement or the obligations of any Project Party under any other Project Document or (ix) to any assignee or participant (or prospective assignee or participant) so long as such assignee or participant (or prospective assignee or participant) first executes and delivers to the respective Lender a Confidentiality Agreement substantially in the form of Exhibit N.  In no event shall any Lender or the Agent be obligated or required to return any materials furnished by any Obligor; *provided,* that any confidential information retained by such Lender or the Agent shall continue to be subject to the provisions of this Section 12.09(b).   The obligations of each Lender under this Section 12.09 shall supersede and replace the obligations of such Lender under any confidentiality letter, or other confidentiality obligation, in respect of this financing effective prior to the date of the execution and delivery of this Agreement.

12.10   Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 10 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

12.11   Limitation of Liability.  Notwithstanding any other provision of this Agreement or of any of the other Financing Documents, there shall be no recourse against any Affiliates of the Credit Parties or any of their respective stockholders, partners, officers, directors, employees or agents (collectively, the "**Nonrecourse Persons**"), for any liability to the Lenders arising in connection with any breach or default under this Agreement, and the Lenders shall look solely to the Credit Parties and the Collateral in exercising the Lenders' rights and remedies and enforcing the obligations of the other parties under and in connection with the Financing Documents; *provided*, that (a) the foregoing provisions of this Section 12.11 shall not constitute a waiver, release or discharge of any of the Indebtedness or Secured Obligations under, or any terms, covenants, conditions or provisions of, this Agreement, the Notes or any other Financing Document, and the same shall continue until fully paid, discharged, observed or performed, (b) the foregoing provisions of this Section 12.11 shall not limit or restrict the right of any Secured Party to name the Borrower or any other Person as defendant in any action or suit for a judicial

foreclosure or for the exercise of any other remedy under or with respect to this Agreement, any of the Security Documents or any other Financing Document, or for injunction or specific performance, so long as (subject, however, to the last sentence of this Section 12.11), no judgment in the nature of a deficiency judgment shall be enforced against any Nonrecourse Person out of any Property other than the Property of the Borrower or the Collateral, (c) the foregoing provisions of this Section 12.11 shall not in any way limit, reduce, restrict or otherwise affect any right, power, privilege or remedy of the Secured Parties (or any assignee or beneficiary thereof or successor thereto) with respect to, and each and every Person (including each and every Nonrecourse Person) shall remain fully liable to the extent that such Person would otherwise be liable for its own actions with respect to, any fraud, gross negligence or willful misrepresentation, or misappropriation of Project Revenues or any other earnings, revenues, rents, issues, profits or proceeds from or of any Credit Party, the Projects or the Collateral that should or would have been paid as provided in the Financing Documents or paid or delivered to the Agent (or any assignee or beneficiary thereof or successor thereto) for any payment required under this Agreement or any other Financing Document and (d) nothing contained herein shall limit the liability of: (i) any Person who is a party to any Transaction Document or (ii) any Person rendering a legal opinion pursuant to Section 6.01(w) or otherwise, in each case under this clause (d) relating solely to such liability of such Person as may arise under such referenced agreement, instrument or opinion. The limitations on recourse set forth in this Section 12.11 shall survive the termination of this Agreement and the full payment and performance of the Secured Obligations.

12.12 Survival. The obligations of the Borrower under Sections 5.02, 5.06, 12.03, 12.18, 12.19, and 12.20 and the obligations of the Lenders under Section 10.05 and 12.09 shall survive after the Termination Date. In addition, each representation and warranty made, or deemed to be made by a notice of any extension of credit, in this Agreement or pursuant to this Agreement shall survive the making of such representation and warranty, and no Lender shall be deemed to have waived, by reason of making any extension of credit under this Agreement, any Default which may arise by reason of such representation or warranty proving to have been false or misleading, notwithstanding that such Lender or the Agent may have had notice or knowledge or reason to believe that such representation or warranty was false or misleading at the time such extension of credit was made.

12.13 Captions. The table of contents and captions and section headings appearing in this Agreement are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

12.14 Counterparts; Integration; Effectiveness. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and any party to this Agreement may execute this Agreement by signing any such counterpart; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signatures are physically attached to the same counterpart. This Agreement and the other Financing Documents constitute the entire agreement and understanding among the parties to this Agreement with

respect to the matters covered by this Agreement and the other Financing Documents and supersede any and all prior agreements and understandings, written or oral, with respect to such matters.

12.15    Reinstatement.  The obligations of the Borrower under this Agreement shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower in respect of the Secured Obligations is rescinded or must be otherwise restored by any holder of any of the Secured Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and the Borrower agrees that it will indemnify each Secured Party on demand for all costs and expenses (including fees of counsel) incurred by such Secured Party in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

12.16    Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions of this Agreement; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

12.17    Remedies.  The Borrower agrees that, as between the Borrower and the Lenders, the obligations of the Borrower under this Agreement may be declared to be forthwith due and payable as provided in Article IX (and shall be deemed to have become automatically due and payable in the circumstances provided in Article IX), and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations shall forthwith become due and payable by the Borrower.

