# EXHIBIT C

COLLATERAL AGENCY AND SECURITY DEPOSIT AGREEMENT

Dated as of [          ], 2010

by and among

WHITE ENERGY HOLDING COMPANY, LLC,
as Borrower

BORROWER SUBSIDIARIES
PARTY TO THIS AGREEMENT
FROM TIME TO TIME,

WESTLB AG, NEW YORK BRANCH,
as the Senior Exit Facility Agent

WESTLB AG, NEW YORK BRANCH,
as the Subordinated Term Loan Agent

THE BANK OF NEW YORK,
as Collateral Agent

and

THE BANK OF NEW YORK,
as Depositary

ARTICLE I DEFINITIONS; RULES OF INTERPRETATION ....................................................... 3
    1.01      Definitions ................................................................................................. 3
    1.02      Rules of Interpretation .............................................................................. 9
    1.03      Uniform Commercial Code Definitions ................................................. 10

ARTICLE II APPOINTMENT OF DEPOSITARY; ESTABLISHMENT OF
            ACCOUNTS ............................................................................................. 10
    2.01      Acceptance of Appointment of Depositary ............................................ 10
    2.02      Establishment of Accounts ..................................................................... 10
    2.03      Security Interests .................................................................................... 12
    2.04      Accounts Maintained as UCC "Securities Accounts." ........................... 14
    2.05      Jurisdiction of Depositary ...................................................................... 16
    2.06      Degree of Care; Liens ............................................................................ 16
    2.07      Subordination of Lien: Waiver of Set-Off .............................................. 16
    2.08      No Other Agreements ............................................................................. 17
    2.09      Notice of Adverse Claims ...................................................................... 17
    2.10      Rights and Powers of the Collateral Agent ............................................ 17
    2.11      Termination ............................................................................................ 17

ARTICLE III THE ACCOUNTS .............................................................................................. 18
    3.01      Hereford Revenue Account ..................................................................... 18
    3.02      USEP Revenue Account ......................................................................... 19
    3.03      Plainview Revenue Account ................................................................... 20
    3.04      Revenue Account .................................................................................... 21
    3.05      Operating Account .................................................................................. 25
    3.06      Interest Payment Accounts ..................................................................... 25
    3.07      Principal Payment Accounts ................................................................... 26
    3.08      Subordinated Cash Sweep Reserve Account .......................................... 27
    3.09      Shareholder Distribution Account .......................................................... 27
    3.10      HerefordCo Loss Proceeds Account ....................................................... 27
    3.11      USEP Loss Proceeds Account ................................................................ 28
    3.12      PlainviewCo Loss Proceeds Account ..................................................... 29
    3.13      Debt Service Reserve Account ............................................................... 30
    3.14      Tax Payment Account ............................................................................. 30
    3.15      Invasion of Accounts .............................................................................. 31
    3.16      Investment of Borrower Accounts .......................................................... 32
    3.17      Investment of Hereford Accounts ........................................................... 33
    3.18      Investment of USEP Accounts ............................................................... 34
    3.19      Investment of Plainview Accounts ......................................................... 35
    3.20      Disposition of Borrower Accounts Upon Termination Date ................... 36
    3.21      Disposition of Hereford Accounts Upon Termination Date ................... 36
    3.22      Disposition of USEP Accounts Upon Termination Date ........................ 36

3.23     Disposition of Plainview Accounts Upon Termination Date ........................... 37

3.24     Borrower Account Balance Statements ............................................................. 37

3.25     Hereford Account Balance Statements .............................................................. 37

3.26     USEP Account Balance Statements .................................................................. 37

3.27     Plainview Account Balance Statements ............................................................ 38

3.28     Events of Default ............................................................................................... 38

3.29     Transfers from Accounts ................................................................................... 39

ARTICLE IV DEPOSITARY ............................................................................................... 39

4.01     Appointment of Depositary, Powers and Immunities ...................................... 39

4.02     Reliance by Depositary ..................................................................................... 41

4.03     Court Orders ...................................................................................................... 41

4.04     Resignation or Removal .................................................................................... 42

4.05     Exculpatory Provisions ..................................................................................... 43

ARTICLE V COLLATERAL AGENT ................................................................................. 43

5.01     Appointment; Powers and Immunities ............................................................. 43

5.02     Rights of Collateral Agent ................................................................................ 44

5.03     Remedies; Application of Proceeds .................................................................. 46

5.04     Limits on Separate Enforcement Actions ........................................................ 48

5.05     Indebtedness Balances ...................................................................................... 48

5.06     Release of Collateral ......................................................................................... 48

5.07     Further Assurances ............................................................................................ 49

ARTICLE VI RESIGNATION OR REMOVAL OF THE COLLATERAL AGENT ................ 49

6.01     Resignation; Removal ....................................................................................... 49

6.02     Substitute Collateral Agent ............................................................................... 50

ARTICLE VII EXPENSES; INDEMNIFICATION; FEES ................................................. 50

7.01     Compensation and Expenses ............................................................................ 50

7.02     Indemnification ................................................................................................. 51

7.03     Prompt Payment ................................................................................................ 51

ARTICLE VIII MISCELLANEOUS .................................................................................... 52

8.01     Amendments; Etc .............................................................................................. 52

8.02     Lien Priority.  The Senior Exit Facility Priority with respect to Liens
granted to and held by the Collateral Agent is as set forth in the
Subordination Agreement. ................................................................................ 52

8.03     Addresses for Notices ....................................................................................... 52

8.04     Governing Law; Jurisdiction ............................................................................ 53

8.05     Headings ............................................................................................................ 55

8.06     Limited Third Party Beneficiaries .................................................................... 55

8.07     No Waiver ......................................................................................................... 55

8.08     Severability ....................................................................................................... 55

8.09     Successors and Assigns ..................................................................................... 55

8.10     Execution in Counterparts ................................................................................ 56

8.11     Force Majeure ................................................................................................... 56

8.12     Consequential Damages ...................................................................................... 56

SCHEDULES

Schedule I:     Account Numbers

EXHIBITS

Exhibit A:     FORM OF ACCESSION AGREEMENT
Exhibit B:     FORM OF OFFICER'S CERTIFICATE
Exhibit C:     FORM OF WITHDRAWAL CERTIFICATE

This AMENDED AND RESTATED COLLATERAL AGENCY AND SECURITY DEPOSIT AGREEMENT, dated as of [          ], 2010 (this "**Agreement**"), is entered into by and among WHITE ENERGY HOLDING COMPANY, LLC a limited liability company formed and existing under the laws the State of Delaware ("**Borrower**"), each of the subsidiaries of the Borrower that is a signatory hereto and identified as a "**Borrower Subsidiary**" on the signature pages hereto (individually, a "**Borrower Subsidiary**" and, collectively, the "**Borrower Subsidiaries**"), WESTLB AG, NEW YORK BRANCH, as administrative agent for the Senior Exit Facility Lenders (in such capacity, the "**Senior Exit Facility Agent**"), WESTLB AG, NEW YORK BRANCH, as administrative agent for the Subordinated Term Loan Lenders (in such capacity, the "**Subordinated Term Loan Agent**" and, together with the Senior Exit Facility Agent, the "**Agent**"), THE BANK OF NEW YORK-MELLON, a New York banking corporation, in its capacity as collateral agent for the Senior Exit Facility Lenders, the Senior Exit Facility Agent, the Subordinated Term Loan Lenders and the Subordinated Term Loan Agent (in such capacity, the "**Collateral Agent**") and THE BANK OF NEW YORK, in its capacity as depositary agent, bank and securities intermediary (in such capacity, the "**Depositary**"). Capitalized terms used in this Agreement have the meanings assigned to them in <u>Section 1.01</u> or <u>Section 1.03</u> below.

RECITALS

A. The Borrower is a party to that certain Senior Secured Exit Financing Facility Agreement, dated as of even date herewith (as amended, restated, supplemented or otherwise modified in accordance with its terms, the "**Senior Exit Facility Agreement**"), among the Borrowers, the other Borrower Subsidiaries from time to time party thereto, the lenders from time to time party thereto (the "**Senior Exit Facility Lenders**") and the Senior Exit Facility Agent, pursuant to which, among other things, the Senior Exit Facility Lenders have agreed, subject to the terms and conditions set forth in the Senior Exit Facility Agreement, to make certain financial accommodations to the Borrower;

B. The Borrower Subsidiaries have agreed to guaranty the Senior Secured Obligations (as hereinafter defined) pursuant to, and subject to the limitations described in the provisions of Article XI of the Senior Exit Facility Agreement (the "**Senior Unconditional Guaranty**").

C. To secure the Senior Secured Obligations, including all obligations under such Unconditional Guaranty, the Obligors have entered into, and may hereafter enter into, Security Documents (as defined in the Senior Exit Facility Agreement) (the "**Senior Security Documents**") providing for the grant of Liens in the Collateral (as hereinafter defined) in favor of the Collateral Agent, for the benefit of the Senior Exit Facility Creditors.

D. The Borrower is also party to that certain Senior Subordinated Term Facility Agreement, dated as of even date herewith (as amended, restated, supplemented or otherwise modified in accordance with its terms and the terms hereof, the "**Subordinated Term Loan Agreement**"), among the Borrowers, the Borrower Subsidiaries from time to time party thereto, the lenders from time to time party

thereto (the "**Subordinated Term Loan Lenders**") and the Subordinated Term Loan Agent, pursuant to which, among other things, the Subordinated Term Loan Lenders have agreed, subject to the terms and conditions set forth in the Subordinated Term Loan Agreement, to make certain financial accommodations to Borrowers.

E.     The Borrower Subsidiaries have agreed to guaranty the Subordinated Secured Obligations (as hereinafter defined) pursuant to, and subject to the limitations described in the provisions of Article XI of the Subordinated Term Loan Agreement (the "**Subordinated Unconditional Guaranty**").

F.     To secure the Subordinated Secured Obligations, including all obligations under the Subordinated Unconditional Guaranty, the Obligors have entered into, and may hereafter enter into, Security Documents (as defined in the Subordinated Term Loan Agreement) ("**Subordinated Security Documents**") providing for the grant of Liens (ranking second in priority to the Senior Secured Obligations) in the Collateral in favor of the Collateral Agent, for the benefit of the Subordinated Term Loan Creditors.

G.     The Senior Exit Facility Agent, the Subordinated Term Loan Agent and the Collateral Agent have entered into that certain Subordination Agreement, dated as of even date herewith (as amended, restated, supplemented or otherwise modified in accordance with its terms, the "**Subordination Agreement**") setting forth the seniority in payment and rights of the Senior Secured Obligations over the Subordinated Secured Obligations and the Liens granted with respect thereto (the "**Senior Exit Facility Priority**").

H.     As a condition precedent to the extension of loans pursuant to the Senior Exit Facility Agreement and the incurrence of loans under Subordinated Term Loan Agreement, the Borrower, the Borrower Subsidiaries, the Senior Exit Facility Agent, the Subordinated Term Loan Agent, the Collateral Agent and the Depositary are required to enter into this Agreement, in order to appoint The Bank of New York-Melon as Collateral Agent for the Senior Exit Facility Lenders, the Subordinated Term Loan Lenders, the other Senior Exit Facility Secured Parties and the other Subordinated Term Loan Secured Parties and to appoint the Depositary as the depositary to hold and administer money deposited in or credited to the accounts established pursuant to this Agreement and funded with, among other things, revenues received by the Borrower from each of the Projects.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, each of the Borrower and each Borrower Subsidiary hereby agrees with the Collateral Agent and the Depositary (each for the benefit of the Senior Exit Facility Secured Parties and Subordinated Term Loan Secured Parties) as follows:

# ARTICLE I

# DEFINITIONS; RULES OF INTERPRETATION

1.01     Definitions.  Unless otherwise defined herein, all capitalized terms used in this Agreement have the respective meanings assigned to such terms in Section 1.01 of the Senior Exit Facility Agreement, (or, after the occurrence of the Termination Date under the Senior Exit Facility Agreement, the Subordinated Term Loan Agreement).  In addition, the terms below shall have the following meanings in this Agreement:

"**Acceptable Credit Support**" means an irrevocable letter of credit issued by a bank or other financial institution with a rating of at least [A3] by Moody's or at least [A-] by S&P and acceptable to the Borrower.  The Borrower may not be the account party under any such letter of credit.

["**Accession Agreement**" means an accession agreement substantially in the form attached hereto as Exhibit A.]

"**Accounts**" means, individually, each of the Borrower Accounts, the Hereford Accounts, the USEP Accounts and the Plainview Accounts, and collectively, all of such Accounts.

"**Account Control Agreement**" means each such control agreement entered into between the Borrower, the Collateral Agent and each bank acting as a "bank" (within the meaning of Section 9-102(a)(8) of the UCC) with respect to the Deposit Accounts, which agreement shall grant and perfect a Lien in the applicable Deposit Account in favor of the Collateral Agent as "deposit accounts" (as defined in Section 9-102(a)(29) of the UCC) and which agreement shall be in form and substance satisfactory to the Collateral Agent and the Agent.

"**Agent**" has the meaning set forth in the Preamble.

"**Agreement**" has the meaning set forth in the Preamble.

"**Borrower**" has the meaning set forth in the Preamble.

"**Borrower Account Collateral**" has the meaning set forth in Section 2.03(a).

"**Borrower Accounts**" has the meaning set forth in Section 2.02(a).

"**Borrower Financial Assets**" has the meaning set forth in Section 2.04.

"**Borrower Subsidiary**" has the meaning set forth in the Preamble.

"**Claims**" means any and all actions, suits, penalties, claims and demands and reasonable out-of-pocket liabilities, losses, costs and expenses (including reasonable attorney's fees and expenses) of any nature whatsoever.

"**Collateral**" means the "Collateral" under and as defined in the Senior Exit Facility Agreement and the Subordinated Term Loan Agreement, as such may be amended, modified or restated from time to time.

"**Collateral Account**" means, collectively, the Borrower Account Collateral, the Hereford Account Collateral, the USEP Account Collateral and the Plainview Account Collateral.

"**Collateral Agent**" has the meaning set forth in the Preamble.

"**Debt Service Reserve Account**" means the Account of such name established pursuant to Section 2.02(a).

"**Debt Service Reserve Requirement**" means as of any date, an amount projected by the Agent (such amount and supporting calculations advised by the Agent to the Collateral Agent and the Borrower at least five Business Days prior to such date) equal to the amount necessary to pay the forecasted Debt Service (as defined in the Subordinated Term Loan Agreement) and including the next Principal Payment Date (as defined in the Subordinated Term Loan Agreement) (assuming that no Default will occur during such period and taking into account, with respect to interest, the maximum amount of interest that could accrue during any [three] month period from the date of calculation to the Final Maturity Date (as defined in the Subordinated Term Loan Agreement)).

"**Default Notice Period**" means the period beginning on the date of the Collateral Agent's receipt of notice from the Senior Exit Facility Agent that an Event of Default under the Senior Exit Facility Agreement has occurred and is continuing (or, after the occurrence of the Termination Date under the Senior Exit Facility Agreement, a notice from the Subordinated Term Loan Agent that an Event of Default under the Subordinated Term Loan Agreement has occurred and is continuing) and ending on the date that the Collateral Agent receives notice from the Senior Exit Facility Agent (or, after the occurrence of the Termination Date under the Senior Exit Facility Agreement, Subordinated Term Loan Agent) that no Event of Default under the Senior Exit Facility Agreement or Subordinated Term Loan Agreement, as the case may be, is then continuing.

"**Deposit Accounts**" means deposit accounts of the Borrower, HerefordCo, USEP and PlainviewCo (whether separate or integrated through a zero-balance cash management account system) maintained at one or more commercial banks with offices in the States of Kansas, Texas or New York; provided, that (a) the aggregate amount on deposit in all such accounts shall not exceed at any one time an amount equal to the sum of (1) [the amount of projected Operation and Maintenance Expenses to be incurred during the then-applicable Funding Period plus (2)] the amount of funds required to meet

Operation and Maintenance Expenses that have been incurred but for which payments have not yet cleared such deposit accounts plus (3) the amount of projected Permitted Capital Expenditures to be incurred during the then-applicable Funding Period plus (4) the amount of funds required to meet Permitted Capital Expenditures that have been incurred but for which payments have not yet cleared such deposit accounts plus (5) an aggregate amount on deposit in all Deposit Accounts not otherwise described in clauses (1) through (4) of up to $[1,000,000] and (b) the Collateral Agent (for the benefit of the Secured Parties) has a perfected Lien on such accounts and the funds on deposit therein pursuant to the terms of one or more Account Control Agreements entered into by the Borrower, the Collateral Agent and such bank or banks acting as deposit banks with respect to such accounts. All amounts from time to time held in each Deposit Account shall be disbursed in accordance with the terms of this Agreement and each Account Control Agreement governing such Deposit Agreement, shall constitute the property of the Borrower and shall be (x) subject to the Lien of the Collateral Agent (for the benefit of the Secured Parties) and (y) held in the sole custody and control of the Collateral Agent for the purposes and on the terms set forth in this Agreement and all such amounts shall constitute a part of the Collateral and shall not constitute payment of any Secured Obligation or any other obligation of the Borrower, unless and until applied thereto as contemplated herein.

