## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Case No. 09-11601 (CSS) |
| WHITE ENERGY, INC., *et al.*, | Chapter 11<br>Jointly Administered |
| Debtors.[1] | **Objection to Docket No. 488**<br>**Hearing: March 4, 2010 at 11:00 a.m.** |

### OBJECTION OF FAGEN, INC. TO CONFIRMATION OF THE AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR WHITE ENERGY, INC. AND ITS AFFILIATED DEBTORS FILED BY THE DEBTORS AND WESTLB AG, NEW YORK BRANCH, AS ADMINISTRATIVE AGENT

Fagen, Inc. ("Fagen"), by and through its undersigned counsel, hereby objects to

confirmation of the Amended Chapter 11 Plan Of Reorganization For White Energy, Inc. And Its

Affiliated Debtors Filed By The Debtors And WestLB AG, New York Branch, As

Administrative Agent (the "Plan"), and in support thereof, respectfully states as follows:

### INTRODUCTION

1.      Fagen holds claims in excess of $17.8 million that are secured by first priority

mechanic's liens[2] on the Debtors' assets (the "Fagen Claims").

---

[1] The Debtors in these cases are: White Energy, Inc.; White Energy Holding Company, LLC; US Energy Partners, LLC; WE Hereford, LLC ("Hereford"); and Plainview BioEnergy, LLC ("Plainview").

[2] Under Texas mechanic's lien law, Fagen has constitutional liens on the Facilities (as defined below). *In re A & M Operating Co.*, 182 B.R. 997, 1004 (E.D. Tex. 1995). The liens are self-executing and, under the facts relevant here, attached prior to WestLB AG's deeds of trust. *Id.* at 1000. Even if the deeds of trust attached to the Facilities before the Fagen mechanic's liens, Fagen is over-secured because the constitutional liens extend to articles deemed "removable" under Texas law; a lien encumbering a removable is superior to pre-existing deeds of trust. *Hoarel Sign Co. v. Dominion Equity Corp.*, 910 S.W.2d 140, 142 (Tex. Ct. App. 1995).

2.     The Fagen Claims are for work under two design-build agreements (the "Agreements") related to the construction and ongoing operation of two of the Debtors' ethanol production facilities in Hereford and Plainview, Texas (the "Facilities"): the April 14, 2006, First Amended and Restated Lump-Sum Design Build Agreement Between W.E. Hereford, Ltd. ("Owner") and Fagen, Inc. ("Design Builder") (as amended by Fagen and the Debtor) (the "Hereford Agreement"); and the July 27, 2006, Lump-Sum Design-Build Agreement Between Plainview Bioenergy, LLC ("Owner") and Fagen, Inc. ("Design Builder") (as amended by Fagen and the Debtor) (the "Plainview Agreement").[3]

3.     The Debtors' plan of reorganization relies on the sale of ethanol produced by the Facilities, ethanol that cannot be produced without the use of technology yet to be licensed under the Agreements. Although the necessary licenses are only granted to the Debtors upon full payment of amounts due under the Agreements, the Debtors' Plan fails to assume the Agreements or cure the amounts owed.

4.     Fagen and ICM, Inc. ("ICM")[4] will not provide the Debtors licenses to use critical intellectual property necessary to operate and maintain the Facilities until the Fagen Claims are paid in full. Accordingly, the required licenses have not been transferred. As material obligations remain on both sides, the Agreements are executory, and must either be assumed or rejected. Testimony at the confirmation hearing will establish that rejection of the Agreements would doom the Debtors' Plan to failure.

---

[3] True and correct copies of relevant parts of both the Hereford (Exhibit A) and Plainview (Exhibit B) Agreements are filed with this Objection. The Agreements are substantially similar in relevant portions, with the exception of the choice of law. The Hereford Agreement selected New York law, while the Plainview Agreement selected Minnesota law. (Ex. A & B, § 21.3.)

[4] On information and belief, ICM intends to file a separate objection because the Plan attempts to assume ICM license agreements for the Facilities without paying the cure amounts owed to Fagen.

