# EXHIBIT A

FIRST AMENDED AND RESTATED

LUMP-SUM DESIGN-BUILD AGREEMENT

BETWEEN

W.E. HEREFORD, LTD. ("**OWNER**")

AND

FAGEN, INC. ("**DESIGN-BUILDER**")


April 14, 2006



# TABLE OF CONTENTS

**Page**

**Article 1**     **Definitions, Rules of Interpretation** ................................................ **5**

1.1     Amendment to Initial Agreement ................................................ 5
1.2     Rules of Construction ................................................................ 5
1.3     Defined Terms .......................................................................... 6

**Article 2**     **White Energy Hereford Project** ............................................. **10**

2.1     Services to be Performed .......................................................... 10
2.2     Extent of Agreement ................................................................ 11
2.3     Conflicting Provisions .............................................................. 11

**Article 3**     **Design-Builder Responsibilities** ............................................ **12**

3.1     Design-Builder's Services in General ........................................ 12
3.2     Design Development and Services .............................................. 12
3.3     Standard of Care ...................................................................... 13
3.4     Government Approvals and Permits ............................................ 13
3.5     Subcontractors ........................................................................ 13
3.6     Maintenance of Site .................................................................. 14
3.7     Project Safety .......................................................................... 14
3.8     Submission of Reports .............................................................. 15
3.9     Training.................................................................................... 15

**Article 4**     **Owner's Responsibilities** ...................................................... **15**

4.1     Duty to Cooperate .................................................................... 15
4.2     Furnishing of Services and Information ...................................... 15
4.3     Financial Information; Cooperation with Lenders; Failure to Obtain Financial Closing;
        Contract Price Escalation.......................................................... 16
4.4     Owner's Representative.............................................................. 17
4.5     Government Approvals and Permits............................................ 17
4.6     Owner's Separate Contractors.................................................... 17
4.7     Right to Inspect ........................................................................ 17
4.8     Security .................................................................................... 18

**Article 5**     **Ownership of Work Product; Risk of Loss** ............................ **18**

5.1     Work Product............................................................................ 18
5.2     Owner's Limited License Upon Payment in Full.......................... 18
5.3     Owner's Limited License Upon Owner's Termination for Convenience or Design-
        Builder's Election to Terminate ................................................ 19
5.4     Owner's Limited License Upon Design-Builder's Default ............ 19
5.5     Owner's Indemnification for Use of Work Product ...................... 20
5.6     Risk of Loss ............................................................................ 20

**Article 6**     **Commencement and Completion of the Project** ...................... **20**

6.1     Work Schedule.......................................................................... 20
6.2     Phase I and Phase II Engineering .............................................. 20



| | | |
|---|---|---|
| 6.3 | Notice to Proceed; Commencement | 21 |
| 6.4 | Limited Notice to Proceed | 21 |
| 6.5 | Project Start-Up and Testing | 22 |
| 6.6 | Substantial Completion | 22 |
| 6.7 | Final Completion | 23 |
| 6.8 | Post Completion Support | 25 |

**Article 7    Performance Testing and Liquidated Damages ........................... 25**

| | | |
|---|---|---|
| 7.1 | Performance Guarantee | 25 |
| 7.2 | Performance Testing | 25 |
| 7.3 | Liquidated Damages | 26 |
| 7.4 | Bonds and Other Performance Security | 27 |

**Article 8    Warranties ........................................................................................ 28**

| | | |
|---|---|---|
| 8.1 | Design-Builder Warranty | 28 |
| 8.2 | Correction of Defective Work | 28 |
| 8.3 | Warranty Period Not Limitation to Owner's Rights | 28 |

**Article 9    Contract Price ................................................................................... 29**

| | | |
|---|---|---|
| 9.1 | Contract Price | 29 |

**Article 10    Payment Procedures ...................................................................... 29**

| | | |
|---|---|---|
| 10.1 | Payment at Financial Closing | 29 |
| 10.2 | Progress Payments | 29 |
| 10.3 | Final Payment | 31 |
| 10.4 | Failure to Pay Amounts Due | 31 |
| 10.5 | Design-Builder's Payment Obligations | 31 |
| 10.6 | Record Keeping and Finance Controls | 31 |

**Article 11    Hazardous Conditions and Differing Site Conditions ................. 32**

| | | |
|---|---|---|
| 11.1 | Hazardous Conditions | 32 |
| 11.2 | Differing Site Conditions | 33 |

**Article 12    Force Majeure; Change in Legal Requirements ........................... 33**

| | | |
|---|---|---|
| 12.1 | Force Majeure Event | 33 |
| 12.2 | Effect of Force Majeure Event | 33 |
| 12.3 | Change in Legal Requirements | 34 |

**Article 13    Changes to the Contract Price and Scheduled Completion Dates ............. 34**

| | | |
|---|---|---|
| 13.1 | Change Orders | 34 |
| 13.2 | Contract Price Adjustments | 35 |
| 13.3 | Emergencies | 35 |
| 13.4 | Requests for Contract Adjustments and Relief | 35 |
| 13.5 | Contract Time Adjustment | 35 |

**Article 14    Indemnity .......................................................................................... 36**

| | | |
|---|---|---|
| 14.1 | Patent and Copyright Infringement | 36 |



14.2     Tax Claim Indemnification ................................................................................ 36
14.3     Payment Claim Indemnification ...................................................................... 37
14.4     Design-Builder's General Indemnification ..................................................... 37
14.5     Owner's General Indemnification .................................................................... 38

**Article 15       Stop Work; Termination for Cause ........................................... 38**

15.1     Owner's Right to Stop Work ............................................................................ 38
15.2     Owner's Right to Perform and Terminate for Cause ....................................... 38
15.3     Owner's Right to Terminate for Convenience ................................................. 39
15.4     Design-Builder's Right to Stop Work .............................................................. 40
15.5     Design-Builder's Right to Terminate for Cause .............................................. 40
15.6     Bankruptcy of Owner or Design-Builder ........................................................ 41
15.7     Lenders Right to Cure ...................................................................................... 42

**Article 16       Representatives of the Parties .................................................... 42**

16.1     Owner's Representatives ................................................................................... 42
16.2     Design-Builder's Representatives .................................................................... 42

**Article 17       Insurance ....................................................................................... 43**

17.1     Insurance .......................................................................................................... 43
17.2     Design-Builder's Insurance Requirements ...................................................... 44
17.3     Owner's Liability Insurance ............................................................................ 45
17.4     Owner's Builder's Risk Insurance ................................................................... 45
17.5     Coordination with Loan Documents ................................................................ 47

**Article 18       Representations and Warranties ............................................... 47**

18.1     Design-Builder and Owner Representations and Warranties ........................... 47
18.2     Design-Builder Representation and Warranties ............................................... 47

**Article 19       Dispute Resolution ...................................................................... 48**

19.1     Dispute Avoidance and Mediation .................................................................. 48
19.2     Arbitration........................................................................................................ 48
19.3     Duty to Continue Performance ........................................................................ 49
19.4     Consequential Damages ................................................................................... 49
19.5     Limitation of Liability ..................................................................................... 49

**Article 20       Confidentiality of Shared Information ...................................... 49**

20.1     Non-Disclosure Obligation .............................................................................. 49
20.2     Publicity and Advertising ................................................................................ 50
20.3     Term of Obligation .......................................................................................... 51

**Article 21       Miscellaneous ............................................................................... 51**

21.1     Assignment ...................................................................................................... 51
21.2     Successors ........................................................................................................ 51
21.3     Governing Law and Venue .............................................................................. 51
21.4     Severability ...................................................................................................... 51
21.5     No Waiver ........................................................................................................ 52

*W.E. Hereford, Ltd.*
*April 14, 2006*



21.6    Headings ............................................................................................................... 52
21.7    Notice .................................................................................................................... 52
21.8    No Privity with Design Consultant/Subcontractors ............................................. 53
21.9    Amendments .......................................................................................................... 53
21.10   Entire Agreement .................................................................................................. 53
21.11   Third-Party Beneficiaries ...................................................................................... 53
21.12   Counterparts .......................................................................................................... 53
21.13   Survival ................................................................................................................. 53

**Exhibit A – Performance Guarantee Criteria** ............................................................... **A-1**

**Exhibit B – General Project Scope** ................................................................................. **B-1**

**Exhibit C – Owner's Responsibilities** .............................................................................. **C-1**

**Exhibit D – ICM License Agreement** ............................................................................. **D-1**

**Exhibit E – Schedule of Values** ...................................................................................... **E-1**

**Exhibit F – Form of Informational Report** .................................................................... **F-1**

**Exhibit G – Required Permits** ........................................................................................ **G-1**

**Exhibit H – Form of Performance Bond** ........................................................................ **H-1**

**Exhibit I – Form of Payment Bond** ................................................................................. **I-1**

**Exhibit J – Work Schedule** ............................................................................................. **J-1**

**Exhibit K – Phase I and Phase II Engineering Services Agreement** ................................. **K-1**

*W.E. Hereford, Ltd.*
*April 14, 2006*



# LUMP SUM DESIGN-BUILD CONTRACT

This **FIRST AMENDED AND RESTATED LUMP SUM DESIGN-BUILD CONTRACT** (the "Agreement") is made as of April 14, 2006, ("Effective Date") by and between W.E. Hereford, Ltd., by and through its general partner, White Energy Hereford, LLC, a Texas limited liability company (collectively referred to herein as the "Owner") and Fagen, Inc., a Minnesota corporation (the "Design-Builder").

## RECITALS

A.      The Owner desires to develop, construct, own and operate a one hundred (100) million gallons per year ("MGY") dry grind ethanol production facility utilizing a mix of corn and grain sorghum located at Hereford, Texas (the "White Energy Hereford Plant" or "Plant"); and

B.      Design-Builder desires to provide design, engineering, procurement and construction services for the Plant; and

C.      Owner and Design-Builder have entered into that certain Lump-Sum Design-Build Agreement dated November 16, 2005 ("Initial Agreement") providing for design, engineering, procurement, and construction services of the Plant; and

D.      Owner and Design-Builder desire to amend the Initial Agreement and replace the Initial Agreement with this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and obligations contained herein and for other good and valuable consideration, Owner and Design-Builder agree as follows:

## AGREEMENT

## Article 1

## Definitions, Rules of Interpretation

**1.1      Amendment to Initial Agreement.** This Agreement amends and replaces the Initial Agreement in all respects.

**1.2      Rules of Construction.** The capitalized terms listed in this Article shall have the meanings set forth herein whenever the terms appear in this Agreement, whether in the singular or the plural or in the present or past tense. Other terms used in this Agreement but not listed in this Article shall have meanings as commonly used in the English language and, where applicable, in generally accepted construction and design-build industry standards. Words not otherwise defined herein that have well known and generally accepted technical or trade meanings are used herein in accordance with such recognized meanings. In addition, the following rules of interpretation shall apply:

a)      The masculine shall include the feminine and neuter.

*W.E. Hereford, Ltd.*
*April 14, 2006*

5



*Preliminary Construction Documents* are defined in Section 3.2.1.

*Project* is defined in Section 2.1.

*Project Scope* is defined in Exhibit B.

*Punch List* is defined in Section 6.6.3.

*Safety Representative* is defined in Section 3.7.1.

*Schedule of Values* is defined in Section 10.2.5.

*Scheduled Final Completion Date* is defined in Section 6.7.1.

*Scheduled Substantial Completion Date* is defined in Section 6.6.1.

*Site* is the land or premises on which the Project is located.

*State* is the State in which the Project is located.

*Sub-Subcontractor* is any person or entity retained by a Subcontractor as an independent contractor to perform any portion of a Subcontractor's Work and shall include materialmen and suppliers.

*Subcontractor* is any person or entity retained by Design-Builder as an independent contractor to perform a portion of the Work and shall include materialmen and suppliers.

*Substantial Completion* is defined in Section 6.6.2.

*TRIA* is defined in Section 17.4.4.

*Work* is defined in Section 3.1.

*Work Product* is defined in Section 5.1.

*Work Schedule* is defined in Section 6.1.