12.18    NO THIRD PARTY BENEFICIARIES.   THE AGREEMENT OF THE LENDERS TO MAKE THE LOANS TO THE BORROWER, ON THE TERMS AND CONDITIONS SET FORTH IN THIS AGREEMENT, IS SOLELY FOR THE BENEFIT OF THE BORROWER, THE BORROWER SUBSIDIARIES, THE PLEDGOR, THE AGENT, SECURITIES INTERMEDIARY AND THE LENDERS, AND NO OTHER PERSON (INCLUDING ANY OTHER PROJECT PARTY, CONTRACTOR, SUBCONTRACTOR, SUPPLIER, WORKMAN, CARRIER, WAREHOUSEMAN OR MATERIALMAN FURNISHING LABOR, SUPPLIES, GOODS OR SERVICES TO OR FOR THE BENEFIT OF THE PROJECTS) SHALL HAVE ANY RIGHTS UNDER THIS AGREEMENT OR UNDER ANY OTHER TRANSACTION DOCUMENT AS AGAINST THE AGENT OR ANY LENDER OR WITH RESPECT TO ANY EXTENSION OF CREDIT CONTEMPLATED BY THIS AGREEMENT.

12.19    SPECIAL EXCULPATION.   TO THE EXTENT PERMITTED BY APPLICABLE GOVERNMENT RULE, NO CLAIM MAY BE MADE BY ANY PARTY HERETO

AGAINST ANY OTHER PARTY HERETO OR ANY OF THEIR RESPECTIVE AFFILIATES, DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS OR AGENTS FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES IN RESPECT OF ANY CLAIM FOR BREACH OF CONTRACT OR ANY OTHER THEORY OF LIABILITY ARISING OUT OF OR RELATING TO, OR ANY ACT, OMISSION OR EVENT OCCURRING IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS (OTHER THAN THE RIGHTS OF THE LENDERS EXPRESSLY SET FORTH IN THIS AGREEMENT AND THE OTHER FINANCING DOCUMENTS), AND EACH PARTY HEREBY WAIVES, RELEASES AND AGREES NOT TO SUE UPON ANY CLAIM FOR ANY SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR.

12.20    Execution of Lender Signature Pages.   Upon satisfaction of the conditions precedent set forth in Section 6.01, this Agreement shall constitute a legal, valid and binding obligation of each Lender enforceable against such Lender in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing.  Notwithstanding the prior sentence or any provision in this Agreement to the contrary, the Agent shall not make any payments to any Lender under this Agreement, whether of principal, interest or otherwise, and shall hold all such funds on behalf of each Lender until such time as the Lender has delivered to the Agent a signature page to this Agreement duly executed by an authorized officer of such Lender.

12.21    Governing Law.   This Agreement and the Notes shall be governed by, and construed in accordance with, the laws of the state of New York excluding choice of law principles of such laws which would require the application of the laws of a jurisdiction other than the state of New York (other than Section 5 1401 of the New York General Obligations Law).

12.22    Waiver of Jury Trial.   Each of the Credit Parties, the Agent and the Lenders hereby waive, to the fullest extent permitted by law, any and all right to trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated by this Agreement and the other Financing Documents.

12.23    Jointly Drafted.   This Agreement and each of the Financing Documents shall be deemed to have been jointly drafted, and no provision shall be interpreted or construed for or against any party hereto because such party purportedly prepared or requested such provision, any other provision, or this Agreement or Financing Document as a whole.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be duly executed as of the day and year first above written.

BORROWER:

WHITE ENERGY HOLDING COMPANY, LLC

By:_____
    Name:
    Title:


Address for Notices:

White Energy Holding Company, LLC
5005 LBJ Freeway, Suite 1400
Dallas, Texas 75244
Attention:  John W. Castle

PLEDGOR:

WHITE ENERGY, INC.


By:_____
    Name:
    Title:


Address for Notices:

White Energy, Inc.
5005 LBJ Freeway, Suite 1400
Dallas, Texas 75244
Attention:  John W. Castle

BORROWER SUBSIDIARIES:

WE HEREFORD, LLC

By:  WHITE ENERGY HOLDING COMPANY, LLC,
   its sole member

By:_____
  Name:
  Title:


Address for Notices:

WE Hereford, LLC
5005 LBJ Freeway, Suite 1400
Dallas, Texas 75244
Attention:  John W. Castle

PLAINVIEW BIOENERGY, LLC

By:  WHITE ENERGY HOLDING COMPANY, LLC,
       its sole member

By:_____
    Name:
    Title:


Address for Notices:

Plainview BioEnergy, LLC
5005 LBJ Freeway, Suite 1400
Dallas, Texas 75244
Attention:  John W. Castle

WHITE ENERGY TECHNOLOGIES, INC.

By:_____

    Name:

    Title:


Address for Notices:

White Energy Technologies, Inc.

5005 LBJ Freeway, Suite 1400

Dallas, Texas 75244

Attention:  John W. Castle

U.S. ENERGY PARTNERS, LLC

By:  WHITE ENERGY HOLDING COMPANY, LLC,
       its sole member

By: _____
    Name:
    Title:


Address for Notices:

U.S. Energy Partners, LLC

5005 LBJ Freeway, Suite 1400

Dallas, Texas 75244

Attention:  John W. Castle

LENDERS:

SIGNATURE BLOCKS FOR LENDERS TO BE INSERTED

<u>THE AGENT</u>:

WESTLB AG, NEW YORK BRANCH,
    as the Agent

By: _____
    Name:
    Title:


By: _____
    Name:
    Title:


Address for Notices:

WestLB AG, New York Branch
1211 Avenue of the Americas
New York, NY 10036
Attention:  Duncan Robertson
Executive Director, Credit Risk Management/Americas

with a copy to:

WestLB AG, Houston Representative Office
5555 San Felipe, 20th Floor
Houston, TX 77056
Attention:  Robert Vincent