"**Depositary**" has the meaning set forth in the Preamble.

"**Directing Party**" means (a) the Senior Exit Facility Agent at all times until the occurrence of the Termination Date under the Senior Exit Facility Agreement, and (b) the Subordinated Term Loan Agent at all times thereafter. For the avoidance of doubt, there shall at all times be only one "Directing Party" at any time.

"**Financing Document**" means, collectively, the "Financing Documents" under and as defined in the Senior Exit Facility Agreement and the "Financing Documents" under and as defined in the Subordinated Term Loan Agreement.

"**Foreclosure Action**" means (i) any action taken by the Collateral Agent to foreclose upon, collect, or otherwise realize upon the Collateral or any portion thereof or any other enforcement or collection action with respect to the Collateral or any portion thereof, (ii) the receipt by the Collateral Agent, the Senior Exit Facility Agent or the Subordinated Term Loan Agent of any amount on account of the Secured Obligations through the exercise of any set-off, banker's lien or similar right, and/or (iii) the making of any demand, or the institution of any action, suit or proceeding, by the Collateral Agent against any of the Credit Parties with respect to the Collateral.

"**Funding Date**" means a Business Day of each month selected by the Borrower (provided no Default or Event of Default shall have occurred and be continuing) falling on or between the 1st and the 20th days of such month, or if such day is not a Business Day the next succeeding Business Day.

"**Funding Period**" means a period commencing on the applicable Funding Date and ending on the day immediately preceding the next Funding Date.

"**Hereford Account Collateral**" has the meaning set forth in Section 2.03(b).

"**Hereford Accounts**" has the meaning set forth in Section 2.02(b).

"**Hereford Financial Assets**" has the meaning set forth in Section 2.04.

"**Hereford Loss Proceeds Account**" means the Account of such name established pursuant to Section 2.02(b).

"**Hereford Revenue Account**" means the Account of such name established pursuant to Section 2.02(b).

"**HerefordCo**" means WE Hereford, LLC , a Delaware limited liability company.

"**Indemnified Person**" means each of the Depositary and the Collateral Agent, including their respective officers, directors, agents, Affiliates and employees.

"**Lenders**" means, collectively, the Senior Exit Facility Lenders and the Subordinated Term Loan Lenders.

"**New WEI**" has the meaning set forth in the Senior Exit Facility Agreement.

"**Officer's Certificate**" means an Officer's Certificate delivered by the Borrower in substantially the form attached hereto as Exhibit B.

"**Operating Account**" means the Account of such name established pursuant to Section 2.02(d).

"**Plainview Account Collateral**" has the meaning set forth in Section 2.03(d).

"**Plainview Accounts**" has the meaning set forth in Section 2.02(d).

"**Plainview Financial Assets**" has the meaning set forth in Section 2.04.

"**Plainview Loss Proceeds Account**" means the Account of such name established pursuant to Section 2.02(d).

"**Plainview Project**" means the operation of the Plainview Facility.

"**Plainview Revenue Account**" means the Account of such name established pursuant to Section 2,02(d).

"**PlainviewCo**" means Plainview Bioenergy, LLC, a Delaware limited liability company.

"**Projects**" means the Hereford Project, the USEP Project and the Plainview Project.

"**Revenue Account**" means the Account of such name established pursuant to Section 2.02(a).

"**Secured Obligations**" means, collectively, the Senior Secured Obligations and the Subordinated Secured Obligations and obligations owing to the Collateral Agent hereunder.

"**Secured Parties**" means, collectively, the Senior Exit Facility Lenders, the Senior Exit Facility Agent, the Subordinated Term Loan Lenders, the Subordinated Term Loan Agent and the Collateral Agent.

"**Security Documents**" means, collectively, the Senior Exit Security Documents and the Subordinated Term Security Documents.

"**Senior Exit Facility Agreement**" has the meaning set forth in Recital A.

"**Senior Exit Facility Lenders**" means the "Lenders" under and as defined in the Senior Exit Facility Agreement.

"**Senior Exit Facility Priority**" has the meaning set forth in Recital G.

"**Senior Exit Financing Documents**" means the "Financing Documents" under and as defined in the Senior Exit Facility Agreement.

"**Senior Exit Security Documents**" means the "Security Documents" under and as defined in the Senior Exit Facility Agreement.

"**Senior Interest Expense**" means "Interest Expense" under and as defined in the Senior Exit Facility Agreement.

"**Senior Interest Payment Date**" means an "Interest Payment Date" under and as defined in the Senior Exit Facility Agreement.

"**Senior Interest Rate Protection Agreement**" means an "Interest Rate Protection Agreement" under and as defined in the Senior Exit Facility Agreement.

"**Senior Principal Payment Account**" means the Account of such name established pursuant to Section 2.02(a).

"**Senior Secured Obligations**" means the "Secured Obligations" under and as defined in the Senior Exit Facility Agreement.

"**Shareholder Distribution Account**" means the Account of such name established pursuant to Section 2.02(a).

"**Subordinated Cash Sweep Reserve Account**" means the account of such name established pursuant to Section 2.02(a).

"**Subordinated Interest Expense**" means Interest Expense as defined in the Subordinated Term Loan Agreement.

"**Subordinated Interest Payment Date**" means the Interest Payment Date as defined in the Subordinated Term Loan Agreement.

"**Subordinated Interest Rate Protection Agreement**" means an "Interest Rate Protection Agreement" as defined in the Subordinated Term Loan Agreement.

"**Subordinated Principal Payment Account**" means the account of such name established pursuant to Section 2.02(a).

"**Subordinated Principal Payment Date**" means a "Principal Payment Date" as defined in the Subordinated Term Loan Agreement.

"**Subordinated Secured Obligations**" means the "Secured Obligations" as defined in the Subordinated Term Loan Agreement.

"**Subordinated Term Loan Agreement**" has the meaning set forth in Recital D.

"**Subordinated Term Loan Lenders**" means the "Lenders" as defined in the Term Loan Agreement.

"**Subordinated Term Financing Documents**" means the "Financing Documents" as defined in the Subordinated Term Loan Agreement.

"**Subordinated Term Security Documents**" means the "Security Documents" as defined in the Subordinated Term Loan Agreement.

"**Subordination Agreement**" has the meaning set forth in Recital G.

"**Tax Payment Account**" means the Account of such name established pursuant to Section 2.02(a).

"**USEP**" means U.S. Energy Partners, L.L.C., a limited liability company formed under the laws of the state of Kansas.

"**USEP Account Collateral**" has the meaning set forth in Section 2.03(c).

"**USEP Accounts**" has the meaning set forth in Section 2.02(c).

"**USEP Financial Assets**" has the meaning set forth in Section 2.04.

"**USEP Loss Proceeds Account**" means the Account of such name established pursuant to Section 2.02(c).

"**USEP Project**" has the meaning set forth in the Recitals.

"**USEP Revenue Account**" means the Account of such name established pursuant to Section 2.02(c).

"**Withdrawal Certificate**" means a Withdrawal Certificate delivered by the Borrower in substantially the form attached hereto as Exhibit C.

1.02    Rules of Interpretation.  For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(i)      unless otherwise expressly provided, all references in this Agreement to designated "Articles," "Sections," "Exhibits," "Schedules," "Appendices," "clauses," and other subdivisions are to the designated Articles, Sections, Exhibits, Schedules, Appendices, clauses, and other subdivisions of this Agreement;

(ii)     the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision;

(iii)    unless otherwise expressly specified, any agreement, contract or document defined or referred to herein means such agreement, contract or document as in effect as of the date hereof, as the same may thereafter be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and of this Agreement and the other Financing Documents and including any agreement, contract or document in substitution or replacement of any of the foregoing in accordance with the terms of this Agreement and the other Financing Documents;

(iv)     unless the context clearly intends to the contrary, pronouns having a masculine or feminine gender shall be deemed to include the other;

(v)     any reference to any Person shall include its successors and permitted assigns in the capacity indicated, and in the case of any Governmental Authority, any Person succeeding to its functions and capacities;

(vi)    the words "include" or "including" shall be deemed to be followed by "without limitation" or "but not limited to" whether or not they are followed by such phrases or words of like import; and

(vii)   in the event that there is a refinancing of the Senior Exit Facility Agreement or the Subordinated Term Loan Agreement, references herein to "Senior Exit Facility Agreement" or "Subordinated Term Loan Agreement" shall be deemed amended to refer to the applicable document executed in connection with such refinancing.

1.03    <u>Uniform Commercial Code Definitions</u>.  All terms defined in the UCC shall have the respective meanings given to those terms in the UCC, except where the context otherwise requires.

ARTICLE II

**APPOINTMENT OF DEPOSITARY; ESTABLISHMENT OF ACCOUNTS**

2.01    <u>Acceptance of Appointment of Depositary</u>.

(a)     The Depositary hereby agrees to act as depositary agent, as "securities intermediary" (within the meaning of Section 8-102(14) of the UCC) with respect to the Accounts and the Financial Assets credited to such Accounts, and as "bank" (within the meaning of 9-102(a) of the UCC) with respect to the Accounts and credit balances not constituting Financial Assets credited thereto and to accept all cash, payments, other amounts and Permitted Investments to be delivered to or held by the Depositary pursuant to the terms of this Agreement.  The Depositary shall hold and safeguard the Accounts during the term of this Agreement in accordance with the provisions of this Agreement.

(b)     None of the Obligors shall have any rights to withdraw or transfer funds from any of the Accounts or Deposit Accounts, as third party beneficiary or otherwise, except as permitted by this Agreement or the applicable Account Control Agreement, and to direct the investment of monies held in the Accounts as permitted by <u>Sections 3.16, 3.17, 3.18 and 3.19</u>.

2.02    <u>Establishment of Accounts</u>.

(a)     The Depositary hereby confirms that the following special, segregated accounts have been established or will be established as of the date hereof (the "**Borrower Accounts**") in the name of the Borrower, the account numbers for which are set forth in <u>Schedule I</u> hereto, which shall be maintained at all times until the termination of this Agreement:

(i)     an Account entitled "Revenue Account;"

(ii)    an Account entitled "Operating Account;"

(iii)   an Account entitled "Senior Interest Payment Account;"

(iv)    an Account entitled "Subordinated Interest Payment Account;"

(v)     an Account entitled "Senior Principal Payment Account;"

(vi)    an Account entitled "Subordinated Principal Payment Account;"

(vii)   an Account entitled "Debt Service Reserve Account;"

(viii)  an Account entitled "Tax Payment Account;"

(ix)    an Account entitled "Subordinated Cash Sweep Reserve Account"; and

(x)     an Account entitled "Shareholder Distribution Account."

All amounts from time to time held in each Borrower Account shall be disbursed in accordance with the terms hereof, shall constitute the property of the Borrower (except for any and all amounts held in (a) the Subordinated Cash Sweep Reserve Account, which shall constitute the property of the Secured Parties, and (b) the Shareholder Distribution Account, which shall constitute property of [the holders of Equity Interests of the Borrower][New WEI]) and shall be (A) subject to the Lien of the Collateral Agent (for the benefit of the Secured Parties) and (B) held in the sole custody and control of the Collateral Agent for the purposes and on the terms set forth in this Agreement and all such amounts shall constitute a part of the Collateral and shall not constitute payment of any Secured Obligation or any other obligation of the Borrower, unless and until applied thereto as contemplated hereby.

(b)     The Depositary hereby establishes the following special, segregated accounts (the "**Hereford Accounts**") in the name of HerefordCo, the account numbers for which are set forth in Schedule I hereto, which shall be maintained at all times until the termination of this Agreement:

(i)     an Account entitled "Hereford Revenue Account;" and

(ii)    an Account entitled "Hereford Loss Proceeds Account."

All amounts from time to time held in each Hereford Account shall be disbursed in accordance with the terms hereof, shall constitute the property of HerefordCo, and shall be (A) subject to the Lien of the Collateral Agent (for the benefit of the Secured Parties) and (B) held in the sole custody and control of the Collateral Agent for the purposes and on the terms set forth in this Agreement and all

such amounts shall constitute a part of the Collateral and shall not constitute payment of any Secured Obligation or any other obligation of HerefordCo unless and until applied thereto as contemplated hereby.

(c)     The Depositary hereby establishes the following special, segregated accounts (the "**USEP Accounts**") in the name of USEP, the account numbers for which are set forth in <u>Schedule I</u> hereto, which shall be maintained at all times until the termination of this Agreement:

(i)     an Account entitled "USEP Revenue Account;" and

(ii)    an Account entitled "USEP Loss Proceeds Account."

All amounts from time to time held in each USEP Account shall be disbursed in accordance with the terms hereof, shall constitute the property of USEP, and shall be (A) subject to the Lien of the Collateral Agent (for the benefit of the Secured Parties) and (B) held in the sole custody and control of the Collateral Agent for the purposes and on the terms set forth in this Agreement and all such amounts shall constitute a part of the Collateral and shall not constitute payment of any Secured Obligation or any other obligation of USEP unless and until applied thereto as contemplated hereby.

(d)     The Depositary hereby establishes the following special, segregated accounts (the "**Plainview Accounts**") in the name of PlainviewCo, the account numbers for which are set forth in Schedule I hereto, which shall be maintained at all times until the termination of this Agreement:

(i)     an Account entitled "Plainview Revenue Account;" and

(ii)    an Account entitled "Plainview Loss Proceeds Account."

All amounts from time to time held in each Plainview Account shall be disbursed in accordance with the terms hereof, shall constitute the property of PlainviewCo, and shall be (A) subject to the Lien of the Collateral Agent (for the benefit of the Secured Parties) and (B) held in the sole custody and control of the Collateral Agent for the purposes and on the terms set forth in this Agreement and all such amounts shall constitute a part of the Collateral and shall not constitute payment of any Secured Obligation or any other obligation of PlainviewCo unless and until applied thereto as contemplated hereby.

2.03    <u>Security Interests</u>.  As collateral security for the prompt and complete payment and performance when due of all Secured Obligations:

(a)     The Borrower pledges, assigns, hypothecates and transfers to the Collateral Agent (for the benefit of the Secured Parties) and grants to the Collateral Agent (for the benefit of the Secured Parties) a Lien on all of the Borrower's rights, titles and interests in, to and under (i) each Borrower Account, (ii) each Deposit Account of the Borrower and (iii) all cash, instruments, investment property, securities, "security entitlements" (as defined in Section 8-102(a)(17) of the

UCC) and other Financial Assets at any time on deposit in any Borrower Account or Deposit Account of the Borrower, including all income, earnings and distributions thereon and all proceeds, products and accessions of and to any and all of the foregoing, including whatever is received or receivable upon any collection, exchange, sale or other disposition of any of the foregoing and any property into which any of the foregoing is converted, whether cash or non-cash proceeds, and any and all other amounts paid or payable under or in connection with any of the foregoing (collectively, the "**Borrower Account Collateral**").

(b) HerefordCo pledges, assigns, hypothecates and transfers to the Collateral Agent (for the benefit of the Secured Parties) and grants to the Collateral Agent (for the benefit of the Secured Parties) a Lien on all of HerefordCo's rights, titles and interests in, to and under (i) each Hereford Account and (ii) each Deposit Account of HerefordCo, and (iii) all cash, instruments, investment property, securities, "security entitlements" (as defined in Section 8-102(a)(17) of the UCC) and other Financial Assets at any time on deposit in any Hereford Account or Deposit Account of HerefordCo, including all income, earnings and distributions thereon and all proceeds, products and accessions of and to any and all of the foregoing, including whatever is received or receivable upon any collection, exchange, sale or other disposition of any of the foregoing and any property into which any of the foregoing is converted, whether cash or non-cash proceeds, and any and all other amounts paid or payable under or in connection with any of the foregoing (collectively, the "**Hereford Account Collateral**").