5.      The Plan does not contemplate the assumption (and cure) of the Agreements. Rather, the Plan contemplates severing the licenses relating to the proprietary property of ICM (the "Proprietary Property Licenses") from the Agreements, and assuming only the Proprietary Property Licenses.

6.      The Proprietary Property Licenses are completely integrated parts of each Agreement, and may not be severed as the Plan proposes.  As required by 11 U.S.C. § 365, the Debtors must assume each Agreement in its entirety – not just those provisions it prefers.

7.      Even if the Proprietary Property Licenses were severable, the remaining provisions of each Agreement are also executory – and are also vital to assume in order to ensure the feasibility of the Plan.  Fagen retains the ownership of certain intellectual property necessary for the operation of the Facilities (the "Fagen Work Product"), and is not required to provide the Debtors with licenses to use that intellectual property (the "Work Product Licenses") until it is paid under the Agreements.

8.      After rejection of the Agreements, Debtors are in the untenable position of operating the Facilities without the necessary licenses to the Facilities' intellectual property. This is not a feasible business plan, and cannot provide the basis for a confirmable plan of reorganization as required by 11 U.S.C. § 1129(a)(11).

9.      Even if the Court were to determine that the Proprietary Property Licenses could be severed from each Agreement, and that the Debtors could reject each Agreement and somehow operate in the absence of the requisite Work Product Licenses from Fagen, the Plan is not confirmable because the rate of interest it proposes to pay Fagen (as a member of Class 3 – Other Secured Claims) does not provide Fagen with the present value of its claim as required by 11 U.S.C. § 1129(b)(2).

10.     The Plan does not comply with all sections of the Code, as required by 11 U.S.C. § 1129(a)(1), is not feasible under 11 U.S.C. § 1129(a)(11), and does not comply with the cramdown requirements of 11 U.S.C. § 1129(b)(2).  It should not be confirmed.

## BACKGROUND

11.     On May 7, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.     Fagen provides engineering, design, procurement, construction, and construction management services to a variety of industries, including the ethanol industry.  Fagen is a world leader in the design and construction of ethanol facilities.  Two-thirds of our nation's ethanol is produced in Fagen designed or constructed plants.  Fagen provided various services to the Debtors in connection with the construction, improvement, commissioning and operation of Debtors' ethanol production Facilities in Hereford and Plainview, Texas.  As of the Petition Date, the Debtors' Schedules acknowledge obligations owing to Fagen of approximately $14.9 million in connection with the construction and improvement of the Facilities.

**A.      Design-Build Agreements**

13.     The Agreements are comprehensive contracts between Fagen and the Debtors regarding the construction and improvement of the Facilities.  They provide, among other things, for the Debtors to receive the Work Product Licenses (relating to intellectual property owned by Fagen) and the Proprietary Property Licenses (relating to intellectual property owned by ICM) upon payment in full of all amounts owed to Fagen under the Agreements.

14.     The Work Product Licenses are vital for the operation of the Facilities.  Fagen

intends to provide testimony at the confirmation hearing that both Facilities rely on Fagen Work

Product in their ongoing operations, including Fagen-provided computer software that controls

critical plant processes.  Fagen will provide testimony that during the pendency of this

Bankruptcy the Debtors have continued to consult with Fagen professionals for the operation of

and upgrades to the Fagen software.

15.     Even if Debtors intended to surrender the Fagen software after Plan confirmation,

testimony will establish that replacing the software, or attempting to operate the Facilities

without the software, would require the Debtors to rely on Fagen Work Product including

schematics, plans, operating procedures and manuals.  Even in process operations that do not

rely on the Fagen software, as well as in the ongoing maintenance of the Facilities, the Debtors

rely on the same types of Fagen Work Product.

16.     The Proprietary Property Licenses are also vital for the operation and

maintenance of the Facilities.  Fagen intends to provide testimony that the Facilities cannot

operate without the intellectual property covered by the Proprietary Property Licenses.  In fact,

by seeking to sever the Proprietary Property License from the rest of each Agreement, and then

assume it, the Debtors appear to concede that the Proprietary Property Licenses are necessary for

the Plan to succeed.