## Article 2

### White Energy Hereford Project

**2.1     Services to Be Performed.**  Design-Builder shall perform all work and services in connection with the engineering, design, procurement, and construction of the Plant, and provide all material, equipment, tools and labor necessary to complete the Plant in accordance with the terms of this Agreement.   The Plant, together with all equipment, labor, services and materials furnished hereunder is defined as the "Project."



**2.2    Extent of Agreement.** This Agreement consists of the following documents, and all exhibits, schedules, appendices and attachments hereto and thereto (collectively, the "<u>Contract Documents</u>"):

**2.2.1** All written modifications, amendments and change orders to this Agreement;

**2.2.2** This Agreement, including all exhibits and attachments, executed by Owner and Design-Builder, including those below:

### List of Exhibits

Exhibit A – Performance Guarantee Criteria

Exhibit B – General Project Scope

Exhibit C – Owner's Responsibilities

Exhibit D – ICM License Agreement

Exhibit E – Schedule of Values

Exhibit F – Form of Informational Report

Exhibit G – Required Permits

Exhibit H – Form of Performance Bond

Exhibit I – Form of Payment Bond

Exhibit J – Work Schedule

Exhibit K – Phase I and Phase II Engineering Services Agreement

**2.2.3** Upon completion by Design-Builder, the Preliminary Construction Documents to be prepared by Design-Builder pursuant to Section 3.2.1 and the Construction Documents to be prepared by Design-Builder pursuant to Section 3.2.2 shall be incorporated in this Agreement.

**2.3    Conflicting Provisions.** In the event of any conflict or inconsistency between the body of this Agreement and any Exhibit or Schedule hereto, the terms and provisions of this Agreement, as amended from time to time, shall prevail and be given priority. Subject to the foregoing, the several documents and instruments forming part of this Agreement are to be taken as mutually explanatory of one another and in the case of ambiguities or discrepancies within or between such parts the same shall be explained and interpreted, if possible, in a manner which gives effect to each part and which avoids or minimizes conflicts among such parts. No oral representations or other agreements have been made by the parties except as specifically stated in the Contract Documents.



**4.8    Security.**

    **4.8.1**    Owner shall be responsible for Site security (including fencing, alarm systems, security guarding services) at all times during the term of this Agreement to prevent vandalism, theft and danger to the Project, the Site, and personnel. Design-Builder shall immediately notify Owner of any Site security dangers observed or recognized by Design-Builder, and will coordinate with Owner to assist Owner in correcting such security dangers. Owner shall coordinate and supervise ingress and egress from the Site so as to minimize disruption to the Work.

    **4.8.2**    Design-Builder shall at all times conduct its operations in a manner to minimize the risk of loss, theft, or damage by vandalism, sabotage, or any other means. Design-Builder shall continuously inspect all Work, materials, and equipment to discover and determine any conditions that might involve such risks and shall be solely responsible for discovery, determination, and correction of any such conditions.

**Article 5**

**Ownership of Work Product; Risk of Loss**

    **5.1**    **Work Product**.  All drawings, specifications, calculations, data, notes and other materials and documents, including electronic data furnished by Design-Builder to Owner under this Agreement ("<u>Work Product</u>") shall be instruments of service and Design-Builder shall retain the ownership and property interests therein, including the copyrights thereto.

    **5.2**    **Owner's Limited License Upon Payment in Full.**  Upon Owner's payment in full for all Work performed under the Contract Documents in full, Design-Builder shall grant Owner a limited license to use the Work Product in connection with Owner's occupancy, operation, and repair of the Project.  Design-Builder acknowledges and agrees that the limited license to use the Work Product granted hereby shall provide Owner sufficient rights in and to the Work Product as shall be necessary for Owner to operate and maintain the Plant and shall include any Pass Through Warranties in connection therewith.  Design-Builder shall provide Owner with a copy of the plans of the Plant, as built, (the "<u>As Built Plans</u>") in their current state of completion, conditioned on Owner's express understanding that its use of the Work Product and its acceptance of the As Built Plans is at Owner's sole risk and without liability or legal exposure to Design-Builder or anyone working by or through Design-Builder, including Design Consultant (collectively the "<u>Indemnified Parties</u>"); provided, however, that any performance guarantees and warranties (of equipment or otherwise) shall remain in effect according to the terms of this Agreement.

    **5.2.1** Owner shall be entitled to use the Work Product for the purpose relating to this Project, but shall not be entitled to use the Work Product for any other purposes whatsoever, including without limitation, expansion of the Plant that results in any increase in the distillation, evaporation, dehydration or dryer capacity of the Plant beyond the size or configuration originally contemplated in this Agreement.  Notwithstanding the foregoing sentence, Owner shall be entitled to use the Work Product for the operation, maintenance and repair of the plant including the interconnection of, but not the design of, any future expansions to the Plant.  The



limited license granted to Owner under Section 5.2, 5.3 or 5.4 to use the Work Product shall be limited by and construed according to the same terms contained in the ICM License Agreement between Owner and ICM, Inc., attached hereto as Exhibit D and incorporated herein by reference thereto, except (i) references in such ICM License Agreement to ICM and Proprietary Property shall refer to Design-Builder and Work Product, respectively, (ii) the laws of the State of New York shall govern such limited license, and (iii) the dispute resolution provisions contained in Article 19 hereof shall apply to any breach or threatened breach of Owner's duties or obligations under such limited license, except that Design-Builder shall have the right to seek injunctive relief in a court of competent jurisdiction against Owner or its Representatives for any such breach or threatened breach. Design-Builder is utilizing certain proprietary property and information of ICM, Inc., a Kansas corporation ("ICM"), in the design and construction of the Project, and Design-Builder may incorporate proprietary property and information of ICM into the Work Product. Owner's use of the proprietary property and information of ICM shall be governed by the terms and provisions of the License Agreement between Owner and ICM, attached hereto as Exhibit D, to be executed by such parties in connection with the execution of this Agreement. The preceding last three sentences of this paragraph also apply to Sections 5.3 and 5.4 below.

**5.3     Owner's Limited License Upon Owner's Termination for Convenience or Design-Builder's Election to Terminate.** If Owner terminates the Project for its convenience as set forth in Section 15.3 hereof, or if Design-Builder elects to terminate this Agreement in accordance with Section 15.5, Design-Builder shall, upon Owner's payment in full of the amounts due Design-Builder under this Agreement, grant Owner a limited license to use the Work Product to complete the Project and subsequently occupy, operate, and repair the Project, subject to the following:

**5.3.1** Use of the Work Product is at Owner's sole risk without liability or legal exposure to any Indemnified Party; provided, however, that any Pass Through Warranties regarding equipment or express warranties regarding equipment provided by this Agreement shall remain in effect according to their terms; and

**5.3.2** If the termination for convenience is by Owner in accordance with Section 15.3 hereof, or if Design-Builder elects to terminate this Agreement in accordance with Section 15.5, then Owner agrees to pay Design-Builder the additional sum of One Million Dollars ($1,000,000.00) as compensation for the limited right to use the Work Product completed "as is" on the date of termination in accordance with this Article 5.

**5.4     Owner's Limited License Upon Design-Builder's Default.** If this Agreement is terminated due to Design-Builder's default pursuant to Section 15.2 and (i) it is adjudged that Design-Builder was in default, and (ii) Owner has fully satisfied all of its obligations under the Contract Documents through the time of Design-Builder's default, then Design-Builder shall grant Owner a limited license to use the Work Product in connection with Owner's completion, occupancy, operation, and repair of the Project. This limited license is conditioned on Owner's express understanding that its use of the Work Product is at Owner's sole risk without liability or legal exposure to any Indemnified Party; provided, however, that any Pass Through Warranties regarding equipment or express warranties regarding equipment provided by this Agreement



shall remain in effect according to their terms.  This limited license grants Owner the ability to repair the Project at Owner's discretion.

**5.5** **Owner's Indemnification for Use of Work Product.**  If Owner uses the Work Product or Plant under any of the circumstances identified in this Article 5, to the fullest extent allowed by law, Owner shall defend, indemnify and hold harmless the Indemnified Parties from and against any and all claims, damages, liabilities, losses and expenses, including attorneys' fees, arising out of or resulting from the acts of Owner in its use of the Work Product and Plant; provided, however, that any Pass Through Warranties regarding equipment or express warranties regarding equipment provided by this Agreement shall remain in effect according to their terms.

**5.6** **Risk of Loss.**  Design-Builder shall have no liability for a physical loss of or damage to the Work unless such loss or damage is caused by the willful misconduct or gross negligence of Design-Builder or someone acting under its direction or control.  Design-Builder shall not be liable for physical loss of or damage to the Work where such loss or damage is caused by the willful misconduct or gross negligence of Owner's employees or third parties who are not Subcontractors.  Design-Builder shall have no liability for a physical loss of or damage to the Work occurring after Final Completion.  Design-Builder shall have no liability for losses or damages for which insurance coverage under this Agreement is available to Owner; in such circumstances, Design-Builder's liability for losses and damages as described in this Section 5.6 shall be limited to losses or damages which exceed insurance coverage available to the Owner without the application of any reductions from such coverages due to deductible, retention, or retrospective premiums.

## Article 6

## Commencement and Completion of the Project

**6.1** **Work Schedule.**  The preliminary schedule for the execution of the Work is attached as Exhibit J hereto (the "Work Schedule").  The final schedule for execution of the Work shall be provided within thirty (30) Days after receipt of the Notice to Proceed.  The Work Schedule provides the scheduled  dates for the commencement and completion of the various stages of Work, including the dates when Owner's obligations are required to be complete to enable Design-Builder to achieve the Contract Time(s).  The Work Schedule shall be revised as required by conditions and progress of the Work but such revisions shall not relieve Design-Builder of its obligations to complete the Work within the Contract Time(s), unless such revisions to the Work Schedule are the result of any direct or indirect delay in the completion of Owner's obligations or as a result of a Force Majeure Event.   In such event, the Work Schedule shall be revised to provide, without penalty to Design-Builder, a Day-for-Day extension of the Contract Time(s) for completion of the Work for each Day during which Owner's failure to complete its obligations or a Force Majeure Event causes such delay.

**6.2** **Phase I and Phase II Engineering.**  Owner and Design-Builder have entered into that certain Phase I and Phase II Engineering Services Agreement dated October 21, 2005 and attached hereto as Exhibit K. The Phase I and Phase II Engineering Services Agreement provides for Design-builder to commence work on the Phase I and Phase II engineering for the Project as set forth therein.  Owner has agreed to pay Design-Builder Ninety-Two Thousand Five Hundred



Completion, Owner shall release to Design-Builder all retained amounts equal to Four Million Eight Hundred Sixty Seven Thousand and Eight Hundred Dollars ($4,867,800) less an amount equal to One Hundred Fifty Percent (150%) of the value of any Subcontractor lien waivers not yet obtained, as noted in the Certificate of Substantial Completion. Upon Design-Builder's demonstration of compliance with the Performance Guarantee Criteria, Owner shall release to Design-Builder all remaining retained amounts.

**10.3    Final Payment.**  Design-Builder shall deliver to Owner a request for final payment (the "Final Application for Payment") when Design-Builder believes Final Completion has been achieved in accordance with Section 6.7. Owner shall make final payment within thirty (30) Days after Owner's receipt of the Final Application for Payment ("Final Payment").

**10.4    Failure to Pay Amounts Due.**

**10.4.1 Interest**.  Payments which are due and unpaid by Owner to Design-Builder, whether progress payments or final payment, shall bear interest commencing the Day after payment is due at the rate of eighteen percent (18%) per annum, or the maximum rate allowed by law.

**10.4.2 Right to Suspend Work.**  If Owner fails to pay Design-Builder any undisputed amount that becomes due, Design-Builder, in addition to all other remedies provided in the Contract Documents, may stop Work pursuant to Section 15.4 hereof. All payments properly due and unpaid shall bear interest at the rate set forth in Section 10.4.1.