(c) USEP pledges, assignees, hypothecates and transfers to the Collateral Agent (for the benefit of the Secured Parties) and grants to the Collateral Agent (for the benefit of the Secured Parties) a Lien on all of USEP's rights, titles and interests in, to and under (i) each USEP Account and (ii) each Deposit Account of USEP and (iii) all cash, instruments, investment property, securities, "security entitlements" (as defined in Section 8-102(a)(17) of the UCC) and other Financial Assets at any time on deposit in any USEP Account or Deposit Account of USEP, including all income, earnings and distributions thereon and all proceeds, products and accessions of and to any and all of the foregoing, including whatever is received or receivable upon any collection, exchange, sale or other disposition of any of the foregoing and any property into which any of the foregoing is converted, whether cash or non-cash proceeds, and any and all other amounts paid or payable under or in connection with any of the foregoing (collectively, the "**USEP Account Collateral**").

(d) PlainviewCo pledges, assigns, hypothecates and transfers to the Collateral Agent (for the benefit of the Secured Parties) and grants to the Collateral Agent (for the benefit of the Secured Parties) a Lien on all of PlainviewCo's rights, titles and interests in, to and under (i) each Plainview Account and (ii) each Deposit Account of PlainviewCo, and (iii) all cash, instruments, investment property, securities, "security entitlements" (as defined in Section 8-102)(a)(17) of the UCC) and other Financial Assets at any time on deposit in any Plainview Account or Deposit Account of PlainviewCo, including all income, earnings and distributions thereon and all proceeds, products and accessions of and

to any and all of the foregoing, including whatever is received or receivable upon any collection, exchange, sale or other disposition of any of the foregoing and any property into which any of the foregoing is converted, whether cash or non-cash proceeds, and any and all other amounts paid or payable under or in connection with any of the foregoing (collectively, the "**Plainview Account Collateral**").

(e)    The Depositary is the agent of the Collateral Agent (for the benefit of the Secured Parties) for the purpose of receiving payments contemplated hereunder.  This Agreement constitutes a "security agreement" as defined in Article 9 of the UCC.

2.04    Accounts Maintained as UCC "Securities Accounts."

(a)    The Depositary hereby agrees and confirms that it has established the Accounts as set forth and defined in this Agreement.

(b)    The Depositary agrees that:

(i)    each such Account established by Depositary is and will be maintained as a "securities account" (within the meaning of Section 8-501 of the UCC);

(ii)    Borrower is the "entitlement holder" (within the meaning of Section 8-102(a)(7) of the UCC) in respect of the "financial assets" (within the meaning of Section 8-102(a)(9) of the UCC, the "**Borrower Financial Assets**") credited to the Borrower Accounts that are "securities accounts;"

(iii)    HerefordCo is the "entitlement holder" (within the meaning of Section 8-102(a)(7) of the UCC) in respect of the "financial assets" (within the meaning of Section 8-102(a)(9) of the UCC, the "**Hereford Financial Assets**") credited to the Hereford Accounts that are "securities accounts;"

(iv)    USEP is the "entitlement holder" (within the meaning of Section 8-102(a)(7) of the UCC) in respect of the "financial assets" (within the meaning of Section 8-102(a)(9) of the UCC, the "**USEP Financial Assets**" credited to the USEP Accounts that are "securities accounts;"

(v)    PlainviewCo is the "entitlement holder" (within the meaning of Section 8-102(a)(7) of the UCC, in respect of the "financial assets" (within the meaning of Section 8-102(a)(9) of the UCC, " "the "Plainview Financial Assets" and, together with the Borrower Financial Assets, the Hereford Financial Assets and the USEP Financial Assets, the "**Financial Assets**") credited to the Plainview Accounts that are "securities accounts;"

(vi)     all Financial Assets in registered form or payable to or to the order of and credited to any such Account shall be registered in the name of, payable to or to the order of, or specially endorsed to, Depositary or in blank, or credited to another securities account maintained in the name of Depositary;

(vii)     in no case will any Financial Asset credited to any such Account be registered in the name of, payable to or to the order of, or endorsed to, the Borrower, HerefordCo. USEP or PlainviewCo except to the extent the foregoing have been subsequently endorsed by the Borrower, HerefordCo, USEP or PlainviewCo to Depositary or in blank;

(viii)     each item of Property (including a security, security entitlement, investment property, instrument or obligation, share, participation, interest or other property whatsoever) credited to any Account shall to the fullest extent permitted by law be treated as a Financial Asset of the applicable Person;

(ix)     until the Termination Date, the Collateral Agent shall have "control" (within the meaning of Section 8-106(d)(2) or Section 9-104(a) (as applicable) of the UCC) of the Accounts and the Borrower's, HerefordCo's, USEP's and PlainviewCo's "security entitlements" (within the meaning of Section 8-102(a)(17) of the UCC) with respect to the Financial Assets credited to the Accounts; and

(x)     all property delivered to the Depositary pursuant to this Agreement will be promptly credited to the applicable Account.

(c)     Each of the Borrower, HerefordCo USEP and PlainviewCo hereby irrevocably directs, and the Depositary (in its capacity as securities intermediary) hereby agrees, that the Depositary will comply with all instructions and orders (including entitlement orders within the meaning of Section 8-102(a)(8) of the UCC) regarding each Account and any Financial Asset therein originated by the Collateral Agent without the further consent of the Borrower, HerefordCo, USEP, PlainviewCo or any other Person. In the case of a conflict between any instruction or order originated by the Collateral Agent and any instruction or order originated by the Borrower, HerefordCo, USEP, PlainviewCo or any other Person other than a court of competent jurisdiction, the instruction or order originated by the Collateral Agent shall prevail. The Depositary shall not change the name or account number of any Account without the prior written consent of the Collateral Agent and at least five Business Days' prior notice to the Borrower and HerefordCo or USEP or PlainviewCo, with respect to such Person's Accounts, and shall not change the entitlement holder of any Account.

(d)     To the extent that the Accounts are not considered "securities accounts" (within the meaning of Section 8-501(a) of the UCC), the Accounts shall be deemed to be "<u>deposit accounts</u>" (as deemed in Section 9-102(a)(29) of the UCC) to the extent a security interest can be granted and perfected

under the UCC in the Accounts as deposit accounts, which the Borrower, with respect to the Borrower Accounts, HerefordCo, with respect to the Hereford Accounts, USEP, with respect to the USEP Accounts, and PlainviewCo. with respect to the Plainview Accounts, shall maintain with the Depositary acting not as a securities intermediary but as a "bank" (within the meaning of Section 9-102(a)(8) of the UCC).

(e)     The Depositary shall not have title to the funds on deposit in the Accounts, and shall credit the Accounts with all receipts of interest, dividends and other income received on the Property held in the Accounts which shall accrue for the account of the Borrower, with respect to the Borrower Accounts (other than in respect of the Subordinated Cash Sweep Reserve Account, which shall accrue for the benefit of the Secured Parties), HerefordCo, with respect to the Hereford Accounts, USEP, with respect to the USEP Accounts, and PlainviewCo, with respect to the Plainview Accounts. The Depositary shall administer and manage the Accounts in strict compliance with all the terms applicable to the Accounts pursuant to this Agreement, and shall be subject to and comply with all the obligations that the Depositary owes to the Collateral Agent with respect to the Accounts, including all subordination obligations, pursuant to the terms of this Agreement and the Subordination Agreement. The Depositary hereby agrees to comply with any and all instructions originated by the Collateral Agent (acting at the direction of the Directing Party) directing disposition of funds and all other Property in the Accounts without any further consent of the Borrower, HerefordCo, USEP or PlainviewCo.

2.05     <u>Jurisdiction of Depositary</u>.   The Borrower, each Borrower Subsidiary, the Collateral Agent and the Depositary agree that, for purposes of the UCC, notwithstanding anything to the contrary contained in any other agreement relating to the establishment and operation of the Accounts, the jurisdiction of the Depositary (in its capacity as the securities intermediary and bank) is the State of New York and the laws of the State of New York govern the establishment and operation of the Accounts.

2.06     <u>Degree of Care; Liens</u>.   The Depositary shall exercise the same degree of care in administering the funds held in the Accounts and the investments purchased with such funds in accordance with the terms of this Agreement as Depositary exercises in the ordinary course of its day-to-day business in administering other funds and investments for its own account and as required by applicable Government Rule. The Depositary is not party to and shall not execute and deliver, or otherwise become bound by, any agreement under which the Depositary agrees with any Person other than the Collateral Agent to comply with entitlement orders or instructions originated by such Person relating to any of the Accounts or the security entitlements that are the subject of this Agreement. The Depositary shall not grant any Lien on any Financial Asset, other than any Lien granted to the Collateral Agent under the Security Documents.

2.07     <u>Subordination of Lien: Waiver of Set-Off</u>.   In the event that the Depositary has or subsequently obtains by agreement, operation of law or otherwise a Lien in any Account or in any Collateral Account, the Depositary agrees that such Lien shall (except to the extent provided in the last

sentence of this <u>Section 2.07</u>) be subordinate to the Lien of the Collateral Agent. The financial assets standing to the credit of the Accounts will not be subject to deduction, set-off, banker's lien, or any other right in favor of any Person other than the Collateral Agent (except to the extent of returned items and chargebacks either for uncollected checks or other items of payment and transfers previously credited to one or more of the Accounts, and the Borrower, HerefordCo, USEP, PlainviewCo and the Collateral Agent hereby authorize the Depositary to debit the Account for such amounts).

2.08    <u>No Other Agreements</u>.    None of the Depositary, the Collateral Agent, the Borrower and any Borrower Subsidiary has entered or will enter into any agreement with respect to any Account or Deposit Account or in any Collateral Account, other than the agreement establishing such account, this Agreement, any Account Control Agreement in respect of the Deposit Accounts and the other Financing Documents.

2.09    <u>Notice of Adverse Claims</u>.    Depositary hereby represents that, except for the claims and interests of the Collateral Agent, the Borrower, HerefordCo, USEP, PlainviewCo and any other Borrower Subsidiary in each of the Accounts, the Depositary, (a) as of the initial Closing Date, has no actual knowledge of, and has received no written notice of, and (b) as of each date on which any Account is established pursuant to this Agreement, has received no notice of, any claim to, or interest in, any Account or in any other Collateral Account. If any Person asserts any Lien (including any writ, garnishment, judgment, warrant of attachment, execution or similar process) against any Account or in any other Collateral Account, the Depositary, upon obtaining written notice thereof, will promptly notify the Collateral Agent, the Borrower, HerefordCo, USEP and PlainviewCo thereof.

2.10    <u>Rights and Powers of the Collateral Agent</u>.    The rights and powers granted to the Collateral Agent by the Secured Parties have been granted in order to, among other things, perfect their Lien in the Accounts, the Deposit Accounts and the other Collateral Account and to otherwise act as their agent with respect to the matters contemplated hereby and contemplated in any Account Control Agreement. The Collateral Agent agrees that it shall take instructions from, file documents, make demands, give notices and otherwise take any other action under this Agreement as directed by, the Directing Party and not any other Person.

2.11    <u>Termination</u>.    This Agreement shall remain in full force and effect until the Termination Date under the Subordinated Term Loan Agreement.

## ARTICLE III

## THE ACCOUNTS

3.01    Hereford Revenue Account.

(a)    HerefordCo agrees that all Hereford Project Revenues shall be deposited with the Depositary promptly following receipt thereof by HerefordCo.  The following amounts shall be deposited by the Depositary into the Hereford Revenue Account directly by the Depositary, or if received by or under the control of HerefordCo as and when set forth in clauses (i) through (iii), in either case in accordance with this Section 3.01(a):

(i)    promptly upon receipt, all Hereford Project Revenues;

(ii)    promptly upon receipt, any amount of proceeds of business interruption insurance, delay in startup insurance and other payments received for interruption of operations in respect of any Event of Loss in respect of the Hereford Project; and

(iii)    whenever required under this Agreement (and, if not specified herein, promptly), all amounts required to be transferred to the Hereford Revenue Account from any other Accounts, Deposit Accounts and as contemplated under this Agreement.

If any of the foregoing amounts required to be deposited with the Depositary in accordance with the terms of this Agreement are received by HerefordCo or an Affiliate thereof, including the Borrower, such Person shall hold such payments in trust for the Depositary and shall promptly remit such payments to the Depositary for deposit in the Hereford Revenue Account, in the form received, with any necessary endorsements.

(b)    HerefordCo hereby irrevocably authorizes the Depositary to transfer in immediately available funds the full amount of the opening available balance in the Hereford Revenue Account at the beginning of each Business Day to the Revenue Account in accordance with irrevocable standing instructions delivered to the Depositary, using the Fedwire system to make each such transfer or such other funds transfer system or other means of making such transfer as may be approved by the Agent.  Each such transfer to the Revenue Account shall be characterized as a return on capital for the account of the Borrower through equity distributions from HerefordCo through any then-existing intermediate Borrower Subsidiaries[; *provided*, that if any amount is required to be retained as capital of HerefordCo or any intermediate Borrower Subsidiary in the event 100% of such transfer is characterized as an equity distribution, then such remaining amount shall constitute an issuance of subordinated Indebtedness from HerefordCo or such intermediate Borrower Subsidiary to the Borrower containing requisite Terms and Conditions as set forth in Exhibit H to the Senior Exit Facility Agreement.]

3.02    <u>USEP Revenue Account</u>.

(a)    USEP agrees that all USEP Project Revenues shall be deposited with the Depositary promptly following receipt thereof by USEP.  The following amounts shall be deposited by the Depositary into the USEP Revenue Account directly by the Depositary, or if received by or under the control of USEP as and when set forth in clauses (i) through (iii), in either case in accordance with this <u>Section 3.02(a)</u>:

(i)    promptly upon receipt, all USEP Project Revenues;

(ii)    promptly upon receipt, any amount of proceeds of business interruption insurance, delay in startup insurance and other payments received for interruption of operations in respect of any Event of Loss in respect of the USEP Project; and

(iii)    whenever required under this Agreement (and, if not specified herein, promptly), all amounts required to be transferred to the USEP Revenue Account from any other Accounts, Deposit Accounts and as contemplated under this Agreement.

If any of the foregoing amounts required to be deposited with the Depositary in accordance with the terms of this Agreement are received by USEP or an Affiliate thereof, including the Borrower, such Person shall hold such payments in trust for the Depositary and shall promptly remit such payments to the Depositary for deposit in the USEP Revenue Account, in the form received, with any necessary endorsements.

(b)    USEP hereby irrevocably authorizes the Depositary to transfer in immediately available funds the full amount of the opening available balance in the USEP Revenue Account at the beginning of each Business Day to the Revenue Account in accordance with irrevocable standing instructions delivered to the Depositary, using the Fedwire system to make each such transfer or such other funds transfer system or other means of making such transfer as may be approved by the Agent. Each such transfer to the Revenue Account shall be characterized as a return on capital for the account of the Borrower through equity distributions from USEP through any then-existing intermediate Borrower Subsidiaries[; *provided*, that if any amount is required to be retained as capital of USEP or such intermediate Borrower or any intermediate Borrower Subsidiary in the event 100% of such transfer is characterized as an equity distribution, then such remaining amount shall constitute an issuance of subordinated Indebtedness from USEP or such intermediate Borrower Subsidiary to the Borrower containing requisite Terms and Conditions as set forth in Exhibit H to the Senior Exit Facility Agreement.]

3.03    Plainview Revenue Account.

(a)    PlainviewCo agrees that all Plainview Project Revenues shall be deposited with the Depositary promptly following receipt thereof by PlainviewCo. The following amounts shall be deposited by the Depositary into the Plainview Revenue Account directly by the Depositary, or if received by or under the control of PlainviewCo as and when set forth in clauses (i) through (iii), in either case in accordance with this Section 3.03(a):

(i)    promptly upon receipt, all Plainview Project Revenues;

(ii)    promptly upon receipt, any amount of proceeds of business interruption insurance, delay in startup insurance and other payments received for interruption of operations in respect of any Event of Loss in respect of the Plainview Project; and

(iii)    whenever required under this Agreement (and, if not specified herein, promptly), all amounts required to be transferred to the Plainview Revenue Account from any other Accounts, Deposit Accounts and a contemplated under this Agreement.

If any of the foregoing amounts required to be deposited with the Depositary in accordance with the terms of this Agreement are received by PlainviewCo or an Affiliate thereof, including the Borrower, such Person shall hold such payments in trust for the Depositary and shall promptly remit such payments to the Depositary for deposit in the Plainview Revenue Account in the form received, with any necessary endorsements.