17.     The Facilities are extremely complicated and simply cannot operate without the

Proprietary Property Licenses.  Under those licenses, the Proprietary Property includes all

"documents, Operating Procedures (herein defined), materials, and other information" furnished

to the Debtors in any form concerning the "design, arrangement, configuration, and

specifications" for the equipment that controls the "distillation, evaporation, and alcohol dehydration" at the Facilities. (Ex. A & B, p. D-1, ¶ 2.)

18.     Even after the issuance of the Proprietary Property Licenses, the Debtors have no ownership rights in the Proprietary Property (*id.* ¶ 6), cannot use it to expand or enlarge their operations (*id.* ¶ 3), and are obligated to keep all of the Proprietary Property confidential (*id.* ¶ 9).

19.     The Work Product Licenses incorporate the same limitations on the use of covered intellectual property, notification requirements, and confidentiality obligations. (Ex. A & B, § 5.2.1.)

20.     The Proprietary Property Licenses extend to all equipment and operations in the Facilities, and the "Operating Procedures" include "without limitation" all manuals, "standards of quality, service protocols, data collection methods, construction specifications, training methods, engineering standards" and all other ICM provided information. (*Id.*) Put simply, the Facilities without the Proprietary Property Licenses are useless piles of stainless steel and electronics.

21.     By way of example, the Facilities presently operate using a computer based Data Control System ("DCS") belonging to ICM. The DCS controls all aspects of the Facilities' chemical, industrial, safety, and production processes. Testimony will establish that the Facilities cannot operate without the DCS.

22.     Because the DCS is fully integrated with plant processes and instrumentation, any attempt to replace the DCS with alternative software would require using piping and instrument diagrams ("PIDs") that are the intellectual property of ICM and Proprietary Property. Using the PIDs for this purpose is a violation of the Proprietary Property License. (*Id.*)

23.     Both Agreements provide that Fagen will grant the relevant Debtor Work Product

Licenses in order to operate and maintain the facilities ***only upon payment in full***:

> **5.2 Owner's Limited License Upon Payment in Full.** Upon
> Owner's payment in full for all Work performed under the
> Contract Documents, Design-Builder shall grant Owner a limited
> license to use the Work Product in connection with Owner's
> occupancy and repair of the Plant. Design-Builder acknowledges
> and agrees that the limited license to use the Work Product granted
> hereby shall provide Owner sufficient rights in and to the Work
> Product as shall be necessary for Owner to operate and maintain
> the Plant and shall include any Pass Through Warranties in
> connection therewith . . .
>
> (Ex. A & B, § 5.2.)

24.     Both Agreements also provide that the Debtor will receive the Proprietary

Property Licenses to operate and maintain the facilities ***only upon payment in full:***

> Upon . . . payment by OWNER of all amounts due and owning to
> Fagen under the [Agreement], ICM grants to OWNER a limited
> license to use the [intellectual property] solely in connection with
> the ownership, operation, maintenance and repair of the Plant,
> subject to the limitations provided herein (the "Purpose").
>
> (*Id.*, p. D-1, ¶ 1.)

25.     The Proprietary Property Licenses, which are exhibits to the Agreements, are

***expressly incorporated*** into the Agreements, as shown by the following excerpts from both

Agreements:

> **2.2     Extent of Agreement.** This Agreement consists of the
> following documents and all exhibits, schedules, appendices and
> attachments hereto and thereto . . .
>
> **2.2.2** This Agreement, including all exhibits and
> attachments . . .
>
> (*Id.*, § 2.2.)
>
> **5.2.1** . . . Owner's use of the proprietary property and information
> of ICM shall be governed by the terms and provisions of the

[Proprietary Property License], to be executed by [Owner and ICM] in connection with the execution of this Agreement. . . .

(*Id.*, § 5.2.1.)

**21.10 Entire Agreement.** This Agreement consists of the terms and conditions set forth herein, as well as the Exhibits hereto, which are incorporated by reference herein and made a part hereof. This Agreement sets forth the full and complete understanding of the Parties as of the Effective Date with respect to the subject matter hereof.

(*Id.*, § 21.10.)