**10.5    Design-Builder's Payment Obligations.**    Design-Builder will pay Design Consultant and Subcontractors, in accordance with its contractual obligations to such parties, all the amounts Design-Builder has received from Owner on account of their work. Design-Builder will impose similar requirements on Design Consultant and Subcontractors to pay those parties with whom they have contracted. Design-Builder will indemnify and defend Owner against any claims for payment and mechanic's liens as set forth in Section 14.3 hereof.

**10.6    Record Keeping and Finance Controls.**  With respect to changes in the Work performed on a cost basis by Design-Builder pursuant to the Contract Documents, Design-Builder shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management, using accounting and control systems in accordance with generally accepted accounting principles and as may be provided in the Contract Documents. During the performance of the Work and for a period of three (3) years after Final Payment, Owner and Owner's accountants shall be afforded access from time to time, upon reasonable notice, to Design-Builder's records, books, correspondence, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to changes in the Work performed on a cost basis in accordance with the Contract Documents, all of which Design-Builder shall preserve for a period of three (3) years after Final Payment.



make any other type of communication to any member of the public, press, business entity, or any official body which names the other Party unless prior written consent is obtained from the other Party, which consent shall not be unreasonably withheld.

**20.3    Term of Obligation.**    The confidentiality obligations of the Parties pursuant to this Article 20 shall survive the expiration or other termination of this Agreement for a period of five (5) years.

## Article 21

### Miscellaneous

**21.1    Assignment.**    Neither Design-Builder nor Owner shall, without the written consent of the other, which shall not be unreasonably withheld or delayed, assign, transfer or sublet any portion or part of the Work or the obligations required by the Contract Documents. Notwithstanding the foregoing, Owner may assign all of its rights and obligations under the Contract Documents to its Lenders or Lenders' Agent, including to senior lender, as collateral security in connection with Owner obtaining or arranging any financing for the Plant; provided, however, Owner shall deliver, at least ten (10) Days prior to any such assignment, to Design-Builder (a) written notice of such assignment and (b) a written instrument of assignment from the assignee in form and substance reasonably acceptable to Design-Builder, whose approval shall not be unreasonably withheld.  In respect to any assignment to the Lenders or Lenders' Agent, the written assignment may authorize such Lenders or Lenders' Agent to subsequently assign their rights under the Contract Documents in connection with any foreclosure or other enforcement of their security interest, if such Lenders or Lenders' Agent comply with clauses (a) and (b) above with respect to such subsequent assignment.  Design-Builder shall execute, if requested, a consent to assignment for the benefit of the Lenders and/or the Lenders' Agent, with respect to any such assignments.

**21.2    Successors.**  Design-Builder and Owner intend that the provisions of the Contract Documents are binding upon the parties, their employees, agents, heirs, successors and assigns.

**21.3    Governing Law and Venue.**  The Agreement and all Contract Documents shall be governed by the laws of the State of New York, without giving effect to its conflict of law principles.  Any legal action brought to enforce or construe the provisions of this Agreement shall be brought in or removed to the federal courts located in, or the state courts of, the State of New York, and the parties agree to and hereby submit to the exclusive jurisdiction of such courts and agree that they will not invoke the doctrine of forum non conveniens or other similar defenses in any such action brought in such courts.

**21.4    Severability.**    If any provision or any part of a provision of the Contract Documents shall be finally determined to be superseded, invalid, illegal, or otherwise unenforceable pursuant to any applicable Legal Requirements, such determination shall not impair or otherwise affect the validity, legality, or enforceability of the remaining provision or parts of the provision of the Contract Documents, which shall remain in full force and effect as if the unenforceable provision or part were deleted.



**21.5    No Waiver.**   The failure of either Design-Builder or Owner to insist, in any one or more instances, on the performance of any of the obligations required by the other under the Contract Documents shall not be construed as a waiver or relinquishment of such obligation or right with respect to future performance.

**21.6    Headings.**   The headings used in this Agreement or any other Contract Document, are for ease of reference only and shall not in any way be construed to limit or alter the meaning of any provision.

**21.7    Notice.**   Whenever the Contract Documents require that notice be provided to a party, notice shall be delivered to such party at the address listed below and will be deemed to have been validly given (i) if delivered in person to the individual intended to receive such notice, (ii) four (4) Days after being sent by registered or certified mail, postage prepaid to the address indicated in the Agreement or (iii) if transmitted by facsimile, by the time stated in a machine-generated confirmation that notice was received at the facsimile number of the intended recipient.

If to Design-Builder, to:

> Fagen, Inc.
> 501 W. Highway 212
> P. O. Box 159
> Granite Falls, MN  56241
> Attention: Aaron Fagen
> Fax:  (320) 564-3278

with a copy to:

> Fagen, Inc.
> 501 W. Highway 212
> P. O. Box 159
> Granite Falls, MN  56241
> Attention: Bruce Langseth
> Fax:  (320) 564-3278

and to:

> Fagen, Inc.
> 501 W. Highway 212
> P. O. Box 159
> Granite Falls, MN  56241
> Attention: Wayne Mitchell
> Fax:  (320) 564-3278

If to Owner, to:

> Kevin Kuykendall
> 13455 Noel Road

*W.E. Hereford, Ltd.*
*April 14, 2006*



Dallas, Texas 75240
Fax: (972) 392-3956

with copies to:

Michelle E. Roberts
Bracewell & Giuliani, LLP
500 N. Akard, Suite 4000
Dallas, Texas 75240
Fax: (214) 758-8332

and

Lender's Agent at the address provided for Lender's Agent to Design-Builder by Owner by notice within five (5) Days following the Financial Closing.

**21.8    No Privity with Design Consultant/Subcontractors.** Nothing in the Contract Documents is intended or deemed to create any legal or contractual relationship between Owner and any Design Consultant or Subcontractor.

**21.9    Amendments.** The Contract Documents may not be changed, altered, or amended in any way except in writing signed by a duly authorized representative of each party.

**21.10    Entire Agreement.** This Agreement consists of the terms and conditions set forth herein, as well as the Exhibits hereto, which are incorporated by reference herein and made a part hereof. This Agreement sets forth the full and complete understanding of the Parties as of the Effective Date with respect to the subject matter hereof.

**21.11    Third-Party Beneficiaries.** Except as expressly provided herein, this Agreement is intended to be solely for the benefit of the Owner, the Design-Builder and permitted assigns, and is not intended to and shall not confer any rights or benefits on any person not a signatory hereto.

**21.12    Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall be deemed one and the same Agreement, and may be executed and delivered by facsimile signature, which shall be considered an original.

**21.13    Survival.** Notwithstanding any provisions herein to the contrary, the Work Product provisions set forth in Article 5 and the indemnity obligations set forth herein shall survive (in full force) the expiration or termination of this Agreement and shall continue to apply to the Parties to this Agreement even after termination of this Agreement or the transfer of such Party's interest in this Agreement.

[The next page is the signature page.]



**IN WITNESS WHEREOF**, the parties hereto have caused their names to be hereunto subscribed by their officers thereunto duly authorized, intending thereby that this Agreement shall be effective as of this April 14, 2006.

**OWNER:**

W.E. Hereford, LTD,
by and through its General Partner,
White Energy Hereford, LLC
*(Name of Design-Builder)*

_(Signature)_

Kevin D. Kuykendall
*(Printed Name)*

Managing Director
*(Title)*

Date: 4/17/2006

**DESIGN-BUILDER:**

Fagen, Inc.
*(Name of Owner)*

_(Signature)_

Roland "Ron" Fagen
*(Printed Name)*

CEO and President
*(Title)*

Date: 4/18/06

*W.E. Hereford, Ltd.*
*April 14, 2006*



**EXHIBIT D**

**ICM LICENSE AGREEMENT**

**THIS LICENSE AGREEMENT** (this "License Agreement") is entered into and made effective as of the 14th day of April, 2006 ("Effective Date") by and between W.E. Hereford, Ltd., by and through its general partner, White Energy Hereford, LLC, a Texas limited liability company ("OWNER"), and ICM, Inc., a Kansas corporation ("ICM").

WHEREAS, OWNER has entered into that certain Lump Sum Design-Build Contract dated April 14, 2006 (the "Contract") with Fagen, Inc., a Minnesota corporation ("Fagen"), under which Fagen is to design and construct a 100 million gallon per year ethanol plant for OWNER to be located in or near Hereford, Texas (the "Plant");

WHEREAS, ICM has granted Fagen the right to use certain proprietary technology and information of ICM in the design and construction of the Plant; and

WHEREAS, OWNER desires from ICM, and ICM desires to grant to OWNER, a license to use such proprietary technology and information in connection with OWNER's ownership and operation of the Plant, all upon the terms and conditions set forth herein;

NOW, THEREFORE, the parties, in consideration of the foregoing premises and the mutual promises contained herein and for other good and valuable consideration, receipt of which is hereby acknowledged, agree as follows:

1. Upon substantial completion of the Plant by Fagen pursuant to the terms of the Contract or, if later, payment by OWNER of all amounts due and owing to Fagen under the Contract, ICM grants to OWNER a limited license to use the Proprietary Property (hereinafter defined) solely in connection with the ownership, operation, maintenance and repair of the Plant, subject to the limitations provided herein (the "Purpose").

2. The "Proprietary Property" means, without limitation, documents, Operating Procedures (hereinafter defined), materials and other information that are furnished by ICM to OWNER in connection with the Purpose, whether orally, visually, in writing, or by any other means, whether tangible or intangible, directly or indirectly (including, without limitation, through Fagen) and in whatever form or medium including, without limitation, the design, arrangement, configuration, and specifications of (i) the combinations of distillation, evaporation, and alcohol dehydration equipment (including, but not limited to, pumps, vessels, tanks, heat exchangers, piping, valves and associated electronic control equipment) and all documents supporting those combinations; (ii) the combination of the distillers grain drying (DGD), and heat recovery steam generation (HRSG) equipment (including, but not limited to, pumps, vessels, tanks, heat exchangers, piping and associated electronic control equipment) and all documents supporting those combinations; and (iii) the computer system, known as the distributed control system (DCS and/or PLC) (including, but not limited to, the software configuration, programming, parameters, set points, alarm points, ranges, graphical interface, and system hardware connections) and all documents supporting that system. The "Operating Procedures" means, without limitation, the process equipment and specifications manuals, standards of quality, service protocols, data collection methods, construction specifications, training methods, engineering standards and any other information prescribed by ICM from time to time concerning the Purpose. Proprietary Property shall not include any information or materials that OWNER can



demonstrate by clear and convincing written evidence: (i) was lawfully in the possession of OWNER prior to disclosure by ICM or Fagen; (ii) was in the public domain prior to disclosure by ICM or Fagen; (iii) was disclosed to OWNER by a third party other than Fagen having the legal right to possess and disclose such information or materials; or (iv) after disclosure by ICM or Fagen comes into the public domain through no fault of OWNER or its members, directors, officers, employees, agents, contractors, consultants or other representatives (hereinafter collectively referred to as "Representatives"). Information and materials shall not be deemed to be in the public domain merely because such information is embraced by more general disclosures in the public domain, and any combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain if the combination itself and its principles of operation are not in the public domain.

3.  OWNER shall not use the Proprietary Property for any purpose other than the Purpose. OWNER shall not use the Proprietary Property in connection with any expansion or enlargement of the Plant. ICM and its Representatives shall have the express right at any time to enter upon the premises of the Plant to inspect the Plant and its operation to ensure that OWNER is complying with the terms of this License Agreement.

4.  OWNER's failure to materially comply with the Operating Procedures shall void all guarantees, representations and warranties, whether expressed or implied, if any, that were given by ICM to OWNER, directly or indirectly through Fagen, concerning the performance of the Plant that ICM reasonably determines are materially affected by OWNER's failure to materially comply with such Operating Procedures. OWNER agrees to indemnify, defend and hold harmless ICM, Fagen and their respective Representatives from any and all losses, damages and expenses including, without limitation, reasonable attorneys' fees resulting from, relating to or arising out of Owner's or its Representatives' (a) failure to materially comply with the Operating Procedures or (b) negligent use of the Proprietary Property.