(b)    PlainviewCo hereby irrevocably authorizes the Depositary to transfer in immediately available funds the full amount of the opening available balance in the Plainview Revenue Account at the beginning of each Business Day to the Revenue Account in accordance with irrevocable standing instructions delivered to the Depositary, using the Fedwire system to make each such transfer or such other funds transfer system or other means of making such transfer as may be approved by the Agent. Each such transfer to the Revenue Account shall be characterized as a return on capital for the account of the Borrower through equity distributions from PlainviewCo through any then-existing intermediate Borrower Subsidiaries[; *provided*, that if any amount is required to be retained as capital of PlainviewCo or any intermediate Borrower Subsidiary in the event 100% of such transfer is characterized as an equity distribution, then such remaining amount shall constitute an issuance of subordinated Indebtedness from PlainviewCo or such intermediate Borrower Subsidiary to the Borrower containing requisite Terms and Conditions as set forth in Exhibit H to the Senior Exit Facility Agreement.]

3.04    Revenue Account.

(a)    The Borrower agrees that all Project Revenues earned by the Borrower and all proceeds of borrowings of Loans under the Senior Exit Facility Agreement shall be deposited with the Depositary promptly following receipt thereof by the Borrower.  The following amounts shall be deposited by the Depositary into the Revenue Account directly by the Depositary, or if received by or under the control of the Borrower as and when set forth in clauses (i) through (v), in either case in accordance with this Section 3.04(a):

(i)    promptly upon receipt, all Project Revenues earned by the Borrower or transferred from the Hereford Revenue Account, the USEP Revenue Account and the Plainview Revenue Account;

(ii)    proceeds of borrowings of Loans under the Senior Exit Facility Agreement;

(iii)    promptly upon receipt, any amount of proceeds of business interruption insurance, delay in startup insurance and other payments received for interruption of operations in respect of any Event of Loss of the Borrower;

(iv)    whenever required under this Agreement (and, if not specified herein, promptly), all amounts required to be transferred to the Revenue Account from any other Accounts, Deposit Accounts and as contemplated under this Agreement; and

(v)    amounts referred to in clause (b) below.

If any of the foregoing amounts required to be deposited with the Depositary in accordance with the terms of this Agreement are received by the Borrower, the Borrower shall hold such payments in trust for the Depositary and shall promptly remit such payments to the Depositary for deposit in the Revenue Account, in the form received, with any necessary endorsements.

(b)    In the event the Depositary receives monies without adequate instruction with respect to the proper Account in which such monies are to be deposited, the Depositary shall deposit such monies into the Revenue Account and segregate such monies from all other amounts on deposit in the Revenue Account and notify the Borrower and the Collateral Agent of the receipt of such monies.  Upon receipt of written instructions from the Borrower, the Depositary shall transfer such monies from the Revenue Account to the Account specified by such instructions and consented to in writing by the Collateral Agent (acting at the direction of the Directing Party).

(c)    Commencing on the date hereof until the Termination Date, the Borrower hereby irrevocably authorizes the Depositary to make withdrawals and transfers of monies on each Funding Date specified in clauses *first* through *ninth* below (via wire transfer or check pursuant to written

instructions provided by the Borrower or by internal transfer between Accounts, if applicable) to the extent then available in the Revenue Account and not otherwise segregated for any specific purpose expressly provided for herein, upon the receipt by the Depositary of a duly completed and executed Withdrawal Certificate at least three Business Days prior to the applicable Funding Date setting forth the amounts to be withdrawn from the Revenue Account and the amounts to be transferred pursuant to this <u>clause (c)</u> in the following order of priority all in accordance with such Withdrawal Certificate and this Agreement:

*first*, on each Funding Date, transfer from the Revenue Account to the Operating Account, an amount, as certified by the Borrower in such Withdrawal Certificate, which, together with the amount then on deposit in or credited to the Operating Account, equals the sum (without duplication) of: (i) the Operation and Maintenance Expenses and Permitted Capital Expenditures then due and payable, <u>plus</u> (ii) $10,000,000 in cash so long as the Senior Exit Facility Agreement has not been terminated or the Maturity Date thereunder has not occurred and thereafter, such amount in cash as shall be as agreed between the Borrower and the Agent, <u>plus</u> (iii) to the extent not already included in clause (i) above, the fees and expenses of the Subordinated Term Loan Agent (acting in such capacity) under the Subordinated Term Loan Agreement;

*second*, on each Funding Date and after giving effect to the withdrawals and transfers specified in clause *first* above, transfer from the Revenue Account to the Senior Interest Payment Account an amount, as certified by the Borrower in such Withdrawal Certificate, which equals the sum of (i) any amounts due and payable or to become due and payable on the next Senior Interest Payment Date in respect of Senior Interest Expense related to the Senior Secured Obligations, <u>plus</u> (ii) any amounts of unpaid fees due to the Senior Exit Facility Agent or the Issuing Bank under Section 2.04(d) of the Senior Exit Facility Agreement <u>plus</u> (iii) any amount of interest accrued on reimbursements for LC Disbursements that remain unpaid by the Borrower <u>plus</u> (iv) any amounts then due and payable or becoming due and payable during the Funding Period commencing on such Funding Date in respect of any ordinary course settlement payments under any Senior Interest Rate Protection Agreement entered into pursuant to the Senior Exit Financing Documents;

*third*, on each Funding Date and after giving effect to the withdrawals and transfers specified in clauses *first* through *second* above, transfer from the Revenue Account to the Senior Principal Payment Account an amount, as certified by the Borrower in such Withdrawal Certificate, equal to the sum of (i) any amounts then due and payable (or becoming due and payable during the Funding Period commencing on such Funding Date) in respect of outstanding principal under the Senior Exit Financing Documents <u>plus</u> (ii) the aggregate amount of any reimbursement for LC Disbursements that remain unpaid by the Borrower <u>plus</u> (iii) any amounts then due and payable (or becoming due and payable during the Funding Period commencing on

such Funding Date) in respect of termination payments under any Senior Interest Rate Protection Agreement entered into pursuant to the Senior Exit Financing Documents;

*fourth*, on each Funding Date and after giving effect to the withdrawals and transfers specified in clause *first* through *third* above, transfer from the Revenue Account to the Subordinated Interest Payment Account an amount, as certified by the Borrower in such Withdrawal Certificate, which equals the sum of (i) any amounts due and payable or to become due and payable on the next Subordinated Interest Payment Date in respect of Subordinated Interest Expense related to the Subordinated Secured Obligations plus (ii) any amounts then due and payable or becoming due and payable during the Funding Period commencing on such Funding Date in respect of any ordinary course settlement payments under any Subordinated Interest Rate Protection Agreement entered into pursuant to the Subordinated Term Financing Documents;

*fifth*, on each Funding Date and after giving effect to the withdrawals and transfers specified in clauses *first* through *fourth* above, transfer from the Revenue Account to the Subordinated Principal Payment Account an amount, as certified by the Borrower in such Withdrawal Certificate, equal to the sum of (i) any amounts due and payable or to become due and payable on the next Subordinated Principal Payment Date or on or after Funding Date in respect of outstanding principal under the Subordinated Term Financing Documents, less any amounts then on deposit in or credited to the Subordinated Principal Payment Account plus (ii) any amounts then due and payable or becoming due and payable during the Funding Period commencing on such Funding Date in respect of termination payments under any Subordinated Interest Rate Protection Agreement entered into pursuant to the Subordinated Term Loan Agreement;

*sixth*, on each Funding Date and after giving effect to the withdrawals and transfers specified in clauses *first* through *fifth* above, transfer from the Revenue Account to the Debt Service Reserve Account, an amount, as certified by the Borrower in such Withdrawal Certificate, which equals (i) the then-current Debt Service Reserve Requirement minus (ii) the sum of (A) the amount then on deposit in or credited to the Debt Service Reserve Account and (B) the amounts available to be drawn in respect of Acceptable Credit Support posted in respect of the Debt Service Reserve Requirement;

*seventh*, on each Funding Date that falls immediately prior to a Quarterly Date and after giving effect to the withdrawals and transfers specified in clauses *first* through *sixth* above, transfer from the Revenue Account to the Tax Payment Account an amount, as specified in such Withdrawal Certificate, which equals (i) the amount of Hypothetical Tax Obligations in respect of the income earned in the preceding Funding Period for the then current fiscal quarter minus

(ii) the amount then on deposit in the Tax Payment Account deposited in such Account after the last Quarterly Date;

*eighth*, on each Funding Date and after giving effect to the withdrawals and transfers specified in clauses *first* through *seventh* above, transfer from the Revenue Account to the Subordinated Cash Sweep Reserve Account the following amounts: (a) all amounts remaining on deposit in the Revenue Account on such Funding Date until the Borrower notifies the Collateral Agent (such notification to be confirmed in writing by the Agent) that the principal amount outstanding of the Loans under the Subordinated Term Loan Agreement has been reduced to $100,000,000, (b) if the principal amount outstanding of the Loans under the Subordinated Term Loan Agreement is less than $100,000,000, 75% of all amounts remaining on deposit in the Revenue Account on such Funding Date until the Borrower notifies the Collateral Agent (such notification to be confirmed in writing by the Agent) that the principal amount outstanding of the Loans under the Subordinated Term Loan Agreement has been reduced to $50,000,000, or (c) if the principal amount outstanding of the Loans under the Subordinated Term Loan Agreement is less than $50,000,000, 50% of all amounts remaining on deposit in the Revenue Account on such Funding Date until the Borrower notifies the Collateral Agent (such notification to be confirmed in writing by the Agent) that the Termination Date under the Subordinated Term Loan Agreement has occurred;

*ninth*, on each Funding Date that falls immediately prior to the 5th day of each of July and January of each year (or if such date is not a Business Day, the immediately following Business Day) and after giving effect to the withdrawals and transfers specified in clause *first* through *eighth* above, transfer all amounts on deposit in the Subordinated Cash Sweep Reserve Account to the Subordinated Term Loan Agent to be applied by the Subordinated Term Loan Agent to the mandatory prepayment of principal amounts outstanding under the Subordinated Term Loan Agreement;

*tenth*, on each Funding Date and after giving effect to the withdrawals and transfers specified in clauses *first* through *ninth* above, transfer all amounts remaining on deposit in the Revenue Account to the Shareholder Distribution Account for further distribution of such amount, upon the written instructions of the Collateral Agent (acting upon the direction of the Directing Party), of such amount to [Reorganized White Energy, Inc.][New WEI], and any such distribution shall be characterized as a return on capital for the account of [Reorganized White Energy, Inc.][New WEI] through equity distributions from the Borrower through the [Reorganized White Energy, Inc.] or any then-existing intermediate holding company of the Borrower; *provided*, that if any amount is required to be retained by [Reorganized White Energy, Inc.] to enable to pay ministerial expenses or Taxes then such retained amount shall constitute an issuance of subordinated Indebtedness by the Borrower [or Reorganized White Energy, Inc.] to New WEI].

3.05    Operating Account.  The Operating Account shall be funded from transfers from the Revenue Account and such other Accounts as specified in Section 3.15.  Upon receipt by the Depositary of a Withdrawal Certificate detailing the amounts and Persons to be paid, the Depositary shall transfer funds in the Operating Account to (a) any Person to whom a payment is then due and payable, or becoming due and payable during the current Funding Period (or any weekly period immediately following the date on which the Borrower makes a request for the withdrawal of funds pursuant to Section 3.15), in respect of Operation and Maintenance Expenses, Permitted Capital Expenditures or the prepayment of one or more Loans under the Senior Exit Facility Agreement, in each case as, when and to the extent specified in such Withdrawal Certificate (except that the fees, if any, due and payable to the Agent shall be paid first to the Senior Exit Facility Agent and second to the Subordinated Term Loan Agent) or (b) to one or more Deposit Accounts for payment of such Operation and Maintenance Expenses or Permitted Capital Expenditures, in each case in accordance with the Senior Exit Facility Agreement and this Agreement.

3.06    Interest Payment Accounts.

(a)    The Senior Interest Payment Account shall be funded from the Revenue Account and such other Accounts as specified in Section 3.15.  Upon receipt by the Depositary of a Withdrawal Certificate detailing the amounts and Person to be paid, the Depositary shall transfer funds in the Interest Senior Interest Payment Account to (i) first, the Senior Exit Facility Agent to pay Senior Interest Expense then due and payable under the Senior Exit Facility Agreement, or becoming due and payable during the current Funding Period, (ii) second, the Senior Exit Facility Agent (for the benefit of itself, the Senior Exit Facility Lenders and the Issuing Bank) to pay any amount of unpaid fees due to such parties pursuant to Sections 2.04(c) and (d) of the Senior Exit Facility Agreement, (iii) third, the Senior Exit Facility Agent for the benefit of the Senior Exit Facility Lenders, any amount of interest accrued on reimbursement for LC Disbursements that remain unpaid by the Borrower, (iv) fourth, to providers of Senior Interest Rate Protection Agreements to pay ordinary course settlement payments under any Senior Interest Rate Protection Agreement entered into under the Senior Exit Facility Documents which are then due and payable, or becoming due and payable during the current Funding Period, in each case as, when and to the extent specified in such Withdrawal Certificate.

(b)    Subject to application of funds in accordance with Section 3.15, if the monies on deposit in the Senior Interest Payment Account are insufficient on any date to make the transfers and payments specified in clause (a), then the amounts on deposit in or credited to the Senior Interest Payment Account at such time shall be transferred ratably to the Senior Secured Parties (or the agents thereof) based on the respective amounts owed to such Senior Secured Parties in the order of priority provided in clause (a) above.

(c)    The Subordinated Interest Payment Account shall be funded from the Revenue Account and such other Accounts as specified in Section 3.15.  Upon receipt by the Depositary of a

Withdrawal Certificate detailing the amounts and Person to be paid, the Depositary shall transfer funds in the Subordinated Interest Payment Account to (i) first, the Subordinated Term Loan Agent to pay Interest Expense then due and payable under the Subordinated Term Loan Agreement, or becoming due and payable during the current Funding Period and (ii) second, providers of Subordinated Interest Rate Protection Agreements to pay ordinary course settlement payments under any Subordinated Interest Rate Protection Agreement entered into under the Subordinated Term Financing Documents which are then due and payable, or becoming due and payable during the current Funding Period, in each case as, when and to the extent specified in such Withdrawal Certificate.

(d)   Subject to application of funds in accordance with Section 3.15, if the monies on deposit in the Subordinated Interest Payment Account are insufficient on any date to make the transfers and payments specified in clause (c), then the amounts on deposit in or credited to the Subordinated Interest Payment Account at such time shall be transferred ratably to the Subordinated Secured Parties (or the agents thereof) based on the respective amounts owed to such Subordinated Secured Parties in the order of priority provided in clause (c) above.

3.07   Principal Payment Accounts.

(a)   The Senior Principal Payment Account shall be funded from transfers from the Revenue Account and such other Accounts as specified in Section 3.15.   Upon receipt by the Depositary of a Withdrawal Certificate detailing the amounts and Person to be paid, the Depositary shall transfer funds in the Senior Principal Payment Account to (i) first, the Senior Exit Facility Agent to pay principal outstanding under the Senior Exit Facility Agreement which is then due and payable, or becoming due and payable during the current Funding Period, under the Senior Exit Facility Agreement, (ii) second, the Senior Exit Facility Agent on behalf of the Lenders, to pay any amount of reimbursement for LC Disbursements that remain unpaid by the Borrower, and (ii) third, the providers of Senior Interest Rate Protection Agreements to pay termination payments under any Senior Interest Rate Protection Agreement entered into under the Senior Exit Facility Documents which are then due and payable, or becoming due and payable during the current Funding Period, in each case as, when and to the extent specified in such Withdrawal Certificate.

(b)   Subject to application of funds in accordance with Section 3.15, if the monies on deposit in the Senior Principal Payment Account are insufficient on any date to make the transfers and payments specified in clause (a), then the amounts on deposit in or credited to the Senior Principal Payment Account at such time shall be transferred ratably to the Senior Secured Parties (or the agents thereof) based on the respective amounts owed to such Senior Secured Parties in the order of priority provided in clause (a) above.

(c)   The Subordinated Principal Payment Account shall be funded from transfers from the Revenue Account and such other Accounts as specified in Section 3.15.   Upon receipt by the

Depositary of a Withdrawal Certificate detailing the amounts and Person to be paid, the Depositary shall transfer funds in the Subordinate Principal Payment Account to (i) first, the Subordinated Term Loan Agent to pay principal outstanding under the Subordinated Term Loan Agreement which is then due and payable, or becoming due and payable during the current Funding Period, under the Subordinated Term Loan Agreement and (ii) second, the providers of Subordinated Interest Rate Protection Agreements to pay termination payments under any Subordinated Interest Rate Protection Agreement entered into under the Subordinated Term Facility Documents which are then due and payable, or becoming due and payable during the current Funding Period, in each case as, when and to the extent specified in such Withdrawal Certificate.