26. As further evidence of the integration of the Proprietary Property Licenses into the Agreements, paragraph seven of the Proprietary Property License states:

OWNER shall pay no license fee or royalty to ICM for OWNER's use of the Proprietary Property pursuant to this License Agreement, the consideration for the limited license granted herein is certain payments by Fagen to ICM, which is funded by and included in the amounts payable by OWNER to Fagen for the construction of the Plant under the Contract.

(*Id.*, p. D-2, ¶ 7.)

## B.     Fagen's Scheduled Claims Against the Debtors

27. On July 15, 2009, Hereford filed its Schedules with the Bankruptcy Court [Docket No. 189]. Hereford's Schedule D identifies a secured claim in the amount of $8,883,920 owing to Fagen. Similarly, on July 15, 2009, Plainview filed its Schedules with the Bankruptcy Court [Docket No. 190]. Plainview's Schedule D identifies a secured claim in the amount of $6,016,750 owing to Fagen. Neither of these scheduled claims are identified as being contingent, unliquidated or disputed.

## C.    Fagen's Claims Against the Debtors

28.    On September 4, 2009, Fagen filed the Fagen Claims:  proofs of claim asserting a secured claim in the base amount of $6,016,749.55 against Plainview (the "Plainview Claim") and a secured claim in the base amount of $8,883,919.84 against Hereford (the "Hereford Claim").  As set forth therein, the Fagen Claims are secured by the Debtors' real property and improvements pursuant to the provisions of the Texas Property Code and Article XVI, Section 37 of the Texas Constitution.  The Plainview Claim and the Hereford Claim have been designated as Claim No. 171 and 172 respectively by the Debtors' claims agent.

29.    It is unclear why the Debtors now dispute the amounts of the Fagen Claims.  Prior to the filing of this Bankruptcy, on November 18, 2008, the Debtors agreed that it owed Fagen $18,729,467.06 and agreed to a payment schedule to satisfy its obligations under the Agreements.  (Ex. C.)

30.    Fagen acknowledges that the Debtors made two of the agreed payments: $1,858,951.56 on December 2, 2008, and $2,000,000 on December 16, 2008, totaling $3,858,951.56.  The Debtors also approved additional work under the Agreements of $30,153.89.  That additional work, plus the outstanding payments owed of $14,870,515.50, total the base amount of the Fagen claims of $14,900,669.39.

31.    If Fagen is correct that its liens are in first priority either with respect to the entirety of the Facilities, or with respect to "removables" worth more than the Fagen Claims, then Fagen is oversecured, and is entitled to interest pursuant to 11 U.S.C. § 506.  The Agreements provide for 1.5% interest per month on past due amounts.  (Ex. A & B, § 10.4.1.) Because the Debtors defaulted on their agreed payment plan on January 31, 2009, Fagen is

entitled to interest of not less than the $2,950,332.40 under the Agreements (13 months interest on the base amount of the Fagen claims).

32.     As fully secured claims, the Fagen Claims would be no less than $17,851,001.79.

**D.     The Plan of Confirmation**

33.     Pursuant to § 11.1 of the Plan, the Debtors intend to assume those executory contracts listed on Exhibit J (Schedule of Assumed Executory Contracts), and reject all others.

34.     The Schedule of Assumed Executory Contracts lists the following two items:

a.   ICM License Agreement, by and between WE Hereford, Ltd., by and through its general partner WE Hereford, LLC, and ICM, Inc., dated as of April 14, 2006 (as may be amended, modified, or supplemented from time to time).

b.   ICM License Agreement, by and between Plainview BioEnergy, LLC, and IMC, Inc., dated as of July 27, 2006 (as may be amended, modified, or supplemented from time to time).

35.     The Schedule of Assumed Executory Contracts does not list the Agreements; therefore, under the terms of the Plan, they will be rejected.

36.     Pursuant to § 11.2 of the Plan, the Debtors propose to cure all assumed executory contracts by paying the proposed cure amount found on Exhibit 1 to the Schedule of Assumed Executory Contracts.  There is no cure amount listed for either Proprietary Property License.