5.  Any and all modifications to the Proprietary Property made by OWNER or its Representatives shall be the property of ICM. OWNER shall promptly notify ICM of any such modification and OWNER agrees to assign all right, title and interest in such modification to ICM; provided, however, OWNER shall retain the right, at no cost, to use such modification in connection with the Purpose.

6.  ICM has the exclusive right and interest in and to the Proprietary Property and the goodwill associated therewith. OWNER will not, directly or indirectly, contest ICM's ownership of the Proprietary Property. OWNER's use of the Proprietary Property does not give OWNER any ownership interest or other interest in or to the Proprietary Property except for the limited license granted to OWNER herein.

7.  OWNER shall pay no license fee or royalty to ICM for OWNER's use of the Proprietary Property pursuant to this License Agreement, the consideration for the limited license granted herein is certain payments by Fagen to ICM, which is funded by and included in the amounts payable by OWNER to Fagen for the construction of the Plant under the Contract.

8.  OWNER may not assign the limited license granted herein, in whole or in part, without the prior written consent of ICM, which will not be unreasonably withheld or delayed. Prior to any assignment, OWNER shall obtain from such assignee a written instrument, in form and substance reasonably acceptable to ICM, agreeing to be bound by all the terms and provisions of this License Agreement. Any assignment of this License Agreement shall not release OWNER from (i) its duties and obligations hereunder concerning the disclosure and use of the Proprietary Property by OWNER or its Representatives, or (ii) damages to ICM resulting from, or arising out of, a breach of such duties



or obligations by OWNER or its Representatives. ICM may assign its right, title and interest in the Proprietary Property, in whole or part, subject to the limited license granted herein.

9. The Proprietary Property is confidential and proprietary. OWNER shall keep the Proprietary Property confidential and shall use all reasonable efforts to maintain the Proprietary Property as secret and confidential for the sole use of OWNER and its Representatives for the Purpose. OWNER shall retain all Proprietary Property at its principal place of business and/or the Plant. OWNER shall not at any time without ICM's prior written consent, copy, duplicate, record, or otherwise reproduce the Proprietary Property, in whole or in part, or otherwise make the same available to any unauthorized person provided, OWNER shall be permitted to copy, duplicate or otherwise reproduce the Proprietary Property in whole or in part in connection with, and to the extent it is necessary and essential for, the Purpose so long as all such copies, duplicates or reproductions are kept at its principal place of business and/or the Plant and are treated the same as any other Proprietary Property. OWNER shall not disclose the Proprietary Property except to its Representatives who are directly involved with the Purpose, and even then only to such extent as is necessary and essential for such Representative's involvement. OWNER shall inform such Representatives of the confidential and proprietary nature of such information and, if requested by ICM, OWNER shall obtain from such Representative a written instrument, in form and substance reasonably acceptable to ICM, agreeing to be bound by all of the terms and provisions of this License Agreement to the same extent as OWNER. OWNER shall make all reasonable efforts to safeguard the Proprietary Property from disclosure by its Representatives to anyone other than permitted hereby. OWNER shall notify ICM immediately upon discovery of any unauthorized use or disclosure of the Proprietary Property, or any other breach of this License Agreement by OWNER or its Representatives, and shall cooperate with ICM in every reasonable way to help ICM regain possession of the Proprietary Property and prevent its further unauthorized use or disclosure. In the event that OWNER or its Representatives are required by law to disclose the Proprietary Property, OWNER shall provide ICM with prompt written notice of same so that ICM may seek a protective order or other appropriate remedy. In the event that such protective order or other appropriate remedy is not obtained, OWNER or its Representatives will furnish only that portion of the Proprietary Property which in the reasonable opinion of its or their legal counsel is legally required and will exercise its reasonable efforts to obtain reliable assurance that the Proprietary Property so disclosed will be accorded confidential treatment.

10. OWNER agrees to indemnify ICM for any and all damages (including, without limitation, reasonable attorneys' fees) arising out of or resulting from any unauthorized disclosure or use of the Proprietary Property by OWNER or its Representatives. OWNER agrees that ICM would be irreparably damaged by reason of a violation of the provisions contained herein and that any remedy at law for a breach of such provisions would be inadequate. OWNER agrees that ICM shall be entitled to seek injunctive or other equitable relief in a court of competent jurisdiction against OWNER or its Representatives for any unauthorized disclosure or use of the Proprietary Property without the necessity of proving actual monetary loss or posting any bond. It is expressly understood that the remedy described herein shall not be the exclusive remedy of ICM for any breach of such covenants, and ICM shall be entitled to seek such other relief or remedy, at law or in equity, to which it may be entitled as a consequence of any breach of such duties or obligations.

11. The duties and obligations of OWNER under this License Agreement, and all provisions relating to the enforcement of such duties and obligations shall survive and remain in full force and effect notwithstanding any termination or expiration of the Contract or this License Agreement.

12. ICM may terminate this License Agreement upon written notice to OWNER if OWNER willfully or wantonly (a) uses the Proprietary Property for any purpose, or (b) discloses the Proprietary Property to anyone, in each case other than permitted herein. Upon termination of this License



Agreement, OWNER shall cease using the Proprietary Property for any purpose (including the Purpose) and, upon request by ICM, shall promptly return to ICM all documents or other materials in OWNER's or its Representatives' possession that contain Proprietary Property in whatever format, whether written or electronic, including any and all copies or reproductions of the Proprietary Property. OWNER shall permanently delete all such Proprietary Property from its computer hard drives and any other electronic storage medium (including any backup or archive system). OWNER shall deliver to ICM a written certificate which certifies that all electronic copies or reproductions of the Proprietary Property have been permanently deleted.

13. The laws of the State of Kansas, United States of America (or US), shall govern the validity of the provisions contained herein, the construction of such provisions, and the interpretation of the rights and duties of the parties. Any legal action brought to enforce or construe the provisions of this License Agreement shall be brought in the federal or state courts located in Wichita, Kansas, and the parties agree to and hereby submit to the exclusive jurisdiction of such courts and agree that they will not invoke the doctrine of forum non conveniens or other similar defenses in any such action brought in such courts. Notwithstanding the foregoing, nothing in this License Agreement will affect any right ICM may otherwise have to bring any action or proceeding relating to this License Agreement against OWNER or its properties in the courts of any jurisdiction. In the event the Plant is located in, or OWNER is organized under the laws of, a country other than the US, OWNER hereby specifically agrees that any injunctive or other equitable relief granted by a court located in the State of Kansas, US, or any award by a court located in the State of Kansas, shall be specifically enforceable as a foreign judgment in the country in which the Plant is located, OWNER is organized or both, as the case may be, and agrees not to contest the validity of such relief or award in such foreign jurisdiction, regardless of whether the laws of such foreign jurisdiction would otherwise authorize such injunctive or other equitable relief, or award.

14. OWNER hereby agrees to waive all claims against ICM and ICM's Representatives for any consequential damages that may arise out of or relate to this License Agreement, the Contract or the Proprietary Property whether arising in contract, warranty, tort (including negligence), strict liability or otherwise, including but not limited to losses of use, profits, business, reputation or financing. OWNER further agrees that the aggregate recovery of OWNER and Fagen (and everyone claiming by or through OWNER and Fagen), as a whole, against ICM and ICM's Representatives, collectively, for any and all claims that arise out of, relate to or result from this License Agreement, the Proprietary Property or the Contract, whether arising in contract, warranty, tort (including negligence), strict liability or otherwise, shall not exceed One Million US Dollars ($1,000,000).

15. The terms and conditions of this License Agreement constitute the entire agreement between the parties with respect to the subject matter hereof and supersede any prior understandings, agreements or representations by or between the parties, written or oral. Any rule of construction to the effect that any ambiguity is to be resolved against the drafting party shall not be applicable in the interpretation of this License Agreement. This License Agreement may not be modified or amended at any time without the written consent of the parties.

16. All notices, requests, demands, reports, statements or other communications (herein referred to collectively as "Notices") required to be given hereunder or relating to this License Agreement shall be in writing and shall be deemed to have been duly given if transmitted by personal delivery or mailed by certified mail, return receipt requested, postage prepaid, to the address of the party as set forth below. Any such Notice shall be deemed to be delivered and received as of the date so delivered, if delivered personally, or as of the third business day following the day sent, if sent by certified mail. Any party may, at any time, designate a different address to which Notices shall be directed by providing written notice in the manner set forth in this paragraph.

*W.E. Hereford, Ltd.*
*April 14, 2006*



17. In the event that any of the terms, conditions, covenants or agreements contained in this License Agreement, or the application of any thereof, shall be held by a court of competent jurisdiction to be invalid, illegal or unenforceable, such term, condition, covenant or agreement shall be deemed void ab initio and shall be deemed severed from this License Agreement. In such event, and except if such determination by a court of competent jurisdiction materially changes the rights, benefits and obligations of the parties under this License Agreement, the remaining provisions of this License Agreement shall remain unchanged unaffected and unimpaired thereby and, to the extent possible, such remaining provisions shall be construed such that the purpose of this License Agreement and the intent of the parties can be achieved in a lawful manner.

18. The duties and obligations herein contained shall bind, and the benefits and advantages shall inure to, the respective successors and permitted assigns of the parties hereto.

19. The waiver by any party hereto of the breach of any term, covenant, agreement or condition herein contained shall not be deemed a waiver of any subsequent breach of the same or any other term, covenant, agreement or condition herein, nor shall any custom, practice or course of dealings arising among the parties hereto in the administration hereof be construed as a waiver or diminution of the right of any party hereto to insist upon the strict performance by any other party of the terms, covenants, agreement and conditions herein contained.

20. In this License Agreement, where applicable, (i) references to the singular shall include the plural and references to the plural shall include the singular, and (ii) references to the male, female, or neuter gender shall include references to all other such genders where the context so requires.



IN WITNESS WHEREOF, the parties hereto have executed this License Agreement, the Effective Date of which is indicated on page 1 of this License Agreement.

OWNER:

**W.E. Hereford, Ltd., by and through its general partner, White Energy Hereford, LLC, a Texas limited liability company**

By: _(signature)_

Title:
Chief Executive Officer

Date Signed:
4/17/2006

Address for giving notices:

13455 Noel Rd.
Suite 2300
Dallas, TX 75240

ICM: _(signature)_

ICM, Inc.