(d)    Subject to application of funds in accordance with Section 3.15, if the monies on deposit in the Subordinated Principal Payment Account are insufficient on any date to make the transfers and payments specified in clause (c), then the amounts on deposit in or credited to the Subordinated Principal Payment Account at such time shall be transferred ratably to the Subordinated Secured Parties (or the agents thereof) based on the respective amounts owed to such Subordinated Secured Parties in the order of priority provided in clause (c) above.

3.08    Subordinated Cash Sweep Reserve Account.

The Subordinated Cash Sweep Reserve Account shall be funded from transfers from the Revenue Account.  On each Funding Date that falls immediately prior to the 5th day of each of July and January of each year (or if such date is not a Business Day, the immediately following Business Day), the Depositary shall transfer all funds on deposit in the Subordinated Cash Sweep Reserve Account to the Subordinated Term Loan Agent, to be applied by the Subordinated Term Loan Agent to the mandatory prepayment of principal amounts outstanding under the Subordinated Term Loan Agreement, in inverse order of maturity.

3.09    Shareholder Distribution Account.

The Shareholder Distribution Account shall be funded from transfers from the Revenue Account.  Subject to the application of funds in the Subordinated Cash Sweep Reserve Account pursuant to Section 3.08, the Depositary shall transfer all amounts on deposit in the Shareholder Distribution Account, upon the instruction of the Collateral Agent (acting on the instructions of the Directing Party), to New WEI.

3.10    HerefordCo Loss Proceeds Account.

(a)    HerefordCo shall cause any Net Available Amount in respect of the Hereford Project to be deposited in the Hereford Loss Proceeds Account.

(b)    In accordance with Section 8.05(k) of the Senior Exit Facility Agreement and Subordinated Term Loan Agreement, as applicable, funds on deposit in the Hereford Loss Proceeds

Account shall, pursuant to the terms of this Agreement and the Senior Exit Facility Agreement and Subordinated Term Loan Agreement, as applicable, be transferred from time to time by the Depositary, as directed by HerefordCo in writing pursuant to a Withdrawal Certificate, for Restoration following any Hereford Event of Loss, as follows:

(i)      in the event the amount to be transferred is less than or equal to $50,000, with no further approval or consent;

(ii)      in the event the amount to be transferred is greater than $50,000 but less than or equal to $250,000 if the Independent Engineer shall have delivered to the Collateral Agent a certificate to the effect that the Net Available Amount in respect of the Hereford Project deposited in the Hereford Loss Proceeds Account is sufficient as determined by the Collateral Agent in consultation with the Independent Engineer), in the reasonable opinion of the Independent Engineer, for such Restoration; and

(iii)      in the event the amount to be transferred is greater than $250,000 if (A) HerefordCo shall submit a plan for Restoration as soon as commercially practicable, but in no event more than 60 days after the occurrence of such Event of Loss and the Independent Engineer shall have delivered a certificate to the Collateral Agent to the effect that HerefordCo's plan of Restoration is prudent and sound and the Net Available Amount deposited in the Hereford Loss Proceeds Account is sufficient (as determined by the Collateral Agent in consultation with the Independent Engineer), in the reasonable opinion of the Independent Engineer, for such Restoration and (B) the Directing Party (acting on the instructions of the Supermajority Lenders under the Senior Exit Facility Agreement, or after the occurrence of the Termination Date under the Senior Exit Facility Agreement, the Supermajority Lenders under the Subordinated Term Loan Agreement) has consented to such use of the Net Available Amount.

3.11      <u>USEP Loss Proceeds Account</u>.

(a)    USEP shall cause any Net Available Amount in respect of the Plainview Project to be deposited in the Plainview Loss Proceeds Account.

(b)    In accordance with Section 8.05(k) of the Senior Exit Facility Agreement and Senior Term Loan Agreement, as the case may be, funds on deposit in the Plainview Loss Proceeds Account shall, pursuant to the terms of this Agreement and the Senior Exit Facility Agreement and Senior Term Loan Agreement, as the case may be, be transferred from time to time by the Depositary, as directed by USEP in writing pursuant to a Withdrawal Certificate for Restoration following any Plainview Event of Loss, as follows:

(i)        in the event the amount to be transferred is less than or equal to $50,000 with no further approval or consent;

(ii)       in the event the amount to be transferred is greater than $50,000 but less than or equal to $250,000 if the Independent Engineer shall have delivered to the Collateral Agent a certificate to the effect that the Net Available Amount in respect of the Plainview Project deposited in the Plainview Loss Proceeds Account is sufficient as determined by the Collateral Agent in consultation with the Independent Engineer), in the reasonable opinion of the Independent Engineer, for such Restoration; and

(iii)      in the event the amount to be transferred is greater than $250,000 if (A) USEP shall submit a plan for Restoration as soon as commercially practicable, but in no event more than 60 days after the occurrence of such Event of Loss and the Independent Engineer shall have delivered a certificate to the Collateral Agent to the effect that USEP's plan of Restoration is prudent and sound and the Net Available Amount deposited in the Plainview Loss Proceeds Account is sufficient (as determined by the Collateral Agent in consultation with the Independent Engineer), in the reasonable opinion of the Independent Engineer, for such Restoration and (B) the Directing Party (acting on the instructions of the Supermajority Lenders under the Senior Exit Facility Agreement, or after the occurrence of the Termination Date under the Senior Exit Facility Agreement, the Supermajority Lenders under the Subordinated Term Loan Agreement) has consented to such use of the Net Available Amount.

3.12    PlainviewCo Loss Proceeds Account.

(a)    PlainviewCo shall cause any Net Available Amount in respect of the Plainview Project to be deposited in the Plainview Loss Proceeds Account.

(b)    In accordance with Section 8.05(k) of the Senior Exit Facility Agreement and Senior Term Loan Agreement, as the case may be, funds on deposit in the Plainview Loss Proceeds Account shall, pursuant to the terms of this Agreement and the Senior Exit Facility Agreement and Senior Term Loan Agreement, as the case may be, be transferred from time to time by the Depositary, as directed by PlainviewCo in writing pursuant to a Withdrawal Certificate for Restoration following any Plainview Event of Loss, as follows:

(i)        in the event the amount to be transferred is less than or equal to $50,000 with no further approval or consent;

(ii)       in the event the amount to be transferred is greater than $50,000 but less than or equal to $250,000 if the Independent Engineer shall have delivered to the Collateral Agent a certificate to the effect that the Net Available Amount in respect of the

Plainview Project deposited in the Plainview Loss Proceeds Account is sufficient as determined by the Collateral Agent in consultation with the Independent Engineer), in the reasonable opinion of the Independent Engineer, for such Restoration; and

(iii)    in the event the amount to be transferred is greater than $250,000 if (A) PlainviewCo shall submit a plan for Restoration as soon as commercially practicable, but in no event more than 60 days after the occurrence of such Event of Loss and the Independent Engineer shall have delivered a certificate to the Collateral Agent to the effect that PlainviewCo's plan of Restoration is prudent and sound and the Net Available Amount deposited in the Plainview Loss Proceeds Account is sufficient (as determined by the Collateral Agent in consultation with the Independent Engineer), in the reasonable opinion of the Independent Engineer, for such Restoration and (B) the Directing Party (acting on the instructions of the Supermajority Lenders under the Senior Exit Facility Agreement, or after the occurrence of the Termination Date under the Senior Exit Facility Agreement, the Supermajority Lenders under the Subordinated Term Loan Agreement) has consented to such use of the Net Available Amount.

3.13    <u>Debt Service Reserve Account</u>.  The Debt Service Reserve Account shall be funded from the Revenue Account in an amount sufficient to satisfy the Debt Service Reserve Requirement.  Upon receipt by the Depositary of a Withdrawal Certificate, the Depositary shall transfer amounts specified by the Borrower from the Debt Service Reserve Account to the Senior Interest Payment Account, Senior Principal Payment Account, (or the Senior Exit Facility Agent in respect of Senior Interest Expense and principal then due under the Senior Exit Facility Agreement), the Subordinated Interest Payment Account, the Subordinated Principal Payment Account or to the Subordinated Term Loan Agent in respect of Subordinated Interest Expense and principal then due and payable under the Subordinated Term Loan Agreement, or ordinary course settlement payments or termination payments then due and payable under any Senior Interest Rate Protection Agreement or Subordinated Interest Rate Protection Agreements, together with any outstanding amounts, including default interest which may be due and owing under the Senior Exit Facility Agreement Subordinated Term Loan Agreement.

3.14    <u>Tax Payment Account</u>.  The Tax Payment Account shall be funded from the Revenue Account.  Upon receipt by the Depositary of a Withdrawal Certificate detailing the amounts and Persons to be paid, the Depositary shall transfer funds in the Tax Payment Account to the Borrower for payment of Hypothetical Tax Obligations then due and payable, or becoming due and payable during the current Funding Period, in each case as, when and to the extent specified in such Withdrawal Certificate; provided, that the Borrower certifies to the Collateral Agent and the Depositary in an Officer's Certificate delivered to the Collateral Agent at least five Business Days prior to the proposed distribution that all funds to be transferred shall be used to pay Hypothetical Tax Obligations then due and payable, or becoming due and payable during the current Funding Period.

3.15   <u>Invasion of Accounts</u>.

(a)   One Business Day prior to any weekly period (but in any event not more frequently than once during a period of 5 Business Days) during which:

(i)   Operation and Maintenance Expenses will become due and payable and the monies on deposit in or credited to the Operating Account are not anticipated to be adequate to pay such Operation and Maintenance Expenses (including the aggregate amount of funds then on deposit in the Deposit Accounts);

(ii)   Interest Expense (and the amounts specified in subclauses (ii) and (iii) of clause *second* of <u>Section 3.04(c)</u>) will become due and payable under the Senior Exit Facility Agreement and the monies on deposit in or credited to the Senior Interest Payment Account are not anticipated to be adequate to pay the Senior Interest Expense (and the amounts specified in subclauses (ii) and (iii) of clause *second* of <u>Section 3.04(c)</u>);

(iii)   principal (and the amounts specified in subclause (ii) of clause *third* of <u>Section 3.04(c)</u>) will become due and payable under the Senior Exit Facility Agreement and the monies on deposit in or credited to the Senior Principal Payment Account are not anticipated to be adequate to pay the such principal amount (and the amounts specified in subclause (ii) of clause *third* of <u>Section 3.04(c)</u>);

(iv)   Subordinated Interest Expense will become due and payable under the Subordinated Term Loan Agreement and the monies on deposit in or credited to the Subordinated Interest Payment Account are not anticipated to be adequate to pay the Subordinated Interest Expense;

(v)   principal will become due and payable under the Subordinated Term Loan Agreement and the monies on deposit in or credited to the Subordinated Principal Payment Account are not anticipated to be adequate to pay such principal (and the amounts specified in subclause (ii) of clause *third* of <u>Section 3.04(c)</u>); or

(vi)   the Borrower has notified the Senior Exit Facility Agent that a prepayment of one or more Loans will be made by it under the Senior Exit Facility Agreement;

the Borrower may (with a concurrent written notice of such request to the Agent) request the Depositary to withdraw and the Depositary shall (but in the case of clause *third* below, only upon receipt by the Depositary of the consent specified therein), withdraw from the Borrower Accounts specified below in the order of priority set forth below and transfer to the Operating Account (including in

any transfers to such Account, the amount of the Loan prepayment(s) that the Borrower has notified it will make under the Senior Exit Facility Agreement), the Senior Interest Payment Account, the Senior Principal Payment Account, the Subordinated Interest Payment Account, or the Subordinated Principal Payment Account (as applicable and in an order of priority consistent with the priorities established by Section 3.04(c)) an amount sufficient to cause the balance in such Accounts (and with respect to Operation and Maintenance Expenses only, such Deposit Accounts) (when taken together with all other amounts deposited therein or credited thereto at such time) to equal the amount of such Operation and Maintenance Expenses, Senior Interest Expense (and the amounts specified in subclauses (ii) and (iii) of clause *second* of Section 3.04(c)), principal (and the amounts specified in subclause (ii) of clause *third* of Section 3.04(c)) under the Senior Exit Facility Agreement, principal (and the amounts specified in subclause (ii) of clause *third* of Section 3.04(c)) under the Subordinated Term Loan Agreement, premium (if any) due and payable by the Borrower during such weekly period, or the amount of one or more Loans (as defined under the Senior Exit Facility Agreement) notified by the Borrower to be prepaid,

> *first*, from the Revenue Account;

> *second*, from the Debt Service Reserve Account, but only to the extent such monies are used to pay for Senior Interest Expense, Subordinated Interest Expense, principal under the Senior Exit Facility Agreement or, after satisfying payment obligations then due thereunder, the Subordinated Term Loan Agreement, or ordinary course settlement payments or termination payments under any Interest Rate Protection Agreement; and

> *third*, from the Subordinated Cash Sweep Reserve Account; *provided*, that at least [5] Business Days, prior to giving such instructions to the Depositary to withdraw monies from such Account, the Borrower shall provide a written request for such withdrawal accompanied by an explanation to the Directing Party as to the reason(s) for the shortfall in each of the above Accounts and the purpose towards which such withdrawal would be applied and the Directing Party may or may not consent to such withdrawal, in its reasonable discretion.

(b)    The Borrower may, with the consent of the Directing Party, make the request for withdrawal as specified in Section 3.15(a) above on two other occasions during any Funding Period.

3.16    Investment of Borrower Accounts.

(a)    Amounts deposited in the Borrower Accounts under this Agreement shall, at the Borrower's written request and direction, be invested by the Depositary in Investments described in clauses (a) through (e) and (g) of Section 8.13 of the Senior Exit Facility Agreement as specifically directed in such written request and direction.  Such investments will mature in such amounts and not later than such times as may be necessary to provide monies when needed to make payments from such monies as provided in this Agreement.  Except as otherwise provided herein, net interest or gain

received, if any, from such investments with respect to any Borrower Account shall be deposited into the Revenue Account.  Any loss shall be charged to the applicable Borrower Account.

(b)    Absent written instructions from the Borrower, the Depositary shall invest the amounts held in the Borrower Accounts under this Agreement in Investments described in clause (b) or (e) of Section 8.13 of the Senior Exit Facility Agreement pursuant to the specific, standing investment instructions the Borrower has provided the Depositary from time to time.  In the event that at any time amounts are funded into a Borrower Account after 11:00 am New York City time on any Business Day, the Depositary shall have no obligation to invest or reinvest such amounts on the date on which such amounts are funded.

(c)    If and when cash is required for the making of any transfer, disbursement or withdrawal in accordance with this Agreement (it being understood that cash shall not be required for any transfer between Accounts unless Permitted Investments do not exist in the Account from which monies are being transferred in appropriate amounts in order to permit such transfer), the Borrower shall cause Permitted Investments described in clauses (a) through (e) of Section 8.13 of the Senior Exit Facility Agreement to be sold or otherwise liquidated into cash (without regard to maturity) as and to the extent necessary in order to make such transfers, disbursements or withdrawals required pursuant to this Agreement.  The Depositary shall comply with any instruction from the Borrower with respect to the liquidation of such Permitted Investments described in the preceding sentence.  In the event any such investments are so redeemed prior to the maturity thereof, neither the Depositary nor the Collateral Agent shall be liable for any loss or penalties relating thereto.  Neither the Depository nor the Collateral Agent shall be liable for the diminution in value of any Permitted Investment which is made pursuant to the terms of this Agreement.

(d)    For purposes of determining responsibility for any income tax payable on account of any income or gain on any Permitted Investment hereunder, such income or gain shall be for the account of the Borrower.

3.17    <u>Investment of Hereford Accounts</u>.

(a)    Amounts deposited in the Hereford Accounts under this Agreement shall, at HerefordCo's written request and direction, be invested by the Depositary in any Investments described in clauses (a) through (e) and (g) of Section 8.13 of the Senior Exit Facility Agreement as specifically directed in such written request and direction.  Such investments will mature in such amounts and not later than such times as may be necessary to provide monies when needed to make payments from such monies as provided in this Agreement.  Except as otherwise provided herein, net interest or gain received, if any, from such investments with respect to any Hereford Account shall be deposited into the Hereford Revenue Account.  Any loss shall be charged to the applicable Hereford Account.

(b)   Absent written instructions from HerefordCo, the Depositary shall invest the amounts held in the Hereford Accounts under this Agreement in Investments described in clause (b) or (e) of Section 8.13 of the Senior Exit Facility Agreement pursuant to the specific, standing investment instructions HerefordCo has provided the Depositary from time to time.  In the event that at any time amounts are funded into a Hereford Account after 11:00 am New York City time on any Business Day, the Depositary shall have no obligation to invest or reinvest such amounts on the date on which such amounts are funded.