37.     Pursuant to § 4.4 of the Plan, the Debtors may, at their option, treat claims within Class 3 – Other Secured Claims, which are impaired, in any of the following ways:

a.   Payment equal to the net proceeds of the sale or disposition of the collateral.
b.   Surrender of the collateral.
c.   20 quarterly payments equal to 1/20th of the secured claim, plus 6% interest.
d.   Such other distribution that is necessary to comply with the Bankruptcy Code.

38.     Treatment of Fagen's claims pursuant to "Option C" would require quarterly payments of $892,550.09 plus applicable interest.

39.     Pursuant to an Order entered on February 17, 2010 [Docket No. 572], Fagen was

temporarily allowed claims in the amount of $15 million in Class 3 – Other Secured Claims.

Fagen, as the only member of Class 3, voted to reject the Plan.

## OBJECTION

40.     Fagen hereby objects to confirmation of the Plan on the basis that (i) it

impermissibly severs and assumes only a portion of the Agreements in contravention to the

requirements of the Bankruptcy Code; (ii) it is not feasible in that it does not provide for the

assumption of the Agreements, is unable to support the cure of the Proprietary Property License

(if severable) or the Agreements, and is unable to support the treatment of Class 3 – Other

Secured Claims; and (iii) the Plan does not meet the requirements of 11 U.S.C. § 1129(b)(2) as to

Class 3 – Other Secured Claims, which has rejected the Plan.

## APPLICABLE AUTHORITY

A.      **Compliance with the Code**

41.     In order to be confirmed, the plan must comply with all provisions of the

Bankruptcy Code.  11 U.S.C. § 1129(a)(1).

42.     Under 11 U.S.C. § 365, a debtor cannot assume just part of an integrated

executory contract.  It must assume or reject the entire contract – all or nothing.  *In re CellNet*

*Data Systems, Inc.*, 327 F.3d 242 (3d Cir. 2003).  Under the analysis used by the Eleventh

Circuit in *In re Gardinier*, the Agreement and the Proprietary Property License form a single,

integrated contract that must be assumed or rejected together.  *See Byrd v. Gardinier (In re*

*Gardinier, Inc.)*, 831 F.2d 974 (11th Cir. 1987), *cert. denied*, 488 U.S. 853, 109 S. Ct. 140, 102

L. Ed. 2d 112 (1988).  This analysis was recently employed by this Court to determine whether a

"Master Agreement" was severable into separate nonexecutory parts that could be sold pursuant

to 11 U.S.C. § 363. *In re American Home Mortgage Holdings, Inc.*, 402 B.R. 87 (Bankr. D. Del. 2009).

43.     In *American Home Mortgage*, as with respect to the Hereford Agreement, New York law provided the background rule for contractual interpretation. *Id.* at 95; (Ex. A, § 21.3). The Plainview Agreement, which is governed by Minnesota law, calls for a slightly different analysis. (Ex. B, § 21.3.)

44.     As articulated in *American Home Mortgage*, whether a contract is severable under New York law "is a question of the parties' intent, to be determined from the language employed by the parties, viewed in light of the circumstances surrounding them at the time they contracted." 402 B.R. at 94. Put another way, "a contract is severable when by its terms, nature and purpose, it is susceptible of division and apportionment." *Id.*

45.     When determining whether a contract is integrated or severable, Minnesota courts look primarily to whether the various documents were all necessary for the transaction. *American National Bank v. HRA For Brainerd*, 773 N.W.2d 333, 337 (Minn. Ct. App. 2009) (citing *Anderson v. Kammeier*, 262 N.W.2d 366, 370-71, n. 2 (Minn. 1977)). The *Gardinier* analysis arguably considers additional facts than those required under Minnesota law to support the finding of an integrated agreement. Yet even applying the *Gardinier* factors supports the conclusion that the Agreement and the Proprietary Property License are part of a single, integrated transaction.

46.     The *Gardinier* analysis provides a framework for examining the parties' intent through the objective facts of the language of the agreement and certain relevant surrounding facts. The *Gardinier* court held that an agreement to pay a brokerage commission was *not* integrated into its accompanying purchase agreement because:

> (1) The nature and purpose of the agreements was different;
> (2) Consideration for each agreement was separate and distinct; and
> (3) The obligations under the agreements were not interrelated.