By: _(signature)_ Gary Vander Byrrend

Title: CEO

Date Signed: 4-21-06

Address for giving notices:

301 N First Street
Colwich, KS 67030

*W.E. Hereford, Ltd.*
*April 14, 2006*

D-6



# EXHIBIT B

LUMP SUM DESIGN-BUILD AGREEMENT

BETWEEN

PLAINVIEW BIOENERGY, LLC (**"OWNER"**)

AND

FAGEN, INC. (**"DESIGN-BUILDER"**)


July 27, 2006



# TABLE OF CONTENTS

**Page**

**Article 1 Definitions; Rules of Interpretation** .......................................................................... 1

   1.1    Rules of Construction. .......................................................................................... 1
   1.2    Defined Terms. ..................................................................................................... 2

**Article 2 The Project** ......................................................................................................... 6

   2.1    Services to be Performed. .................................................................................... 6
   2.2    Extent of Agreement. ........................................................................................... 6
   2.3    Conflicting Provisions. ......................................................................................... 7

**Article 3 Design-Builder Responsibilities** .......................................................................... 7

   3.1    Design-Builder's Services in General. ................................................................. 7
   3.2    Design Development and Services. ...................................................................... 8
   3.3    Standard of Care. ................................................................................................. 8
   3.4    Government Approvals and Permits. ..................................................................... 9
   3.5    Subcontractors. .................................................................................................... 9
   3.6    Maintenance of Site. ............................................................................................ 9
   3.7    Project Safety. ...................................................................................................... 9
   3.8    Submission of Reports. ........................................................................................ 10
   3.9    Training. ................................................................................................................ 10

**Article 4 Owner's Responsibilities** ..................................................................................... 11

   4.1    Duty to Cooperate. .............................................................................................. 11
   4.2    Furnishing of Services and Information. ............................................................... 11
   4.3    Financial Information; Cooperation with Lenders; Failure to Obtain Financial Closing.
            ......................................................................................................................... 12
   4.4    Owner's Representative. ...................................................................................... 12
   4.5    Government Approvals and Permits. ..................................................................... 12
   4.6    Owner's Separate Contractors. ........................................................................... 13
   4.7    Security. ............................................................................................................... 13

**Article 5 Ownership of Work Product; Risk of Loss** ............................................................ 13

   5.1    Work Product. ....................................................................................................... 13
   5.2    Owner's Limited License Upon Payment in Full. ................................................. 13
   5.3    Owner's Limited License Upon Owner's Termination for Convenience or Design-
            Builder's Election to Terminate. ........................................................................... 14
   5.4    Owner's Limited License Upon Design-Builder's Default. ................................... 14
   5.5    Owner's Indemnification for Use of Work Product. ............................................. 15
   5.6    Risk of Loss. ........................................................................................................ 15

**Article 6 Commencement and Completion of the Project** ................................................... 15

   6.1    Phase I and Phase II Engineering. ...................................................................... 15
   6.2    Notice to Proceed; Commencement. ................................................................... 15
   6.3    Project Start-Up and Testing. .............................................................................. 16

*i*



Table of Contents
(continued)

Page

6.4    Substantial Completion.....................................................................16
6.5    Final Completion. ...........................................................................18
6.6    Post Completion Support..................................................................19

**Article 7 Performance Testing and Liquidated Damages .....................................19**

7.1    Performance Guarantee....................................................................19
7.2    Performance Testing. .......................................................................19
7.3    Liquidated Damages. .......................................................................20
7.4    Bonds and Other Performance Security................................................21

**Article 8 Warranties ...................................................................................22**

8.1    Design-Builder Warranty..................................................................22
8.2    Correction of Defective Work. ...........................................................22
8.3    Warranty Period Not Limitation to Owner's Rights..................................23

**Article 9 Contract Price..............................................................................23**

9.1    Contract Price. ..............................................................................23
9.2    Effect of Construction Cost Index Increase on Contract Price.....................23

**Article 10 Payment Procedures ...................................................................24**

10.1    Payment at Financial Closing. ..........................................................24
10.2    Progress Payments. ........................................................................24
10.3    Final Payment. .............................................................................25
10.4    Failure to Pay Amounts Due..............................................................25
10.5    Design-Builder's Payment Obligations. ...............................................26
10.6    Record Keeping and Finance Controls. ................................................26

**Article 11 Hazardous Conditions and Differing Site Conditions ..........................26**

11.1    Hazardous Conditions.....................................................................26
11.2    Differing Site Conditions; Inspection. ..................................................27

**Article 12 Force Majeure; Change in Legal Requirements .................................28**

12.1    Force Majeure Event.......................................................................28
12.2    Effect of Force Majeure Event...........................................................28
12.3    Change in Legal Requirements. .........................................................29
12.4    Time Impact And Availability............................................................29

**Article 13 Changes to the Contract Price and Scheduled Completion Dates.............29**

13.1    Change Orders. .............................................................................29
13.2    Contract Price Adjustments. .............................................................30
13.3    Emergencies.................................................................................30
13.4    Failure to Complete Owner's Milestones. .............................................31

**Article 14 Indemnity .................................................................................31**

14.1    Tax Claim Indemnification................................................................31
14.2    Patent and Copyright Infringement.....................................................31
14.3    Payment Claim Indemnification. ........................................................32



Table of Contents
(continued)

Page

14.4 Design-Builder's General Indemnification...............................................................32
14.5 Owner's General Indemnification. .........................................................................33

**Article 15 Stop Work; Termination for Cause.................................................................33**

15.1 Owner's Right to Stop Work. ................................................................................33
15.2 Owner's Right to Perform and Terminate for Cause. .............................................33
15.3 Owner's Right to Terminate for Convenience. ......................................................35
15.4 Design-Builder's Right to Stop Work. ..................................................................35
15.5 Design-Builder's Right to Terminate for Cause. ..................................................36
15.6 Bankruptcy of Owner or Design-Builder................................................................36
15.7 Lenders' Right to Cure. .......................................................................................37

**Article 16 Representatives of the Parties ........................................................................37**

16.1 Designation of Owner's Representatives.................................................................37
16.2 Designation of Design-Builder's Representatives. .................................................37

**Article 17 Insurance.............................................................................................................38**

17.1 Insurance. ...........................................................................................................38
17.2 Design-Builder's Insurance Requirements. ...........................................................39
17.3 Owner's Liability Insurance. ................................................................................40
17.4 Owner's Property Insurance. ................................................................................40

**Article 18 Representations and Warranties ....................................................................42**

18.1 Design-Builder and Owner Representations and Warranties. .................................42
18.2 Design-Builder Representations and Warranties. ..................................................42

**Article 19 Dispute Resolution ..........................................................................................42**

19.1 Dispute Avoidance and Mediation. .......................................................................42
19.2 Arbitration...........................................................................................................43
19.3 Duty to Continue Performance. ............................................................................43
19.4 No Consequential Damages....................................................................................43
19.5 Limitation of Liability. ........................................................................................44

**Article 20 Confidentiality of Shared Information .........................................................44**

20.1 Non-Disclosure Obligation...................................................................................44
20.2 Publicity and Advertising. ...................................................................................45
20.3 Term of Obligation. ............................................................................................46

**Article 21 Miscellaneous....................................................................................................46**

21.1 Assignment. ........................................................................................................46
21.2 Successors............................................................................................................46
21.3 Governing Law. ...................................................................................................46
21.4 Severability. .......................................................................................................46
21.5 No Waiver............................................................................................................46
21.6 Headings. ............................................................................................................47
21.7 Notice. ................................................................................................................47
21.8 No Privity with Design Consultant/Subcontractors. ..............................................48



Table of Contents
(continued)

Page

21.9    Amendments. ..................................................................... 48
21.10   Entire Agreement. ............................................................. 48
21.11   Third-Party Beneficiaries. ................................................. 48
21.12   Counterparts. .................................................................... 48
21.13   Survival. ........................................................................... 48

EXHIBIT A  Performance Guarantee Criteria ............................... A-1

EXHIBIT B  General Project Scope .............................................. B-1

EXHIBIT C  Owner's Responsibilities .......................................... C-1

EXHIBIT D  ICM License Agreement............................................ D-1

EXHIBIT E   Schedule of Values.................................................. E-1

EXHIBIT F  Form of Informational Report .................................... F-1

EXHIBIT G  Required Permits ..................................................... G-1

EXHIBIT H  Form of Performance Bond ...................................... H-1

EXHIBIT I  Form of Payment Bond.............................................. I-1

EXHIBIT J  Draw (Payment) Schedule......................................... J-1

EXHIBIT K  Air Emissions Application or Permit........................... K-1

EXHIBIT L  Phase I and Phase II Engineering Services Agreement ........ L-1

EXHIBIT M  Form of Application for Payment............................... M-1

EXHIBIT N  Form of Lien Waiver ................................................ N-1



## LUMP SUM DESIGN-BUILD CONTRACT

This LUMP SUM DESIGN-BUILD CONTRACT (the "Agreement") is made as of July 27, 2006, (the "Effective Date") by and between Plainview BioEnergy, LLC, a Delaware limited liability company (the "Owner") and Fagen, Inc., a Minnesota corporation (the "Design-Builder") (each a "Party" and collectively, the "Parties").

### RECITALS

A. The Owner desires to develop, construct, own and operate a one hundred (100) million gallons per year ("MGY") dry grind ethanol production facility located at Plainview, Texas (the "Plant"); and

B. Design-Builder desires to provide design, engineering, procurement and construction services for the Plant.

NOW, THEREFORE, in consideration of the mutual covenants and obligations contained herein and for other good and valuable consideration, Owner and Design-Builder agree as follows.

### AGREEMENT

### Article 1

### Definitions; Rules of Interpretation

**1.1    Rules of Construction.** The capitalized terms listed in this Article shall have the meanings set forth herein whenever the terms appear in this Agreement, whether in the singular or the plural or in the present or past tense. Other terms used in this Agreement but not listed in this Article shall have meanings as commonly used in the English language and, where applicable, in generally accepted construction and design-build standards of the fuel ethanol industry in the United States. Words not otherwise defined herein that have well known and generally accepted technical or trade meanings are used herein in accordance with such recognized meanings. In addition, the following rules of interpretation shall apply:

(a)    The masculine shall include the feminine and neuter.

(b)    References to "Articles," "Sections," "Schedules," or "Exhibits" shall be to Articles, Sections, Schedules or Exhibits of this Agreement.

(c)    This Agreement was negotiated and prepared by each of the Parties with the advice and participation of counsel. The Parties have agreed to the wording of this Agreement and none of the provisions hereof shall be construed against one Party on the ground that such Party is the author of this Agreement or any part hereof.

*Project* is defined in Section 2.1.

*Punch List* is defined in Section 6.4.3.

*Qualified Independent Expert* means an expert retained by Owner and approved by Design-Builder pursuant to Section 11.1.2.

*Safety Representative* is defined in Section 3.7.1.

*Schedule of Values* is defined in Section 10.2.5.

*Scheduled Substantial Completion Date* is defined in Section 6.4.1.

*Site* is the land or premises on which the Project is located.

*Subcontractor* is any person or entity retained by Design-Builder, or by any person or entity retained directly or indirectly by Design-Builder, in each case as an independent contractor to perform a portion of the Work, and shall include materialmen and suppliers.

*Substantial Completion* is defined in Section 6.4.2.

*Work* is defined in Section 3.1.

*Work Product* is defined in Section 5.1.


### Article 2

### The Project

**2.1    Services to be Performed.**

Pursuant to this Agreement, Design-Builder shall perform all work and services in connection with the engineering, design, procurement, construction startup, testing and training for the operation and maintenance of the Plant, and provide all material, equipment, tools and labor necessary to complete the Plant in accordance with the terms of this Agreement.    The Plant, together with all equipment, labor, services and materials furnished hereunder is defined as the "Project."

**2.2    Extent of Agreement.** This Agreement consists of the following documents, and all exhibits, schedules, appendices and attachments hereto and thereto (collectively, the "Contract Documents"):

**2.2.1** All written modifications, amendments and change orders to this Agreement.

**2.2.2** This Agreement, including all exhibits and attachments, executed by Owner and Design-Builder, including those below:

**List of Exhibits**

| Exhibit A | Performance Guarantee Criteria |
| Exhibit B | General Project Scope |
| Exhibit C | Owner's Responsibilities |
| Exhibit D | ICM License Agreement |
| Exhibit E | Schedule of Values |
| Exhibit F | Form of Informational Report |
| Exhibit G | Required Permits |
| Exhibit H | Form of Performance Bond |
| Exhibit I | Form of Payment Bond |
| Exhibit J | Draw (Payment) Schedule |
| Exhibit K | Air Emissions Application or Permit |
| Exhibit L | Phase I and Phase II Engineering Services Agreement |
| Exhibit M | Form of Application for Payment |
| Exhibit N | Form of Lien Waiver |

**2.2.3** Construction Documents to be prepared by Design-Builder pursuant to Section 3.2.1 shall be incorporated in this Agreement.

**2.3** **Conflicting Provisions.** In the event of any conflict or inconsistency between the body of this Agreement and any Exhibit or Schedule hereto, the terms and provisions of this Agreement, as amended from time to time, shall prevail and be given priority. Subject to the foregoing, the several documents and instruments forming part of this Agreement are to be taken as mutually explanatory of one another and in the case of ambiguities or discrepancies within or between such parts the same shall be explained and interpreted, if possible, in a manner which gives effect to each part and which avoids or minimizes conflicts among such parts. No oral representations or other agreements have been made by the Parties except as specifically stated in the Contract Documents.