(c)   If and when cash is required for the making of any transfer, disbursement or withdrawal in accordance with this Agreement (it being understood that cash shall not be required for any transfer between Accounts unless Permitted Investments do not exist in the Account from which monies are being transferred in appropriate amounts in order to permit such transfer), HerefordCo shall cause Permitted Investments described in clauses (a) through (e) of Section 8.13 of the Senior Exit Facility Agreement to be sold or otherwise liquidated into cash (without regard to maturity) as and to the extent necessary in order to make such transfers, disbursements or withdrawals required pursuant to this Agreement.  The Depositary shall comply with any instruction from HerefordCo with respect to the liquidation of such Permitted Investments described in the preceding sentence.  In the event any such investments are so redeemed prior to the maturity thereof, neither the Depositary nor the Collateral Agent shall be liable for any loss or penalties relating thereto.  Neither the Depository nor the Collateral Agent shall be liable for the diminution in value of any Permitted Investment which is made pursuant to the terms of this Agreement.

(d)   For purposes of determining responsibility for any income tax payable on account of any income or gain on any Permitted Investment hereunder, such income or gain shall be for the account of HerefordCo.

3.18   <u>Investment of USEP Accounts</u>.

(a)   Amounts deposited in the USEP Accounts under this Agreement shall, at USEP's written request and direction, be invested by the Depositary in any Investments described in clauses (a) through (e) and (g) of Section 8.13 of the Senior Exit Facility Agreement as specifically directed in such written request and direction.  Such investments will mature in such amounts and not later than such times as may be necessary to provide monies when needed to make payments from such monies as provided in this Agreement.  Except as otherwise provided herein, net interest or gain received, if any, from such investments with respect to any USEP Account shall be deposited into the USEP Revenue Account.  Any loss shall be charged to the applicable USEP Account.

(b)   Absent written instructions from USEP, the Depositary shall invest the amounts held in the USEP Accounts under this Agreement in Investments described in clause (b) or (e) of Section 8.13 of the Senior Exit Facility Agreement pursuant to the standing investment instructions

USEP has provided the Depositary from time to time. In the event that at any time amounts are funded into a USEP Account after 11:00 am New York City time on any Business Day, the Depositary shall have no obligation to invest or reinvest such amounts on the date on which such amounts are funded.

(c)   If and when cash is required for the making of any transfer, disbursement or withdrawal in accordance with this Agreement (it being understood that cash shall not be required for any transfer between Accounts unless Permitted Investments do not exist in the Account from which monies are being transferred in appropriate amounts in order to permit such transfer), USEP shall cause Permitted Investments described in clauses (a) through (e) of Section 8.13 of the Senior Exit Facility Agreement to be sold or otherwise liquidated into cash (without regard to maturity) as and to the extent necessary in order to make such transfers, disbursements or withdrawals required pursuant to this Agreement. The Depositary shall comply with any instruction from USEP with respect to the liquidation of such Permitted Investments described in the preceding sentence. In the event any such investments are so redeemed prior to the maturity thereof, neither the Depositary nor the Collateral Agent shall be liable for any loss or penalties relating thereto. Neither the Depository nor the Collateral Agent shall be liable for the diminution in value of any Permitted Investment which is made pursuant to the terms of this Agreement.

(d)   For purposes of determining responsibility for any income tax payable on account of any income or gain on any Permitted Investment hereunder, such income or gain shall be for the account of USEP.

3.19   Investment of Plainview Accounts.

(a)   Amounts deposited in the Plainview Accounts under this Agreement shall at PlainviewCo's written request and direction, be invested by the Depositary in any Investments described in clauses (a) through (e) and (g) of Section 8.13 of the Senior Exit Facility Agreement as specifically directed in such written request and direction. Such investments will mature in such amounts and not later than such times as may be necessary to provide monies when needed to make payments from such monies as provided in this Agreement. Except as otherwise provided herein, net interest or gain received, if any, from such investments with respect to any Plainview Account shall be deposited into the Plainview Revenue Account. Any loss shall be charged to the applicable Plainview Account.

(b)   Absent written instructions from PlainviewCo, the Depositary shall invest the amounts held in the Plainview Accounts under this Agreement in Investments described in clause (b) or (e) of Section 8.13 of the Senior Exit Facility Agreement pursuant to the specific, standing investment instructions PlainviewCo has provided the Depositary from time to time. In the event that at any time amounts are funded into a Plainview Account after 11:00 am New York City time on any

Business Day, the Depositary shall have no obligation to invest or reinvest such amounts on the date on which such amounts are funded.

(c)   If and when cash is required for the making of any transfer, disbursement or withdrawal in accordance with this Agreement (it being understood that cash shall not be required for any transfer between Accounts unless Permitted Investments do not exist in the Account from which monies are being transferred in appropriate amounts in order to permit such transfer), PlainviewCo shall cause Permitted Investments described in clauses (a) through (e) of Section 8.13 of the Senior Exit Facility Agreement to be sold or otherwise liquidated into cash (without regard to maturity) as and to the extent necessary in order to make such transfer, disbursements or withdrawals required pursuant to this Agreement.  The Depositary shall comply with any instruction from PlainviewCo with respect to the liquidation of such Permitted Investments described in the preceding sentence.  In the event any such investments are so redeemed prior to the maturity thereof, neither the Depositary nor the Collateral Agent shall be liable for any loss or penalties relating thereto.  Neither the Depositary nor the Collateral Agent shall be liable for the diminution in value of any Permitted Investment which is made pursuant to the terms of this Agreement.

(d)   For purposes of determining responsibility for any income tax payable on account of any income or gain on any Permitted Investment hereunder, such income or gain shall be for the account of PlainviewCo.

3.20    <u>Disposition of Borrower Accounts Upon Termination Date</u>.  In the event that the Depositary shall have received a certificate from the Collateral Agent stating that the Termination Date under the Subordinated Term Loan Agreement shall have occurred, all amounts remaining in the Borrower Accounts shall be held by the Depositary for the benefit of the Agent and the Lenders until written instructions regarding disbursement thereof is given to the Depositary by the Collateral Agent, acting upon the instructions of the Directing Party.

3.21    <u>Disposition of Hereford Accounts Upon Termination Date</u>.  In the event that the Depositary shall have received a certificate from the Collateral Agent stating that the Termination Date shall have occurred, all amounts remaining in the Accounts thereto shall be held by the Depositary for the benefit of the Agent and the Lenders until written instructions regarding disbursement thereof is given to the Depositary by the Collateral Agent, acting upon the instructions of the Directing Party.

3.22    <u>Disposition of USEP Accounts Upon Termination Date</u>.  In the event that the Depositary shall have received a certificate from the Collateral Agent stating that the Termination Date shall have occurred, all amounts remaining in the Accounts thereto shall be held by the Depositary for the benefit of the Agent and the Lenders until written instructions regarding disbursement thereof is given to the Depositary by the Collateral Agent, acting upon the instructions of the Directing Party.

3.23    Disposition of Plainview Accounts Upon Termination Date.  In the event that the Depositary shall have received a certificate from the Collateral Agent stating that the Termination Date under the Subordinated Term Loan Agreement shall have occurred, all amounts remaining in the Accounts thereto shall be held by the Depository for the benefit of the Agent and the Lenders until written instructions regarding disbursement thereof is given to the Depository by the Collateral Agent, acting upon the instructions of the Directing Party.

3.24    Borrower Account Balance Statements.  The Depositary shall, on a monthly basis within 15 days after the end of each month and at such other times as the Collateral Agent or the Borrower may from time to time reasonably request, provide to the Collateral Agent, the Agent and the Borrower, fund balance statements in respect of each of the Borrower Accounts.  Such balance statement shall also include deposits, withdrawals and transfers from and to any Account and the net investment income or gain received and collected in each such Borrower Account.  The Depositary shall maintain records of all receipts, disbursements, and investments of funds with respect to the Borrower Accounts until the third anniversary of the Termination Date under the Subordinated Term Loan Agreement. Within 90 days after the end of each year, the Depositary shall furnish to the Collateral Agent, with a copy to the Borrower, a report setting forth in reasonable detail the account balance, receipts, disbursements, transfers, investment transactions and accruals for each of the Borrower Accounts during such year.  The Depositary shall give notice to the Collateral Agent and the Borrower of the location of the Borrower Accounts and sub-accounts.

3.25    Hereford Account Balance Statements.  The Depositary shall, on a monthly basis within 15 days after the end of each month and at such other times as the Collateral Agent or HerefordCo may from time to time reasonably request, provide to the Collateral Agent, the Agent, HerefordCo and the Borrower, fund balance statements in respect of each of the Hereford Accounts.  Such balance statement shall also include deposits, withdrawals and transfers from and to any Hereford Account and the net investment income or gain received and collected in each such Hereford Account.  The Depositary shall maintain records of all receipts, disbursements, and investments of funds with respect to the Hereford Accounts until the third anniversary of the Termination Date under the Subordinated Term Loan Agreement.  Within 90 days after the end of each year, the Depositary shall furnish to the Collateral Agent, with copies to the Agent, HerefordCo and the Borrower, a report setting forth in reasonable detail the account balance, receipts, disbursements, transfers, investment transactions and accruals for each of the Hereford Accounts during such year.  The Depositary shall give notice to the Collateral Agent, the Agent, HerefordCo and the Borrower of the location of the Hereford Accounts and sub-accounts.

3.26    USEP Account Balance Statements.  The Depositary shall, on a monthly basis within 15 days after the end of each month and at such other times as the Collateral Agent or USEP may from time to time reasonably request, provide to the Collateral Agent, the Agent, USEP and the Borrower, fund balance statements in respect of each of the USEP Accounts.  Such balance statement shall also include deposits, withdrawals and transfers from and to any USEP Account and the net investment

income or gain received and collected in each such USEP Account. The Depositary shall maintain records of all receipts, disbursements, and investments of funds with respect to the USEP Accounts until the third anniversary of the Termination Date under the Subordinated Term Loan Agreement. Within 90 days after the end of each year, the Depositary shall furnish to the Collateral Agent, with copies to the Agent, USEP and the Borrower, a report setting forth in reasonable detail the account balance, receipts, disbursements, transfers, investment transactions and accruals for each of the USEP Accounts during such year. The Depositary shall give notice to the Collateral Agent, the Agent, USEP and the Borrower of the location of the USEP Accounts and sub-accounts.

3.27 <u>Plainview Account Balance Statements</u>. The Depositary shall, on a monthly basis within 15 days after the end of each month and at such other times as the Collateral Agent or PlainviewCo may from time to time reasonably request, provide to the Collateral Agent, the Agent, PlainviewCo and the Borrower, fund balance statements in respect of each of the Plainview Accounts. Such balance statement shall also include deposits, withdrawals and transfers from and to any Plainview Account and the net investment income or gain received and collected in each such Plainview Account. The Depositary shall maintain records of all receipts, disbursements, and investments of funds with respect to the Plainview Accounts until the third anniversary of the Termination Date under the Subordinated Term Loan Agreement. Within 90 days after the end of each year, the Depositary shall furnish to the Collateral Agent, with copies to the Agent, PlainviewCo and the Borrower a report setting forth in reasonable detail the account balance receipts, disbursements, transfers, investment transactions and accruals for each of the Plainview Accounts during such year. The Depositary shall give notice to the Collateral Agent, the Agent, PlainviewCo and the Borrower of the location of the Plainview Accounts and sub-accounts.

3.28 <u>Events of Default</u>.

(a) On and after any date on which the Depositary receives written notice from the Collateral Agent that a Default Notice Period has occurred and is continuing and that the Collateral Agent has been directed by the Directing Party to take control of the Accounts, notwithstanding anything to the contrary contained herein, the Depositary shall thereafter accept all notices and instructions required or permitted to be given to the Depositary pursuant to the terms of this Agreement only from the Collateral Agent and not from the Borrower, HerefordCo, USEP, PlainviewCo or any other Person and the Depositary shall not withdraw, transfer, pay, invest or otherwise distribute any monies in any of the Accounts except pursuant to such notices and instructions from the Collateral Agent unless such Default Notice Period has ended, in which event the terms of this <u>Section 3.28</u> shall thereafter be inapplicable to such Event of Default.

(b) Within three Business Days of being informed of a Default Notice Period, the Depositary shall render an accounting of all monies in the Accounts as of the start of such Default Notice Period to the Collateral Agent.

(c)    All of the Collateral Agent's rights and remedies with respect to the Accounts, Deposit Accounts and the other Collateral Account shall be subject to the terms of this Agreement and any Account Control Agreements in respect of the Deposit Accounts.  Accordingly, from and after a the start of a Default Notice Period, the Collateral Agent shall have the right to control the Accounts, Deposit Accounts, use the Collateral Account to repay the Secured Obligations and sell, dispose or realize on the Collateral Account, in each case in accordance with this Agreement and each such Account Control Agreement.

(d)    From and after the start of any Default Notice Period, and notwithstanding anything herein to the contrary (but without limiting any of the Secured Parties' rights or remedies under the Security Documents and in each case subject to the terms of this Agreement), the Collateral Agent upon instruction of the Directing Party shall be permitted to (x)(i) liquidate and make Permitted Investments, (ii) direct the disposition of the funds in each of the Accounts, (iii) pay Operation and Maintenance Expenses then due and payable, (iv) pay Senior Interest Expense and fees in respect of Letters of Credit due and payable under Section 2.04(d) of the Senior Exit Facility Agreement, interest expense accrued on any amount of reimbursement of LC Disbursements that are unpaid by the Borrower, any reimbursement of LC Disbursements that remain unpaid by the Borrower or Subordinated Interest Expense and ordinary course settlement payments in respect of Senior Interest Rate Protection Agreements and Subordinated Interest Rate Protection Agreements and (v) pay principal under the Senior Exit Facility Agreement or Subordinated Term Loan Agreement and termination payments in respect of Senior Interest Rate Protection Agreements entered into under the Senior Exit Facility Documents and Subordinated Interest Rate Protection Agreements entered into under the Subordinated Term Facility Documents, all of such payments to be made in accordance with the priorities established by Section 3.04(c) and this Agreement and (y) (i) dispose of the funds in each of the Deposit Accounts to pay Operation and Maintenance Expenses then due and payable and (ii) take such other action in respect of the Deposit Accounts pursuant to instruction from the Directing Party.

3.29    Transfers from Accounts.  Whenever required under this Agreement and unless otherwise specified, all amounts required to be transferred from one Account to any other Account shall be so transferred by the Depositary as promptly as practicable.  Unless otherwise specified in this Agreement, all transfers shall be made by the Depositary pursuant to a Withdrawal Certificate.