*Gardinier*, 831 F.2d at 976. Taken together, these factors suggested to the court that the parties did not intend the agreements to function as a single, integrated contract. Therefore, the brokerage commission agreement could be severed from the purchase agreement, and could be separately rejected pursuant to 11 U.S.C. § 365. *Id.*

47. In the present case, each of the *Gardinier* factors weighs in favor of finding that each Agreement and its associated Proprietary Property License are part of a single, integrated transaction:

> (1) The nature and purpose of the Agreement and the Proprietary Property License are the same;
> (2) Consideration for the Agreement and the Proprietary Property License is tightly tied together; and
> (3) The obligations arising under the Agreement and the Proprietary Property License are interrelated.

To put it even more forcefully, both the Agreement and the Proprietary Property License were necessary for this transaction.

48. Testimony at the confirmation hearing will confirm that Fagen relied on the intellectual property of ICM, its subcontractor, in designing and constructing the Facilities. The Proprietary Property Licenses, in important part, protect the ICM intellectual property utilized in constructing the Facilities under the Agreements and were an ICM precondition to provide the design services used by Fagen to complete the Facilities.

49. The ICM intellectual property utilized by Fagen under the Agreements is fully integrated into the Facilities and is inseparable from the operation of the same Facilities.

Accordingly, it would be impossible to perform under the Agreements unless they contained the Proprietary Property Licenses.

50.     The payments and exchange of consideration anticipated under the Proprietary Property Licenses are also inextricably tied to the Agreements. Debtors do not receive the Proprietary Property Licenses until after Fagen is paid in full under the Agreements (Ex. A & B, p. D-1, ¶ 1), and the Debtors' consideration for the Licenses are the payments to Fagen, not direct Debtor payments to ICM. (*Id.*, p. D-2, ¶ 7.) ICM receives its license fees from Fagen, but cannot issue the licenses to the Debtors until Fagen is paid in full. (*Id.*, ¶¶ 1 & 2.)

51.     The Debtors' obligations to Fagen and ICM are almost identical with respect to the treatment of intellectual property, and all the obligations of Fagen and ICM to the Debtors relate to the design, construction and operation of the Facilities.

52.     Even if the Agreements and Proprietary Property Licenses are separate and distinct, each Proprietary Property License requires, by its plain terms, full payment of amounts due under the corresponding Agreement. (*Id.* ¶ 1.) These are not boilerplate cross-default clauses. Although courts may refuse to enforce cross-default provisions that link "parallel contracts" with "unrelated consideration," *see In re IT Group, Inc.*, 350 B.R. 156, 179 (Bankr. D. Del. 2006), that is not the situation here. Instead, the Agreements and Proprietary Property Licenses are economically interdependent, as discussed above.

53.     Furthermore, even an explicit cross-default provision is enforceable when there would have been no transaction without each of the separate parts. *In re Kopel*, 232 B.R. 57, 67 (Bankr. E.D.N.Y. 1999). Here, each Agreement makes no commercial sense without its accompanying Proprietary Property License. Fagen could not build the Facilities without the

Proprietary Property Licenses, and the Debtors cannot now separate the protected intellectual property from the rest of the Facilities.

**B.    Feasibility**

54.    Even if the Debtors were allowed to sever and separately assume the Proprietary Property License, the Plan is not feasible unless the Debtors assume the Agreements as well.

55.    Under 11 U.S.C. § 1129(a)(11), the plan proponent must show that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . ." Commonly called the feasibility requirement, this does not require the debtor to prove that success is inevitable, but only that it is reasonably likely. *See, e.g., In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1165-66 (5th Cir. 1993). But the Code *does* require the plan proponent to show a reasonable possibility that the Plan will succeed. *See Global Ocean Carriers Ltd.*, 251 B.R. 31, 47 (Bankr. D. Del. 2000) (finding plan not feasible where debtor would immediately be in default on exit financing).