### Article 3

### Design-Builder Responsibilities

**3.1** **Design-Builder's Services in General.** Except for services and information to be provided by Owner and specifically set forth in Article 4 and Exhibit C, Design-Builder shall perform or cause to be performed all design, engineering, procurement, construction services, supervision, labor, inspection, testing, start-up, material, equipment, machinery, temporary utilities and other temporary facilities to complete construction of the Project consistent with the Contract Documents (the "Work"). All design and engineering and construction services and other Work of the Design-Builder shall be performed in accordance with (i) the general project scope guidelines set forth in Exhibit B, (ii) the Construction Documents, (iii) all Legal Requirements, and (iv) generally accepted construction and design-build standards of the fuel ethanol industry in the United States during the relevant time period. Any design and engineering or other professional service to be performed pursuant to this Agreement, which under Applicable Law must be performed by licensed personnel, shall be performed by licensed personnel as required by Law. The enumeration of specific duties and obligations to be



government charges and inspection fees set forth in Exhibit C and, to the extent identified as Owner's responsibility, Exhibit G. Owner shall provide reasonable assistance to Design-Builder in obtaining those permits, approvals and licenses that are Design-Builder's responsibility pursuant to Exhibit G and Section 3.4.

**4.6 Owner's Separate Contractors.** Owner is responsible for all work, including such work listed on Exhibit C, performed on the Project or at the Site by separate contractors under Owner's control. Owner shall contractually require its separate contractors to cooperate with, and coordinate their activities so as not to interfere with, Design-Builder in order to enable Design-Builder to timely complete the Work consistent with the Contract Documents.

**4.7 Security.**

**4.7.1** Owner shall be responsible for Site security (including fencing, alarm systems, security guarding services and the like) at all times during the term of this Agreement to prevent vandalism, theft and danger to the Project, the Site, and personnel. Owner shall coordinate and supervise ingress and egress from the Site so as to minimize disruption to the Work.

**4.7.2** Design-Builder shall at all times conduct its operations in a manner to minimize the risk of loss, theft, or damage by vandalism, sabotage, or any other means. Design-Builder shall continuously inspect all Work, materials, and equipment to discover and determine any conditions that might involve such risks and shall be solely responsible for discovery, determination, and correction of any such conditions.

## Article 5

### Ownership of Work Product; Risk of Loss

**5.1 Work Product.** All drawings, specifications, calculations, data, notes and other materials and documents, including electronic data furnished by Design-Builder to Owner under this Agreement ("Work Product") shall be instruments of service and Design-Builder shall retain the ownership and property interests therein, including the copyrights thereto.

**5.2 Owner's Limited License Upon Payment in Full.** Upon Owner's payment in full for all Work performed under the Contract Documents, Design-Builder shall grant Owner a limited license to use the Work Product in connection with Owner's occupancy and repair of the Plant. Design-Builder acknowledges and agrees that the limited license to use the Work Product granted hereby shall provide Owner sufficient rights in and to the Work Product as shall be necessary for Owner to operate and maintain the Plant and shall include any Pass Through Warranties in connection therewith. Design-Builder shall provide Owner with a copy of the plans of the Plant, as built, (the "As Built Plans") conditioned on Owner's express understanding that its use of the Work Product and its acceptance of the As Built Plans is at Owner's sole risk and without liability or legal exposure to Design-Builder or anyone working by or through Design-Builder, including Design Consultants of any tier (collectively the "Indemnified Parties"); provided, however, that any warranties (of equipment or otherwise) shall remain in effect according to the terms of this Agreement.



**5.2.1** Design-Builder is utilizing certain proprietary property and information of ICM in the design and construction of the Project and Design-Builder may incorporate proprietary property and information of ICM into the Work Product. Owner's use of the proprietary property and information of ICM shall be governed by the terms and provisions of the ICM License Agreement, to be executed by Owner and ICM in connection with the execution of this Agreement. Owner shall be entitled to use the Work Product solely for purposes relating to the Plant, but shall not be entitled to use the Work Product for any other purposes whatsoever, including without limitation, expansion of the Plant. Notwithstanding the foregoing sentence, Owner shall be entitled to use the Work Product for the operation, maintenance and repair of the plant including the interconnection of, but not the design of, any future expansions to the Plant. The limited license granted to Owner under Sections 5.2, 5.3 or 5.4 to use the Work Product shall be limited by and construed according to the same terms contained in the ICM License Agreement, attached hereto as Exhibit D and incorporated herein by reference thereto, except (i) references in such ICM License Agreement to ICM and Proprietary Property shall refer to Design-Builder and Work Product, respectively, (ii) the Laws of the State of Minnesota shall govern such limited license, and (iii) the dispute resolution provisions contained in Article 19 hereof shall apply to any breach or threatened breach of Owner's duties or obligations under such limited license, except that Design-Builder shall have the right to seek injunctive relief in a court of competent jurisdiction against Owner or its Representatives for any such breach or threatened breach. This paragraph also applies to Sections 5.3 and 5.4 below.

**5.3    Owner's Limited License Upon Owner's Termination for Convenience or Design-Builder's Election to Terminate.** If Owner terminates the Project for its convenience as set forth in Section 15.3 hereof, or if Design-Builder elects to terminate this Agreement in accordance with Section 15.5, Design-Builder shall, upon Owner's payment in full of the amounts due Design-Builder under this Agreement, grant Owner a limited license to use the Work Product to complete the Plant and subsequently occupy and repair the Plant, subject to the following:

(a)    Use of the Work Product is at Owner's sole risk without liability or legal exposure to any Indemnified Party; provided, however, that any Pass Through Warranties regarding equipment or express warranties regarding equipment provided by this Agreement shall remain in effect according to their terms; and

(b)    If the termination for convenience is by Owner in accordance with Section 15.3 hereof, or if Design-Builder elects to terminate this Agreement in accordance with Section 15.5, then Owner agrees to pay Design-Builder the additional sum of Two Million Five Hundred Thousand Dollars ($2,500,000.00) as compensation for the limited right to use the Work Product completed "as is" on the date of termination in accordance with this Article 5.

**5.4    Owner's Limited License Upon Design-Builder's Default.** If this Agreement is terminated due to Design-Builder's default pursuant to Section 15.2 and (i) it is adjudged that Design-Builder was in default, and (ii) Owner has fully satisfied all of its obligations under the Contract Documents through the time of Design-Builder's default, then Design-Builder shall grant Owner a limited license to use the Work Product in connection with Owner's completion and occupancy and repair of the Plant. This limited license is conditioned on Owner's express



agreement that its use of the Work Product is at Owner's sole risk without liability or legal exposure to any Indemnified Party; provided, however, that any Pass Through Warranties regarding equipment or express warranties regarding equipment provided by this Agreement shall remain in effect according to their terms. This limited license grants Owner the ability to repair the Plant at Owner's discretion.

**5.5    Owner's Indemnification for Use of Work Product.**  If Owner uses the Work Product or Plant under any of the circumstances identified in this Article 5, to the fullest extent allowed by Law, Owner shall defend, indemnify and hold harmless the Indemnified Parties from and against any and all claims, damages, liabilities, losses and expenses, including attorneys' fees, arising out of or resulting from the use of the Work Product and Plant; provided, however, that any Pass Through Warranties regarding equipment or express warranties regarding equipment provided by this Agreement shall remain in effect according to their terms.

**5.6    Risk of Loss.**  Design-Builder shall have no liability for a physical loss of or damage to the Work unless such loss or damage is caused by the willful misconduct or gross negligence of Design-Builder or someone acting under its direction or control. Design-Builder shall not be liable for physical loss of or damage to the Work where such loss or damage is caused by the willful misconduct or gross negligence of Owner's employees or third parties who are not Subcontractors. Design-Builder shall have no liability for a physical loss of or damage to the Work occurring after Final Completion. Design-Builder shall have no liability for losses or damages for which insurance coverage under this Agreement is available to Owner; in such circumstances, any liability for losses and damages as described in this Section 5.6 shall be limited to losses or damages which exceed insurance coverage available to the Owner without the application of any reductions from such coverages due to deductible, retention, or retrospective premiums.

## Article 6

### Commencement and Completion of the Project

**6.1    Phase I and Phase II Engineering.**  Owner shall have entered into that certain Phase I and Phase II Engineering Services Agreement dated May 22, 2006 between Owner and Fagen Engineering, LLC ("Fagen Engineering") and attached hereto as Exhibit L ("Phase I and Phase II Engineering Services Agreement"). The Phase I and Phase II Engineering Services Agreement provides for Fagen Engineering to commence work on the Phase I and Phase II engineering for the Project as set forth therein. Owner has agreed to pay Fagen Engineering Ninety-two Thousand Five Hundred Dollars ($92,500.00) for such engineering services pursuant to the terms of that agreement, the full amount of which shall be included in and credited to the Contract Price. Notwithstanding the foregoing sentence, if a Notice to Proceed is not issued pursuant to Section 6.2, or Financial Closing is not obtained pursuant to Section 4.3, then no amount paid under the Phase I and Phase II Engineering Services Agreement shall be refunded to Owner.

**6.2    Notice to Proceed; Commencement.**  The Work shall commence within five (5) Days of Design-Builder's receipt of Owner's written valid notice to proceed ("Notice to Proceed") unless the Parties mutually agree otherwise in writing. The Parties agree that a valid



**10.4.1 Interest.** Payments which are due and unpaid by Owner to Design-Builder, whether progress payments or Final Payment, shall bear interest commencing five (5) Days after payment is due at the rate of eighteen percent (18%) per annum, or the maximum rate allowed by Law.

**10.4.2 Right to Suspend Work.** If Owner fails to pay Design-Builder any undisputed amount that becomes due, Design-Builder, in addition to all other remedies provided in the Contract Documents, may stop Work pursuant to Section 15.4 hereof. All payments properly due and unpaid shall bear interest at the rate set forth in Section 10.4.1.

**10.4.3 Failure to Make Final Payment.** Owner's failure to make Final Payment pursuant to section 10.3 hereof shall void any and all warranties, whether express or implied, provided by Design-Builder pursuant to this Agreement.

**10.5 Design-Builder's Payment Obligations.** Design-Builder will pay Design Consultants and Subcontractors, in accordance with its contractual obligations to such parties, all the amounts Design-Builder has received from Owner on account of their work. Design-Builder will impose similar requirements on Design Consultants and Subcontractors to pay those parties with whom they have contracted. Design-Builder will indemnify and defend Owner against any claims for payment and mechanic's liens as set forth in Section 14.3 hereof.

**10.6 Record Keeping and Finance Controls.** With respect to changes in the Work performed on a cost basis by Design-Builder pursuant to the Contract Documents, Design-Builder shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management, using accounting and control systems in accordance with generally accepted accounting principles and as may be provided in the Contract Documents. During the performance of the Work and for a period of three (3) years after Final Payment, Owner and Owner's accountants shall be afforded access from time to time, upon reasonable notice, to Design-Builder's records, books, correspondence, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to changes in the Work performed on a cost basis in accordance with the Contract Documents, all of which Design-Builder shall preserve for a period of three (3) years after Final Payment.

## Article 11

## Hazardous Conditions and Differing Site Conditions

### 11.1 Hazardous Conditions.

**11.1.1** Unless otherwise expressly provided in the Contract Documents to be part of the Work, Design-Builder is not responsible for any Hazardous Conditions encountered at the Site. Upon encountering any Hazardous Conditions, Design-Builder will stop Work immediately in the affected area and as promptly as practicable notify Owner and, if Design-Builder is specifically required to do so by Legal Requirements, all Governmental Authorities having jurisdiction over the Project or Site. Design-Builder shall not remove, remediate or handle in any way (except in case of emergency) any Hazardous Conditions encountered at the Site without prior written approval of Owner.

type of communication to any member of the public, press, business entity, or any official body which names Fagen unless prior written consent is obtained from Fagen, which consent shall not be unreasonably withheld.

**20.3    Term of Obligation.**  The confidentiality obligations of the Parties pursuant to this Article 20 shall survive the expiration or other termination of this Agreement for a period of five (5) years.