ARTICLE IV

**DEPOSITARY**

4.01    Appointment of Depositary, Powers and Immunities.  The Borrower, for itself and on behalf of each Borrower Subsidiary, and the Collateral Agent, at the direction of the Senior Exit Facility Agent acting on behalf of the Senior Exit Facility Lenders and the Subordinated Term Loan

Agent, acting on behalf of the Subordinated Term Loan Lenders, hereby appoint the Depositary to act as its agent hereunder, with such powers as are expressly delegated to the Depositary by the terms of this Agreement, together with such other powers as are reasonably incidental thereto. The Depositary shall not have any duties or responsibilities except those expressly set forth in this Agreement and no implied duties or covenants shall be read against the Depositary. Without limiting the generality of the foregoing, the Depositary shall take all actions as the Collateral Agent or Directing Party shall direct it to perform in accordance with the express provisions of this Agreement. Notwithstanding anything to the contrary contained herein, the Depositary shall not be required to take any action which is contrary to this Agreement or Government Rule. Neither the Depositary nor any of its Affiliates shall be responsible to the Lenders for any recitals, statements, representations or warranties made by the Borrower or any Borrower Subsidiary and contained in this Agreement or any other Security Document or Financing Document or in any certificate or other document referred to or provided for in, or received by any Lender under this Agreement or any other Security Document or Financing Document for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Security Document or any other document referred to or provided for herein or therein or for any failure by the Borrower or any Borrower Subsidiary to perform its obligations hereunder or thereunder. The Depositary shall not be required to ascertain or inquire as to the performance by the Borrower or any Borrower Subsidiary of any of its obligations under this Agreement or any other document or agreement contemplated hereby or thereby. The Depositary shall not be (a) required to initiate or conduct any litigation or collection proceeding hereunder or under any other Security Document or (b) responsible for any action taken or omitted to be taken by it hereunder (except for its own gross negligence or willful misconduct) or in connection with any other Security Document. Except as otherwise provided under this Agreement, the Depositary shall take action under this Agreement only as it shall be directed in writing. Whenever in the administration of this Agreement the Depositary shall deem it necessary or desirable that a factual matter be proved or established in connection with the Depositary taking, suffering or omitting to take any action hereunder, such matter (unless other evidence in respect thereof is herein specifically prescribed) may be deemed to be conclusively proved or established by an Officer's Certificate of the Borrower, HerefordCo, USEP or PlainviewCo (as the case may be) or a certificate of a senior officer of the Collateral Agent, if appropriate. The Depositary shall have the right at any time to seek instructions concerning the administration of this Agreement from the Collateral Agent, the Borrower, HerefordCo, USEP or PlainviewCo or any court of competent jurisdiction. The Depositary shall have no obligation to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder. The Depositary shall not be liable for any error of judgment made in good faith by an officer or officers of the Depositary, unless it shall be conclusively determined by a court of competent jurisdiction that the Depositary was grossly negligent or acting with willful misconduct in ascertaining the pertinent facts. The Depositary may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees appointed with due care, and shall not be responsible for any willful misconduct or gross negligence on the part of, or for the supervision of, any agent, attorney, custodian or nominee so appointed. Neither the Depositary nor any of

its officers, directors, employees or agents shall be liable for any action taken or omitted under this Agreement or in connection therewith except to the extent caused by the Depositary's own gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction, no longer subject to appeal or review. The Depositary shall not be deemed to have knowledge of an Event of Default unless the Depositary shall have received written notice thereof. The rights, privileges, protections and benefits given to the Depositary, including, without limitation, its rights to be indemnified, are extended to, and shall be enforceable by, the Depositary in each of its capacities hereunder, and to each agent, custodian and other Persons employed by the Collateral Agent in accordance herewith to act hereunder.

4.02    Reliance by Depositary. The Depositary shall be entitled to conclusively rely upon and shall not be bound to make any investigation into the facts or matters stated in any certificate of the Borrower, HerefordCo, USEP, PlainviewCo, the Collateral Agent or any other notice or other document (including any cable, telegram, telecopy or telex) reasonably believed by it to be genuine and to have been signed or sent by or on behalf of the proper Person or Persons, and upon advice and statement of legal counsel, independent accountants and other experts selected by the Depositary with reasonable care and shall have no liability for its actions taken thereupon. Without limiting the foregoing, the Depositary shall be required to make payments to the Lenders only as set forth herein. The Depositary shall be fully justified in failing or refusing to take any action under this Agreement (a) if such action would, in the reasonable opinion of the Depositary, be contrary to applicable Government Rule or the terms of this Agreement, (b) if such action is not specifically provided for in this Agreement, it shall not have received any such advice or concurrence of the Collateral Agent as it deems appropriate or (c) if, in connection with the taking of any such action that would constitute an exercise of remedies under this Agreement (whether such action is or is intended to be an action of the Depositary or the Collateral Agent), it shall not first be indemnified to its reasonable satisfaction by the Lenders (other than the Collateral Agent (in its individual capacity) or any other agent or trustee under any of the Financing Documents (in their respective individual capacities)) against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Depositary shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement in accordance with a request of the Collateral Agent or the Agent, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

4.03    Court Orders. The Depositary is hereby authorized, in its exclusive discretion, to obey and comply with all writs, orders, judgments or decrees issued by any court or administrative agency affecting any money, documents or things held by the Depositary. The Depositary shall not be liable to any of the parties hereto or any of the Lenders or their successors, heirs or personal representatives by reason of the Depositary's compliance with such writs, orders, judgments or decrees, notwithstanding such writ, order, judgment or decree is later reversed, modified, set aside or vacated.

4.04    Resignation or Removal.    Subject to the appointment and acceptance of a successor Depositary as provided below, the Depositary may resign at any time by giving 30 days' written notice thereof to the Collateral Agent and the Borrower, provided that in the event the Depositary is also the Collateral Agent, it must also resign as the Collateral Agent at the same time.  The Depositary may be removed at any time with or without cause by the Collateral Agent.  So long as no Event of Default shall have then occurred and be continuing, the Borrower shall have the right to remove the Depositary for cause upon 60 days' notice to the Depositary and the Collateral Agent.  Each Borrower Subsidiary shall have no right to remove the Depositary and shall be bound by the actions of the parties hereto.  In the event that the Depositary shall decline to take any action without first receiving adequate indemnity from the Borrower or the Secured Parties and, having received an indemnity, shall continue to decline to take such action, the Borrower and the Collateral Agent shall be deemed to have sufficient cause to remove the Depositary.  Notwithstanding anything to the contrary, no resignation or removal of the Depositary shall be effective until: (i) a successor Depositary is appointed in accordance with this Section 4.04, (ii) the resigning or removed Depositary has transferred to its successor all of its rights and obligations in its capacity as the Depositary under this Agreement and the other Financing Documents, and (iii) the successor Depositary has executed and delivered an agreement to be bound by the terms hereof and perform all duties required of the Depositary hereunder.  Within 30 days of receipt of a written notice of any resignation or removal of the Depositary, so long as no Event of Default shall have then occurred and be continuing, the Borrower shall appoint a successor Depositary reasonably acceptable to the Collateral Agent; provided, that if the Collateral Agent does not confirm such acceptance or reject such appointee in writing within 30 days following selection of such successor by the Borrower, then it shall be deemed to have given acceptance thereof and such successor shall be deemed appointed as the Depositary hereunder.  If no successor Depositary shall have been appointed by the Borrower and shall have accepted such appointment within 30 days after the retiring Depositary's giving of notice of resignation or the removal of the retiring Depositary or if an Event of Default shall have then occurred and be continuing, then the retiring Depositary may apply to a court of competent jurisdiction to appoint a successor Depositary, which shall be an Acceptable Bank and is reasonably acceptable to the Collateral Agent.  Upon the acceptance of any appointment as Depositary hereunder by the successor Depositary, (a) such successor Depositary shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Depositary, and the retiring Depositary shall be discharged from its duties and obligations hereunder and (b) the retiring Depositary shall promptly transfer all monies and Permitted Investments within its possession or control to the possession or control of the successor Depositary and shall execute and deliver such notices, instructions and assignments as may be necessary or desirable to transfer the rights of the Depositary with respect to the monies and Permitted Investments to the successor Depositary.  After the retiring Depositary's resignation or removal hereunder as Depositary, the provisions of this Article IV and of Article V shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as Depositary.  Any corporation into which the Depositary may be merged or converted or with which it may be consolidated or any corporation resulting from any merger, conversion or consolidation to which the Depositary shall

be a party, or any corporation succeeding to the business of the Depositary shall be the successor of the Depositary hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

4.05    Exculpatory Provisions.   Beyond the exercise of reasonable care in the custody thereof and as otherwise specifically set forth herein, the Depositary shall have no duty as to any of the Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Depositary shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral.  The Depositary shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Depositary in good faith.

The Depositary shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Depositary, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of each of the Borrower, HerefordCo, USEP and PlainviewCo to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral.

ARTICLE V

COLLATERAL AGENT

5.01    Appointment; Powers and Immunities.

(a)    The Senior Exit Facility Agent acting on behalf of the Senior Exit Facility Lenders, and the Subordinated Term Loan Agent, acting on behalf of the Subordinated Term Loan Lenders, hereby designate and appoint The Bank of New York to act as the Collateral Agent under the Security Documents, and authorize the Collateral Agent to enter into this Agreement, each of the other Security Documents, the Senior Exit Facility Agreement and the Subordinated Term Loan Agreement, appoint the Depositary pursuant to the terms of this Agreement, take such actions on its and their behalf under the provisions of the Security Documents and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of the Security Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in the Financing Documents, the Collateral Agent shall not have any duties,

responsibilities or fiduciary relationship with any Secured Party, except those expressly set forth in this Agreement and the other Security Documents, and no implied covenants, functions or responsibilities, fiduciary or otherwise, shall be read into this Agreement or any other Security Document or otherwise exist against the Collateral Agent, and any such implied duties that may exist under any applicable Government Rule are hereby waived to the fullest extent permitted under such applicable Government Rule.

(b)    The Collateral Agent will give notice to the Agent on behalf of the Secured Parties of any action to be taken by the Collateral Agent under any Security Document; such notice shall be given prior to the taking of such action unless the Collateral Agent determines that to do so would be detrimental to the interests of the Secured Parties, in which event such notice shall be given promptly after the taking of such action.

(c)    Notwithstanding anything to the contrary in any Security Document, the Collateral Agent shall not be required to exercise any discretionary rights or remedies under any of the Security Documents or give any consent under any of the Security Documents or enter into any agreement amending, modifying, supplementing or waiving any provision of any Security Document unless it shall have been expressly directed in writing to do so by the Agent; *provided*, that the Agent shall obtain the necessary consent of the number of lenders required under the Senior Exit Financing Agreement or Subordinated Term Loan Agreement, as applicable, before giving any such direction to the Collateral Agent.

5.02    Rights of Collateral Agent.

(a)    The Collateral Agent may execute any of its duties under the Security Documents by or through agents or attorneys-in-fact and shall not be liable for any acts or omissions of any such agent appointed with due care by it hereunder.  The Collateral Agent shall be entitled to seek the advice of its independent counsel concerning all matters pertaining to such duties and shall not be liable for any action or inaction based in good faith on such advice.

(b)    Neither the Collateral Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (i) liable to any of the Secured Parties for any action lawfully taken or omitted to be taken by it under or in connection with any Security Document (except for its own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Secured Parties for any recitals, statements, representations or warranties made by the Borrower, any Borrower Subsidiary or any other party to a Financing Document or any Authorized Officer of any thereof contained in any Financing Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Collateral Agent under or in connection with, any Financing Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of the Financing Documents or for any failure of the Borrower, any Borrower Subsidiary or any other

party to a Financing Document to perform its obligations thereunder. The Collateral Agent shall not be under any obligation to any Secured Party to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, any Financing Document, or to inspect the properties, books or records of the Borrower, any Borrower Subsidiary or any other party to a Financing Document.

(c)  The Collateral Agent shall be entitled to rely and shall be fully protected in relying upon any note, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, electronic mail message, telex or teletype message, statement, order or other document (whether in original or facsimile form) reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel, independent accountants and other experts selected by the Collateral Agent.

(d)  Neither the Collateral Agent nor any of its officers, directors, employees, agents, or attorneys-in-fact shall be liable to the Borrower, any Borrower Subsidiary or any of the Secured Parties or any other Person for any act or omission on its part except for any such act or omission which is the result of its own gross negligence or willful misconduct. The powers conferred on the Collateral Agent hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of the Collateral in its possession and the accounting for monies actually received by it hereunder, the Collateral Agent shall have no other duty as to the Collateral, whether or not the Collateral Agent or any of the other Secured Parties has or is deemed to have knowledge of any matters, or as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to the Collateral. The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Collateral Agent accords its own property.

(e)  The Collateral Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Financing Document unless it shall first receive instruction from the Directing Party as it reasonably deems appropriate or it shall first be indemnified to its reasonable satisfaction by the Secured Parties against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action, and any action taken or failure to act pursuant thereto shall be binding upon all the Secured Parties. The Collateral Agent shall affirmatively act under this Agreement and the other Financing Documents in accordance with any instructions by the Directing Party made pursuant to and not in contravention of this Agreement. The Collateral Agent shall not incur any liability for any determination made or instruction given by the Directing Party. In no event shall the Collateral Agent be required to take any action that exposes it to personal liability or that is contrary to this Agreement or any applicable Government Rule.

(f)     The Collateral Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Borrower, any Borrower Subsidiary and the other parties to the Transaction Documents, without regard to its acting as the Collateral Agent hereunder and under the other Financing Documents.  With respect to the extensions of credit made by it under a Financing Document, the Collateral Agent shall have the same rights and powers under this Agreement and the other Financing Documents as any other Lender making a comparable extension of credit to the Borrower and may exercise the same as though it were not the Collateral Agent.

(g)     For the purposes of this Agreement and all other Financing Documents, the Collateral Agent shall not be deemed to have knowledge of, or have any duty to ascertain or inquire into, (i) the occurrence of any Default or Event of Default unless and until it has received written notice thereof from the Borrower, the Agent or any other Secured Party describing such Default or Event of Default and stating that such notice is a "notice of default," and informing the Collateral Agency of the commencement of a Default Notice Period or (ii) the existence, the content, or the terms and conditions of, any other agreement, instrument or document, in each case, to which it is not a party or beneficiary, whether or not referenced herein.  The Collateral Agent may take such action with respect to such Default or Event of Default as is required or permitted to be taken by it pursuant to each Security Document following the start of the Default Notice Period.  Without prejudice to the foregoing, none of the knowledge or information that any department or division of the Collateral Agent or any of its affiliates may have from time to time shall be attributed to the Collateral Agent, and the Collateral Agent shall have no duty to disclose nor shall the Collateral Agent be liable for the failure to disclose, any information relating to the Borrower that is communicated to or obtained by the Collateral Agent or any of its affiliates in any capacity.

(h)     The Collateral Agent shall not be deemed to have knowledge of facts and circumstances unless it has received written notice of such facts and circumstances, nor shall the Collateral Agent have any obligation to perform any actions or respond to any matters without express authorization to do so.

5.03     Remedies; Application of Proceeds.

(a)     The Collateral Agent, at the direction of the Directing Party, shall have the right to enforce rights, exercise remedies (including set-off and the right to credit bid their Indebtedness) and make determinations regarding the release, disposition, or restrictions with respect to the Collateral, may enforce the provisions of the Security Documents and exercise remedies thereunder, all in such order and in such manner as the Directing Party may determine in the exercise of their sole discretion.  Such exercise and enforcement shall include the rights of the Collateral Agent to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC and the Security Documents and of a secured creditor under the Bankruptcy Code of any Government

Authority; provided that unless and until the Collateral Agent shall have received such direction, the Collateral Agent may (but shall not be obligated to) also take such action, or refrain from taking such action, in order to preserve or protect its Liens on the Collateral and preserve the value of the Collateral, with respect to any Default or Event of Default as it shall deem advisable in the best interests of the Secured Parties.

(b)   Regardless of whether any Bankruptcy has been commenced by or against the Borrower or any other Credit Party, any money collected or to be applied by the Collateral Agent pursuant to this Agreement and the other Security Documents (other than monies for its own account), whether upon disposition of Collateral in accordance with the terms of this Agreement and the other Security Documents or pursuant to direction from the Directing Party, together with any other monies which may then be held by, or under the control of, the Collateral Agent under any of the Accounts or Deposit Accounts shall be applied in the following order (it being agreed that the Collateral Agent shall apply such amounts in the following order as promptly as is reasonably practicable after the receipt thereof):

*first*, on a pro rata basis, to the payment of all amounts due to the Collateral Agent, the Depositary, the Agent and any of the other agents, trustees and issuing banks under any of the Financing Documents;

*second*, on a pro rata basis, to the payment of (i) any Senior Interest Expense then due and payable on the Senior Secured Obligations, (ii) any amounts of unpaid fees due to the Senior Exit Facility Agent or the Issuing Bank under Section 2.04(d) of the Senior Exit Facility Agreement, (iii) any amount of interest accrued on reimbursements for LC Disbursements that remain unpaid by the Borrower, and (iv) ordinary course settlement payments under the Senior Interest Rate Protection Agreement Agreements then due and payable to the providers of such Senior Interest Rate Protection Agreement Agreements who are Senior Exit Facility Lenders;

*third*, on a pro rata basis, to the payment of (i) any principal then due and payable under the Senior Exit Financing Documents, (ii) the aggregate amount of any reimbursement for LC Disbursements that remain unpaid by the Borrower (including the cash collateralization (at 102.5% of the aggregate undrawn amount) of all outstanding Letters of Credit issued by the Issuing Bank (it being acknowledged and agreed that such cash collateralization shall be effectuated in a manner reasonably satisfactory to the Senior Exit Facility Agent), and (iii) termination payments under any Senior Interest Rate Protection Agreement entered into pursuant to the Senior Exit Financing Documents then due and payable to the providers of such Senior Interest Rate Protection Agreements who are Senior Exit Facility Lenders;

*fourth*, on a pro rata basis, to the payment of (i) any Subordinated Interest Expense then due and payable on the Subordinated Secured Obligations, and (ii) ordinary course settlement payments under any Subordinated Interest Rate Protection Agreement then due and payable to the providers of such Subordinated Interest Rate Protection Agreement who are Subordinated Term Loan Lenders;

*fifth*, on a pro rata basis, to the payment of (i) any principal then due and payable under the Subordinated Term Financing Documents, and (ii) termination payments under any Subordinated Interest Rate Protection Agreement due and payable to the providers of such Subordinated Interest Rate Protection Agreement who are Subordinated Term Loan Lenders;

*sixth*, on a pro rata basis in inverse order of maturity, to the payment of any principal amount outstanding of the Loans under the Subordinated Term Loan Agreement; and

*seventh*, any remaining amounts to New WEI or as directed by a court of competent jurisdiction.