56.    Fagen's challenge to the Plan's feasibility is not a challenge at the margins. Fagen is not quibbling about whether the Debtors will hit their projected numbers. Without the Work Product Licenses and the Proprietary Property Licenses, the Hereford and Plainview Facilities *cannot function*. Any Plan that does not provide for the acquisition of the core intellectual property needed to operate and maintain the Facilities is not feasible.

57.    Even if the Proprietary Property License is severed, each Agreement is still executory. The Third Circuit applies the "Countryman" test to determine whether a contract is executory. *In re Columbia Gas Sys.*, 50 F.3d 233, 239 (3d Cir. 1995) (citing *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 38-39 (3d Cir. 1989)). Under this test, a contract is executory when the obligations of "both the bankrupt and the other party to the contract are so

far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973).

58.     Here, the Agreements are executory, even if the Proprietary Property License is severed.  Both the Debtors and Fagen had performance remaining under the Agreements as of the petition date.  *See In re Penn Traffic Co.*, 524 F.3d 373 (2d Cir. 2008)  (holding a development agreement to be executory where conveyance of title was preconditioned on reimbursement of certain expenses).  Fagen has yet to grant its Work Product Licenses for the Facilities.  The Debtors have yet to provide full payment to Fagen, and, once they receive the licenses, they will have continuing obligations with respect to the intellectual property, including limitations on its use, and notification and confidentiality requirements.  Because material obligations remain on both sides, the Agreements are executory and must be either assumed or rejected.

59.     Because the Agreements will be rejected under the terms of the Plan, the licenses required to operate the Facilities will never be transferred.  This leaves the Debtors in the untenable position of trying to operate the Hereford and Plainview Facilities without necessary intellectual property.  This is not a feasible business plan, and cannot provide the basis for a confirmable plan of reorganization.

60.     Alternatively, the Plan is not feasible because the Debtors do not currently have the current assets, cash flow, or financing arranged:  (i) to cure the Proprietary Property License, which requires the Debtors to pay all amounts due under the Agreements; (ii) to cure the Agreements; or (iii) to support the required treatment of Class 3 – Other Secured Claims.  *See,*

*e.g., In re Preferred Door Co., Inc.*, 990 F.2d 547, 549 (10th Cir. 1993) (plan was not feasible where debtor was unable to pay administrative claims on the effective date).

## C.    Treatment of Secured Claims

61.    Even if the Court were to determine that the Proprietary Property Licenses could be severed from the Agreements, and that the Debtors could reject each Agreement and somehow operate in the absence of the requisite licenses from Fagen, the Plan is not confirmable because it does not comply with the cramdown requirements of 11 U.S.C. § 1129(b)(2).  A plan may be confirmed over the objection of a rejecting impaired class of secured claims only if it is fair and equitable.  It must, at a minimum, satisfy one of the three following requirements:

> (i)    (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>
> (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
>
> (iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A).

62.    As noted above, the Plan provides the Debtors with four options for treating Class 3 – Other Secured Claims:

> a.    Payment equal to the net proceeds of the sale or disposition of the collateral.
> b.    Surrender of the collateral.
> c.    20 quarterly payments equal to 1/20th of the secured claim, plus 6% interest.

d.   Such other distribution as is necessary to comply with the Bankruptcy Code. (Plan, § 4.4.)

63.    As the Plan does not contemplate the sale or abandonment of Fagen's collateral, Options a. and b. are simply not relevant. *See In re VIP Motor Lodge, Inc.*, 133 B.R. 41, 47 (Bankr. D. Del. 1991). Further, unless the Debtors propose that Fagen's claim will not be impaired under the plan, Fagen has a right to know what "indubitably equivalent" treatment the Debtors propose in Option d.  11 U.S.C. § 1123(a); *In re Century Glove*, 74 B.R. 958, 961 (Bankr. D. Del. 1987).

64.    Therefore, the only option plausibly on the table is Option c., which proposes that Fagen be paid over five years at 6% interest.

65.    The Bankruptcy Code does not define what rate of interest is appropriate in a cramdown situation.  Although the Supreme Court's opinion in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004) may be limited to Chapter 13, *see In re Prussia Assocs.*, 322 B.R. 572, 585, 589 (Bankr. E.D. Pa. 2005), the co-proponent of the Plan uses the *Till* approach with respect to the interest it provides itself in Class 2 – LIBOR plus a risk premium – but has established 6% as a *floor*.  The rate of interest paid to Class 3 is a flat 6%.