**Article 21**

**Miscellaneous**

**21.1    Assignment.**  This Agreement shall be binding upon, shall inure to the benefit of, and may be performed by, the successors and permitted assigns of the Parties, except that neither Design-Builder nor Owner shall, without the written consent of the other, assign or transfer this Agreement or any of the Contract Documents.  Design-Builder's subcontracting portions of the Work in accordance with this Agreement shall not be deemed to be an assignment of this Agreement.  Owner may assign all of its rights and obligations under the Contract Documents to its Lenders or Lenders' Agent as collateral security in connection with Owner obtaining or arranging any financing for the Project; provided, however, Owner shall deliver, at least ten (10) Days prior to any such assignment, to Design-Builder (i) written notice of such assignment and (ii) a copy of the instrument of assignment in form and substance reasonably acceptable to Design-Builder, whose approval shall not be unreasonably withheld.  The Lenders or Lenders' Agent may assign the Contract Documents or their rights under the Contract Documents, including without limitation in connection with any foreclosure or other enforcement of their security interest.  Design-Builder shall execute, if requested, a consent to assignment for the benefit of the Lenders and/or the Lenders' Agent in form and substance reasonably acceptable to Design-Builder, provided that with respect to any such assignments such assignee demonstrates to Design-Builder's satisfaction that it has the capability to fulfill Owner's obligations under this Agreement.

**21.2    Successors.**  Design-Builder and Owner intend that the provisions of the Contract Documents are binding upon the Parties, their employees, agents, heirs, successors and assigns.

**21.3    Governing Law.**  This Agreement shall be governed by and construed and enforced in accordance with, the substantive laws of the state of Minnesota, without regard to the conflict of laws provisions thereof.

**21.4    Severability.**  If any provision or any part of a provision of the Contract Documents shall be finally determined to be superseded, invalid, illegal, or otherwise unenforceable pursuant to any applicable Legal Requirements, such determination shall not impair or otherwise affect the validity, legality, or enforceability of the remaining provision or parts of the provision of the Contract Documents, which shall remain in full force and effect as if the unenforceable provision or part were deleted.

**21.5    No Waiver.**  The failure of either Design-Builder or Owner to insist, in any one (1) or more instances, on the performance of any of the obligations required by the other under



the Contract Documents shall not be construed as a waiver or relinquishment of such obligation or right with respect to future performance.

**21.6     Headings.**  The table of contents and the headings used in this Agreement or any other Contract Document, are for ease of reference only and shall not in any way be construed to limit, define, extend, describe, alter, or otherwise affect the scope or the meaning of any provision of this Agreement.

**21.7     Notice.**  Whenever the Contract Documents require that notice be provided to a Party, notice shall be delivered in writing to such Party at the address listed below.  Notice will be deemed to have been validly given if delivered (i) in person to the individual intended to receive such notice, (ii) by registered or by certified mail, postage prepaid to the address indicated in the Agreement within four (4) Days after being sent, or (iii) by facsimile, by the time stated in a machine-generated confirmation that notice was received at the facsimile number of the intended recipient.

If to Design-Builder, to:

> Fagen, Inc.
> 501 W. Highway 212
> P. O. Box 159
> Granite Falls, MN  56241
> Attention: Aaron Fagen
> Fax:  (320) 564-3278

with a copy to:

> Fagen, Inc.
> 501 W. Highway 212
> P. O. Box 159
> Granite Falls, MN  56241
> Attention: Jennifer Johnson
> Fax:  (320) 564-3278

and to:

> Fagen, Inc.
> 501 W. Highway 212
> P. O. Box 159
> Granite Falls, MN  56241
> Attention: Wayne Mitchell
> Fax:  (320) 564-5190

If to Owner, to:

> Mr. Randy Hellerich
> Plainview BioEnergy, LLC



2027 Dodge Street
Omaha, NE 68102
Fax: (402) 342-5568

with a copy to:

Ms. Joan C. Maclin
General Counsel
Plainview BioEnergy, LLC
250 Marquette Ave., Suite 1050
Minneapolis, MN 55401
Fax: (612) 252-3566

and

Lender's Agent at the address provided for Lender's Agent to Design-Builder by
Owner by notice within five (5) Days following the Financial Closing.

**21.8   No Privity with Design Consultant/Subcontractors.**  Nothing in the Contract
Documents is intended or deemed to create any legal or contractual relationship between Owner
and any Design Consultant or Subcontractor.

**21.9   Amendments.**  The Contract Documents may not ·be changed, altered, or
amended in any way except in writing signed by a duly authorized representative of each Party.

**21.10   Entire Agreement.**  This Agreement consists of the terms and conditions set
forth herein, as well as the Exhibits hereto, which are incorporated by reference herein and made
a part hereof.  This Agreement sets forth the full and complete understanding of the Parties as of
the Effective Date with respect to the subject matter hereof.

**21.11   Third-Party Beneficiaries.**  Except as expressly provided herein, this Agreement
is intended to be solely for the benefit of the Owner, the Design-Builder and permitted assigns,
and is not intended to and shall not confer any rights or benefits on any person not a signatory
hereto.

**21.12   Counterparts.**  This Agreement may be executed in one (1) or more counterparts,
each of which shall be deemed an original and all of which together shall be deemed one and the
same Agreement, and may be executed and delivered by facsimile signature, which shall be
considered an original.

**21.13   Survival.**   Notwithstanding any provisions herein to the contrary, the Work
Product provisions set forth in Article 5 and the indemnity obligations set forth herein shall
survive (in full force and effect) the expiration or termination of this Agreement and shall
continue to apply to the Parties to this Agreement even after termination of this Agreement or the
transfer of such Party's interest in this Agreement.

[The next page is the signature page.]



**IN WITNESS WHEREOF**, the Parties hereto have caused their names to be hereunto subscribed by their officers thereunto duly authorized, intending thereby that this Agreement shall be effective as of this July 27, 2006.

**OWNER:**

Plainview BioEnergy, LLC
*(Name of Owner)*

*Randy Hellevich* (signature)
*(Signature)*

Randy Hellevich
*(Printed Name)*

President
*(Title)*

Date: July 28, 2006

**DESIGN-BUILDER:**

Fagen, Inc.
*(Name of Design-Builder)*

(signature)
*(Signature)*

Roland "Ron" Fagen
*(Printed Name)*

CEO and President
*(Title)*

Date: 8/4/06

# EXHIBIT D

## ICM License Agreement

**THIS LICENSE AGREEMENT** (this "License Agreement") is entered into and made effective as of the 27th day of July, 2006 ("Effective Date") by and between Plainview BioEnergy, LLC, a Delaware limited liability company ("OWNER"), and ICM, Inc., a Kansas corporation ("ICM").

WHEREAS, OWNER has entered into that certain Design-Build Lump Sum Contract dated July 27, 2006 (the "Contract") with Fagen, Inc., a Minnesota corporation ("Fagen"), under which Fagen is to design and construct a 100 million gallon per year ethanol plant for OWNER to be located in or near Plainview, Texas (the "Plant");

WHEREAS, ICM has granted Fagen the right to use certain proprietary technology and information of ICM in the design and construction of the Plant; and

WHEREAS, OWNER desires from ICM, and ICM desires to grant to OWNER, a license to use such proprietary technology and information in connection with OWNER's ownership, operation, maintenance and repair of the Plant, all upon the terms and conditions set forth herein;

NOW, THEREFORE, the parties, in consideration of the foregoing premises and the mutual promises contained herein and for other good and valuable consideration, receipt of which is hereby acknowledged, agree as follows:

1. Upon substantial completion of the Plant by Fagen pursuant to the terms of the Contract or, if later, payment by OWNER of all amounts due and owing to Fagen under the Contract, ICM grants to OWNER a limited license to use the Proprietary Property (hereinafter defined) solely in connection with the ownership, operation, maintenance and repair of the Plant, subject to the limitations provided herein (the "Purpose").

2. The "Proprietary Property" means, without limitation, documents, Operating Procedures (hereinafter defined), materials and other information that are furnished by ICM to OWNER in connection with the Purpose, whether orally, visually, in writing, or by any other means, whether tangible or intangible, directly or indirectly (including, without limitation, through Fagen) and in whatever form or medium including, without limitation, the design, arrangement, configuration, and specifications of (i) the combinations of distillation, evaporation, and alcohol dehydration equipment (including, but not limited to, pumps, vessels, tanks, heat exchangers, piping, valves and associated electronic control equipment) and all documents supporting those combinations; (ii) the combination of the distillers grain drying (DGD), and heat recovery steam generation (HRSG) equipment (including, but not limited to, pumps, vessels, tanks, heat exchangers, piping and associated electronic control equipment) and all documents supporting those combinations; and (iii) the computer system, known as the distributed control system (DCS and/or PLC) (including, but not limited to, the software configuration, programming, parameters, set points, alarm points, ranges, graphical interface, and system hardware connections) and all documents supporting that system. The "Operating Procedures" means, without limitation, the process equipment and specifications manuals, standards of quality, service protocols, data collection methods, construction specifications, training methods, engineering standards and any other information prescribed by ICM from time to time concerning the Purpose. Proprietary Property shall not include any information or materials that OWNER can demonstrate by clear and convincing written evidence: (i) was lawfully in the possession of OWNER prior to disclosure by ICM or Fagen; (ii) was in the public domain prior to disclosure by ICM or



Fagen; (iii) was disclosed to OWNER by a third party other than Fagen having the legal right to possess and disclose such information or materials; or (iv) after disclosure by ICM or Fagen comes into the public domain through no fault of OWNER or its members, directors, officers, employees, agents, contractors, consultants or other representatives (hereinafter collectively referred to as "Representatives"). Information and materials shall not be deemed to be in the public domain merely because such information is embraced by more general disclosures in the public domain, and any combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain if the combination itself and its principles of operation are not in the public domain.

3.   OWNER shall not use the Proprietary Property for any purpose other than the Purpose. OWNER shall not use the Proprietary Property in connection with any expansion or enlargement of the Plant. ICM and its Representatives shall have the express right at any time to enter upon the premises of the Plant to inspect the Plant and its operation to ensure that OWNER is complying with the terms of this License Agreement.

4.   OWNER's failure to materially comply with the Operating Procedures shall void all guarantees, representations and warranties, whether expressed or implied, if any, that were given by ICM to OWNER, directly or indirectly through Fagen, concerning the performance of the Plant that ICM reasonably determines are materially affected by OWNER's failure to materially comply with such Operating Procedures. OWNER agrees to indemnify, defend and hold harmless ICM, Fagen and their respective Representatives from any and all losses, damages and expenses including, without limitation, reasonable attorneys' fees resulting from, relating to or arising out of Owner's or its Representatives' (a) failure to materially comply with the Operating Procedures or (b) negligent use of the Proprietary Property.

5.   Any and all modifications to the Proprietary Property made by OWNER or its Representatives shall be the property of ICM.  OWNER shall promptly notify ICM of any such modification and OWNER agrees to assign all right, title and interest in such modification to ICM; provided, however, OWNER shall retain the right, at no cost, to use such modification in connection with the Purpose.

6.   ICM has the exclusive right and interest in and to the Proprietary Property and the goodwill associated therewith.  OWNER will not, directly or indirectly, contest ICM's ownership of the Proprietary Property.  OWNER's use of the Proprietary Property does not give OWNER any ownership interest or other interest in or to the Proprietary Property except for the limited license granted to OWNER herein.

7.   OWNER shall pay no license fee or royalty to ICM for OWNER's use of the Proprietary Property pursuant to this License Agreement, the consideration for the limited license granted herein is certain payments by Fagen to ICM, which is funded by and included in the amounts payable by OWNER to Fagen for the construction of the Plant under the Contract.

8.   OWNER may not assign the limited license granted herein, in whole or in part, without the prior written consent of ICM, which will not be unreasonably withheld or delayed.  Prior to any assignment, OWNER shall obtain from such assignee a written instrument, in form and substance reasonably acceptable to ICM, agreeing to be bound by all the terms and provisions of this License Agreement.  Any assignment of this License Agreement shall not release OWNER from (i) its duties and obligations hereunder concerning the disclosure and use of the Proprietary Property by OWNER or its Representatives, or (ii) damages to ICM resulting from, or arising out of, a breach of such duties or obligations by OWNER or its Representatives.  ICM may assign its right, title and interest in the Proprietary Property, in whole or part, subject to the limited license granted herein.