5.04    <u>Limits on Separate Enforcement Actions</u>.  No Lender shall have any right to institute any Foreclosure Action nor to exercise any other remedy provided by the Security Documents or by law or equity for the purpose of realizing upon the Liens in the Collateral, which actions shall only be taken by the Collateral Agent (acting at the direction of the Directing Party), Senior Exit Facility Agent until the occurrence of the Termination Date under the Senior Exit Facility Agreement and thereafter, the Subordinated Term Loan Agent.

5.05    <u>Indebtedness Balances</u>.  Upon the written request of the Collateral Agent, each Permitted Swap Provider that is a Lender and the Agent shall promptly (and, in any event, within five (5) Business Days) give the Collateral Agent written notice of the aggregate amount of the Secured Obligations then outstanding and due and payable by the Borrower to such Secured Parties under the applicable Financing Documents and any other information that the Collateral Agent may reasonably request of such Secured Parties; which written notice shall be updated by such Secured Parties from time to time upon request of the Collateral Agent after receipt of proceeds of Collateral or otherwise.

5.06    <u>Release of Collateral</u>.

(a)    If in connection with the exercise of any of the Secured Parties' remedies under the Financing Documents, the Collateral Agent disposes of any part of the Collateral or in connection with any conveyance, sale, lease, transfer or other disposition permitted under the Financing Documents, then the Liens, if any, of the Collateral Agent for the benefit of any of the Secured Parties on such Collateral shall be automatically, unconditionally and simultaneously released.  The Collateral

Agent (on behalf of the Secured Parties) shall promptly execute and deliver such termination statements, releases and other documents as reasonably required or requested to effectively confirm such release.

(b)   To the extent that the Collateral Agent (acting at the direction of the Directing Party) or any of the Secured Parties (i) have released any Lien on Collateral and any such Liens are later reinstated or (ii) obtain any new Liens, then each such reinstated Lien or new Liens shall be subject to the provisions of this Agreement.

5.07   <u>Further Assurances</u>.  Each Obligor hereby agrees that, at any time and from time to time, at its sole cost and expense, it shall promptly execute and deliver all further agreements, instruments, documents and certificates and take all further action that may be necessary in order to fully effect the purposes of this Agreement and the other Financing Documents (including, to the extent required by any Financing Document, the delivery of possession of any Collateral represented by certificated securities that hereafter comes into existence or is acquired in the future by the Collateral Agent as pledgee for the benefit of the Secured Parties) and to enable the Collateral Agent to exercise and enforce its rights and remedies under the Security Documents with respect to the Collateral or any part thereof.

ARTICLE VI

RESIGNATION OR REMOVAL OF THE COLLATERAL AGENT

6.01   <u>Resignation; Removal</u>.  The Collateral Agent (x) may resign as Collateral Agent upon 60 days' written notice to the Agent and the Borrower (so long as (1) the Agent has not given written notice to the Collateral Agent that a Default has occurred and is continuing and (2) a Default Notice Period is not in effect) and (y) may be removed at any time with or without cause by the Directing Party acting at the direction of the Majority Lenders under the Senior Exit Facility Agreement or Subordinated Term Loan Agreement, as applicable, with any such resignation or removal to become effective only upon the appointment of a successor Collateral Agent under this <u>Article VI</u>.  If the Collateral Agent shall resign or be removed as Collateral Agent, then the Directing Party acting at the direction of the Majority Lenders under the Senior Exit Facility Agreement or Subordinated Term Loan Agreement, as applicable, shall (and if no such successor shall have been appointed within 30 days of the Collateral Agent's resignation or removal, the Collateral Agent may) appoint a successor agent for the Secured Parties, which successor agent shall be (so long as (1) the Directing Party has not given written notice to the Collateral Agent that a Default has occurred and is continuing and (2) a Default Notice Period is not in effect), reasonably acceptable to the Borrower (and which successor agent shall be an Acceptable Bank) whereupon such successor agent shall succeed to the rights, powers and duties of the Collateral Agent, and the term "**Collateral Agent**" shall mean such successor agent effective upon its appointment, and the former Collateral Agent's rights, powers and duties as Collateral Agent shall be

terminated, without any other or further act or deed on the part of such former Collateral Agent (except that the former Collateral Agent shall deliver all Collateral then in its possession to the successor Collateral Agent) or any of the other Secured Parties. After resignation or removal hereunder as Collateral Agent, the provisions of this Agreement shall continue to inure to the former Collateral Agent's benefit as to any actions taken or omitted to be taken by it while it was Collateral Agent.

6.02    Substitute Collateral Agent. If at any time the Collateral Agent shall reasonably determine that it shall be necessary or appropriate under any applicable Government Rule or in order to permit action to be taken hereunder, the Collateral Agent and the Borrower shall execute and deliver all instruments necessary to appoint any Person as a co-Collateral Agent, or substitute Collateral Agent, with respect to all or any portion of the Collateral, in any case with such powers, rights, duties, obligations and immunities conferred upon the Collateral Agent hereunder as may be specified therein. If the Borrower shall refuse to join in the execution of any such instrument within 10 Business Days of any written request therefor by the Collateral Agent, or if (1) the Directing Party has given written notice to the Collateral Agent that a Default has occurred and is continuing or (2) a Default Notice Period is in effect, then in any such instance the Collateral Agent may act under the foregoing provisions without the concurrence of the Borrower. The Borrower hereby irrevocably makes, constitutes and appoints the Collateral Agent as the Borrower's agent and attorney-in-fact to act for the Borrower under the provisions of this Section 6.02.

ARTICLE VII

EXPENSES; INDEMNIFICATION; FEES

7.01    Compensation and Expenses.

(a)    The Borrower agrees to pay to the Depositary (a) the Depositary's fees as separately agreed by the Borrower and the Depositary and (b) the amount of any and all of the Depositary's reasonable and documented out-of-pocket expenses, including the reasonable and documented fees and expenses of its counsel (and any local counsel) and of any accountants, experts or agents, which the Depositary may incur in connection with (i) the administration of this Agreement, (ii) the custody or preservation of, or the sale of, collection from, or other realization upon, any of the Collateral Account or (iii) the exercise or enforcement (whether through negotiations, legal proceedings or otherwise) of any of the rights of the Depositary under this Agreement.

(b)    The Borrower agrees to pay to the Collateral Agent (a) the Collateral Agent's fees as separately agreed by the Borrower in the Collateral Agency Fee Letter and (b) the amount of any and all of the Collateral Agent's documented out-of-pocket expenses, including the documented fees and expenses of its counsel (and any local counsel) and of any accountants, experts or agents, which the Collateral Agent may incur in connection with (i) the administration of this Agreement,

(ii) the custody or preservation of, or the sale of, collection from, or other realization upon, any of the Collateral or (iii) the exercise or enforcement (whether through negotiations, legal proceedings or otherwise) of any of the rights of the Collateral under this Agreement and any other Financing Document.

7.02    Indemnification.

(a)    Each of the Borrower and each Borrower Subsidiary, whether or not any of the transactions contemplated hereby shall be consummated, jointly and severally, hereby assumes liability for and agrees to defend, indemnify and hold harmless each Indemnified Person from and against any Claims which may be imposed on, incurred by or asserted against an Indemnified Person in any way relating to or arising or alleged to arise out of: (a) the financing, ownership, operation or maintenance of any Project, or any part thereof; (b) any latent or other defects in any Project whether or not discoverable by an Indemnified Person, the Borrower or a Borrower Subsidiary; (c) a violation of Environmental Laws, Environmental Claim or other loss of or damage relating to any Project; (d) any breach by the Borrower or any Borrower Subsidiary of any of its representations or warranties under the Financing Documents or failure by the Borrower or any Borrower Subsidiary to perform or observe any covenant or agreement to be performed by it under any of the Financing Documents; (e) personal injury, death or property damage relating to any Project, including Claims based on strict liability in tort and (f) the transactions contemplated hereby (including the performance by each of the Depositary and the Collateral Agent of its duties, rights and obligations hereunder); provided, that the foregoing indemnities in clauses (a) through (f) shall not, as to any Indemnified Person, apply to Claims to the extent they are determined to have been caused by (i) the gross negligence or willful misconduct of such Indemnified Person as determined in a final, non-appealable judgment by a court of competent jurisdiction, or (ii) any Taxes owed by the Indemnified Person in its individual capacity.

(b)    To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in clause (a) may be unenforceable in whole or in part because they are violative of any law or public policy, the Borrower and any Borrower Subsidiary shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all indemnified liabilities incurred pursuant to clause (a) by any Indemnified Person.

(c)    The agreements in this Section 7.02 shall survive termination of this Agreement.

7.03    Prompt Payment.  All amounts due under this Article VII shall be payable by the Borrower or any Borrower Subsidiary within 30 days after receipt of written demand therefor.

# ARTICLE VIII

## MISCELLANEOUS

8.01    <u>Amendments; Etc</u>.  No amendment or waiver of any provision of this Agreement nor consent to any departure by the Borrower or any Borrower Subsidiary herefrom shall in any event be effective unless the same shall be in writing and signed by each of the parties hereto and is otherwise in accordance with the terms of this Agreement.  Any such amendment, waiver or consent shall be effective only in the specific instance and for the specified purpose for which given.  For amendments or waivers of this Agreement, the Borrower shall have the authority to execute such amendment or waiver for itself and on behalf of each of the Borrower Subsidiaries.

8.02    <u>Lien Priority</u>.  The Senior Exit Facility Priority with respect to Liens granted to and held by the Collateral Agent is as set forth in the Subordination Agreement.

8.03    <u>Addresses for Notices</u>.  All notices, requests and other communications provided for hereunder shall be in writing and, except as otherwise required by the provisions of this Agreement, shall be sufficiently given and shall be deemed given when personally delivered or, if mailed by registered or certified mail, postage prepaid, or sent by overnight delivery or telecopy (provided, that if any notice is delivered by means of telecopy, such notice shall only be effective if the recipient confirms via telephone, electronic mail or facsimile receipt of such notice to the sender), upon receipt by the addressee, in each case addressed to the parties as follows (or such other address as shall be designated by such party in a written notice to each other party):

Borrower:                          WHITE ENERGY HOLDING COMPANY, LLC
                                   5005 LBJ Freeway, Suite 1400
                                   Dallas, Texas  75244
                                   Attn: John W.  Castle

Borrower Subsidiaries:             WHITE ENERGY HEREFORD, LLC
                                   5005 LBJ Freeway, Suite 1400
                                   Dallas, Texas  75244
                                   Attn: John W. Castle

                                   WE HEREFORD, LTD.
                                   5005 LBJ Freeway, Suite 1400
                                   Dallas, Texas  75244
                                   Attn: John W.  Castle

                                   WHITE ENERGY PARTNERS, LLC

5005 LBJ Freeway, Suite 1400

Dallas, Texas  75244

Attn: John W.  Castle


U.S. ENERGY PARTNERS, LLC

5005 LBJ Freeway, Suite 1400

Dallas, Texas  75244

Attn: John W.  Castle


PLAINVIEW BIOENERGY, LLC

5005 LBJ Freeway, Suite 1400

Dallas, Texas  75244

Attn: John W.  Castle


Collateral Agent:       THE BANK OF NEW YORK

101 Barclay Street, F1 8W

New York, NY  10286

Attn: Corporate Trust Administration


with a copy to:        WESTLB AG, NEW YORK BRANCH, as Agent

1211 Avenue of the Americas

New York, NY  10036

Attention: Duncan Robertson


Depositary:          THE BANK OF NEW YORK

101 Barclay Street, Fl. 8W

New York, NY 10286

Attn: Corporate Trust Administration


Wiring Instructions:     Bank: The Bank of New York

ABA #: 021000018

Account #: GLA111-565

Account Name: Corporate Trust Agency

For Further Credit to: White Energy Revenue A/C No.  486910

Attention: Corporate Finance/Beata Hryniewicka


8.04     Governing Law; Jurisdiction.

(a) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK EXCLUDING CHOICE OF LAW PRINCIPLES OF SUCH LAWS WHICH WOULD REQUIRE THE APPLICATION OF THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

(b) ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT AND ANY ACTION FOR ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HERETO HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS AND APPELLATE COURTS FROM ANY THEREOF.  EACH OF THE BORROWER AND EACH BORROWER SUBSIDIARY HEREBY IRREVOCABLY DESIGNATES, APPOINTS AND EMPOWERS CT CORPORATION SYSTEM AS ITS DESIGNEE, APPOINTEE AND AGENT TO RECEIVE, ACCEPT AND ACKNOWLEDGE FOR AND ON ITS BEHALF, AND IN RESPECT OF ITS PROPERTY, SERVICE OF ANY AND ALL LEGAL PROCESS, SUMMONS, NOTICES AND DOCUMENTS WHICH MAY BE SERVED IN ANY ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  IF FOR ANY REASON SUCH DESIGNEE, APPOINTEE AND AGENT SHALL CEASE TO BE AVAILABLE TO ACT AS SUCH, EACH OF THE BORROWER AND EACH BORROWER SUBSIDIARY AGREES TO DESIGNATE A NEW DESIGNEE, APPOINTEE AND AGENT IN NEW YORK CITY ON THE TERMS AND FOR THE PURPOSES OF THIS PROVISION SATISFACTORY TO THE COLLATERAL AGENT.  EACH OF THE PARTIES HERETO IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER, EACH BORROWER SUBSIDIARY, THE DEPOSITARY AND THE COLLATERAL AGENT AT ITS ADDRESS REFERRED TO IN SECTION 8.03.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY DO SO UNDER APPLICABLE LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT BROUGHT IN THE COURTS REFERRED TO ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER

PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED IN ANY OTHER JURISDICTION.

(c)   TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT OF TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY MATTER ARISING HEREUNDER.

8.05    <u>Headings</u>.  Section and Article headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

8.06    <u>Limited Third Party Beneficiaries</u>.  This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of the Lenders.

8.07    <u>No Waiver</u>.  No failure on the part of the Depositary, the Collateral Agent or any of the Lenders or any of their nominees or representatives to exercise, and no course of dealing with respect to, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof., nor shall any single or partial exercise by the Depositary, the Collateral Agent or any of the Lenders or any of their nominees or representatives of any right, power or remedy hereunder preclude any other or future exercise thereof or the exercise of any other right, power or remedy, nor shall any waiver of any single Event of Default or other breach or default be deemed a waiver of any other Event of Default or other breach or default theretofore or thereafter occurring.  Without limiting the generality of the foregoing, if the Collateral Agent or the Depositary fails to make any transfers or withdrawals as and when specified in this Agreement, such failure shall not operate as a waiver of any of the rights that the Secured Parties may have under the Financing Documents (or obligations of the Borrower or any Borrower Subsidiary) and the Collateral Agent or the Depositary, as applicable, will promptly take any such action which it previously failed to take in accordance with the terms of this Agreement.  All remedies either under this Agreement or by law or otherwise afforded to any Lender shall be cumulative and not alternative.

8.08    <u>Severability</u>.  If any provision of this Agreement or the application thereof shall be invalid or unenforceable to any extent, (a) the remainder of this Agreement and the application of such remaining provisions shall not be affected thereby and (b) each such remaining provision shall be enforced to the greatest extent permitted by law.

8.09    <u>Successors and Assigns</u>.   All covenants, agreements, representations and warranties in this Agreement by each party hereto shall bind and, to the extent permitted hereby, shall inure to the benefit of and be enforceable by their respective successors and assigns and the Lenders, whether so expressed or not.

8.10    Execution in Counterparts.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

8.11    Force Majeure.  In no event shall the Collateral Agent or Depositary be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of god, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Collateral Agent or Depositary shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance promptly under the circumstances.

8.12    Consequential Damages.  Anything in this Agreement to the contrary notwithstanding, in no event shall any of the parties hereto be liable under or in connection with this Agreement for indirect, special, incidental, punitive or consequential losses or damages of any kind whatsoever, including but not limited to lost profits, whether or not foreseeable, even if such party has been advised of the possibility thereof and regardless of the form of action in which such damages are sought.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]