66.    The rate of interest proposed for Fagen as the Class 3 creditor does not provide Fagen with the present value of its claim especially in light of that fact that Fagen's lien rights may not adequately protect the stream of payments due to Fagen under the Plan.

67.    There is no basis for providing Class 3 with a lower rate of interest than that enjoyed by Class 2, which is also a secured class, subject to the same risks of nonpayment as Fagen.  In fact, the risk faced by Fagen may be higher than the risk faced by the members of Class 2.  Fagen may establish its first-lien priority by proving the value of the "removables" at

each Facility is in excess of the Fagen Liens. Fagen intends to provide testimony that the remaining useful life of some of the removables is less than the five years over which the Debtors may pay the Fagen Claims. If Fagen's secured status is derived under "removable" treatment under Texas law (instead of a blanket lien in the entire Facility), the value of Fagen's collateral may decrease at a faster rate than the remaining amount owed. Unless Fagen is granted replacement liens in any "new" removables replacing existing equipment, Fagen's position will not be adequately protected. *See Till*, 541 U.S. at 485 (identifying the rate of collateral depreciation as a factor to be used in calculating the appropriate risk premium).

68.     Furthermore, § 4.3.3(i) of the Plan provides that Class 2 – Secured Lender Claims will receive new term loans "secured by a Lien on substantially all of the assets of the Reorganized Debtors (on the priority basis set forth in the New Term Loan Facility)". It is unclear what "priority basis" the New Term Loan Facility will specify. The Plan should not be confirmed to the extent it purports to authorize the Debtors to grant a lien to Class 2 that is superior to the pre-confirmation relative priority of Class 2 and Class 3 liens. For the Plan to be confirmable, any liens held by Fagen pursuant to § 4.4.2 of the Plan must have the same relative priority to the Class 2 liens as existed pre-confirmation.

## THE CONFIRMATION HEARING

69.     Fagen intends to offer evidence and call witnesses at the confirmation hearing. In addition to examining the witnesses called by others, and subject to the right to rebut evidence and testimony offered at the hearing, Fagen intends to call the following witnesses:[5]

---

[5] Fagen reserves the right to supplement this list.

Jeremy Eischens
Control Systems Department Head
Fagen Engineering LLC
501 W. Highway 212
Granite Falls, MN 56241

Evan Fagen
Executive Vice President
Fagen, Inc.
501 W. Highway 212
Granite Falls, MN 56241

Jennifer Johnson
Chief Financial Officer
Fagen, Inc.
501 W. Highway 212
Granite Falls, MN 56241

Reid Jurgenson
Project Manager/Warranty Manager
Fagen, Inc.
501 W. Highway 212
Granite Falls, MN 56241

Bruce Langseth
Senior Vice-President
Fagen, Inc.
501 W. Highway 212
Granite Falls, MN 56241

Michael Messing
Plant Manager
Platinum Ethanol, LLC
2585 Quail Avenue
Arthur, IA 51431

## CONCLUSION

WHEREFORE, Fagen respectfully objects to confirmation of the Plan and requests that

the Court enter such relief as may be appropriate under the circumstances.


Dated: February 25, 2010
Wilmington, Delaware

/s/ Michael P. Migliore
Kathleen M. Miller (Del. Bar #2898)
Michael P. Migliore (Del. Bar #4331)
**SMITH, KATZENSTEIN & FURLOW, LLP**
800 Delaware Avenue, 10th Floor
P.O. Box 410
Wilmington, DE 19899 (19801 courier)
Telephone: (302) 652-8400
Fax: (302) 652-8405

S. Steven Prince
**LEONARD, STREET AND DEINARD**
*Professional Association*
150 South Fifth Street, Suite 2300
Minneapolis, MN 55402
Telephone: (612) 335-1500
Facsimile: (612) 335-1657

**ATTORNEYS FOR FAGEN, INC.**