9. The Proprietary Property is confidential and proprietary. OWNER shall keep the Proprietary Property confidential and shall use all reasonable efforts to maintain the Proprietary Property as secret and confidential for the sole use of OWNER and its Representatives for the Purpose. OWNER shall retain all Proprietary Property at its principal place of business and/or the Plant. OWNER shall not at any time without ICM's prior written consent, copy, duplicate, record, or otherwise reproduce the Proprietary Property, in whole or in part, or otherwise make the same available to any unauthorized person provided, OWNER shall be permitted to copy, duplicate or otherwise reproduce the Proprietary Property in whole or in part in connection with, and to the extent it is necessary and essential for, the Purpose so long as all such copies, duplicates or reproductions are kept at its principal place of business and/or the Plant and are treated the same as any other Proprietary Property. OWNER shall not disclose the Proprietary Property except to its Representatives who are directly involved with the Purpose, and even then only to such extent as is necessary and essential for such Representative's involvement. OWNER shall inform such Representatives of the confidential and proprietary nature of such information and, if requested by ICM, OWNER shall obtain from such Representative a written instrument, in form and substance reasonably acceptable to ICM, agreeing to be bound by all of the terms and provisions of this License Agreement to the same extent as OWNER. OWNER shall make all reasonable efforts to safeguard the Proprietary Property from disclosure by its Representatives to anyone other than permitted hereby. OWNER shall notify ICM immediately upon discovery of any unauthorized use or disclosure of the Proprietary Property, or any other breach of this License Agreement by OWNER or its Representatives, and shall cooperate with ICM in every reasonable way to help ICM regain possession of the Proprietary Property and prevent its further unauthorized use or disclosure. In the event that OWNER or its Representatives are required by law to disclose the Proprietary Property, OWNER shall provide ICM with prompt written notice of same so that ICM may seek a protective order or other appropriate remedy. In the event that such protective order or other appropriate remedy is not obtained, OWNER or its Representatives will furnish only that portion of the Proprietary Property which in the reasonable opinion of its or their legal counsel is legally required and will exercise its reasonable efforts to obtain reliable assurance that the Proprietary Property so disclosed will be accorded confidential treatment.

10. OWNER agrees to indemnify ICM for any and all damages (including, without limitation, reasonable attorneys' fees) arising out of or resulting from any unauthorized disclosure or use of the Proprietary Property by OWNER or its Representatives. OWNER agrees that ICM would be irreparably damaged by reason of a violation of the provisions contained herein and that any remedy at law for a breach of such provisions would be inadequate. OWNER agrees that ICM shall be entitled to seek injunctive or other equitable relief in a court of competent jurisdiction against OWNER or its Representatives for any unauthorized disclosure or use of the Proprietary Property without the necessity of proving actual monetary loss or posting any bond. It is expressly understood that the remedy described herein shall not be the exclusive remedy of ICM for any breach of such covenants, and ICM shall be entitled to seek such other relief or remedy, at law or in equity, to which it may be entitled as a consequence of any breach of such duties or obligations.

11. The duties and obligations of OWNER under this License Agreement, and all provisions relating to the enforcement of such duties and obligations shall survive and remain in full force and effect notwithstanding any termination or expiration of the Contract or this License Agreement.

12. ICM may terminate this License Agreement upon written notice to OWNER if OWNER willfully or wantonly (a) uses the Proprietary Property for any purpose, or (b) discloses the Proprietary Property to anyone, in each case other than permitted herein. Upon termination of this License Agreement, OWNER shall cease using the Proprietary Property for any purpose (including the Purpose) and, upon request by ICM, shall promptly return to ICM all documents or other materials in



OWNER's or its Representatives' possession that contain Proprietary Property in whatever format, whether written or electronic, including any and all copies or reproductions of the Proprietary Property. OWNER shall permanently delete all such Proprietary Property from its computer hard drives and any other electronic storage medium (including any backup or archive system). OWNER shall deliver to ICM a written certificate which certifies that all electronic copies or reproductions of the Proprietary Property have been permanently deleted.

13. The laws of the State of Kansas, United States of America (or US), shall govern the validity of the provisions contained herein, the construction of such provisions, and the interpretation of the rights and duties of the parties. Any legal action brought to enforce or construe the provisions of this License Agreement shall be brought in the federal or state courts located in Wichita, Kansas, and the parties agree to and hereby submit to the exclusive jurisdiction of such courts and agree that they will not invoke the doctrine of forum non conveniens or other similar defenses in any such action brought in such courts. Notwithstanding the foregoing, nothing in this License Agreement will affect any right ICM may otherwise have to bring any action or proceeding relating to this License Agreement against OWNER or its properties in the courts of any jurisdiction. In the event the Plant is located in, or OWNER is organized under the laws of, a country other than the US, OWNER hereby specifically agrees that any injunctive or other equitable relief granted by a court located in the State of Kansas, US, or any award by a court located in the State of Kansas, shall be specifically enforceable as a foreign judgment in the country in which the Plant is located, OWNER is organized or both, as the case may be, and agrees not to contest the validity of such relief or award in such foreign jurisdiction, regardless of whether the laws of such foreign jurisdiction would otherwise authorize such injunctive or other equitable relief, or award.

14. OWNER hereby agrees to waive all claims against ICM and ICM's Representatives for any consequential damages that may arise out of or relate to this License Agreement, the Contract or the Proprietary Property whether arising in contract, warranty, tort (including negligence), strict liability or otherwise, including but not limited to losses of use, profits, business, reputation or financing. OWNER further agrees that the aggregate recovery of OWNER and Fagen (and everyone claiming by or through OWNER and Fagen), as a whole, against ICM and ICM's Representatives, collectively, for any and all claims that arise out of, relate to or result from this License Agreement, the Proprietary Property or the Contract, whether arising in contract, warranty, tort (including negligence), strict liability or otherwise, shall not exceed One Million US Dollars ($1,000,000).

15. The terms and conditions of this License Agreement constitute the entire agreement between the parties with respect to the subject matter hereof and supersede any prior understandings, agreements or representations by or between the parties, written or oral. Any rule of construction to the effect that any ambiguity is to be resolved against the drafting party shall not be applicable in the interpretation of this License Agreement. This License Agreement may not be modified or amended at any time without the written consent of the parties.

16. All notices, requests, demands, reports, statements or other communications (herein referred to collectively as "Notices") required to be given hereunder or relating to this License Agreement shall be in writing and shall be deemed to have been duly given if transmitted by personal delivery or mailed by certified mail, return receipt requested, postage prepaid, to the address of the party as set forth below. Any such Notice shall be deemed to be delivered and received as of the date so delivered, if delivered personally, or as of the third business day following the day sent, if sent by certified mail. Any party may, at any time, designate a different address to which Notices shall be directed by providing written notice in the manner set forth in this paragraph.

17. In the event that any of the terms, conditions, covenants or agreements contained in this License



Agreement, or the application of any thereof, shall be held by a court of competent jurisdiction to be invalid, illegal or unenforceable, such term, condition, covenant or agreement shall be deemed void ab initio and shall be deemed severed from this License Agreement. In such event, and except if such determination by a court of competent jurisdiction materially changes the rights, benefits and obligations of the parties under this License Agreement, the remaining provisions of this License Agreement shall remain unchanged unaffected and unimpaired thereby and, to the extent possible, such remaining provisions shall be construed such that the purpose of this License Agreement and the intent of the parties can be achieved in a lawful manner.

18. The duties and obligations herein contained shall bind, and the benefits and advantages shall inure to, the respective successors and permitted assigns of the parties hereto.

19. The waiver by any party hereto of the breach of any term, covenant, agreement or condition herein contained shall not be deemed a waiver of any subsequent breach of the same or any other term, covenant, agreement or condition herein, nor shall any custom, practice or course of dealings arising among the parties hereto in the administration hereof be construed as a waiver or diminution of the right of any party hereto to insist upon the strict performance by any other party of the terms, covenants, agreement and conditions herein contained.

20. In this License Agreement, where applicable, (i) references to the singular shall include the plural and references to the plural shall include the singular, and (ii) references to the male, female, or neuter gender shall include references to all other such genders where the context so requires.

IN WITNESS WHEREOF, the parties hereto have executed this License Agreement, the Effective Date of which is indicated on page 1 of this License Agreement.

OWNER:                                              ICM:

**Plainview BioEnergy, LLC**                        **ICM, Inc.**

By: _Randy Hellic_                                  By: _David_

Title: _President_                                  Title: _President_

Date Signed: _July 28, 2006_                        Date Signed: _August 14, 2006_

Address for giving notices:                         Address for giving notices:

2027 Dodge St.                                      301 N First Street
Omaha, NE 68102                                     Colwich, KS 67030



# EXHIBIT C

Please see the final payment schedule (attached) that has been agreed to by both White and Fagen. Call
if questions.  Thank you.
----- Forwarded by Jennifer Johnson/Fagen on 11/18/2008 10:44 AM -----



"John Castle"
<jcastle@white-energy.com>         To  <jjohnson@fageninc.com>

11/18/2008 08:28 AM                cc

                                   Subject  RE: Payment Schedule


Jennifer,
        Sorry for the delay but I was traveling yesterday.  I am fine with what you suggested below.  I
have adjusted the schedule to reflect this and attached it here.  If you find it acceptable would you
forward it to Jonathan?

Thank you for being so helpful.

John

**From:** jjohnson@fageninc.com [mailto:jjohnson@fageninc.com]
**Sent:** Sunday, November 16, 2008 4:06 PM
**To:** John Castle
**Subject:** RE: Payment Schedule


We understood you wanted to payoff the Plainview Water Treatment with the first payment.  Then you and
I also discussed taking the $600K stock value off of the water treatment instead of off the retainage on the
DB Contract to lessen that first payment.  You also requested the Early Completion Bonus be handled that
way.  We could maybe deduct the $260K ECB amount from the first payment and add $520K back to be
paid at the end.  Would that be agreeable as a compromise? (an additional deduction of $260K now and
pay $520 at the end, grand total still the same?)


**"John Castle" <jcastle@white-energy.com>**              To<jjohnson@fageninc.com>
                                                          cc
11/14/2008 03:07 PM                                       SubjectRE: Payment Schedule



Jennifer,
        Sorry for the delay.  David has asked that I request a reduction in the first payment back down to the

amount that Andy & Ron discussed.  Are you willing to do this?

Thanks,
John

Please review and let me know if this looks ok and is accurate with your books and records. Thanks.



White Energy Payment Sch v1.xls

# White Energy Payment Schedule

| Date | Plainview Design-Build Contract/T & M | Plainview Water Treatment | Hereford Design-Build Contract/T & M | Hereford Water Treatment | Plainview Early Completion | Monthly Total Due |
|---|---|---|---|---|---|---|
| Upon Execution of Change Orders (November 2008) | | $ 1,858,951.56 | | | | $ 1,858,951.56 |
| December 15, 2008 | $ 1,000,000.00 | | $ 1,000,000.00 | | | $ 2,000,000.00 |
| January 31, 2009 | $ 1,093,319.13 | | $ 781,723.08 | | | $ 1,875,042.21 |
| February 28, 2009 | $ 1,093,319.13 | | $ 781,723.08 | | | $ 1,875,042.21 |
| March 31, 2009 | $ 1,093,319.13 | | $ 781,723.08 | | | $ 1,875,042.21 |
| April 30, 2009 | $ 1,093,319.13 | | $ 781,723.08 | $ 2,487,652.22 | | $ 4,362,694.43 |
| May 31, 2009 | $ 1,093,319.14 | | $ 781,723.09 | $ 2,487,652.21 | $ 520,000.00 | $ 4,882,694.44 |
| | $ 6,466,595.66 | $ 1,858,951.56 | $ 4,908,615.41 | $ 4,975,304.43 | $ 520,000.00 | $ 18,729,467.06 |